No. 12-17803

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

ESPANOLA JACKSON, et al.,

*Plaintiffs-Appellants*,

v.

CITY AND COUNTY OF SAN FRANCISCO, et al.,

*Defendants-Appellees*.

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
(CV-09-2143-RS)

**APPELLANTS' OPENING BRIEF**

C. D. Michel (S.B.N. 144258)
Glenn S. McRoberts (S.B.N. 144852)
Clinton B. Monfort (S.B.N. 255609)
Anna M. Barvir (S.B.N. 268728)
MICHEL & ASSOCIATES, P.C.
180 East Ocean Blvd., Suite 200
Long Beach, CA 90802
Tel. No. (562) 216-4444
Fax No: (562) 216-4445
e-mail: cmichel@michellawyers.com

**Counsel for Plaintiffs-Appellants**

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, counsel for Plaintiffs-Appellants certify the following:

### NATIONAL RIFLE ASSOCIATION, INC.

The National Rifle Association of America, Inc. ("NRA") is a New York not-for-profit membership corporation founded in 1871. NRA is not a publicly-held corporation, does not have a parent corporation, and no publicly-held corporation owns 10 percent or more of its stock.

### SAN FRANCISCO VETERAN POLICE OFFICERS ASSOCIATION

The San Francisco Veteran Police Officers Association is a California nonprofit public benefit organization that represents the interests of veteran police officers in the City and County of San Francisco. The San Francisco Veteran Police Officers Association is not a publicly-held corporation, does not have a parent corporation, and no publicly-held corporation owns 10 percent or more of its stock.

Date: February 7, 2013                    MICHEL & ASSOCIATES, P.C.


/s/ C. D. Michel
C. D. Michel
Attorney for Plaintiffs-Appellants

# TABLE OF CONTENTS

PAGE(S)

**CORPORATE DISCLOSURE STATEMENT**. . . . . . . . . . . . . . . . . . . . . . . . 1

NATIONAL RIFLE ASSOCIATION, INC.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

SAN FRANCISCO VETERAN POLICE OFFICERS ASSOCIATION. . . . . . . . . . . . . . 1

**STATEMENT OF JURISDICTION**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

**STATEMENT OF THE ISSUES PRESENTED**. . . . . . . . . . . . . . . . . . . . . . . 1

**STATEMENT REGARDING ADDENDUM**. . . . . . . . . . . . . . . . . . . . . . . . . 2

**STATEMENT REGARDING ORAL ARGUMENT**. . . . . . . . . . . . . . . . . . . . 2

**STATEMENT OF THE CASE**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

**STATEMENT OF FACTS**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

I.     SECTION 4512: LOCKED-STORAGE REQUIREMENT. . . . . . . . . . . . . . . . 4

II.    SECTION 613.10(g): AMMUNITION SALES BAN. . . . . . . . . . . . . . . . . . 6

**SUMMARY OF ARGUMENT**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

**ARGUMENT**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

i

# TABLE OF CONTENTS (CONT.)

**PAGE(S)**

**I.**  STANDARD OF REVIEW ON MOTION FOR PRELIMINARY INJUNCTION... 10

**II.**  STANDARDS FOR REVIEWING SECOND AMENDMENT CHALLENGES. ... 12

    **A.**  *Heller* and *McDonald* Endorse a Textual, Historical Approach to Analyzing Second Amendment Challenges....... 13

    **B.**  *Heller* Rejects Rational Basis Review of Laws That Pose More than a De Minimis or Incidental Burden............... 16

        **1.**  Tests Requiring a Substantial Burden on the Second Amendment to Trigger Heightened Scrutiny Are Improper. ........................... 16

        **2.**  Laws That Substantially Burden the Second Amendment Must Be Unconstitutional Per Se or, at Minimum, Subject to Strict Scrutiny. ......... 20

    **C.**  Should the Court Adopt a Traditional Means-End Approach, Strict Scrutiny Must Apply...................... 22

**III.**  SECTION 4512 VIOLATES THE SECOND AMENDMENT................. 26

    **A.**  The Second Amendment Elevates Above All Other Interests the Right to Use Arms in Defense of Hearth and Home........ 27

    **B.**  The Locked-Storage Law Burdens the Right to Access Arms for Self-Defense. ........................... 29

ii

# TABLE OF CONTENTS (CONT.)

PAGE(S)

C.     **The Locked-Storage Law Conflicts with the Second Amendment Under Any Test the Court May Apply** . . . . . . . . . . 34

      1.     **The Locked-Storage Law Fails Under a Textual, Historical Analysis** . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

      2.     **The Locked-Storage Law Fails Heightened Means-End Review** . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

      3.     **The Locked-Storage Law Is Invalid Under a Substantial Burden Test** . . . . . . . . . . . . . . . . . . . . . . . . 38

IV.     **SECTION 613.10(g) VIOLATES THE SECOND AMENDMENT** . . . . . . . . . . . . 39

    A.     **The Second Amendment Protects Firearms and Ammunition that Are in Common Use for Lawful Purposes** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

    B.     **The Second Amendment Guarantees the Right to Purchase Protected Firearms and Ammunition** . . . . . . . . . . . . . 41

    C.     **The Prohibited Ammunition is Protected by the Second Amendment Because it Is in Common Use for the Core, Lawful Purpose of Self-Defense** . . . . . . . . . . . . . . . . . . . . . . . . 43

    D.     **The City's Categorical Ban on the Retail Sale of Protected Ammunition is Unconstitutional and May Be Stricken Without Resort to Any Particular Standard of Review** . . . . . . . 46

    E.     **Section 613.10 Conflicts with the Second Amendment Under Any Test the Court May Apply** . . . . . . . . . . . . . . . . . . . . 48

## TABLE OF CONTENTS (CONT.)

PAGE(S)

1.     The Ammunition Ban Fails Under a Textual, Historical Analysis. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

2.     The Ammunition Ban Fails Heightened Means-End Review. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

      a.     Precedent Concerning Bans on Protected Items Commands Strict Scrutiny. . . . . . . . . . . . . . . 50

      b.     The Ammunition Ban Violates the Second Amendment Under Both Strict and Intermediate Scrutiny. . . . . . . . . . . . . . . . . . . . . . . . . 52

3.     The Ammunition Ban Is Invalid Under a Substantial Burden Analysis. . . . . . . . . . . . . . . . . . . . . . . . 55

V.     THE REMAINING PRELIMINARY INJUNCTION FACTORS SUPPORT TEMPORARY RELIEF. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60

    A.     Irreparable Harm Should Be Presumed Because the City's Laws Violate Plaintiffs' Second Amendment Rights. . . . . . . . . . 60

    B.     The Harms to Plaintiffs and the Public Far Outweigh Any Harm to the City. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 63

STATEMENT OF RELATED CASES. . . . . . . . . . . . . . . . . . . . . . . . . . . . 64

CERTIFICATE OF COMPLIANCE. . . . . . . . . . . . . . . . . . . . . . . . . . . . 65

CERTIFICATE OF SERVICE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 66

iv

## <u>TABLE OF AUTHORITIES</u>

**PAGE(S)**

## <u>FEDERAL CASES</u>

*Am. Trucking Ass'ns v. City of Los Angeles*,
    559 F.3d 1046 (9th Cir. 2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Ashcroft v. Am. Civil Liberties Union*,
    542 U.S. 656 (2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

*Ashcroft v. Free Speech Coal.*,
    535 U.S. 234 (2002). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42, 50

*Bateman v. Perdue*,
    No. 5:10-265, 2012 WL 3068580 (E.D. N.C. Mar. 29, 2012). . . . . 42, 43, 51

*Bd. of Trs. of State Univ. of N.Y. v. Fox*,
    492 U.S. 469 (1989). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

*Bland v. Fessler*,
    88 F.3d 729 (9th Cir. 1996). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 63

*Brown v. Entm't Merchs. Ass'n*, __ U.S. __,
    131 S. Ct. 2729 (2011). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42, 50

*Burdick v. Takushi*,
    504 U.S. 428 (1992). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Callaway v. Block*,
    763 F.2d 1283 (11th Cir. 1985). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Carey v. Population Servs. Int'l*,
    431 U.S. 678 (1977). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41, 42, 47, 50

v

# TABLE OF AUTHORITIES (CONT.)

PAGE(S)

## FEDERAL CASES (CONT.)

*Central Hudson Gas & Electric Corp. v.*
*Public Serv. Commission of New York,*
    447 U.S. 557 (1980). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Citizens United v. Fed. Election Comm'n,*
    540 U.S. 310 (2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

*City of Los Angeles v. Alameda Books*, Inc.,
    535 U.S. 425 (2002). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

*Clark v. Cmty. for Creative Non-Violence,*
    468 U.S. 288 (1984). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Coal. For Econ. Equity v. Wilson,*
    122 F.3d 692 (9th Cir. 1997). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Dep't of Hous. & Urban  Dev. v. Rucker,*
    535 U.S. 125 (2002). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Ezell v. City of Chicago,*
    651 F.3d 684 (7th Cir. 2011). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

*Free Speech Coal. v. Reno,*
    198 F.3d 1083 (9th Cir. 1999). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

*GeorgiaCarry.org. v. Georgia,*
    687 F.3d 1244 (11th Cir. 2012). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Gonzales v. Carhart,*
    550 U.S. 124 (2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

## TABLE OF AUTHORITIES (CONT.)

**PAGE(S)**

### FEDERAL CASES (CONT.)

*Griswold v. Connecticut,*
381 U.S. 479 (1965). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41, 42, 47

*Haynes v. Office of the Att'y Gen. Phill Kline,*
298 F. Supp. 2d 1154 (D. Kan. Oct. 26, 2004). . . . . . . . . . . . . . . . . . . . . 62

*Heller v. District of Columbia,*
554 U.S. 570 (2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*Heller v. District of Columbia* (*Heller II*),
670 F.3d 1244 (D.C. Cir. 2011). . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*Herrington  v. United States,*
6 A.3d 1237 (D.C. Cir. 2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

*Int'l Molders'& Allied Workers' Local Union v. Nelson,*
799 F.2d 547 (9th Cir 1986). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Islamic Ctr. of Miss., Inc. v. City of Starkville,*
840 F.2d 293 (5th Cir. 1988). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

*Klein v. City of San Clemente,*
584 F.3d 1196 (9th Cir. 2009). . . . . . . . . . . . . . . . . . . . . . . . . . . 61, 62

*Kodak v. Holder,*
342 F. App'x 907 (4th Cir. 2009). . . . . . . . . . . . . . . . . . . . . . . . . . 40, 41

*Lamont v. Postmaster General,*
381 U.S. 301 (1965). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42, 47

vii

## TABLE OF AUTHORITIES (CONT.)

**PAGE(S)**

### FEDERAL CASES (CONT.)

*Local Union v. Nelson*,
    799 F.2d 547 (9th Cir. 1986). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Martin v. Harrington & Richardson*, *Inc.*,
    743 F.2d 1200 (7th Cir.1984). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

*McConnell v. Fed. Election Comm'n*,
    540 U.S. 93 (2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

*McDonald v. City of Chicago*,
    561 U.S. 2025, S. Ct. 3020 (2010). . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*Monterey Mech. Co. v. Wilson*,
    125 F.3d 702 (9th Cir. 1997). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60

*Nat'l Rifle Ass'n v. BATFE*,
    700 F.3d 185 (5th Cir. 2012). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25, 26

*Nordyke v. King* (*Nordyke V*),
    644 F.3d 776 (9th Cir. 2011). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*Nordyke v. King*,
    681 F.3d 1041 (9th Cir. 2012). . . . . . . . . . . . . . . . . . . . . . . . . . . 18, 55

*Parker v. District of Columbia*,
    478 F.3d 370 (D.C. Cir. 2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

*Perry Educ. Ass'n v. Perry Local Educators' Ass'n*,
    460 U.S. 37 (1983). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

# TABLE OF AUTHORITIES (CONT.)

**PAGE(S)**

## FEDERAL CASES (CONT.)

*Planned Parenthood of Se. Pa. v. Casey*,
  505 U.S. 833 (1992). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17, 21, 47

*Preminger v. Principi*,
  422 F.3d 815 (9th Cir. 2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62

*Reliable Consultants, Inc. v. Earle*,
  517 F.3d 738 (2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47, 56

*Richmond Newspapers v. Virginia*,
  448 U.S. 555 (1980). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

*Rucker v. Davis*,
  237 F.3d 1113 (9th Cir. 2001). . . . . . . . . . . . . . . . . . . . . . . . . . 11, 12, 15

*Russell v. Gregoire*,
  124 F.3d 1079 (9th Cir. 1997). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Schad v. Borough of Mt. Ephraim*,
  452 U.S. 61 (1982). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

*Schneider v. State*,
  308 U.S. 147 (1939). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

*Shapiro v. Thompson*,
  394 U.S. 618 (1969). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Shaw v. Hunt*,
  517 U.S. 899 (1996). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

# TABLE OF AUTHORITIES (CONT.)

**PAGE(S)**

## FEDERAL CASES (CONT.)

*Sports Form, Inc. v. United Press Int'l, Inc.*,
  686 F.2d 750 (9th Cir. 1982). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Tucson Woman's Clinic v. Eden*,
  379 F.3d 531 (9th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*United States v. Chester*,
  628 F.3d 673 (4th Cir. 2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18, 25

*United States v. Decastro*,
  682 F.3d 160 (2d Cir. 2012). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18, 19

*United States v. Marzzarella*,
  614 F.3d 85 (3d Cir. 2010). . . . . . . . . . . . . . . . . . . . . . . . . . 17, 18, 25, 42

*United States v. Masciandaro*,
  638 F.3d 458 (4th Cir. 2011). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18, 25

*United States v. McCartney*,
  357 F. App'x 73 (9th Cir. 2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

*United States v. Reese*,
  627 F.3d 792 (10th Cir. 2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18, 25

*United States v. Skoien*,
  614 F.3d 638 (7th Cir. 2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 26

## TABLE OF AUTHORITIES (CONT.)

**PAGE(S)**

**FEDERAL CASES (CONT.)**

*United States v. Williams*,
   616 F.3d 685 (7th Cir. 2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Ward v. Rock Against Racism*,
   491 U.S. 781 (1989). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Wash. State Grange v. Wash. State Republican Party*,
   552 U.S. 442 (2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*West Side Women's Servs., Inc. v. City of Cleveland*,
   573 F.Supp. 504 (N.D. Ohio 1983).. . . . . . . . . . . . . . . . . . . . . . . . . . 57, 58

*Vincenty v. Bloomberg*,
   476 F.3d 74 (2d Cir. 2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

*Zepeda v. U.S. Immigration*,
   753 F.2d 719 (9th Cir. 1983). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62


**STATE CASES**

*Andrews v. State*,
   50 Tenn. 165 (1871). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40, 42

# TABLE OF AUTHORITIES (CONT.)

PAGE(S)

## STATUTES, RULES, & REGULATIONS

18 U.S.C. § 922. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

28 U.S.C. § 1292. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

28 U.S.C. § 1331. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

42 U.S.C. § 1983. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Cal. Penal Code § 30315. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

Mass. Gen. Laws ch. 140, § 131L. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

N.J. Stat. Ann. § 2C:39-3(f)-(g). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

S.B. 53, 2013-2014 Reg. Sess. (Cal. Dec. 20, 2012). . . . . . . . . . . . . . . . . 54

S.F., Cal., Police Code art. 9, § 613.9.5. . . . . . . . . . . . . . . . . . . . . . . . . . . 44

S.F., Cal., Police Code art. 9, § 613.10(g). . . . . . . . . . . . . . . . . . . . . . *passim*

S.F., Cal., Police Code art. 9, § 615(b). . . . . . . . . . . . . . . . . . . . . . . . . . . 54

S.F., Cal., Police Code art. 45, § 4511. . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

S.F., Cal., Police Code art. 45, § 4512. . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

# TABLE OF AUTHORITIES (CONT.)

PAGE(S)

## OTHER AUTHORITY

Antonin Scalia & Bryan A. Garner,
   *Reading Law: The Interpretation of Legal Texts* 192-94 (2012)......... 29

Bureau of Justice Statistics,
   U.S. Dep't of Justice, National Crime Victimization Survey 6 tbl.9
   (2010), *available* at http://www.bjs. gov/content/pub/pdf/vdhb.pdf.. .... 33

Eugene Volokh,
   *Implementing the Right to Keep and Bear Arms for Self-Defense*,
   56 UCLA L. Rev. 1443, 1454 n.39................................. 21

11A Charles Alan Wright et al.,
   *Federal Practice and Procedure* § 2948.1 (2d ed. 1995). ............. 60

## STATEMENT OF JURISDICTION

Because this suit arises under the Constitution and laws of the United States, the district court had original jurisdiction pursuant to 28 U.S.C. § 1331. Further, because this is a 42 U.S.C. § 1983 action, the court had jurisdiction pursuant to 28 U.S.C. § 1343.

On November 26, 2012, the district court denied Plaintiffs' Motion for Preliminary Injunction. Pursuant to 28 U.S.C. § 1292(a)(1), this Court has jurisdiction over interlocutory appeals of a district court order refusing to issue an injunction.

Plaintiffs filed a notice of appeal on December 21, 2012, in accordance with Federal Rules of Appellate Procedure 3 and 4 and Ninth Circuit Rules 3-1–3-4.

## STATEMENT OF THE ISSUES PRESENTED

1.      Does the government violate the Second Amendment right "to use arms in defense of hearth and home" by requiring competent, law-abiding adults to keep their handguns in a locked box or disabled with a trigger-lock at all times within the sanctity of their homes, unless the handguns are "carried on the person?"

2.      Does the government violate the Second Amendment by banning the

1

retail sale of ammunition that is in common use for the core, lawful purpose of self-defense?

## STATEMENT REGARDING ADDENDUM

An addendum reproducing relevant constitutional and statutory provisions is bound with this brief.

## STATEMENT REGARDING ORAL ARGUMENT

Pursuant to Federal Rule of Appellate Procedure 34(a)(1), Plaintiffs request the opportunity to present oral argument. Oral argument is necessary because this is a case of first impression in this circuit, and it involves critical constitutional issues that, once clarified, will further inform the scope of the right to keep and bear arms and the analytical framework for Second Amendment claims.

## STATEMENT OF THE CASE

This is a Second Amendment challenge to Police Code sections 4512 (Addend. 52-53) and 613.10(g) (Addend. 42-43),[1] enacted by the City and County of San Francisco and enforced by its Mayor and Chief of Police ("the City"). E.R.

---

[1] All statutory references are to the San Francisco Police Code, unless indicated. This case initially also challenged former Section 1290, a firearms discharge ban. The City amended the law to allow for certain discharges, and Plaintiffs are no longer pursuing that claim.

2

II 134, III 391, IV 537. The challenged laws mandate locked-storage of handguns and prohibit the sale of certain ammunition within San Francisco.

Plaintiffs filed the initial complaint in this matter on May 15, 2009. E.R. IV 574. The City first moved to dismiss on July 9, 2009. E.R. IV 560. Plaintiffs subsequently amended their complaint, and the City's motion was withdrawn. E.R. IV 585. The case was then stayed pending a decision in *McDonald v. City of Chicago*, 561 U.S. 2025, 130 S. Ct. 3020 (2010). E.R. IV 588-89.

After the stay was lifted, the City filed another motion to dismiss. E.R. IV 506-26. The district court denied the City's motion and ordered the City to respond to Plaintiffs' claims. E.R. IV 430-36, 582. On October 17, 2011, the City filed its Answer. E.R. IV 418-28.

On May 17, 2012, Plaintiffs filed a motion for partial judgment on the pleadings; that motion was denied on August 17, 2012. E.R. III 306-11, 383-414.

Plaintiffs then brought a motion for preliminary injunction, asking the court to enjoin enforcement of the challenged ordinances pending resolution of this case. E.R. II 126-58. On November 26, 2012, the district court denied that motion. E.R. I 001-08. Plaintiffs filed a notice of appeal on December 21, 2012. E.R. II 009-12.

3

## STATEMENT OF FACTS

### I.    SECTION 4512: LOCKED-STORAGE REQUIREMENT

Section 4512 requires handguns kept within the home to be stored in a locked container or disabled with a trigger-lock at all times, unless that firearm "is carried on the person of an individual over the age of 18" or "under the control of a person who is a peace officer." Addend. 52-53.

The only time non-peace officer residents may unlock their handguns or remove them from their safes is when they "carry" them "on the[ir] person." Addend. 52-53. Thus, to have arms accessible for use in self-defense emergencies during waking hours, the City's residents must carry them at all times. At times when carrying them is impossible or impractical, e.g., while sleeping, showering, or exercising, residents must keep their handguns locked up. This is true regardless of whether children, felons, or other persons who *should* be denied access to handguns are present.

The City has taken no steps to amend its locked-storage law in the wake of *Heller v. District of Columbia*, 554 U.S. 570 (2008), and it has never indicated that it intends to stop enforcing it. Instead, it has resisted this constitutional challenge vigorously for nearly four years. E.R. IV 574-89. And in response to this suit, it

4

attempted to *bolster* its locked-storage requirement with legislative "findings," claiming the law "does not substantially burden the right or ability to use firearms for self-defense in the home." S.F., Cal., Police Code art. 45, § 4511 (Addend. 50); E.R. II 238-53, 255-57.

Plaintiffs each own a handgun that they intend to keep accessible for use in self-defense emergencies in their homes, but in compliance with the law, they presently keep their handguns locked up at all times when not carried. E.R. II 161-84. But for Section 4512, each Plaintiff would keep his or her handgun readily accessible as needed for use in self-defense. E.R. II 161-84.

Plaintiffs are concerned about their ability to retrieve their handguns from locked-storage in time to use their arms for self-defense. E.R. II 161-84. Even under ideal circumstances, "the additional time it would take to remove a firearm from a locked box or to remove a trigger lock would effectively preclude the ability to effectively defend against a violent attacker who is at close range (21 feet or less)." E.R. II 054-57, 060. An attacker within 21 feet can close the entire distance between himself and his victim in approximately 1 ½ seconds. E.R. II 058 (describing the Tueller Drill used in law enforcement training). The City optimistically estimates it takes 3-4 seconds to retrieve a firearm from a locked

5

container. E.R. II 91-93.[2] In that time, an intruder will have had more than ample time to come upon his victim and begin an attack. Even *assuming* that a firearm can be removed *reliably* from a locked container under the duress of a self-defense emergency in seconds,[3] *fractions of a second* often mean the difference between life and death. E.R. II 059. Consequently, the additional delay imposed by Section 4512 "severely restricts the ability of a potential victim to engage in self-defense when facing a violent attack." E.R. II 058.

Of course, the City's time estimates envision ideal circumstances, with lights on, people awake, alert, and calm. Common sense and science dictate that one's ability to respond in other circumstances, e.g., a late-night attack with lights off, and people suddenly awakened and scared, would be impaired far more by the locked-storage requirement. *See infra* Part III.B.

## II. SECTION 613.10(g): AMMUNITION SALES BAN

Section 613.10(g) prohibits the retail sale of ammunition that is designed to

---

[2] The City tested two, new electronic lock boxes under ideal conditions to arrive at its estimate. E.R. II 91-93.

[3] The City's estimate assumes the operator is not under stress, the operator can easily recall the lock box's combination, the batteries in the lock box have not been drained, and that the operator's fingerprints are not obscured by any foreign substance. *See* E.R. II 091-93. All of these factors can – and do – increase the time required to retrieve a firearm from a locked container. E.R. II 57-59.

expand and/or fragment upon impact. Addend. 41-43. The City also characterizes this ammunition as serving "no sporting purpose." Addend. 42.

The characteristic that allows a bullet to expand or fragment upon impact is commonly referred to as a "hollow point" or a "soft nose." E.R. II 231, 234. For ease of reference, Plaintiffs refer to the prohibited ammunition as "hollow-point ammunition." Hollow-point ammunition is *not* "armor-piercing ammunition" (sometimes referred to as "cop-killer ammunition") – it is effectively the opposite. E.R.III 262-63. By flattening out, or expanding, hollow-point ammunition is less likely to pass through an attacker, or even a wall. E.R. III 228, 262, 268, 270. Armor-piercing ammunition has a harder or denser, solid metal core that allows it to penetrate metal, a characteristic absent from hollow-point ammunition. E.R. III 262-63. Armor-piercing ammunition has long been prohibited under both state and federal law. *See* Cal. Penal Code § 30315; 18 U.S.C. § 922(a)(7)-(8). Hollow-point ammunition, by contrast, is widely available for sale throughout the United States.

The ongoing historical use of hollow-point ammunition for lawful purposes is well documented. There is nothing new or unconventional about the hollow-point bullet. E.R. III 233-34. Hollow-point and soft nose technology has been employed by ammunition manufacturers dating back to the turn of the twentieth century. E.R. III 233-34. It was originally developed for hunting applications, and

7

it is currently used for that purpose, as well as self-defense. E.R. III 231, 234, 262, 291-305. It is produced and distributed by nearly every major ammunition manufacturer, E.R. III 225-26, and it is typically preferred for self-defense because of its capacity to incapacitate an aggressor rapidly enough to prevent injury to the intended victim. E.R. III 231. The extent of the use of hollow-point ammunition throughout the country for both self-defense and hunting are expanded upon in Part IV.C of this brief.

## SUMMARY OF ARGUMENT

Police Code sections 4512 and 613.10(g) infringe upon Plaintiffs' Second Amendment rights to keep and bear arms by unjustifiably interfering with the core interest protected by that right: "[T]he right to use arms in defense of self, family, and property." *Heller*, 554 U.S. at 628-29.

Section 4512 imposes a significant and potentially deadly delay on residents' access to arms by requiring handguns be kept in a locked box or disabled with a trigger lock at all times, except when actually "carried on the person." In practice, this means gun owners cannot use their handguns as effectively to defend against a sudden attack. The City claims its interest is in keeping handguns away from minors, felons, and mental incompetents. But its locked-storage law applies even when the gun owner is home, alone, with the

8

handgun exclusively under his or her control. There is no justification for that.

Section 613.10(g) flatly bans the retail sale of ammunition that is in common use for the core lawful purpose of self-defense. The right to buy and sell arms and ammunition that are in common use is a necessary incident of the fundamental right to use arms in self-defense, and equally protected by the Second Amendment. The City claimed, and the court agreed, that residents can acquire the banned ammunition elsewhere, so there is no burden on Plaintiffs' rights. But that is incorrect as a matter of law. One's ability to exercise a constitutional right in another jurisdiction has never been considered justification for the local denial of that right. Like the locked-storage law, the City's retail sales ban on a category of ammunition in common use exists at the extreme end of the gun-regulation continuum. Both restrictions are among the most, if not the most restrictive such laws in the nation.

Notably, unlike the vast majority of post-*Heller* decisions; this case concerns law-abiding adults, seeking to purchase protected ammunition and access their handguns for use in defense of hearth and home. *Heller* found the Second Amendment "surely elevates above all other interests the right of law-abiding, responsible citizens to use arms in defense of hearth and home," *id.* at 635, and specifically protects the right to engage in this activity *with arms that are in*

9

*common use*, *id.* at 624-25.

The court failed to consider "predicate acts" covered by the Second Amendment. For example, the court failed to recognize that accessing arms is necessarily encompassed by the right to use those arms in self-defense, and that delaying access directly interferes with that right. Likewise, the court failed to recognize that the Second Amendment necessarily extends to the purchase of protected classes of firearms and ammunition.

Finally, the court erred in declining to follow the mode of analysis used by the Supreme Court in *Heller* when considering similar ordinances, and significantly, failed to place the burden of proof on the City to justify its restrictions on Plaintiffs' constitutional rights.

These fundamental errors undermined the district court's analysis and decision. Had the court applied an analysis consistent with *Heller* and established Supreme Court authority concerning the scope of fundamental rights, it would have granted Plaintiffs' motion.

## **ARGUMENT**

## I.    STANDARD OF REVIEW ON MOTION FOR PRELIMINARY INJUNCTION

Plaintiffs seeking a preliminary injunction must establish: (1) they are likely to succeed on the merits; (2) they are likely to suffer irreparable harm in the

absence of preliminary relief; (3) the balance of equities tips in their favor; and (4) an injunction is in the public interest. *Am. Trucking Ass'ns v. City of Los Angeles*, 559 F.3d 1046, 1052 (9th Cir. 2009). Plaintiffs satisfied their showing under each prong, and a preliminary injunction should have been issued.

Generally, the appellate standard of review for a preliminary injunction order is abuse of discretion. *See, e.g.*, *Rucker v. Davis*, 237 F.3d 1113, 1118 (9th Cir. 2001) (en banc), *rev'd on other grounds*, *Dep't of Hous. & Urban Dev. v. Rucker*, 535 U.S. 125 (2002). A district court, however, never has discretion to apply the wrong legal standard. *Id.* at 1118; *Sports Form, Inc. v. United Press Int'l, Inc.*, 686 F.2d 750, 752 (9th Cir. 1982) ("misapprehend[ing] the law with respect to the underlying issues in litigation" constitutes reversible legal error). Therefore, if the district court "applied incorrect substantive law," its ruling denying preliminary relief must be reversed. *Int'l Molders'& Allied Workers' Local Union v. Nelson*, 799 F.2d 547, 550 n.1 (9th Cir. 1986).

Insofar as a denial rests on a premise concerning the pertinent rule of law, that premise is reviewed de novo. *Russell v. Gregoire*, 124 F.3d 1079, 1083 (9th Cir. 1997). If the appellate court holds a view of the applicable legal principle that differs from that of the district court, it has a duty to apply the principle which it believes proper and sound. *Coal. For Econ. Equity v. Wilson*, 122 F.3d 692, 701

11

n.9 (9th Cir. 1997) ("Where the issue is whether the district court got the law right in the first place," this Court does "not defer review and thereby allow lawsuits to proceed on potentially erroneous legal premises.").

Further, where application of the correct rule compels resolution of the ultimate issues, the court of appeals may reach the merits. *Rucker*, 237 F.3d at 1118-19; *see also Callaway v. Block*, 763 F.2d 1283, 1287 n.6 (11th Cir. 1985) (citing authority that "courts may, and have, ruled on legal issues and claims on the merits in the course of reviewing interlocutory orders . . . denying preliminary injunctions").

Here, the district court abused its discretion in applying improper substantive law to the underlying legal questions. *See* E.R. I 001-08; E.R. II 126-58. And because resolution of the ultimate issues necessarily follows application of the proper rule of law, this Court should rule on the merits.

## II. STANDARDS FOR REVIEWING SECOND AMENDMENT CHALLENGES

The lower court's failure to grant Plaintiffs' motion can be traced back to a fundamental misunderstanding about the applicable standard for reviewing Second Amendment challenges. The court erred by adopting a minimalist view of the landmark *Heller* decision that focuses myopically on the Court's narrow holding, while ignoring much of the in-depth analysis of Second Amendment rights. *See*

E.R. I 001-08. *Heller*, while leaving much to be decided, included guidance to lower courts as to the considerations that should shape Second Amendment analyses.

The court should have followed *Heller's* example before looking to adopt an analytical framework for Second Amendment challenges that is foreign to *Heller*. Regardless, the City's laws cannot survive judicial scrutiny under *any* standard of review.

### A. *Heller* and *McDonald* Endorse a Textual, Historical Approach to Analyzing Second Amendment Challenges

The Supreme Court, while not articulating a comprehensive analytical framework or standard for reviewing all Second Amendment challenges, has left little doubt that courts are to assess gun laws based on "both text and history," *Heller*, 554 U.S. at 595, and not by resorting to interest-balancing tests, *McDonald*, 130 S. Ct. at 3047. *See also Heller v. District of Columbia* (*Heller II*), 670 F.3d 1244, 1271-73 (D.C. Cir. 2011) (Kavanaugh, J., dissenting). This framework first examines "a variety of legal and other sources to determine *the public understanding* of [the] legal text," *Heller*, 554 U.S. at 605, with particular focus on "the founding period," *id*. at 604, to determine whether the restricted activity falls within the scope of the Second Amendment. If it does, the burden

13

shifts to the government to establish an historical justification for its regulation, evidenced by a tradition of similar regulations or historical analogues. *Id.* at 635.

In *Heller*, the Court found that handguns are arms protected by the Second Amendment, *id.* at 629, and that using arms for self-defense in the home is "core" conduct, "central" to the Second Amendment, *id.* at 630; *accord id.* at 628. Because the District's locked-storage requirement and arms ban prohibited Second Amendment conduct, and because there was no historical justification for such restrictions, the laws were unconstitutional per se. *Id.* at 628-30.

*Heller* focused on whether the challenged laws restricted the right to arms as it was understood by those who drafted and enacted the Second and Fourteenth Amendments. *Id.* at 626-34. And it gleaned this understanding from an extensive examination of the textual and historical narrative surrounding the right to arms. *Id*. at 605-19. The Court did *not* make any reference to "compelling interests," "narrow tailoring," or even "legislative findings" common to judicial balancing tests.

*McDonald* further underscored the notion that text and history, not burdens or benefits, should guide Second Amendment analyses. 130 S. Ct. at 3047. It expressly rejected judicial assessments of "the costs and benefits of firearms restrictions," stating that courts should not make "difficult empirical judgments"

14

about the efficacy of particular gun regulations. *Id.* at 3050. This language is compelling. Means-end tests, like strict or intermediate scrutiny, necessarily require courts to engage in both.

To decide this case, the Court need not venture beyond the precedents of the Supreme Court, and no expedition into the " 'levels of scrutiny' quagmire" is required. *See United States v. Skoien*, 614 F.3d 638, 641-42 (7th Cir. 2010) (en banc). The Court can, and should, decide this case by determining whether there is sufficient support for the challenged restrictions in the text of the Second Amendment and in whatever "historical justification" may be offered in their defense. *Heller*, 554 U.S. at 635. In rejecting this textual, historical test, E.R. I 005-06, the lower court misinterpreted the law with respect to the underlying Second Amendment issues and, basing its decision on an erroneous legal interpretation, abused its discretion. *See Rucker*, 237 F.3d at 1119.

While the district court correctly notes that Second Amendment jurisprudence is in its infancy, its contention that *Heller* and *McDonald* fail to inform this case as to both the right's scope and the mode of analysis is misguided. *See* E.R. I 001-02 (reasoning that *Heller* "expressly left for future consideration the full scope of the Second Amendment, and the mode of analysis to be employed"). On the contrary, the Supreme Court in both cases engaged in

15

extensive analysis of the Second Amendment's scope as a necessary part of the larger questions before it. *Heller*, 554 U.S. at 626-27, 634-35; *McDonald*, 130 S. Ct. at 3036-37, 3044. "Although the critical question in *Heller* – whether the Amendment secures an individual or collective right – was interpretive rather than doctrinal, the Court's decision method is instructive." *Ezell*, 651 F.3d at 700.

Accordingly, the district court erred in failing to apply an analytical framework based on text, history, and tradition, particularly given that it had before it laws, like those at issue in *Heller*, mandating locked-storage and banning arms in common use for the core, lawful purpose of self-defense.

### B. *Heller* Rejects Rational Basis Review of Laws That Pose More than a De Minimis or Incidental Burden

Tests that apply heightened scrutiny only to those laws that pose a "substantial burden" are improper because they treat rational basis as the default standard for reviewing laws that pose more than an incidental burden on the right to arms. If the Court does adopt a "substantial burden" test, it should treat substantially burdensome laws as unconstitutional per se or, at minimum, warranting strict scrutiny.

#### 1. Tests Requiring a Substantial Burden on the Second Amendment to Trigger Heightened Scrutiny Are Improper

The explicit nature of the right to arms precludes application of rational

basis review. *Heller*, 554 U.S. at 628 n.27. Whatever else *Heller* left for future courts to decide, it is clear on this point. *Id.* Accordingly, a law that directly restricts Second Amendment conduct, making it more difficult to use arms for self-defense, burdens the right and requires heightened scrutiny. *See, e.g.*, *Ezell v. City of Chicago*, 651 F.3d 684, 701 (7th Cir. 2011); *United States v. Marzzarella*, 614 F.3d 85, 89 (3d Cir. 2010). Meaningful judicial review cannot be avoided simply by calling such a restriction not quite "substantial" enough.[4]

In light of *Heller*'s clear direction on this point, the majority of circuits to

---

[4] Justice Scalia, *Heller's* author, has decried the contention that a law that directly regulates a fundamental right is valid unless it imposes an "undue" or "substantial" burden:

> [A] law of general applicability which places only an incidental burden on a fundamental right does not infringe that right, . . . but that principle does not establish the quite different (and quite dangerous) proposition that a law which *directly* regulates a fundamental right will not be found to violate the Constitution unless it imposes an "undue burden." It is that, of course, which is at issue here: Pennsylvania has *consciously and directly* regulated conduct that our cases have held is constitutionally protected. The appropriate analogy, therefore, is that of a state law requiring purchasers of religious books to endure a 24-hour waiting period, or to pay a nominal additional tax of 1¢. The joint opinion cannot possibly be correct in suggesting that we would uphold such legislation on the ground that it does not impose a "substantial obstacle" to the exercise of First Amendment rights.

*Planned Parenthood of Se. Pa. v. Casey*, 505 U.S. 833, 987-88 (1992) (Scalia, J., dissenting) (citations omitted).

have decided the issue apply some form of heightened scrutiny to all regulations that impose more than a de minimis or incidental burden on Second Amendment activity. *See, e.g.*, *GeorgiaCarry.org. v. Georgia*, 687 F.3d 1244, 1260 n.34 (11th Cir. 2012); *Heller II*, 670 F.3d at 1252; *Ezell*, 651 F.3d at 706; *United States v. Chester*, 628 F.3d 673, 680 (4th Cir. 2010); *United States v. Masciandaro*, 638 F.3d 458, 469, 471 (4th Cir. 2011); *United States v. Reese*, 627 F.3d 792, 800-01 (10th Cir. 2010); *Marzzarella*, 614 F.3d at 94-95. Under the majority approach, the only threshold question is whether the challenged restriction burdens activity that falls within the scope of the right. *See, e.g.*, *Ezell*, 651 F.3d at 701-03.

Despite this developing consensus, the Second Circuit, relying heavily on the Ninth Circuit decision in the vacated case, *Nordyke v. King* (*Nordyke V*), 644 F.3d 776 (9th Cir. 2011), *vacated following reh'g en banc*, 681 F.3d 1041 (9th Cir. 2012), applied mere rational basis in a case challenging restrictions on Second Amendment conduct, holding that "heightened scrutiny is appropriate *only* as to those regulations that *substantially burden*" the right. *United States v. Decastro*, 682 F.3d 160, 164 (2d Cir. 2012) (emphasis added). *Decastro* is unclear what constitutes a "substantial burden," but to the extent the analysis excludes from heightened scrutiny all burdens falling somewhere between de minimis and substantial, it is improperly applied to the Second Amendment. *Compare*

18

*Decastro*, 682 F.3d at 164 (applying mere rational basis review to all burdens on the Second Amendment until they are deemed "substantial"), *with Heller II*, 670 F.3d at 1255-56 (recognizing that, while a de minimis burden might not warrant heightened scrutiny, *Heller* "clearly does reject any kind of 'rational basis' " test for evaluating laws directly regulating Second Amendment conduct).

Under the *Decastro* substantial burden test, rational basis is effectively the default standard, disregarded only if the law imposes a sufficiently serious burden on protected conduct. 682 F.3d at 164. This introduces a threshold requirement that appears nowhere in *Heller*, which explicitly rejected rational basis and reasonableness tests. 554 U.S. at 628 n.27, 635-35.

Relying on the vacated *Nordyke V* opinion and giving little practical effect to *Heller's* forceful rejection of rational basis review, E.R. I 003-08, the district court erred in adopting an analytical framework that applies heightened scrutiny only to substantially burdensome laws. This error poisoned the district court's entire analysis, preventing it from shifting any burden to the City to justify its laws and setting a very low bar for upholding laws that directly regulate, and in fact, prohibit conduct protected by the Second Amendment.

19

### 2. Laws That Substantially Burden the Second Amendment Must Be Unconstitutional Per Se or, at Minimum, Subject to Strict Scrutiny

If the Court adopts a substantial burden test, it should adopt an approach that treats the substantial burden question as itself an independent test, not a threshold inquiry for determining whether heightened scrutiny applies. Under such a test, any regulation that substantially burdens the right is necessarily unconstitutional. At minimum, strict scrutiny must be the level of heightened scrutiny applied if one is to be required at all. In light of the authority cited in *Nordyke V*, this is the most logical interpretation of the Second Amendment substantial burden test articulated in that case. 644 F.3d at 784-86.

In *Nordyke V*, a panel of this Court went to great lengths to illustrate the limitations of means-end tests, like strict and intermediate scrutiny, that focus on the extent to which any regulation furthers the government's stated interest. *Id.* at 784-85 ("*Heller* specifically renounced an approach that would base the constitutionality of gun-control regulations on judicial estimations of the extent to which each regulation is likely to reduce . . . crime."). Accordingly, *Nordyke V* adopted a test relying not on interest-balancing, but on whether the regulation "substantially burdens Second Amendment rights." *Id.* at 786-87. The question under *Nordyke V* is whether the challenged law "leaves law-abiding citizens with

20

reasonable alternative[s]" for exercising their rights. *Id.* at 787.[5]

*Nordyke V* analogized its test to the Supreme Court's "undue burden" test, applicable to regulations on the right to obtain an abortion. 644 F.3d at 785-86 (citing *Gonzales v. Carhart*, 550 U.S. 124, 146 (2007)). The undue burden test asks whether the regulation's "purpose or effect is to place a substantial obstacle in the path of a woman seeking an abortion before the fetus" is viable. *Gonzales*, 550 U.S. at 146 (quoting *Casey*, 505 U.S. at 878). If it does, the regulation is invalid. In this context, the finding of an undue burden does not simply trigger the application of means-end review; it is fatal. *See* Eugene Volokh, *Implementing the Right to Keep and Bear Arms for Self-Defense*, 56 UCLA L. Rev. 1443, 1454 n.39 (2009).

Similarly, *Nordyke V* relied on content-neutral First Amendment time, place, and manner cases. While the Court notes that such regulations *may* be subject to intermediate scrutiny, 644 F.3d 786 (citing *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989)), a restriction that does not "leave open ample alternative channels for communication" cannot be saved even if it would otherwise satisfy

---

[5] Because *Nordyke V* dealt with a restriction on gun sales on government property, it limited its analysis to whether the restriction leaves law-abiding citizens with reasonable alternative means for obtaining firearms. 644 F.3d at 787. Whether the City's laws impose a substantial burden must turn on whether they leave "reasonable alternative means" for the exercise of the respective rights at issue.

*strict* scrutiny, *Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 293 (1984); *see also Nordyke*, 644 F.3d at 790. Such restrictions are *necessarily* unconstitutional.

Finally, *Nordyke V* invoked cases regarding the rights to vote and to associate, 644 F.3d at 786 (citing *Burdick v. Takushi*, 504 U.S. 428, 432 (1992); *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 451-52 (2008)), where the Supreme Court generally applies reasonableness review to laws that impose only "modest" burdens, but demands *strict* scrutiny for laws imposing more "severe" burdens. *Wash. State Grange*, 442 U.S. at 451-52.

In sum, when the Ninth Circuit formulated its substantial burden test, it drew heavily from doctrines generated in other rights contexts – doctrines in which laws that substantially burden fundamental rights are unconstitutional per se or, at least, subject to strict scrutiny. Accordingly, if the Court adopts a substantial burden test, the City's laws must be subject to nothing less than strict scrutiny. "Assuming" the existence of a "substantial burden," the lower court erred in applying a lesser standard. *See* E.R. I 007-08.

### C. Should the Court Adopt a Traditional Means-End Approach, Strict Scrutiny Must Apply

As described in *Nordyke V*, 644 F.3d at 784-85, and Part II.A above,

22

traditional means-end tests provide an improper framework under which to evaluate many Second Amendment claims. Should this Court, however, find means-end scrutiny appropriate, strict scrutiny is required.

"[A] law is subject to strict scrutiny . . . when that law *impacts* a fundamental right, not when it *infringes* it." *Tucson Woman's Clinic v. Eden*, 379 F.3d 531, 544 (9th Cir. 2004) (citing *Shapiro v. Thompson*, 394 U.S. 618, 638 (1969)); *see also Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 54 (1983) ("strict scrutiny [is] applied when government action impinges upon a fundamental right protected by the Constitution"). In *McDonald*, the Supreme Court laid rest to any doubt that the right to keep and bear arms is fundamental. 130 S. Ct. at 3037 (declaring the right to be "fundamental to the newly formed system of government"). It further silenced any chattering that Second Amendment rights should not be afforded the same status as other fundamental rights. *Id.* at 3043 (plurality op.) ("[W]hat [respondents] must mean is that the Second Amendment should be singled out for special – and specially unfavorable – treatment. We reject that suggestion."). In short, strict scrutiny is the "default" standard for fundamental rights – and the right to arms is no exception.

Even before *McDonald* confirmed the right to arms as fundamental, *Heller* itself signaled the inadequacy of intermediate scrutiny. There, the Supreme Court

23

explicitly rejected not only rational basis review, but also Justice Breyer's proposed "interest-balancing" approach, 554 U.S. at 628 n.27, 634, a test that, in substance, is simply intermediate scrutiny by another name. In essence, Justice Breyer would have required the balancing of competing protected interests – namely the individual's right to keep and bear arms and the government's compelling public safety interest – to determine whether the statute's burden on the right "is out of proportion to the statute's salutary effects upon other important governmental interests." *Id.* at 689-90 (Breyer, J., dissenting).

Like intermediate scrutiny, which considers whether the challenged law "directly advances the governmental interest asserted, and . . . whether it is not more extensive than is necessary to serve that interest," *Central Hudson Gas & Electric Corp. v. Public Serv. Commission of New York*, 447 U.S. 557, 566 (1980), Justice Breyer's test accounts for both "the statute's effects upon the competing interests and the existence of any clearly superior less restrictive alternative." *Heller*, 554 U.S. at 690 (Breyer, J., dissenting). Because Justice Breyer's "interest balancing" amounts to intermediate scrutiny and the Court twice rejected it, intermediate scrutiny is an improper test for judging laws, like the City's, that impinge upon the fundamental right to keep and bear arms.

While many courts have drawn from First Amendment jurisprudence and

24

settled on intermediate scrutiny, they have done so where the interest asserted does not involve "core" Second Amendment conduct, reasoning that "we might expect that courts will employ different types of scrutiny . . . , depending on the character of the Second Amendment question presented." *Masciandaro*, 638 F.3d at 470. Even under this analysis, the City's laws must be subject to strict scrutiny because Plaintiffs seek to engage in conduct at the very core of the Second Amendment. And, just as "any law regulating the content of speech is subject to strict scrutiny, . . . any law that would burden the 'fundamental,' core right of self-defense in the home by a law-abiding citizen would be subject to strict scrutiny." *Id.*; *see also Nat'l Rifle Ass'n v. BATFE, and Explosives*, 700 F.3d 185, 195 (5th Cir. 2012).

Unlike this case, cases applying intermediate scrutiny almost invariably involve conduct outside the Second Amendment's core. *See, e.g.*, *Booker*, 644 F.3d 12, 25 (1st Cir. 2011) (possession by violent misdemeanant); *Masciandaro*, 638 F.3d at 471 (possession of loaded firearms in vehicle within public sensitive places); *Chester*, 628 F.3d at 680, 682-83 (possession by violent misdemeanant); *Reese*, 627 F.3d at 802 (possession while subject to a domestic violence protective order); *United States v. Williams*, 616 F.3d 685, 692 (7th Cir. 2010) (possession by felons); *Marzzarella*, 614 F.3d at 98 (possession of firearms with obliterated

25

serial numbers); *Skoien*, 614 F.3d at 641-42 (possession by violent

misdemeanant). Moreover, those rare cases applying intermediate scrutiny to laws

touching upon arguably core conduct presented factors not present here. *See*

*Heller II*, 670 F.3d at 1262-64 (applying intermediate scrutiny to registration

requirement that did not restrict use of arms and to ban on arms the court found ill-

suited for self-defense or sporting purposes); *Nat'l Rifle Ass'n*, 700 F.3d at 207-11

(upholding restriction to persons not historically considered responsible adults

under the Second Amendment).

As discussed below, the City's laws restrict conduct central to the Second

Amendment right. *See infra* Parts III.B, IV.C. They infringe on the right of law-

abiding residents to use arms in self-defense within the home, and entirely ban the

retail sale of a protected class of ammunition. As such, strict scrutiny must apply.

## III.   SECTION 4512 VIOLATES THE SECOND AMENDMENT

The question whether the locked-storage law violates the Second

Amendment is important but not difficult, once one recognizes three controlling

points of fact and law: (1) That the Second Amendment elevates above all other

interests the right to *use arms* in defense of hearth and home; (2) that requiring

residents to store arms locked up or disabled at all times unless "carried on the

person" necessarily, and by design, burdens the rights to *access* and *use* those

arms in self-defense; and (3) that the government bears the burden of justifying this interference with Plaintiffs' rights under any applicable standard of review.

Section 4512 impacts the core right to access and use protected arms in defense of hearth and home. The Court must thus determine whether the City's law burdens that protected interest and, if so, whether the law survives heightened review. While the degree of interference may vary depending upon the circumstances, it is self-evident that the locked-storage mandate interferes with one's access to arms.

The burden should have been on the City to justify its law – something the City failed to do and, in fact, could not have done. There are no historical precedents that would support such a law, and there is no compelling reason to require that law-abiding adults keep their arms locked, denying them ready access for emergency self-defense use, regardless of whether anyone else is present.

## A. The Second Amendment Elevates Above All Other Interests the Right to Use Arms in Defense of Hearth and Home

"[T]he Second Amendment protects a personal right to keep and bear arms for lawful purposes, most notably for self-defense within the home," *McDonald*, 130 S. Ct. at 3044, "where the need for defense of self, family, and property is most acute," *Heller*, 554 U.S. at 628. In *Heller*, the Court identified the nature of

27

the right and the interests it protects, declaring that "self-defense . . .was the *central component* of the right itself," *id.*at 599, and "whatever else [the Second Amendment] leaves to future evaluation, it surely elevates above all other interests the right of law-abiding, responsible citizens *to use arms* in defense of hearth and home," *id.* at 635 (emphasis added).

Although a flood of litigation followed these landmark cases, this case represents the *first* time since *Heller* that a federal court has been presented the opportunity to revisit the in-home setting of *Heller* and review a locked-storage law – the same type of restriction struck down in *Heller*. The law in *Heller* was more extreme. It denied access to arms, prohibiting armed self-defense in the home, while the City's mandate interferes with access to those arms, making armed self-defense more difficult. Still, the City's locked-storage law is by far the most restrictive such law remaining on the books.

Further, unlike the cases outlined in Part II.C, Plaintiffs' challenge to Section 4512 involves neither countervailing factors nor any of the "presumptively lawful" restrictions referenced in *Heller's* footnoted dicta, including restrictions on possession by felons or the mentally ill. 554 U.S. at 627 n.26. Instead, this claim involves competent, law-abiding adults who own lawful arms and seek to keep them in a manner that allows for effective armed defense within their homes.

28

E.R. II 161-84, IV 540-41.

**B.**     **The Locked-Storage Law Burdens the Right to Access Arms for Self-Defense**

The right to use arms in self-defense necessarily includes the predicate act of accessing an operable firearm when needed. Any interference with the predicate act is an interference with the right itself. Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 192-94 (2012) (the Predicate-Act Canon instructs that "authorization of an act also authorizes a necessary predicate act"). In this case, forcing Plaintiffs to lock up their handguns at all times when not "carried on the person" directly interferes with that access at all times, with potentially deadly consequences in the event of a self-defense emergency.

The City admits that its purpose is to deny or delay access to arms by requiring that they be locked or disabled at all times when not being carried by an authorized user. Addend. 49-53; E.R. II 103, III 368-69. While the City argues that its intent is only to keep arms out of the wrong hands, Addend. 48-50, E.R. II 104-05, 238-49, 255-56, it in fact restricts access by lawful gun possessors whose rights to use arms for self-defense are constitutionally guaranteed – *even when no one else is present*. Moreover, it does so at times when the need for immediate access to arms is most acute, i.e., when one is faced with a self-defense emergency

29

in the home.

The City's rejoinder that there is no real interference because residents may carry their handguns around the house all day – and wear them to bed at night – cannot be taken seriously. E.R. III 369 ("If Plaintiffs fear nighttime burglary and wish to sleep with their guns holstered to their bodies, they are free to do so under the plain terms of the ordinance."). It trivializes the Second Amendment right and the values it protects. This case does not seek vindication of some generalized right to spend all day with a holstered handgun. Nor does it seek to vindicate some imaginary right to sleep with guns strapped to one's body at night – a preposterous and dangerous notion.

Rather, Plaintiffs' challenge to Section 4512, like *Heller* and *McDonald*, is about the right to keep and *use* arms for *self-defense* within the home. And it is about the freedom to exercise that fundamental right without unwarranted, unjustifiable government interference. The interference of City's locked-storage law with Plaintiffs' ability to access and use arms in self-defense is undeniable. Addend. 48-51; E.R. II 103-04, III 361-62.

The district court, nevertheless, suggested that *Heller's* narrow holding undermines Plaintiffs' claim. Specifically, the court argued that Section 4512 "provides exactly the relief the *Heller* plaintiff sought and obtained, or even more,

30

in that it does not require an explicit need for self-defense." E.R. I 003. But that argument supposes three things: (1) That only a *total ban* on use of firearms in the home violates the right "to use arms in defense of hearth and home"; (2) that a self-defense exception would have saved the locked-storage law in *Heller*; and (3) that a "wear-it-or-lock-it" law, like the City's, is superior to a self-defense exception. Each supposition is false.

First, the Second Amendment protects law-abiding adults from more than just total bans on the right to arms. *Heller*, itself, confirms this as the Court invalidated the ban on handguns even though other arms remained available. 554 U.S. at 629.

Second, as the Supreme Court noted during oral argument in *Heller*, it is doubtful that a self-defense exception would have saved the locked-storage law in that case. Chief Justice Roberts and Justice Scalia made this point (humorously) after counsel suggested that the District's locked-storage law had an implied self-defense exception. Counsel argued that, because of the implied exception, the ordinance did *not* impose a burden on one's right to armed self-defense. The Chief Justice and Justice Scalia disagreed, finding the contention implausible as they briefly imagined the steps needed to unlock a handgun and use it to defend against a late-night attack:

31

JUSTICE SCALIA:      You turn on, you turn on the lamp next to your bed

so you can – you can turn the knob at 3-22-95, and so somebody –

MR. DELLINGER:      Well –

CHIEF JUSTICE ROBERTS: Is it like that? Is it a numerical code?

MR. DELLINGER:      Yes, you can have one with a numerical code.

CHIEF JUSTICE ROBERTS: So then you turn on the lamp, you pick up

your reading glasses –

(laughter)

E.R. III 205-06. Counsel for the District did not press the point further.[6]

Third, the district court's suggestion that Section 4512 goes beyond the

right vindicated in *Heller*, E.R. I 003, only highlights the court's misunderstanding

of the right at issue. The "right" to wear a loaded handgun around the house (for

no particular purpose) adds little to the inadequate self-defense exception

considered by the Court in the quote above. For it is the right to *access* and *use*

arms for self-defense that is "elevated," not the right to bear arms in the home

generally.

The district court, however, failed to examine the City's restrictive storage

---

[6]  While Plaintiffs submitted an expert declaration on this point, *see* E.R. II 053-60, such testimony simply confirms what common sense dictates.

32

law in terms of its burden on the right to access arms for use in self-defense.

E.R.007-08. Instead, it described Plaintiffs' asserted rights as if they existed only

in some theoretical sphere, finding:

> Plaintiffs have offered only the *possibility* that in a *very narrow range of circumstances*, the delay inherent in rendering a handgun operable or in retrieving it from a locked container *theoretically could impair* a person's ability to employ it successfully in self-defense.

E.R. I 007-08 (emphasis added). By describing the burden on Plaintiffs' rights in

this way, the court missed the point entirely. Those "narrow" circumstances *are*

*the circumstances requiring armed self-defense*. Far from being part of a "narrow

range of circumstances" that might "raise only the possibility" of a delay in

accessing one's arms, the late-night attack is among the *most common* self-defense

situations one might face within the home.[7]

Plaintiffs do not contend that all (or even most) firearm-storage laws are

invalid.[8] But requiring law-abiding, competent adults to keep their handguns

locked up unless "carried on the person" – *at all times and under all*

---

[7]    From 2003 to 2007, an estimated 61.3% of robberies of occupied dwellings occurred between 6 p.m. and 6 a.m. Bureau of Justice Statistics, U.S. Dep't of Justice, National Crime Victimization Survey 6 tbl.9 (2010), *available at* http://www.bjs. gov/content/pub/pdf/vdhb.pdf.

[8]   Plaintiffs have cited multiple safe-storage laws that restrict unauthorized access to arms without denying or delaying access to arms for in-home, self-defense purposes to the authorized possessor. Addend. 3-12, 14-20, 24-27; E.R. II 045, 148.

*circumstances* – goes too far.

### C. The Locked-Storage Law Conflicts with the Second Amendment Under Any Test the Court May Apply

Under a proper application of any of the standards for reviewing Second Amendment claims, it would have been the City's burden to justify its restrictive locked-storage law – either by establishing an historical justification, or by establishing that Section 4512 is sufficiently tailored to its stated public safety interest. That is something the City cannot do.

### 1. The Locked-Storage Law Fails Under a Textual, Historical Analysis

As described in Part II.A above, the district court should have followed the mode of analysis used in *Heller*, inasmuch as it is the only federal case to have considered a locked-storage law, and it is binding authority. In *Heller*, the Supreme Court looked solely to: (1) A textual understanding of the Second Amendment to determine whether the law affects conduct within its scope; and (2) whether the law is nevertheless permissible in light of a tradition of similar regulations and/or historical analogues. *Heller*, 554 U.S. at 595, 634-36, *see* also *supra* Part II.A.

As explained more fully in Parts III.A and III.B above, the City's locked-storage law interferes with the right to access and use arms for self-defense,

34

conduct at the very core of the Second Amendment. The burden thus shifts to the

City to provide historical justification for its infringement.

In the court below, the City relied on three Framing-era regulations. Two of

the ordinances regulated only the storage of *large* quantities of gunpowder and

were motivated by an expressed desire to prevent widespread fires. *Heller*, 554

U.S. at 631. And the only ordinance that did prohibit the taking of loaded firearms

into buildings was similarly aimed at reducing the risk of fire. *Id.* Unlike the City's

generalized interest in preventing accidents, those ordinances do not claim some

amorphous regulatory interest in public safety, nor do they reference the harm

posed by unsecured firearms. Rather, they target a specific harm – entirely

unrelated to the storage and possession of firearms for self-defense. *See id.* at 632.

Plaintiffs assert that there is no history and tradition justifying ordinances like the

City's that mandate the locked storage of firearms in the home regardless of the

circumstances, and the City cited none.

In any event, the City cannot justify its extreme locked-storage requirement

on so few marginally relevant Framing-era ordinances. *Id.* at 632. This is

especially clear considering that the modern gun storage provisions of nearly

every other jurisdiction come nowhere close to the restriction the City imposes in

requiring locked storage at all times. Addend. 3-12, 14-20, 24-27.[9] Indeed, the locked-storage requirement most similar to the City's was struck down in *Heller*. *Id.* at 635.

Further, *Heller* cited no examples of laws requiring law-abiding citizens to keep firearms locked or disabled in the home under any circumstances. If there had been historical evidence suggesting the government had such authority, the dissent surely would have cited it and the majority would have addressed it.

Accordingly, Section 4512 violates the Second Amendment.

## 2. The Locked-Storage Law Fails Heightened Means-End Review

Under strict scrutiny, the City must show its locked-storage law is "narrowly tailored to serve a compelling state interest." *Reno*, 507 U.S. at 301-02. And to pass muster under intermediate scrutiny, the City still must establish that its law is substantially related to an important governmental objective and represents a tight "fit" between the law and the government interest, a fit "that employs not necessarily the least restrictive means but . . . a means *narrowly tailored* to achieve the desired objective." *Bd. of Trs. of State Univ. of N.Y. v. Fox*, 492 U.S.

---

[9] Aside from the City, Massachusetts has the most extreme locked-storage requirement, but even that law expressly allows its residents to have their arms unlocked and available for self-defense emergencies, if the firearms are under their control. *See* Mass. Gen. Laws ch. 140, § 131L (Addend. 13).

469, 480 (1989) (emphasis added). *See supra* Part II.C.

The City has no legitimate – let alone compelling – interest in requiring its residents to lock up their handguns at all times when not carried. The City's asserted public safety interests are not directly advanced by such an extreme restriction. Indeed, it makes residents *less* safe insomuch as it hinders access to their handguns when they are at the greatest risk for criminal attack. *See supra* n.7.

Even assuming the government interest in keeping firearms away from of unsupervised children or felons is sufficient, the City's law is not "narrowly tailored." It keeps operable handguns out of the hands of competent, law-abiding adults at all times when not being carried – regardless of whether minors or felons or anyone else is present or has access to them.

Many states have *safe*-storage regulations that address the City's safety concerns above, but in a far less burdensome manner, with safe storage being a factor that absolves the gun owner of criminal liability if an unauthorized person gains access to and misuses the firearm, thus providing significant incentive for safe storage.[10] Such laws allow law-abiding adults to "keep" their arms operable and ready for use in case of confrontation under most circumstances. The City's restrictions come at the problem from the opposite perspective, with law-abiding

---

[10] *See* Addend. 3-12, 14-20, 24-27.

37

adults only able to "keep" operable handguns accessible when carrying them. That is impractical during waking hours and impossible while asleep. In effect, the City's law is little more than a self-defense exception, allowing one to unlock his or her guns after an attack begins – with potentially deadly consequences.

### 3. The Locked-Storage Law Is Invalid Under a Substantial Burden Test

Under the framework set forth in *Nordyke V*, Section 4512 is unconstitutional because it places a substantial burden on Plaintiffs' right to access and use arms for self-defense in the home. *See* 644 F.3d at 785-86. The City reaches into the sanctity of Plaintiffs' homes, dictating to them that they may not have an unlocked firearm available for immediate self-defense throughout the night, when they are at the greatest risk of criminal attack. The claim that the City's locked-storage law does not impose a substantial burden is untenable.

Section 4512 leaves Plaintiffs with *no* reasonable alternative to access arms quickly for self-defense when it is impractical or impossible to carry it on one's person. *See id.* at 787. The law requires Plaintiffs, under threat of criminal penalty, to choose between locking up their handguns or carrying them while awake. At night, when they are at greatest risk for attack, Plaintiffs' have no alternative; the handguns must remain locked up, for it is impossible to "carry" arms while

38

sleeping.

The district court misunderstood the burden on Plaintiffs' rights, finding that, in a "very narrow range of circumstances," the locked-storage law "theoretically" might interfere with Plaintiffs' ability to retrieve and use a handgun successfully in self-defense. But the burden Plaintiffs seek to enjoin is not "theoretical." Forcing residents to lock up their handguns whenever not carried on their person directly interferes with their access at *all* times. The court's misapprehension of the right led it to erroneously conclude that Section 4512 does not substantially burden Plaintiffs' core rights.

Thus, the law should have thus been deemed unconstitutional per se or, at minimum, subjected to strict scrutiny. And, as described above, the locked-storage law cannot survive *any* heightened scrutiny.

Finally, in reasoning that "*plaintiffs* ha[d] *not shown* the regulation to be overreaching or improper in any way, or that it fails to serve a legitimate governmental interest," E.R. I 007, the court further erred in failing to place the burden on the City to justify its restriction under the level of heightened scrutiny it did apply. *See, e.g.*, *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 664 (1994).

## IV. SECTION 613.10(g) VIOLATES THE SECOND AMENDMENT

The City lies at the extreme end of the gun control continuum by flatly

39

banning the retail sale of ammunition that is in common use for the core, lawful purpose of self-defense. A prohibition on these arms, whether imposed in the form of a possession ban or sales ban, is invalid under any standard of review.

**A.    The Second Amendment Protects Firearms and Ammunition that Are in Common Use for Lawful Purposes**

*Heller* and its progeny make clear that whether constitutional protections extend to various arms turns on their usage for lawful purposes. Arms "typically possessed by law-abiding citizens for lawful purposes" or those "in common use" are protected. *Heller*, 554 U.S. at 624-25 (citation and internal quotation marks omitted). And the right to keep and bear arms, as a matter of course, extends its protections to ammunition. "The right to keep arms necessarily involves the right to . . . provide ammunition" for them. *Andrews v. State*, 50 Tenn. 165, 178 (1871); *see also Bateman v. Perdue*, No. 5:10-265, 2012 WL 3068580, at *4 (E.D. N.C. Mar. 29, 2012). Moreover, the Second Amendment provides protections to ammunition that are "coextensive" with protections for firearms. *Herrington  v. United States*, 6 A.3d 1237, 1243 (D.C. Cir. 2010).

Since *Heller*, circuit courts have already looked to whether a type of ammunition, as well as certain ammunition feeding devices, are in "common use for lawful purposes" to determine Second Amendment protection. *See Kodak v.*

*Holder*, 342 F. App'x 907, 908-09 (4th Cir. 2009) (finding armor-piercing ammunition ban does not violate Second Amendment because it is not in common use); *Heller II*, 670 F.3d 1244, 1261 (examining whether magazines over ten rounds fall within Second Amendment according to common usage.) And this Court has even applied a common use analysis to firearms accessories that are not a necessary component of a firearm. *United States v. McCartney*, 357 F. App'x 73, 76 (9th Cir. 2009) (finding no Second Amendment right implicated because silencers are not "typically possessed for lawful purposes"). Plaintiffs are aware of no authority suggesting an alternative test determines Second Amendment protections for ammunition.

**B.     The Second Amendment Guarantees the Right to Purchase Protected Firearms and Ammunition**

In providing protection to arms in common use, the Second Amendment necessarily protects the purchase and sale of those same arms.

Fundamental rights protect the purchase of items protected by that right, regardless of whether that corollary appears directly in the text of the right itself. *See Richmond Newspapers v. Virginia*, 448 U.S. 555, 579-80 (1980). It is well settled that individuals have an inherent right to access constitutionally protected items. *See*, *e.g.*, *Carey v. Population Servs. Int'l*, 431 U.S. 678 (1977); *Griswold*

41

*v. Connecticut*, 381 U.S. 479, 485-86 (1965); *Brown v. Entm't Merchs. Ass'n*, __ U.S. __, 131 S. Ct. 2729, 2738 (2011); *Ashcroft v. Free Speech Coal.*, 535 U.S. 234 (2002).

In *Carey v. Population Services*, the Supreme Court noted that a significant restriction on contraceptive sales would violate that right "*as harshly as a direct ban on their use.*" 431 U.S. 678 at 687-688. (emphasis added.)

First Amendment cases are equally instructive. Restrictions on speaking or distributing information are unconstitutional not just because they infringe the speaker's right, but also because they infringe the recipient's right to acquire that information. *See Lamont v. Postmaster General*, 381 U.S. 301 (1965). "The right to speak would be largely ineffective if it did not include the right to engage in financial transactions that are the incidents of its exercise." *McConnell v. Fed. Election Comm'n*, 540 U.S. 93, 252 (2003) (Scalia, J., concurring in part and dissenting in part), *overruled on other grounds by, Citizens United v. Fed. Election Comm'n*, 540 U.S. 310 (2010).

The Second Amendment is no different. The right to arms necessarily involves the right to purchase firearms and ammunition. *Andrews*, 50 Tenn. at 178. The notion that commerce in arms is not protected by the Second Amendment is plainly untenable under *Heller*. *Marzzarella*, 614 F.3d at 92 n.8; *see also Bateman*,

2012 WL 3068580, at *4. As the Seventh Circuit recognized, banning the sale of arms would be the functional equivalent of a possession ban. *Martin v. Harrington & Richardson*, Inc., 743 F.2d 1200, 1204 (7th Cir.1984). A right to possess certain firearms and ammunition, without the right to acquire them, would be meaningless.

Accordingly, the City's sales ban curtails Second Amendment conduct if it reaches ammunition that is in common use for a lawful purpose.

### C. The Prohibited Ammunition is Protected by the Second Amendment Because it Is in Common Use for the Core, Lawful Purpose of Self-Defense

Section 613.10(g)(2)-(3) bans the sale of any ammunition "designed to expand . . . [or] fragment upon impact." Addend. 42-43. Such ammunition is typically referred to as hollow-point ammunition. E.R.III 231, 234. Section 613.10(g)(1) prohibits the sale of all ammunition that "serves no sporting purpose."[11] Although it is unclear on its face as to the ammunition the City intended to prohibit via subsection (1), it appears the class of ammunition banned by subsections (2)-(3), i.e., hollow-point ammunition, is the same ammunition prohibited by subsection (1). The City's subsequently enacted "findings"

---

[11] Whatever activities are covered by the City's "sporting purpose" qualification, defending oneself from violent crime is not among them.

43

ordinance, wherein the City refers to all ammunition prohibited by Section 613.10(g) as "enhanced-lethality ammunition," supports this understanding. S.F., Cal., Police Code art. 9, § 613.9.5 (Addend. 41). Subsections (2) and (3) of the "findings" ordinance, in turn, describe that ammunition as that which flattens, expands, or fragments upon impact, and refer to it specifically as hollow-point ammunition. Addend. 41.

*Heller* found a handgun ban categorically invalid without much debate over the uses of handguns, simply referring to them as the "quintessential" self-defense weapon. 554 U.S. at 629. Like the class of arms at issue in *Heller*, the class of ammunition the City has banned is in common use for the core, lawful purpose of self-defense. Although the City's "findings" ordinance includes an unsupported statement that the prohibited ammunition is not in "general use," Addend. 41, the City did not dispute its widespread use for self-defense in opposing Plaintiffs' Motion for Preliminary Injunction, E.R. II 117-22, and the record is devoid of any evidence supporting the City's findings.

Conversely, Plaintiffs submitted nineteen exhibits on this point. E.R. III 208-35, 259-305.[12] The public record on the City's "findings" ordinance also

---

[12] The District Court avoided an express acknowledgment that the prohibited ammunition is protected, instead concluding the City's retail sales ban is not a substantial burden on acquisition, even assuming it is protected. E.R. I 007.

44

included similar information, in the form of reports, articles, historical analyses, and statements from experts. E.R. III 208-26. The City disregarded this evidence. E.R. III 237-57.

Hollow-point ammunition is widely available in every state, there being no statewide ban on its sale or use,[13] and it is produced by nearly every major ammunition manufacturer. E.R. III 225-26. It is no secret that gun owners purchase the prohibited ammunition for self-defense. With its reduced risk of over-penetration and ricochet, and its ability to bring down a violent aggressor with fewer shots fired, hollow-point ammunition is especially preferred for home defense. Hollow points are marketed precisely for these reasons. E.R. III 291-305.[14] It is indeed the "quintessential" self-defense ammunition.[15]

It is also worthy of mention that the City's "no sporting purpose"

_____

[13]  New Jersey restricts the carry of hollow-point ammunition, but expressly allows for the sale of such ammunition for self-defense. N.J. Stat. Ann. § 2C:39-3(f)-(g) (Addend. 21-22.)

[14]  Police also prefer this ammunition for self-defense for the same reasons civilians do. E.R. III 262. If anything, a civilian's needs for effective self-defense ammunition are more acute, as they do not enjoy the comfort of having a partner or other officers available for backup, they are on their own.

[15]  Hollow points are also in widespread common use by hunters, as bullet expansion is a desired characteristic. E.R. III 234. And many states, including California, expressly *require* hollow points for these purposes. Addend. 28; E.R. III 276-89.

characterization conflicts with the Second Amendment's "central component" of individual self-defense. *McDonald*, 130 S. Ct. at 3036. And the Second Amendment protects firearms and ammunition in "common use" for lawful purposes – period. The City cannot impose additional "constitutional" conditions by requiring that commonly used ammunition also be used for some City-recognized "sporting purpose" before Plaintiffs may acquire it.

Accordingly, Section 613.10(g) prohibits the sale of protected ammunition.

### D. The City's Categorical Ban on the Retail Sale of Protected Ammunition is Unconstitutional and May Be Stricken Without Resort to Any Particular Standard of Review

In *Heller*, the Supreme Court announced that a categorical ban on the possession of arms in common use for self-defense would fail under any standard of review applied to fundamental rights. *Heller*, 554 U.S. at 628-29. *Heller* would mean very little if the government was free to prohibit gun stores from selling handguns.

It is a fundamental principle of both law and logic that, where the constitution protects the use of a particular item or service, a ban on commercial transactions in that item or service will be an unconstitutional infringement of that right, regardless of the standard of review. To this end, the courts may forego adoption of a standard of review when striking egregious restrictions on

possession or acquisition of protected items and services. In *Reliable Consultants, Inc. v. Earle*, 517 F.3d 738, 741, 747 (2008), the Fifth Circuit did so in overturning a Texas statute criminalizing the sale of sex toys. The Supreme Court similarly declared a ban on contraceptives unconstitutional without resorting to a particular standard of review. *Griswold v. Connecticut*, 381 U.S. 479 (1965). And in *Lamonte v. Postmaster General*, 381 U.S. 301 (1965), the Supreme Court held that a restriction on access to materials the government deemed "communist political propaganda" was simply "an unconstitutional abridgement" of First Amendment rights. *Id.* at 307.

When courts have selected a standard of review for sales bans and broad restrictions on access, they have routinely done so without consequence. *See, e.g.*, *Carey*, 431 U.S. at 689-91 (ban on contraceptive sales does not survive strict scrutiny); *Casey*, 505 U.S. at 898 (spousal notice requirement for abortion poses an undue burden); *Ezell*, 651 F.3d at 708 (firing ranges ban unconstitutional under "not quite strict scrutiny"); *Vincenty v. Bloomberg*, 476 F.3d 74, 85 (2d Cir. 2007) (striking restriction on sale of spray paint under intermediate scrutiny); *but see Heller II*, 670 F.3d at 1262-64.[16]

---

[16] *See infra* Part IV.E.2.a (distinguishing *Heller II* and discussing the impropriety of applying intermediate scrutiny to the City's ammunition ban).

47

The Second Amendment is not a second-class right. *McDonald,* 130 S. Ct. at 3044. Just as in other constitutional contexts where the government may not stifle sales as a means of frustrating possession, the City may not deter use of protected ammunition by so drastically restricting Plaintiffs' ability to purchase it.

### E.     Section 613.10 Conflicts with the Second Amendment Under Any Test the Court May Apply

Should the Court elect to adopt a particular standard of review, Section 613.10(g) fails to pass constitutional muster because it not only substantially burdens access to protected ammunition – it *bans* it outright. It does so without any historical support, and it is not narrowly tailored to further the City's public safety concerns.

### 1.     The Ammunition Ban Fails Under a Textual, Historical Analysis

As an initial matter, the district court erred in failing to apply a textual, historical analysis to evaluate Section 613.10(g). The Supreme Court has already clarified that those arms in common use for lawful purposes are protected, as supported by a textual understanding of the Second Amendment. *Heller*, 554 U.S. at 624-25. The government thus bears the burden of providing historical justification for its ban, either in the form of commonplace prohibitions or similar

48

historical analogues. *Heller II*, 670 F.3d at 1273-74 (Kavanaugh, J., dissenting) (citing *Heller*, 554 U.S. at 626-27, 635); *see also supra* Part II.A.

In the district court, the City cited to three laws barring sale of *handguns* – the very arms *Heller* deemed specifically protected. E.R. II 118. It strains all sense of reason to suggest these statutes would survive review post-*Heller*. These laws, unconstitutional in their own right, cannot be used to prop up the City's categorical sales ban.

The remaining historical regulations the City cited to support its ban on common self-defense ammunition are equally telling. Not one of them prohibits arms that are in common use. Instead, they prohibit the sale of uncommon armor-piercing, explosive, and incendiary ammunition – ammunition that is unlikely to be in widespread use for lawful purposes. E.R. II 118-19.  Nothing in *Helle*r suggests that a law banning commonly used arms is supported by a history of laws banning uncommon arms. To the contrary, *Heller* struck down the District's handgun ban despite the fact that classes of firearms unlikely to be in widespread use, such as machine guns and short-barreled rifles, had long been prohibited. 554 U.S. at 624-25, 627. Accordingly, Section 613.10(g) lacks historical justification and is invalid.

### 2. The Ammunition Ban Fails Heightened Means-End Review

Under either strict or intermediate scrutiny, the City's approach to regulating protected ammunition – banning retailers from selling it entirely – lacks the required fit with its public safety objectives.

### a. Precedent Concerning Bans on Protected Items Commands Strict Scrutiny

The Supreme Court has consistently reviewed laws barring the retail sale of constitutionally protected items under strict scrutiny. In 1977, the Supreme Court subjected a ban on the sale of contraceptives to strict scrutiny. *Carey*, 431 U.S. at 689-91. In 2002, the Supreme Court affirmed this Court's application of strict scrutiny to a statute that banned distribution of virtual pornographic materials. *Free Speech Coal. v. Reno*, 198 F.3d 1083, 1095 (9th Cir. 1999), *aff'd sub nom*. *Ashcroft v. Free Speech Coal.*, 535 U.S. 234 (2002). And in 2011, the Supreme Court applied strict scrutiny to a retail sales restriction on protected video games. *Brown v. Entm't Merchs. Ass'n*, 131 S. Ct. at 2738.

*Heller* and its progeny also dictate in favor of strict scrutiny if a means-end model is used. Section 613.10(g) is not a mere regulation, or a "condition" or "qualification" on the sale of arms. *See Heller*, 554 U.S. at 626-27 & n.26. It does not target criminals, unprotected arms, the use of arms for some fringe purpose, or

50

even the carry of firearms outside the home. *See supra* Part II.C.; *see also Bateman*, 2012 WL 3068580, at *5 (applying strict scrutiny to law targeting neither criminals nor those posing public safety concerns). Rather, Section 613.10(g) imposes a categorical sales ban on common ammunition, used for not only lawful purposes, but for the *core*, lawful purpose of self-defense, by law-abiding citizens.

Controlling precedent notwithstanding, the Eleventh Circuit in *Heller II* applied intermediate scrutiny to a ban on "assault weapons" and magazines holding more than ten rounds. 670 F.3d at 1262-64. *Heller II* presents a stark departure from decades of judicial assessments of the government's ability to prohibit constitutionally protected items and a defiant rejection of *Heller*'s guidance as to the categories of arms the government may permissibly ban. In any event, *Heller II* does not preclude, and in fact supports, the application of strict scrutiny here. In deciding upon intermediate scrutiny, the *Heller II* court found it important that there was little to suggest the prohibited items were "well-suited to or preferred for the purpose of self-defense or sport." *Id*. at 1262. Setting aside the Supreme Court's express instruction that arms need only be in common use by law-abiding citizens, hollow-point ammunition is in fact both well-suited and preferred for self-defense and sport. It is not only chosen on a widespread scale for

51

self-defense, it is preferred precisely because of its superior effectiveness for this purpose, particularly in the home. E.R. III 225-35, 259-74, 291-305. And California not only prefers hunters use hollow-point ammunition – it *require*s it. E.R. III 289.

In light of precedent concerning bans on protected items, and because Section 613.10(g) severely burdens the right to access protected ammunition, the district court erred in declining to apply strict scrutiny.

> **b. The Ammunition Ban Violates the Second Amendment Under Both Strict and Intermediate Scrutiny**

Under strict scrutiny, the government "must have had a strong basis in evidence to support" its infringement on a constitutional right. *Shaw v. Hunt*, 517 U.S. 899, 908 n.4 (1996). Even under intermediate scrutiny, the government cannot "get away with shoddy data or reasoning." *City of Los Angeles v. Alameda Books*, Inc., 535 U.S. 425, 426 (2002).

Here, the City failed to establish the "strong basis" for its infringement of Plaintiffs' constitutional rights. And the City's post-hoc conclusory statement that the ammunition is "not in general use," in the face of the wealth of evidence to the contrary, amounts to the "shoddy data or reasoning" that the Constitution forbids. Moreover, the City's description of the injuries caused by the prohibited

52

ammunition cannot save its ordinance. Addend. 41.[17] The City could likewise pass findings describing injuries from shotgun wounds – but such descriptions would not allow it to ban them from sale.

What is more, there is no indication that banning hollow points increases safety. To the contrary, in opting to prohibit its sale, the City promotes the sale and use of "fully-jacketed" ammunition that is more likely to ricochet and over-penetrate attackers or building materials. E.R. III 228. And the use of full metal jacket ammunition in self-defense increases the number of shots that must be fired in order to stop an attacker. E.R. III 231, 268, 270, 273-74. Hollow-point ammunition reduces each of these factors, making the public more safe, not less. E.R. III 262.

Further, any public safety considerations must take into account the safety of those facing a violent attack. To this end, the characteristics of hollow-point ammunition that make it less likely to ricochet or over-penetrate and hit a bystander, also make the ammunition *more effective in stopping an attacker*. This characteristic is precisely why civilians regularly choose it for home defense. E.R.

---

[17] Injuries sustained from being shot with a particular type of firearm or ammunition do not determine constitutional protection. In any event, "medical examiners have been unable to show any difference in lethality between hollow-point" and solid core ammunition. E.R. III 262.

III 291-305. The City likewise ignored this information in adopting its "findings." E.R. III 238-52, 255-57.

Accordingly, the City has not justifed such a gross infringement on access to protected ammunition.

Even if the City could establish that Section 613.10(g) furthers the City's interests, the City's law is not narrowly tailored to those ends. *See Reno*, 507 U.S. at 301-02; *Bd. of Trustees of State Univ. of N.Y.*, 492 U.S. at 480. The City's blanket ban is far from the "least restrictive means" required under strict scrutiny. *Ashcroft v. Am. Civil Liberties Union*, 542 U.S. 656, 666-70 (2004). Nor is it tailored to be no "more extensive than is necessary to serve the state's interest" as it must under even intermediate scrutiny. *Cent. Hudson*, 447 U.S. at 599. One need not look far to find a host of effective regulations aimed at reducing misuse of the prohibited ammunition that pose a burden far lighter than the City's overreaching approach. *See, e.g.*, N.J. Stat. Ann. § 2C:39-3(f),(g) (Addend. 21-23) (prohibiting hollow points in public, but allowing purchases for home defense); S.F., Cal., Police Code art. 9, § 615(b) (Addend. 46-47) (registration of ammunition sales); S.B. 53, 2013-2014 Reg. Sess. (Cal. Dec. 20, 2012) (Addend. 61-72) (proposing background checks for ammunition purchasers); *see also supra* Part III.C.2 (discussing laws aimed at preventing access by minors and unauthorized users).

54

Finally, the government's public safety interests in banning handguns are virtually identical to the City's interests in banning hollow-point ammunition: To decrease violent injuries, whether through criminal misuse, accidents, or suicides, through "decreased availability" of those protected arms.[18] Despite these interests, *Heller* found the District's handgun ban unconstitutional – making clear that even if the Court *had* adopted a means-end standard of review, the City's ban on a class of arms in common use would be unconstitutional. *Id.* at 628-29.

Ultimately, the City's ammunition ban represents a policy choice as to the types of arms it desires its residents to have. But such policy choices are off the table when considering commonly used, constitutionally protected arms. *See id.* at 636.

### 3. The Ammunition Ban Is Invalid Under a Substantial Burden Analysis

Under the analysis set forth in *Nordyke V*, Section 613.10(g) is unconstitutional if it places a substantial burden on Plaintiffs' rights to protected arms, taking into consideration alternatives to exercise the right at issue. *See Nordyke V*, 644 F.3d at 785-86; *Nordyke*, 681 F.3d at 1045-46 (O'Scannlain, J.,

---

[18] The District of Columbia advanced these interests in *Heller*, 554 U.S. at 634, and the City itself advanced similar interests in support of its handgun ban. Addend 48-51.

concurring). Although *Heller* does not endorse this approach, the City's ammunition ban nonetheless must fall under this framework.

One would be hard pressed to find a more severe restriction on the right to purchase constitutionally protected goods than a law that prohibits licensed retailers from selling those very items. *Reliable Consultants*, 517 F.3d at 741, 742 & n.16, 744 (restriction on sale of sex toys, although not a total ban, "nevertheless *heavily burden*[*ed*] a constitutional right") (emphasis added).

Nevertheless, the City argued the court should uphold its ammunition sales ban because it "does not *substantially* burden Plaintiffs' rights," as it "allows San Franciscans either to buy th[e prohibited] ammunition online or at gun stores outside of San Francisco." E.R. II 119. The district court agreed, holding that even if the ammunition were protected, Plaintiffs "simply have not shown that prohibiting sales of such ammunition within City limits imposes a substantial burden on their ability to acquire it." E.R. I 007. This logic turns the entire notion of constitutional liberties on its head.

Imagine the litigation that would ensue if a government enacted legislation barring medical facilities from performing abortions or prohibiting bookstores from selling protected books. Then imagine the government defending such laws by claiming that it doesn't prohibit abortions, it merely prevents licensed medical

56

clinics from performing them; or by arguing it can entirely ban bookstores from selling protected books so long as they can be purchased via the internet or by traveling outside the city. That such restrictions would impose severe and unconstitutional burdens is a well-settled matter of law.

The idea that the constitutional harm that arises should be measured according to one's ability to exercise that right in another jurisdiction has been universally condemned. "[O]ne is not to have the exercise of his liberty of expression in appropriate places abridged on the plea that it may be exercised in some other place." *Schad v. Borough of Mt. Ephraim*, 452 U.S. 61, 76-77 (1982) (quoting *Schneider v. State*, 308 U.S. 147, 163 (1939)); *see also Islamic Ctr. of Miss., Inc. v. City of Starkville*, 840 F.2d 293 (5th Cir. 1988) (striking ordinance zoning mosques out of many parts of the city). Likewise, the constitutionality of an ordinance restricting abortions should consider "not whether the activity may be engaged in elsewhere, but whether it was constitutional to restrict it in the manner chosen by defendants." *West Side Women's Servs., Inc. v. City of Cleveland*, 573 F.Supp. 504, 518 (N.D. Ohio 1983).

This notion has already been sharply criticized in the Second Amendment domain. To assume "that the harm to a constitutional violation is measured by the

57

extent to which it can be exercised in another jurisdiction . . . [is] a *profoundly mistaken assumption*." *Ezell*, 651 F.3d at 697 (emphasis added).

The same is true here. Section 613.10(g) cannot avoid constitutional infirmity, or be deemed not to present a substantial burden, merely because it is "limited in its geographical scope." *West Side Women's Servs., Inc.*, 573 F. Supp. at 518.

Although the lower court considered the "alternative means to exercise the right" in the mistaken terms of the ability to purchase the prohibited ammunition elsewhere, Plaintiffs also address the City's assertion that the ability to purchase *other* ammunition should play into an analysis of whether the City's law imposes a substantial burden on Plaintiffs' rights. E.R. II 119.

This argument misunderstands the particular right at issue. It finds no support in *Heller*, and it directly contradicts established constitutional principles.

Plaintiffs do not merely wish to exercise their rights to access firearms and ammunition for self-defense, but to exercise their rights to purchase the class of ammunition the City has prohibited – because it is protected by the Second Amendment. Whether a law that bars access to protected arms is constitutional is not to be judged according to whether a different class of arms, not at issue, might be tolerated by the City. In *Heller*, the Court found a ban on handguns, a class of

58

weapons in common use for self-defense in the home, categorically invalid despite

the availability of long guns. 554 U.S. at 629. The Supreme Court did not require a

showing that shotguns, also widely used for home defense, were insufficient for

those purposes before overturning the handgun ban. The appellate court in *Parker*

(*Heller*) drove this point home:

> The District contends that since it only bans one type of firearm, "residents still have access to hundreds more," and thus its prohibition does not implicate the Second Amendment because it does not threaten total disarmament. *We think that argument frivolous.*

*Parker v. District of Columbia*, 478 F.3d 370, 400 (D.C. Cir. 2007) (emphasis

added).

Accordingly, the City's categorical ban on the sale of ammunition that is

preferred for in-home self-defense and is required for use by State hunting

regulations, violates the Second Amendment. Neither the ability to purchase

ammunition in other cities, nor the availability of other types of ammunition not

yet banned in San Francisco, alleviates this burden. The district court thus erred in

denying the preliminary injunction, and the Court should find Section 613.10(g)

unconstitutional per se or, at minimum, under a strict scrutiny analysis. *See supra*

Part II.C.

## V. THE REMAINING PRELIMINARY INJUNCTION FACTORS SUPPORT TEMPORARY RELIEF

Erroneously finding Plaintiffs had not proven they were likely to succeed on the merits, the district court did not consider seriously the remaining preliminary injunction factors. E.R. I 007-08. Instead, the court presumed some level of irreparable harm and hardship to Plaintiffs, but summarily cast such injury aside as insufficient to warrant preliminary relief. E.R. I 008. But because Plaintiffs are likely to succeed and the City's laws violate their fundamental rights, the remaining factors necessarily weigh in Plaintiffs' favor.

### A. Irreparable Harm Should Be Presumed Because the City's Laws Violate Plaintiffs' Second Amendment Rights

Generally, once a plaintiff shows a likelihood of success on the merits of a constitutional claim, irreparable harm is presumed. 11A Charles Alan Wright et al., *Federal Practice and Procedure* § 2948.1 (2d ed. 1995) ("When an alleged deprivation of a constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary."). The Ninth Circuit has routinely imported the First Amendment's "irreparable-if-only-for-a-minute" concept to cases involving other constitutional rights and, in doing so, have held a deprivation of these rights constitutes irreparable harm, per se. *Monterey Mech. Co. v. Wilson*, 125 F.3d 702, 715 (9th Cir. 1997). The Second Amendment should

60

be treated no differently. *See McDonald*, 130 S. Ct. at 3043, 3044; *see also Ezell*, 651 F.3d at 700 (holding that a deprivation of Second Amendment rights is "irreparable and having no adequate remedy at law").

Here, because Plaintiffs are likely to succeed on the merits of their Second Amendment claims, irreparable harm should have been presumed. But because the district court adopted an improper Second Amendment analytical framework and ultimately ruled that Plaintiffs were unlikely to succeed, it gave insufficient weight to the inherent harm inflicted when a person is denied the exercise of a constitutional right. E.R. I 008. Further, the court ignored the irreparable – and *deadly* – consequences that can arise when one's ability use arms in self-defense is restricted. E.R. I 008.

Because Plaintiffs have here established a likelihood of success on the merits of their constitutional claims, they have necessarily established irreparable harm sufficient to warrant preliminary relief.

### B. The Harms to Plaintiffs and the Public Far Outweigh Any Harm to the City

When plaintiffs challenge government action that affects the exercise of constitutional rights, "[t]he balance of equities and the public interest . . . tip *sharply* in favor of enjoining the ordinance." *Klein v. City of San Clemente*, 584

61

F.3d 1196, 1208 (9th Cir. 2009) (emphasis added). And, the City "cannot reasonably assert that [it] is harmed in any legally cognizable sense by being enjoined from constitutional violations." *Haynes v. Office of the Att'y Gen. Phill Kline*, 298 F. Supp. 2d 1154, 1160 (D. Kan. Oct. 26, 2004) (citing *Zepeda v. U.S. Immigration.*, 753 F.2d 719, 727 (9th Cir. 1983)).

Here, Plaintiffs seek to vindicate their fundamental Second Amendment rights. As the Ninth Circuit has made clear, "all citizens have a stake in upholding the Constitution" and have "concerns [that] are implicated when a constitutional right has been violated." *Preminger v. Principi*, 422 F.3d 815, 826 (9th Cir. 2005). Accordingly, not only Plaintiffs' rights are at stake, but so are the rights of all residents seeking to engage in Second Amendment conduct that is prohibited by the City's laws. The balance of equities and the public interest thus tip *sharply* in Plaintiffs' favor. *See Klein*, 584 F.3d at 1208. The court below failed to consider the severity of this harm, and instead presumed "some degree" of hardship to Plaintiffs, which it found insufficient to warrant relief. E.R. I 008. That finding is in direct conflict with the law in this Circuit, *Klein*, 584 F.3d at 1208, and it cannot stand.

Even absent the constitutional dimension of this lawsuit, the balance of harms tips in Plaintiffs' favor. The City can establish no harm to its interests as

neither law *actually* serves the public interest or increases public safety. *See supra* Parts III, IV. To the contrary, the City's laws make the public *less* secure. Section 4512 impedes access to operable handguns, putting residents at *greater* risk when faced with a self-defense emergency. *See supra* Part III.B; *see also* E.R. II 161-84. And Section 613.10(g) limits access to common and effective self-defense ammunition, while promoting the use of ammunition known to over-penetrate and ricochet, placing bystanders at *greater* risk of harm than that posed by the banned ammunition. *See supra* Part IV.C; *see also* E.R. III 231-35, 262-75.

Further, the City below claimed it has never enforced the challenged ordinances against any person. E.R. IV 512-13, 558-59, 565. While the City is presumed to enforce its laws, *Bland v. Fessler*, 88 F.3d 729, 737 (9th Cir. 1996), if the City's position is that it does not, then the requested injunction will cause it no harm. It will merely maintain what the City claims is the status quo. On the other hand, granting a preliminary injunction will end the ongoing violation of Plaintiffs' Second Amendment rights, allowing them the freedom to exercise those rights without fear of prosecution.

## **CONCLUSION**

This case is important, but not difficult. The City's restrictions exist at the extreme end of the gun-regulation continuum, they impinge upon the core right to

63

self-defense in the home, and present a total ban on the sale of ammunition protected by the Constitution. Plaintiffs respectfully request that this Court declare that the City's laws violate Plaintiffs' Second Amendment rights, reverse the order below, and remand with instructions to enter a permanent injunction consistent with Plaintiffs' prayer for relief.

## STATEMENT OF RELATED CASES

Pursuant to Circuit Rule 28-2.6, Plaintiffs assert that, while there are a number of Second Amendment cases currently before this Court, Plaintiffs do not deem any one sufficiently related to this case.

Date: February 7, 2013                                **MICHEL & ASSOCIATES, P.C.**


                                                     /s/ C. D. Michel
                                                     C. D. Michel
                                                     Attorney for Plaintiffs-Appellants

## <u>CERTIFICATE OF COMPLIANCE</u>

I hereby certify that the attached opening brief complies with Rule 32(a)(7)(C) of the Federal Rules of Appellate Procedure. According to the word count feature of the word-processing system used to prepare the brief, it contains 13972 words, exclusive of those matters that may be omitted under Rule 32(a)(7)(B)(iii).

I further certify that the attached brief complies with the typeface requirements of Rule 32(a)(5) and the type style requirements of Rule 32(a)(6). It was prepared in a proportionately spaced typeface using 14-point Times New Roman font in WordPerfect X5.

Date: February 7, 2013          MICHEL & ASSOCIATES, P.C.


/s/ C. D. Michel
C. D. Michel
Attorney for Plaintiffs-Appellants

65

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on February 7, 2013, an electronic PDF of

APPELLANTS' OPENING BRIEF was uploaded to the Court's CM/ECF system,

which will automatically generate and send by electronic mail a Notice of Docket

Activity to all registered attorneys participating in the case. Such notice constitutes

service on those registered attorneys.

Date: February 7, 2013     **MICHEL & ASSOCIATES, P.C.**

           /s/ C. D. Michel
           C. D. Michel
           Attorney for Plaintiffs-Appellants

# ADDENDUM

# **INDEX TO ADDENDUM**

**PAGE**

U.S. Const. Amend. II. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Addend. 1

U.S. Constitution, Article III. . . . . . . . . . . . . . . . . . . . . . . . . . . . . Addend. 2

Cal. Penal Code § 25100. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Addend. 3

Cal. Penal Code § 25105. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Addend. 4

Cal. Penal Code § 25200. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Addend. 5

Cal. Penal Code § 25205. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Addend. 7

Fla. Stat. §790.174. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Addend. 8

Haw. Rev. Stat. §134-10.5. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Addend. 8

Haw. Rev. Stat. § 707-714.5. . . . . . . . . . . . . . . . . . . . . . . . . . . . . Addend. 10

720 Ill. Comp. Stat. 5/24-9(a). . . . . . . . . . . . . . . . . . . . . . . . . . . Addend. 11

Iowa Code § 724.22(7). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Addend. 12

## INDEX TO ADDENDUM (CONT.)

**PAGE**

Mass. Gen. Laws ch. 140, § 131L . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Addend. 13

Md. Code Ann., Crim. Law § 4-104 . . . . . . . . . . . . . . . . . . . . . . . . . . . Addend. 14

Minn. Stat. § 609.666 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Addend. 16

N.C. Gen. Stat. § 14-315.1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Addend. 17

N.H. Rev. Stat. Ann. § 650-C:1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Addend. 18

N.J. Stat. Ann. § 2C:58-15 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Addend. 20

N.J. Stat. Ann. § 2C:39-3 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Addend. 21

R.I. Gen. Laws § 11-47-60.1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Addend. 24

Tex. Penal Code § 46.13 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Addend. 26

Wash. Admin. Code § 16-24-040 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Addend. 28

Act of March 1, 1783, ch.24, Massachusetts Statute . . . . . . . . . . . . . . Addend. 29

## **INDEX TO ADDENDUM (CONT.)**

**PAGE**

Act of April 13, 1784, ch. 28, New York Statute. . . . . . . . . . . . . . . . . . Addend. 32

Act of April 13, 1782, ch. DCCCCLVIII,
  sec. XLII, Pennsylvania Statute. . . . . . . . . . . . . . . . . . . . . . . . . . Addend. 36

Sacramento, Cal., City Code § 5.66.020. . . . . . . . . . . . . . . . . . . . . . . Addend. 40

S.F. Cal., Police Code art. 9 § 613.9.5. . . . . . . . . . . . . . . . . . . . . . . . Addend. 41

S.F. Cal., Police Code art. 9, § 613.10. . . . . . . . . . . . . . . . . . . . . . . . Addend. 42

S.F., Cal., Police Code § 615(b). . . . . . . . . . . . . . . . . . . . . . . . . . . . . Addend. 46

S.F. Cal., Police Code § art. 45, 4511. . . . . . . . . . . . . . . . . . . . . . . . . Addend. 48

S.F. Cal., Police Code § art. 45, 4512. . . . . . . . . . . . . . . . . . . . . . . . . Addend. 52

S.F., Cal., Ord. 55-06
(codified at S.F., Cal., Police Code, §§ 3600A, 3601A). . . . . . . . . . . . Addend. 54

S. B. 53, 2013-2014 Reg. Sess. (Cal. Dec. 20, 2012). . . . . . . . . . . . . . Addend. 61

Case: 12-17803, 02/07/2013, ID: 8505399, DktEntry: 8, Page 86 of 157

Amendment II. Right To Bear Arms; USCA CONST Amend. II

United States Code Annotated
  Constitution of the United States
    Annotated
      Amendment II. Right to Bear Arms

U.S.C.A. Const. Amend. II

Amendment II. Right To Bear Arms

Currentness

A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed.

Notes of Decisions (235)

U.S.C.A. Const. Amend. II, USCA CONST Amend. II
Current through P.L. 112-207 approved 12-7-12

**End of Document** © 2013 Thomson Reuters. No claim to original U.S. Government Works.

 © 2013 Thomson Reuters. No claim to original U.S. Government Works.

Addend.000001

United States Code Annotated
  Constitution of the United States
    Annotated
      Article III. The Judiciary (Refs & Annos)

U.S.C.A. Const. Art. III § 1

Section 1. Judicial Power, Tenure and Compensation

Currentness

**Section 1.** The judicial Power of the United States, shall be vested in one supreme Court, and in such inferior Courts as the Congress may from time to time ordain and establish. The Judges, both of the supreme and inferior Courts, shall hold their Offices during good Behaviour, and shall, at stated Times, receive for their Services, a Compensation, which shall not be diminished during their Continuance in Office.

Notes of Decisions (685)

U.S.C.A. Const. Art. III § 1, USCA CONST Art. III § 1
Current through P.L. 112-207 approved 12-7-12

**End of Document**

© 2013 Thomson Reuters. No claim to original U.S. Government Works.

Westlaw**Next**® © 2013 Thomson Reuters. No claim to original U.S. Government Works.

Addend.000002

West's Annotated California Codes
    Penal Code (Refs & Annos)
        Part 6. Control of Deadly Weapons (Refs & Annos)
            Title 4. Firearms (Refs & Annos)
                Division 4. Storage of Firearms (Refs & Annos)
                    Chapter 2. Criminal Storage of Firearm (Refs & Annos)

West's Ann.Cal.Penal Code § 25100

§ 25100. Criminal storage of firearm accessible to child; elements of crime

Effective: January 1, 2012

Currentness

(a) Except as provided in Section 25105, a person commits the crime of "criminal storage of a firearm of the first degree" if all of the following conditions are satisfied:

(1) The person keeps any loaded firearm within any premises that are under the person's custody or control.

(2) The person knows or reasonably should know that a child is likely to gain access to the firearm without the permission of the child's parent or legal guardian.

(3) The child obtains access to the firearm and thereby causes death or great bodily injury to the child or any other person.

(b) Except as provided in Section 25105, a person commits the crime of "criminal storage of a firearm of the second degree" if all of the following conditions are satisfied:

(1) The person keeps any loaded firearm within any premises that are under the person's custody or control.

(2) The person knows or reasonably should know that a child is likely to gain access to the firearm without the permission of the child's parent or legal guardian.

(3) The child obtains access to the firearm and thereby causes injury, other than great bodily injury, to the child or any other person, or carries the firearm either to a public place or in violation of Section 417.

**Credits**

(Added by Stats.2010, c. 711 (S.B.1080), § 6, operative Jan. 1, 2012.)

**Editors' Notes**

**LAW REVISION COMMISSION COMMENTS**

West's Annotated California Codes
  Penal Code (Refs & Annos)
    Part 6. Control of Deadly Weapons (Refs & Annos)
      Title 4. Firearms (Refs & Annos)
        Division 4. Storage of Firearms (Refs & Annos)
          Chapter 2. Criminal Storage of Firearm (Refs & Annos)

West's Ann.Cal.Penal Code § 25105

§ 25105. Exceptions to criminal storage of firearm accessible to child

Effective: January 1, 2012
Currentness

Section 25100 does not apply whenever any of the following occurs:

(a) The child obtains the firearm as a result of an illegal entry to any premises by any person.

(b) The firearm is kept in a locked container or in a location that a reasonable person would believe to be secure.

(c) The firearm is carried on the person or within close enough proximity thereto that the individual can readily retrieve and use the firearm as if carried on the person.

(d) The firearm is locked with a locking device, as defined in Section 16860, which has rendered the firearm inoperable.

(e) The person is a peace officer or a member of the Armed Forces or the National Guard and the child obtains the firearm during, or incidental to, the performance of the person's duties.

(f) The child obtains, or obtains and discharges, the firearm in a lawful act of self-defense or defense of another person.

(g) The person who keeps a loaded firearm on premises that are under the person's custody or control has no reasonable expectation, based on objective facts and circumstances, that a child is likely to be present on the premises.

**Credits**

(Added by Stats.2010, c. 711 (S.B.1080), § 6, operative Jan. 1, 2012. Amended by Stats.2011, c. 296 (A.B.1023), § 229; Stats.2011, c. 285 (A.B.1402), § 26.)

**Editors' Notes**

**LAW REVISION COMMISSION COMMENTS**

2010 Addition

WestlawNext © 2013 Thomson Reuters. No claim to original U.S. Government Works.

West's Annotated California Codes
  Penal Code (Refs & Annos)
    Part 6. Control of Deadly Weapons (Refs & Annos)
      Title 4. Firearms (Refs & Annos)
        Division 4. Storage of Firearms (Refs & Annos)
          Chapter 3. Storage of Firearm Where Child Obtains Access and Carries Firearm Off-Premises (Refs & Annos)

West's Ann.Cal.Penal Code § 25200

§ 25200. Storage of firearms accessed by children and carried off-premises; punishment; firearm deemed as used in the commission of any misdemeanor as provided in this code or any felony; off-premises defined

Effective: January 1, 2012
Currentness

(a) If all of the following conditions are satisfied, a person shall be punished by imprisonment in a county jail not exceeding one year, by a fine not exceeding one thousand dollars ($1,000), or by both that imprisonment and fine:

(1) The person keeps a pistol, revolver, or other firearm capable of being concealed upon the person, loaded or unloaded, within any premises that are under the person's custody or control.

(2) The person knows or reasonably should know that a child is likely to gain access to that firearm without the permission of the child's parent or legal guardian.

(3) The child obtains access to that firearm and thereafter carries that firearm off-premises.

(b) If all of the following conditions are satisfied, a person shall be punished by imprisonment in a county jail not exceeding one year, by a fine not exceeding five thousand dollars ($5,000), or by both that imprisonment and fine:

(1) The person keeps any firearm within any premises that are under the person's custody or control.

(2) The person knows or reasonably should know that a child is likely to gain access to the firearm without the permission of the child's parent or legal guardian.

(3) The child obtains access to the firearm and thereafter carries that firearm off-premises to any public or private preschool, elementary school, middle school, high school, or to any school-sponsored event, activity, or performance, whether occurring on school grounds or elsewhere.

(c) A pistol, revolver, or other firearm capable of being concealed upon the person that a child gains access to and carries off-premises in violation of this section shall be deemed "used in the commission of any misdemeanor as provided in this code or any felony" for the purpose of Section 29300 regarding the authority to confiscate firearms and other deadly weapons as a nuisance.

(d) As used in this section, "off-premises" means premises other than the premises where the firearm was stored.

**Credits**

(Added by Stats.2010, c. 711 (S.B.1080), § 6, operative Jan. 1, 2012.)

**Editors' Notes**

## LAW REVISION COMMISSION COMMENTS

2010 Addition

Subdivision (a) of Section 25200 continues former Section 12036(b) without substantive change.

Subdivision (b) continues former Section 12036(c) without substantive change.

Subdivision (c) continues former Section 12036(d) without substantive change.

Subdivision (d) continues former Section 12036(a)(3) without substantive change.

For circumstances in which this section does not apply, see Section 25205. For a provision requiring a firearms dealer to post a notice with warnings about firearm storage, see Section 26835.

See Sections 16520 ("firearm"), 16530 ("firearm capable of being concealed upon the person," "pistol," and "revolver"), 25000 ("child"). [38 Cal.L.Rev.Comm. Reports 217 (2009)].

West's Ann. Cal. Penal Code § 25200, CA PENAL § 25200
Current with all 2012 Reg.Sess. laws, Gov.Reorg.Plan No. 2 of 2011-2012, and all propositions on 2012 ballots.

© 2013 Thomson Reuters. No claim to original U.S. Government Works.

WestlawNext © 2013 Thomson Reuters. No claim to original U.S. Government Works.

West's Annotated California Codes
  Penal Code (Refs & Annos)
    Part 6. Control of Deadly Weapons (Refs & Annos)
      Title 4. Firearms (Refs & Annos)
        Division 4. Storage of Firearms (Refs & Annos)
          Chapter 3. Storage of Firearm Where Child Obtains Access and Carries Firearm Off-Premises (Refs & Annos)

West's Ann.Cal.Penal Code § 25205

§ 25205. Exceptions to unlawful storage of firearm accessed by child and carried off-premises

Effective: January 1, 2012
Currentness

Section 25200 does not apply if any of the following are true:

(a) The child obtains the firearm as a result of an illegal entry into any premises by any person.

(b) The firearm is kept in a locked container or in a location that a reasonable person would believe to be secure.

(c) The firearm is locked with a locking device, as defined in Section 16860, which has rendered the firearm inoperable.

(d) The firearm is carried on the person within close enough range that the individual can readily retrieve and use the firearm as if carried on the person.

(e) The person is a peace officer or a member of the Armed Forces or National Guard and the child obtains the firearm during, or incidental to, the performance of the person's duties.

(f) The child obtains, or obtains and discharges, the firearm in a lawful act of self-defense or defense of another person.

(g) The person who keeps a firearm has no reasonable expectation, based on objective facts and circumstances, that a child is likely to be present on the premises.

**Credits**
(Added by Stats.2010, c. 711 (S.B.1080), § 6, operative Jan. 1, 2012.)

**Editors' Notes**

**LAW REVISION COMMISSION COMMENTS**

2010 Addition

West's Florida Statutes Annotated
Title XLVI. Crimes (Chapters 775-899)
Chapter 790. Weapons and Firearms (Refs & Annos)

West's F.S.A. § 790.174

790.174. Safe storage of firearms required

Currentness

(1) A person who stores or leaves, on a premise under his or her control, a loaded firearm, as defined in s. 790.001, and who knows or reasonably should know that a minor is likely to gain access to the firearm without the lawful permission of the minor's parent or the person having charge of the minor, or without the supervision required by law, shall keep the firearm in a securely locked box or container or in a location which a reasonable person would believe to be secure or shall secure it with a trigger lock, except when the person is carrying the firearm on his or her body or within such close proximity thereto that he or she can retrieve and use it as easily and quickly as if he or she carried it on his or her body.

(2) It is a misdemeanor of the second degree, punishable as provided in s. 775.082 or s. 775.083, if a person violates subsection (1) by failing to store or leave a firearm in the required manner and as a result thereof a minor gains access to the firearm, without the lawful permission of the minor's parent or the person having charge of the minor, and possesses or exhibits it, without the supervision required by law:

(a) In a public place; or

(b) In a rude, careless, angry, or threatening manner in violation of s. 790.10.

This subsection does not apply if the minor obtains the firearm as a result of an unlawful entry by any person.

(3) [1] As used in this act, the term "minor" means any person under the age of 16.

**Credits**
Laws 1989, c. 89-534, §§ 2, 7. Amended by Laws 1997, c. 97-102, § 1216, eff. July 1, 1997.

Footnotes

1          Also published as § 784.05(4).

West's F. S. A. § 790.174, FL ST § 790.174

Current through Ch. 268 (End) of the 2012 2nd Reg. Sess. and the 2012 Extraordinary Apportionment Sess. of the Twenty-Second Legislature

---

**End of Document**

© 2013 Thomson Reuters. No claim to original U.S. Government Works.

West's Hawai'i Revised Statutes Annotated
Division 1. Government
Title 10. Public Safety and Internal Security
Chapter 134. Firearms, Ammunition and Dangerous Weapons
Part I. General Regulations

HRS § 134-10.5

[§ 134-10.5]. Storage of firearm; responsibility with respect to minors

Currentness

No person shall store or keep any firearm on any premises under the person's control if the person knows or reasonably should know that a minor is likely to gain access to the firearm without the permission of the parent or guardian of the minor, unless the person:

(1) Keeps the firearm in a securely locked box or other container or in a location that a reasonable person would believe to be secure; or

(2) Carries the firearm on the person or within such close proximity thereto that the person readily can retrieve and use it as if it were carried on the person.

For purposes of this section, "minor" means any person under the age of sixteen years.

**Credits**
Laws 1992, ch. 288, § 1.

H R S § 134-10.5, HI ST § 134-10.5
Current with amendments through Act 329 of the 2012 Regular Session.

---

**End of Document**                                           © 2013 Thomson Reuters. No claim to original U.S. Government Works.

---

West's Hawai'i Revised Statutes Annotated
　Division 5. Crimes and Criminal Proceedings
　　Title 37. Hawaii Penal Code
　　　Chapter 707. Offenses Against the Person
　　　　Part III. Criminal Assaults and Related Offenses

HRS § 707-714.5

[§ 707-714.5]. Criminally negligent storage of a firearm

Currentness

(1) A person commits the offense of criminally negligent storage of a firearm if the person violates section 134-10.5 and a minor obtains the firearm. For purposes of this section, "minor" means any person under the age of sixteen years.

(2) This section shall not apply if the minor obtains the firearm as a result of an unlawful entry to any premises by any person.

(3) Criminally negligent storage of a firearm is a misdemeanor.

**Credits**
Laws 1992, ch. 288, § 2.

**Editors' Notes**

COMMENTARY ON § 707-714.5

Act 288, Session Laws 1992, added this section to establish that a person can be found criminally negligent for storage of a firearm if a person keeps a firearm on the premises and the person knows or reasonably should know that a minor can gain access to the firearm without the permission of the parent or guardian and that the minor does obtain the firearm. Conference Committee Report No. 119.

H R S § 707-714.5, HI ST § 707-714.5
Current with amendments through Act 329 of the 2012 Regular Session.

　　　© 2013 Thomson Reuters. No claim to original U.S. Government Works.

WestlawNext © 2013 Thomson Reuters. No claim to original U.S. Government Works.　　　Addend.000010

West's Smith-Hurd Illinois Compiled Statutes Annotated
  Chapter 720. Criminal Offenses
    Criminal Code
      Act 5. Criminal Code of 2012 (Refs & Annos)
        Title III. Specific Offenses
          Part D. Offenses Affecting Public Health, Safety and Decency
            Article 24. Deadly Weapons (Refs & Annos)

720 ILCS 5/24-9

5/24-9. Firearms; Child Protection

Effective: January 1, 2000
Currentness

§ 24-9. Firearms; Child Protection.

(a) Except as provided in subsection (c), it is unlawful for any person to store or leave, within premises under his or her control, a firearm if the person knows or has reason to believe that a minor under the age of 14 years who does not have a Firearm Owners Identification Card is likely to gain access to the firearm without the lawful permission of the minor's parent, guardian, or person having charge of the minor, and the minor causes death or great bodily harm with the firearm, unless the firearm is:

  (1) secured by a device or mechanism, other than the firearm safety, designed to render a firearm temporarily inoperable; or

  (2) placed in a securely locked box or container; or

  (3) placed in some other location that a reasonable person would believe to be secure from a minor under the age of 14 years.

(b) Sentence. A person who violates this Section is guilty of a Class C misdemeanor and shall be fined not less than $1,000. A second or subsequent violation of this Section is a Class A misdemeanor.

(c) Subsection (a) does not apply:

  (1) if the minor under 14 years of age gains access to a firearm and uses it in a lawful act of self-defense or defense of another; or

  (2) to any firearm obtained by a minor under the age of 14 because of an unlawful entry of the premises by the minor or another person.

(d) For the purposes of this Section, "firearm" has the meaning ascribed to it in Section 1.1 of the Firearm Owners Identification Card Act. [1]

Iowa Code Annotated
    Title XVI. Criminal Law and Procedure [Chs. 687-915] (Refs & Annos)
        Subtitle 1. Crime Control and Criminal Acts [Chs. 687-747] (Refs & Annos)
            Chapter 724. Weapons (Refs & Annos)

I.C.A. § 724.22

724.22. Persons under twenty-one--sale, loan, gift, making available--possession

Currentness

1. Except as provided in subsection 3, a person who sells, loans, gives, or makes available a rifle or shotgun or ammunition for a rifle or shotgun to a minor commits a serious misdemeanor for a first offense and a class "D" felony for second and subsequent offenses.

2. Except as provided in subsections 4 and 5, a person who sells, loans, gives, or makes available a pistol or revolver or ammunition for a pistol or revolver to a person below the age of twenty-one commits a serious misdemeanor for a first offense and a class "D" felony for second and subsequent offenses.

3. A parent, guardian, spouse who is eighteen years of age or older, or another with the express consent of the minor's parent or guardian or spouse who is eighteen years of age or older may allow a minor to possess a rifle or shotgun or the ammunition therefor which may be lawfully used.

4. A person eighteen, nineteen, or twenty years of age may possess a firearm and the ammunition therefor while on military duty or while a peace officer, security guard or correctional officer, when such duty requires the possession of such a weapon or while the person receives instruction in the proper use thereof from an instructor who is twenty-one years of age or older.

5. A parent or guardian or spouse who is twenty-one years of age or older, of a person fourteen years of age but less than twenty-one may allow the person to possess a pistol or revolver or the ammunition therefor for any lawful purpose while under the direct supervision of the parent or guardian or spouse who is twenty-one years of age or older, or while the person receives instruction in the proper use thereof from an instructor twenty-one years of age or older, with the consent of such parent, guardian or spouse.

6. For the purposes of this section, caliber .22 rimfire ammunition shall be deemed to be rifle ammunition.

7. It shall be unlawful for any person to store or leave a loaded firearm which is not secured by a trigger lock mechanism, placed in a securely locked box or container, or placed in some other location which a reasonable person would believe to be secure from a minor under the age of fourteen years, if such person knows or has reason to believe that a minor under the age of fourteen years is likely to gain access to the firearm without the lawful permission of the minor's parent, guardian, or person having charge of the minor, the minor lawfully gains access to the firearm without the consent of the minor's parent, guardian, or person having charge of the minor, and the minor exhibits the firearm in a public place in an unlawful manner, or uses the firearm unlawfully to cause injury or death to a person. This subsection does not apply if the minor obtains the firearm as a result of an unlawful entry by any person. A violation of this subsection is punishable as a serious misdemeanor.

WestlawNext © 2013 Thomson Reuters. No claim to original U.S. Government Works.

Massachusetts General Laws Annotated
Part I. Administration of the Government (Ch. 1-182)
Title XX. Public Safety and Good Order (Ch. 133-148A)
Chapter 140. Licenses (Refs & Annos)

M.G.L.A. 140 § 131L

§ 131L. Weapons stored or kept by owner; inoperable by any
person other than owner or lawfully authorized user; punishment

Currentness

(a) It shall be unlawful to store or keep any firearm, rifle or shotgun including, but not limited to, large capacity weapons, or machine gun in any place unless such weapon is secured in a locked container or equipped with a tamper-resistant mechanical lock or other safety device, properly engaged so as to render such weapon inoperable by any person other than the owner or other lawfully authorized user. For purposes of this section, such weapon shall not be deemed stored or kept if carried by or under the control of the owner or other lawfully authorized user.

(b) A violation of this section shall be punished, in the case of a firearm, rifle or shotgun that is not a large capacity weapon, by a fine of not less than $500 nor more than $5,000 or by imprisonment for not more than one year, or by both such fine and imprisonment, and in the case of a large capacity weapon or machine gun, by a fine of not less than $1,000 nor more than $10,000 or by imprisonment for not less than one year nor more than ten years, or by both such fine and imprisonment.

(c) A violation of this section shall be punished, in the case of a rifle or shotgun that is not a large capacity weapon and such weapon was stored or kept in a place where a person under the age of 18 who does not possess a valid firearm identification card issued under section 129B may have access without committing an unforeseeable trespass, by a fine of not less than $1,000 nor more than $10,000 or by imprisonment for not less than one year nor more than ten years, or by both such fine and imprisonment.

(d) A violation of this section shall be punished, in the case of a rifle or shotgun that is a large capacity weapon, firearm or machine gun was stored or kept in a place where a person under the age of 18 may have access, without committing an unforeseeable trespass, by a fine of not less than $5,000 nor more than $10,000 or by imprisonment for not less than two and one-half years, nor more than ten years, or by both such fine and imprisonment.

(e) A violation of the provisions of this section shall be evidence of wanton or reckless conduct in any criminal or civil proceeding if a person under the age of 18 who was not a trespasser or was a foreseeable trespasser acquired access to a weapon, unless such person possessed a valid firearm identification card issued under section 129B and was permitted by law to possess such weapon, and such access results in the personal injury to or the death of any person.

(f) This section shall not apply to the storage or keeping of any firearm, rifle or shotgun with matchlock, flintlock, percussion cap or similar type of ignition system manufactured in or prior to the year 1899, or to any replica of any such firearm, rifle or shotgun if such replica is not designed or redesigned for using rimfire or conventional centerfire fixed ammunition.

**Credits**
Added by St.1998, c. 180, § 47. Added by St.1999, c. 1, § 4.

West's Annotated Code of Maryland
Criminal Law (Refs & Annos)
Title 4. Weapon Crimes
Subtitle 1. General Provisions

MD Code, Criminal Law, § 4-104
Formerly cited as MD CODE Art. 27, § 36K

§ 4-104. Child's access to firearms

Currentness

**Definitions**

(a)(1) In this section the following words have the meanings indicated.

(2) "Ammunition" means a cartridge, shell, or other device containing explosive or incendiary material designed and intended for use in a firearm.

(3) "Child" means an individual under the age of 16 years.

(4)(i) "Firearm" means a handgun, rifle, shotgun, short-barreled rifle, or short-barreled shotgun, as those terms are defined in § 4-201 of this title, or any other firearm.

(ii) "Firearm" does not include an antique firearm as defined in § 4-201 of this title.

**Exceptions**

(b) This section does not apply if:

(1) the child's access to a firearm is supervised by an individual at least 18 years old;

(2) the child's access to a firearm was obtained as a result of an unlawful entry;

(3) the firearm is in the possession or control of a law enforcement officer while the officer is engaged in official duties; or

(4) the child has a certificate of firearm and hunter safety issued under § 10-301.1 of the Natural Resources Article.

**Prohibited**

(c) A person may not store or leave a loaded firearm in a location where the person knew or should have known that an unsupervised child would gain access to the firearm.

**Penalty**

(d) A person who violates this section is guilty of a misdemeanor and on conviction is subject to a fine not exceeding $1,000.

**Effect of violation**

(e)(1) A violation of this section may not:

    (i) be considered evidence of negligence;

    (ii) be considered evidence of contributory negligence;

    (iii) limit liability of a party or an insurer; or

    (iv) diminish recovery for damages arising out of the ownership, maintenance, or operation of a firearm or ammunition.

    (2) A party, witness, or lawyer may not refer to a violation of this section during a trial of a civil action that involves property damage, personal injury, or death.

**Credits**

Added by Acts 2002, c. 26, § 2, eff. Oct. 1, 2002.

**Formerly** Art. 27, § 36K.

**Editors' Notes**

**LEGISLATIVE NOTES**

Revisor's Note (Acts 2002, c. 26):

    This section is new language derived without substantive change from former Art. 27, § 36K.

    Throughout this section, the defined term "child" is substituted for the term "minor" that was defined by former Art. 27, § 36K(a)(3) to mean an individual under the age of 16 years, to avoid confusion with the term "minor" that is defined in § 1-101 of this article to mean an individual under the age of 18 years.

    In subsection (a)(4) of this section, the reference to a "handgun" is substituted for the former references to a "pistol" and a "revolver" for consistency within this article.

    Also in subsection (a)(4) of this section, the reference to a handgun, rifle, shotgun, short-barreled rifle, or short-barreled shotgun "as those terms are defined in § 4-201 of this title" is added for clarity.

    In subsection (c) of this section, the former phrase "[e]xcept as provided in this section" is deleted in light of the express language in subsection (b) of this section providing exceptions to this section.

Minnesota Statutes Annotated
    Crimes, Criminals (Ch. 609-624)
        Chapter 609. Criminal Code (Refs & Annos)
        Crimes Against Public Safety and Health

M.S.A. § 609.666

609.666. Negligent storage of firearms

Currentness

**Subdivision 1. Definitions.** For purposes of this section, the following words have the meanings given.

(a) "Firearm" means a device designed to be used as a weapon, from which is expelled a projectile by the force of any explosion or force of combustion.

(b) "Child" means a person under the age of 18 years.

(c) "Loaded" means the firearm has ammunition in the chamber or magazine, if the magazine is in the firearm, unless the firearm is incapable of being fired by a child who is likely to gain access to the firearm.

**Subd. 2. Access to firearms.** A person is guilty of a gross misdemeanor who negligently stores or leaves a loaded firearm in a location where the person knows, or reasonably should know, that a child is likely to gain access, unless reasonable action is taken to secure the firearm against access by the child.

**Subd. 3. Limitations.** Subdivision 2 does not apply to a child's access to firearms that was obtained as a result of an unlawful entry.

**Credits**
Laws 1993, c. 326, art. 1, § 18. Amended by Laws 1996, c. 408, art. 4, § 11.

**Editors' Notes**

### RULES OF CRIMINAL PROCEDURE

<Section 480.059, subd. 7, provides in part that statutes which relate to substantive criminal law found in chapter 609, except for sections 609.115 and 609.145, remain in full force and effect notwithstanding the Rules of Criminal Procedure.>

M. S. A. § 609.666, MN ST § 609.666
Current through the end of the 2012 First Special Session

**End of Document** © 2013 Thomson Reuters. No claim to original U.S. Government Works.

West's North Carolina General Statutes Annotated
    Chapter 14. Criminal Law
        Subchapter XI. General Police Regulations
        Article 39. Protection of Minors

N.C.G.S.A. § 14-315.1

§ 14-315.1. Storage of firearms to protect minors

Currentness

(a) Any person who resides in the same premises as a minor, owns or possesses a firearm, and stores or leaves the firearm (i) in a condition that the firearm can be discharged and (ii) in a manner that the person knew or should have known that an unsupervised minor would be able to gain access to the firearm, is guilty of a Class 1 misdemeanor if a minor gains access to the firearm without the lawful permission of the minor's parents or a person having charge of the minor and the minor:

(1) Possesses it in violation of G.S. 14-269.2(b);

(2) Exhibits it in a public place in a careless, angry, or threatening manner;

(3) Causes personal injury or death with it not in self defense; or

(4) Uses it in the commission of a crime.

(b) Nothing in this section shall prohibit a person from carrying a firearm on his or her body, or placed in such close proximity that it can be used as easily and quickly as if carried on the body.

(c) This section shall not apply if the minor obtained the firearm as a result of an unlawful entry by any person.

(d) "Minor" as used in this section means a person under 18 years of age who is not emancipated.

**Credits**

Added by Laws 1993, c. 558, § 2, eff. Dec. 1, 1993. Amended by Laws 1994 (1st Ex. Sess.), c. 14, § 11, eff. Oct. 1, 1994.

Notes of Decisions (3)

N.C.G.S.A. § 14-315.1, NC ST § 14-315.1
The statutes and Constitution are current through the end of the 2012 Regular Session.

---

**End of Document**                                        © 2013 Thomson Reuters. No claim to original U.S. Government Works.

Revised Statutes Annotated of the State of New Hampshire
Title LXII. Criminal Code (Ch. 625 to 651-F) (Refs & Annos)
Chapter 650-C. Negligent Storage of Firearms (Refs & Annos)

N.H. Rev. Stat. § 650-C:1

650-C:1 Negligent Storage of Firearms.

Currentness

I. Nothing in this section shall be construed to reduce or limit any existing right to purchase and own firearms or ammunition, or both, or to provide authority to any state or local agency to infringe upon the privacy of any family, home or business except by lawful warrant.

II. As used in this section, "child," "juvenile" or "youth" shall mean any person under 16 years of age.

III. Any person who stores or leaves on premises under that person's control a loaded firearm, and who knows or reasonably should know that a child is likely to gain access to the firearm without the permission of the child's parent or guardian, is guilty of a violation if a child gains access to a firearm and:

(a) The firearm is used in a reckless or threatening manner;

(b) The firearm is used during the commission of any misdemeanor or felony; or

(c) The firearm is negligently or recklessly discharged.

IV. Any person who violates paragraph III shall be fined not more than $1,000.

V. This section shall not apply whenever any of the following occurs:

(a) The child has completed firearm safety instructions by a certified firearms safety instructor or has successfully completed a certified hunter safety course.

(b) The firearm is kept secured in a locked box, gun safe, or other secure locked space, or in a location which a reasonable person would believe to be secure, or is secured with a trigger lock or similar device that prevents the firearm from discharging.

(c) The firearm is carried on the person or within such a close proximity thereto so that the individual can readily retrieve and use the firearm as if carried on the person.

(d) The child obtains or obtains and discharges the firearm in a lawful act of self-defense or defense of another person.

WestlawNext © 2013 Thomson Reuters. No claim to original U.S. Government Works.

(e) The person who keeps a loaded firearm on any premises which are under such person's custody or control has no reasonable expectation, based on objective facts and circumstances, that a child is likely to be present on the premises.

(f) The child obtains the firearm as a result of an illegal entry of any premises by any person or an illegal taking of the firearm from the premises of the owner without permission of the owner.

VI. A parent or guardian of a child who is injured or who dies of an accidental shooting shall be prosecuted under this section only in those instances in which the parent or guardian behaved in a grossly negligent manner.

VII. Licensees shall conspicuously post at each purchase counter the following warning in bold type not less than one inch in height: "IT IS IMPORTANT THAT THE OWNER OF A FIREARM SEEK FIREARM SAFETY INSTRUCTIONS FROM A CERTIFIED FIREARMS INSTRUCTOR AND KEEP FIREARMS SECURED FROM UNAUTHORIZED USE." A licensee failing to display this warning to the purchaser of a firearm shall be guilty of a violation.

Copyright © 2013 by the State of New Hampshire Office of the Director of Legislative Services and Thomson Reuters/West 2013.

N.H. Rev. Stat. § 650-C:1, NH ST § 650-C:1

Updated with laws current through Chapter 1 of the 2013 Reg. Sess., not including changes and corrections made by the State of New Hampshire, Office of Legislative Services

---

**End of Document**

© 2013 Thomson Reuters. No claim to original U.S. Government Works.

 © 2013 Thomson Reuters. No claim to original U.S. Government Works.

New Jersey Statutes Annotated
    Title 2C. The New Jersey Code of Criminal Justice (Refs & Annos)
        Subtitle 3. Sentencing
            Chapter 58. Licensing and Other Provisions Relating to Firearms (Refs & Annos)

N.J.S.A. 2C:58-15

2C:58-15. Access by minors to loaded firearm; disorderly persons offense; exceptions

Currentness

a. A person who knows or reasonably should know that a minor is likely to gain access to a loaded firearm at a premises under the person's control commits a disorderly persons offense if a minor gains access to the firearm, unless the person:

(1) Stores the firearm in a securely locked box or container;

(2) Stores the firearm in a location which a reasonable person would believe to be secure; or

(3) Secures the firearm with a trigger lock.

b. This section shall not apply:

(1) To activities authorized by section 14 of P.L.1979, c. 179 (C. 2C:58-6.1), concerning the lawful use of a firearm by a minor; or

(2) Under circumstances where a minor obtained a firearm as a result of an unlawful entry by any person.

c. As used in this act, "minor" means a person under the age of 16.

**Credits**
L.1991, c. 397, § 1, eff. Jan. 17, 1992.

Notes of Decisions (1)

N. J. S. A. 2C:58-15, NJ ST 2C:58-15
Current with laws effective through L.2012, c. 80 and J.R. No. 5.

---

**End of Document**                                              © 2013 Thomson Reuters. No claim to original U.S. Government Works.

New Jersey Statutes Annotated
  Title 2C. The New Jersey Code of Criminal Justice (Refs & Annos)
    Subtitle 2. Definition of Specific Offenses
      Part 5. Offenses Against Public Order, Health and Decency
        Chapter 39. Firearms, Other Dangerous Weapons and Instruments of Crime (Refs & Annos)

N.J.S.A. 2C:39-3

2C:39-3. Prohibited weapons and devices

Effective: September 3, 2003

Currentness

**a. Destructive devices.** Any person who knowingly has in his possession any destructive device is guilty of a crime of the third degree.

**b. Sawed-off shotguns.** Any person who knowingly has in his possession any sawed-off shotgun is guilty of a crime of the third degree.

**c. Silencers.** Any person who knowingly has in his possession any firearm silencer is guilty of a crime of the fourth degree.

**d. Defaced firearms.** Any person who knowingly has in his possession any firearm which has been defaced, except an antique firearm or an antique handgun, is guilty of a crime of the fourth degree.

**e. Certain weapons.** Any person who knowingly has in his possession any gravity knife, switchblade knife, dagger, dirk, stiletto, billy, blackjack, metal knuckle, sandclub, slingshot, cestus or similar leather band studded with metal filings or razor blades imbedded in wood, ballistic knife, without any explainable lawful purpose, is guilty of a crime of the fourth degree.

**f. Dum-dum or body armor penetrating bullets.** (1) Any person, other than a law enforcement officer or persons engaged in activities pursuant to subsection f. of N.J.S.2C:39-6, who knowingly has in his possession any hollow nose or dum-dum bullet, or (2) any person, other than a collector of firearms or ammunition as curios or relics as defined in Title 18, United States Code, section 921 (a) (13) and has in his possession a valid Collector of Curios and Relics License issued by the Bureau of Alcohol, Tobacco and Firearms, who knowingly has in his possession any body armor breaching or penetrating ammunition, which means: (a) ammunition primarily designed for use in a handgun, and (b) which is comprised of a bullet whose core or jacket, if the jacket is thicker than .025 of an inch, is made of tungsten carbide, or hard bronze, or other material which is harder than a rating of 72 or greater on the Rockwell B. Hardness Scale, and (c) is therefore capable of breaching or penetrating body armor, is guilty of a crime of the fourth degree. For purposes of this section, a collector may possess not more than three examples of each distinctive variation of the ammunition described above. A distinctive variation includes a different head stamp, composition, design, or color.

**g. Exceptions.** (1) Nothing in subsection a., b., c. , d., e., f., j. or k. of this section shall apply to any member of the Armed Forces of the United States or the National Guard, or except as otherwise provided, to any law enforcement officer while actually on duty or traveling to or from an authorized place of duty, provided that his possession of the prohibited weapon or device has been duly authorized under the applicable laws, regulations or military or law enforcement orders. Nothing in subsection

h. of this section shall apply to any law enforcement officer who is exempted from the provisions of that subsection by the Attorney General. Nothing in this section shall apply to the possession of any weapon or device by a law enforcement officer who has confiscated, seized or otherwise taken possession of said weapon or device as evidence of the commission of a crime or because he believed it to be possessed illegally by the person from whom it was taken, provided that said law enforcement officer promptly notifies his superiors of his possession of such prohibited weapon or device.

(2) a. Nothing in subsection f. (1) shall be construed to prevent a person from keeping such ammunition at his dwelling, premises or other land owned or possessed by him, or from carrying such ammunition from the place of purchase to said dwelling or land, nor shall subsection f. (1) be construed to prevent any licensed retail or wholesale firearms dealer from possessing such ammunition at its licensed premises, provided that the seller of any such ammunition shall maintain a record of the name, age and place of residence of any purchaser who is not a licensed dealer, together with the date of sale and quantity of ammunition sold.

b. Nothing in subsection f. (1) shall be construed to prevent a designated employee or designated licensed agent for a nuclear power plant under the license of the Nuclear Regulatory Commission from possessing hollow nose ammunition while in the actual performance of his official duties, if the federal licensee certifies that the designated employee or designated licensed agent is assigned to perform site protection, guard, armed response or armed escort duties and is appropriately trained and qualified, as prescribed by federal regulation, to perform those duties.

(3) Nothing in paragraph (2) of subsection f. or in subsection j. shall be construed to prevent any licensed retail or wholesale firearms dealer from possessing that ammunition or large capacity ammunition magazine at its licensed premises for sale or disposition to another licensed dealer, the Armed Forces of the United States or the National Guard, or to a law enforcement agency, provided that the seller maintains a record of any sale or disposition to a law enforcement agency. The record shall include the name of the purchasing agency, together with written authorization of the chief of police or highest ranking official of the agency, the name and rank of the purchasing law enforcement officer, if applicable, and the date, time and amount of ammunition sold or otherwise disposed. A copy of this record shall be forwarded by the seller to the Superintendent of the Division of State Police within 48 hours of the sale or disposition.

(4) Nothing in subsection a. of this section shall be construed to apply to antique cannons as exempted in subsection d. of N.J.S.2C:39-6.

(5) Nothing in subsection c. of this section shall be construed to apply to any person who is specifically identified in a special deer management permit issued by the Division of Fish and Wildlife to utilize a firearm silencer as part of an alternative deer control method implemented in accordance with a special deer management permit issued pursuant to section 4 of P.L.2000, c. 46 (C.23:4-42.6), while the person is in the actual performance of the permitted alternative deer control method and while going to and from the place where the permitted alternative deer control method is being utilized. This exception shall not, however, otherwise apply to any person to authorize the purchase or possession of a firearm silencer.

**h. Stun guns.** Any person who knowingly has in his possession any stun gun is guilty of a crime of the fourth degree.

**i.** Nothing in subsection e. of this section shall be construed to prevent any guard in the employ of a private security company, who is licensed to carry a firearm, from the possession of a nightstick when in the actual performance of his official duties, provided that he has satisfactorily completed a training course approved by the Police Training Commission in the use of a nightstick.

WestlawNext © 2013 Thomson Reuters. No claim to original U.S. Government Works.

**j.** Any person who knowingly has in his possession a large capacity ammunition magazine is guilty of a crime of the fourth degree unless the person has registered an assault firearm pursuant to section 11 of P.L.1990, c. 32 (C.2C:58-12) and the magazine is maintained and used in connection with participation in competitive shooting matches sanctioned by the Director of Civilian Marksmanship of the United States Department of the Army.

**k. Handcuffs.** Any person who knowingly has in his possession handcuffs as defined in P.L.1991, c. 437 (C.2C:39-9.2), under circumstances not manifestly appropriate for such lawful uses as handcuffs may have, is guilty of a disorderly persons offense. A law enforcement officer shall confiscate handcuffs possessed in violation of the law.

**Credits**

L.1978, c. 95, § 2C:39-3, eff. Sept. 1, 1979. Amended by L.1979, c. 179, § 2, eff. Sept. 1, 1979; L.1983, c. 58, § 1, eff. Feb. 7, 1983; L.1983, c. 479, § 2, eff. Jan. 12, 1984; L.1985, c. 360, § 2, eff. Nov. 12, 1985; L.1987, c. 228, § 2, eff. July 30, 1987; L.1989, c. 11, § 1, eff. Feb. 1, 1989; L.1990, c. 32, § 10, eff. May 30, 1990; L.1991, c. 437, § 1, eff. Jan. 18, 1992; L.1999, c. 233, § 2; L.2000, c. 46, § 5, eff. June 30, 2000; L.2003, c. 168, § 1, eff. Sept. 3, 2003.

**Editors' Notes**

### SENATE LAW, PUBLIC SAFETY AND DEFENSE COMMITTEE STATEMENT

**Senate, No. 650--L.1989, c. 11**

Senate 650 permits a guard who is licensed to carry a firearm and is employed by a private security company to lawfully carry a nightstick when in the actual performance of his official duties, provided that he has satisfactorily completed a training course.

The bill requires that a training course, approved by the Police Training Commission, in the use of a nightstick must be completed before a private security guard licensed to carry a firearm is authorized to carry a nightstick while in the performance of his official duties.

This bill was pre-filed for introduction in the 1988 session pending technical review. As reported, the bill includes the changes required by technical review which has been performed.

Notes of Decisions (39)

N. J. S. A. 2C:39-3, NJ ST 2C:39-3
Current with laws effective through L.2013, c. 4.

---

**End of Document**                                      © 2013 Thomson Reuters. No claim to original U.S. Government Works.

---

West's General Laws of Rhode Island Annotated
  Title 11. Criminal Offenses
    Chapter 47. Weapons

Gen.Laws 1956, § 11-47-60.1

§ 11-47-60.1. Safe storage

Currentness

(a) Nothing in this section shall be construed to reduce or limit any existing right to purchase and own firearms and/or ammunition or to provide authority to any state or local agency to infringe upon the privacy of any family, home or business except by lawful warrant.

(b) A person who stores or leaves on premises under his or her control a loaded firearm and who knows or reasonably should know that a child is likely to gain access to the firearm without the permission of the child's parent or guardian, and the child obtains access to the firearm and causes injury to himself or herself or any other person with the firearm, is guilty of the crime of criminal storage of a firearm and, upon conviction shall be fined not more than one thousand dollars ($1,000) or imprisoned for not more than one (1) year, or both. For purposes of this section, a "child" is defined as any person who has not attained the age of sixteen (16) years.

(c) The provisions of subsection (b) of this section shall not apply whenever any of the following occurs:

(1) The child obtains the firearm as a result of an illegal entry of any premises by any person or an illegal taking of the firearm from the premises of the owner without permission of the owner;

(2) The firearm is kept in a locked container or in a location which a reasonable person would believe to be secured;

(3) The firearm is carried on the person or within such a close proximity so that the individual can readily retrieve and use the firearm as if carried on the person;

(4) The firearm is locked with a locking device;

(5) The child obtains or obtains and discharges the firearm in a lawful act of self-defense or defense of another person;

(6) The person who keeps a loaded firearm on any premises which is under his or her custody or control has no reasonable expectations, based on objective facts and circumstances, that a child is likely to be present on the premises.

(d)(1) If the person who allegedly violated this section is the parent or guardian of a child who is injured or who dies as the result of an accidental shooting, the attorney general's department shall consider among other factors, the impact of the injury or death on the person who has allegedly violated this section when deciding whether to prosecute an alleged violation.

Addend.000024

(2) It is the intent of the general assembly that a parent or guardian of a child who is injured or who dies of an accidental shooting shall be prosecuted only in those instances in which the parent or guardian behaved in a grossly negligent manner.

**Credits**

P.L. 1995, ch. 62, § 1.

Notes of Decisions (1)

Gen. Laws, 1956, § 11-47-60.1, RI ST § 11-47-60.1
Current with amendments through chapter 491 of the 2012 Regular Session. For research tips related to newly added material, see Scope.

**End of Document**
© 2013 Thomson Reuters. No claim to original U.S. Government Works.

 © 2013 Thomson Reuters. No claim to original U.S. Government Works.

Vernon's Texas Statutes and Codes Annotated
  Penal Code (Refs & Annos)
    Title 10. Offenses Against Public Health, Safety, and Morals (Refs & Annos)
      Chapter 46. Weapons (Refs & Annos)

V.T.C.A., Penal Code § 46.13

§ 46.13. Making a Firearm Accessible to a Child

Currentness

(a) In this section:

(1) "Child" means a person younger than 17 years of age.

(2) "Readily dischargeable firearm" means a firearm that is loaded with ammunition, whether or not a round is in the chamber.

(3) "Secure" means to take steps that a reasonable person would take to prevent the access to a readily dischargeable firearm by a child, including but not limited to placing a firearm in a locked container or temporarily rendering the firearm inoperable by a trigger lock or other means.

(b) A person commits an offense if a child gains access to a readily dischargeable firearm and the person with criminal negligence:

(1) failed to secure the firearm; or

(2) left the firearm in a place to which the person knew or should have known the child would gain access.

(c) It is an affirmative defense to prosecution under this section that the child's access to the firearm:

(1) was supervised by a person older than 18 years of age and was for hunting, sporting, or other lawful purposes;

(2) consisted of lawful defense by the child of people or property;

(3) was gained by entering property in violation of this code; or

(4) occurred during a time when the actor was engaged in an agricultural enterprise.

(d) Except as provided by Subsection (e), an offense under this section is a Class C misdemeanor.

WestlawNext © 2013 Thomson Reuters. No claim to original U.S. Government Works.

(e) An offense under this section is a Class A misdemeanor if the child discharges the firearm and causes death or serious bodily injury to himself or another person.

(f) A peace officer or other person may not arrest the actor before the seventh day after the date on which the offense is committed if:

(1) the actor is a member of the family, as defined by Section 71.003, Family Code, of the child who discharged the firearm; and

(2) the child in discharging the firearm caused the death of or serious injury to the child.

(g) A dealer of firearms shall post in a conspicuous position on the premises where the dealer conducts business a sign that contains the following warning in block letters not less than one inch in height:

"IT IS UNLAWFUL TO STORE, TRANSPORT, OR ABANDON AN UNSECURED FIREARM IN A PLACE WHERE CHILDREN ARE LIKELY TO BE AND CAN OBTAIN ACCESS TO THE FIREARM."

**Credits**

Added by Acts 1995, 74th Leg., ch. 83, § 1, eff. Sept. 1, 1995. Amended by Acts 1999, 76th Leg., ch. 62, § 15.02(g), eff. Sept. 1, 1999.

V. T. C. A., Penal Code § 46.13, TX PENAL § 46.13

Current through the end of the 2011 Regular Session and First Called Session of the 82nd Legislature

---

**End of Document** © 2013 Thomson Reuters. No claim to original U.S. Government Works.

WestlawNext © 2013 Thomson Reuters. No claim to original U.S. Government Works.

**Addend.000027**

The slaughtering of cattle, calves, sheep, swine, goats, horses and mules by shooting with firearms and the handling in connection therewith, in compliance with the provisions contained in this section, are hereby designated and approved as humane methods of slaughtering and handling of such animals under the law.

(1) Utilization of firearms, required effect; handling.

(a) The firearms shall be employed in the delivery of a bullet or projectile into the animal in accordance with this section so as to produce immediate unconsciousness in the animal by a single shot before it is shackled, hoisted, thrown, cast, or cut. The animals shall be shot in such a manner that they will be rendered unconscious with a minimum of excitement and discomfort.

(b) The driving of the animals to the shooting areas shall be done with a minimum of excitement and discomfort to the animals. Delivery of calm animals to the shooting area is essential since accurate placement of the bullet is difficult in case of nervous or injured animals. Among other things, this requires that, in driving animals to the shooting areas, electrical equipment be used as little as possible and with the lowest effective voltage.

(c) Immediately after the firearm is discharged and the projectile is delivered, the animal shall be in a state of complete unconsciousness and remain in this condition throughout shackling, sticking and bleeding.

(2) Facilities and procedure.

(a) General requirements for shooting facilities; operator.

(i) On discharge, acceptable firearms dispatch free projectiles or bullets of varying sizes and diameters through the skull and into the brain. Unconsciousness is produced immediately by a combination of physical brain destruction and changes in intracranial pressure. Caliber of firearms shall be such that when properly aimed and discharged, the projectile produces immediate unconsciousness.

(ii) To assure uniform unconsciousness with every discharge when small-bore firearms are used, it is necessary to use one of the following type projectiles: Hollow pointed bullets, frangible iron plastic composition bullets, or powdered iron missiles. When powdered iron missiles are used, the firearms shall be in close proximity with the skull of the animal when fired. Firearms must be maintained in good repair. For purposes of protecting employees, inspectors, and others, it is desirable that all firearms be equipped with safety devices to prevent injuries from accidental discharge. Aiming and discharging of firearms should be directed away from operating areas.

(iii) The provisions contained in WAC 16-24-030 (2)(a)(iii) with respect to the stunning area also apply to the shooting area.

(iv) The shooting operation is an exacting procedure and requires a well-trained and experienced operator. He must be able to accurately direct the projectile to produce immediate unconsciousness. He must use the correct caliber firearm, powder charge and type of ammunition to produce the desired results.

(b) Special requirements: Choice of firearms and ammunition with respect to caliber and choice of powder charge required to produce immediate unconsciousness varies, depending on age and sex of the animal. In the case of bulls, rams, and boars, small-bore firearms may be used provided they are able to produce immediate unconsciousness of the animals. Small-bore firearms are usually effective for stunning other cattle, sheep, swine, goats, calves, horses and mules.

[Order 1067, Regulation 8, filed 9/19/67, effective 10/20/67; Order 804, Regulation 1.04, effective 3/18/60.]

THE

# CHARTER

OF

*council*

## THE CITY OF BOSTON,

AND

## ORDINANCES MADE AND ESTABLISHED

BY THE

### MAYOR, ALDERMEN, AND COMMON COUNCIL,

WITH SUCH ACTS OF THE

## LEGISLATURE OF MASSACHUSETTS,

AS RELATE TO THE

## Government of said City.

COMPILED AND ARRANGED IN PURSUANCE OF AN ORDER OF
THE CITY COUNCIL.

BOSTON:
TRUE AND GREENE,—CITY PRINTERS.

1827.

Digitized by Google

Case: 12-17803, 02/07/2013, ID: 8505399, DktEntry: 8, Page 115 of 157

## CHAP. XXIV.

### *Gunpowder.*

ACTS OF THE LEGISLATURE.

An act in addition to the several acts already made for the prudent storage of Gun powder within the town of Boston.

WHEREAS the depositing of loaded arms in the houses of the town of Boston, is dangerous to the lives of those who are disposed to exert themselves when a fire happens to break out in said town.  *Preamble*

SEC. 1. *Be it enacted by the Senate and House of Representatives in General Court assembled, and by the authority of the same,* That if any person shall take into any dwelling house, stable, barn, out house, ware house, store, shop or other building within the town of Boston, any cannon, swivel, mortar, howitzer, cohorn, or fire arm, loaded with or having gunpowder in the same, or shall receive into any dwelling house, stable, barn, out house, store, ware house, shop, or other building within said town, any bomb, grenade, or other iron shell, charged with, or having gun powder in the same, such person shall forfeit and pay the sum of *ten pounds,* to be recovered at the suit of the Firewards of the said town, in an action of debt before any court proper to try the same ; one moiety thereof, to the use of said Firewards, and the other moiety to the support of the poor of said town of Boston.  *Taking loaded arms into houses prohibited.*  *Penalty*

SEC. 2. *Be it further enacted,* That all cannons, swivels, mortars, howitzers, cohorns, fire arms, bombs, grenades and iron shells of any kind, that shall be found in any dwelling house, out house, stable, barn, store, ware house, shop or other building, charged with or having in them any gunpowder, shall be  *Loaded arms in houses to be seized.*

18

138    GUNPOWDER.

liable to be seized by either of the Firewards of the said town; and upon complaint made by the said Fire-wards to the Court of Common Pleas, of such cannon, swivels, mortars, or howitzers, being so found, the Court shall proceed to try the merits of such complaint by a jury; and if the jury shall find such complaint supported, such cannon, swivel, mortar, or howitzer, shall be adjudged forfeit, and sold at public auction; and one half of the proceeds thereof shall be disposed of to the Firewards, and the other half to the use of the poor of the town of Boston. And when any fire arms, or any bomb, grenade or other shell, shall be found in any house, out-house, barn, stable, store, ware-house, shop or other building, so charged, or having gun powder in the same, the same shall be liable to be seized in manner aforesaid; and on complaint thereof, made and supported before a Justice of the Peace, shall be sold and disposed of, as is above provided for cannon.

*How disposed of in cases of forfeiture.*

SEC. 3. *Be it further enacted*, That appeals shall be allowed in prosecutions upon this act, as is usual in other cases.

*Appeals allowed*

### [Passed March 1, 1783.]

[An act in addition to the several acts now in force, which respect the carting and transporting Gunpowder through the streets of the town of Boston, and the storage thereof in the same town.] (Repealed by the provisions of the act of 3d February, 1821, see post and 5 vol. special laws, 401.

An act to provide for the storing and safe keeping of Gunpowder in the town of Boston, and to prevent damage from the same. Passed June 19, 1801. Repealed by the provisions of the act of 3d February, 1821, see post (and 5 vol. special laws 401.

An act in addition to the several acts now in force, which respect the transporting, storing and safe keeping of Gunpowder in the town of Boston. Passed March 7th, 1804—and repealed by the provisions of the act of 3d February 1821, see post and 5 vol special laws, 401.

Digitized by Google

# LAWS

OF THE

# STATE OF NEW-YORK,

PASSED AT THE

**FIRST MEETING OF THE SEVENTH SESSION OF THE LEGISLATURE OF SAID STATE.**

---

## CHAP. 1.

AN ACT to lay a duty of tonnage on vessels for defraying the expence of the lighthouse at Sandy Hook.

PASSED the 12th of February, 1784.

I. *Be it enacted by the People of the State of New York represented in Senate and Assembly and it is hereby enacted by the authority of the same,* That a duty of four pence per ton shall be levied and collected on all vessels which shall arrive from sea into the port of New York excepting vessels the property of citizens of this State while actually employed on whaling or coasting voyages, and all vessels the entire property of citizens of any of the United States, which shall not exceed the burthen of sixty tons carpenters tonnage. [Duty levied.]

That for the orderly collection of the said duty it shall be lawful for the master and wardens of the port of New York, who are or shall be appointed by the council of appointment, to appoint a clerk to execute the duties enjoined upon him by this act. [Clerk to be appointed to collect same.]

That every master or commander of a vessel claiming an exemption from the said duty shall if required make oath before the said clerk or in his absence before any of the said wardens who are hereby respectively empowered to administer the same. That according to the best of his knowledge and belief such vessel is a whaling or a coasting vessel entitled to exemption from the said duty, according to the true intent meaning of this act; and in case of refusal to take the said oath such master or commander shall be liable not only to the duty of tonnage the penalties in such cases to be imposed by this act. That every master of a vessel subject to the said duty who shall not within twenty-four [Masters claiming exemption to make oath. Penalty for failure to report to clerk on arrival.]

74

Digitized by Google

Case: 12-17803, 02/07/2013, ID: 8505399, DktEntry: 8, Page 118 of 157

*And be it further enacted by the authority aforesaid* That whenever any person shall refuse to appear and make affidavit in pursuance of such summons, a warrant shall issue from such judge or magistrate to compel his appearance, and if on his appearance he shall refuse to make affidavit, or affirmation if a Quaker, of the fact which may be within his knowledge touching the matters in question, he shall be committed to the common gaol of the county, there to remain without bail or mainprise for the term of six callender months. <span style="float:right">Warrant to issue against witnesses refusing to appear.</span>

# CHAP. 27.

AN ACT to repeal an act entitled An act to revive and amend an act entitled an act more effectually to prevent robberies within this State.

PASSED the 10th of April, 1784.

*Be it enacted by the People of the State of New York, represented in Senate and Assembly, and it is hereby enacted by the authority of the same,* That the act entitled "An act to revive and amend an act entitled an act more effectually to prevent robberies within this State," passed the first day of July, one thousand seven hundred and eighty, shall be, and the same is hereby repealed. <span style="float:right">Act named repealed.</span>

# CHAP. 28.

AN ACT to prevent the danger arising from the pernicious practice of lodging gun powder in dwelling houses, stores, or other places within certain parts of the city of New York, or on board of vessels within the harbour thereof.

PASSED the 13th of April, 1784.

WHEREAS the storing of gun powder within the city of New York is dangerous to the safety thereof. <span style="float:right">Preamble.</span>

*Be it therefore enacted by the People of the State of New York, represented in Senate and Assembly, and it is hereby enacted by the authority of the same,* That from and after the passing of this act, it shall not be lawfull for any merchant, shopkeeper, or retailer, or any other person, or persons whatsoever, to have or keep any quantity of gun powder exceeding twenty-eight pounds weight, in any one place, less than one mile to the northward of the city hall of the said city, except in the public magazine at the Fresh-water, and the said quantity of twenty-eight pounds weight, which shall be lawfull for any person to have and keep at any place within this city, shall be seperated into four stone jugs or tin cannisters, which shall not contain more than seven pounds each, on pain of forfeiting all such gun powder, and the sum of fifty pounds for every hundred weight, and in that proportion for a greater or lesser quantity, and upon pain of forfeiting such quantity which any person may lawfully keep as aforesaid, and which shall not be seperated as above directed, with full costs of suit to any person, or persons, who will inform and sue for the same, by any action, bill, or information, in any of the courts of record, in this city, who are hereby impowered, and required, to give special judgment in such action bills or informations, to be brought <span style="float:right">Unlawful to keep gunpowder in quantities exceeding twenty-eight pounds except in public magazine, etc.</span> <span style="float:right">Penalty.</span>

Digitized by Google

by virtue of this act, as well for the recovery of the value of such gun powder in specie, as for the penalty aforesaid, besides costs, and to award, effectual execution thereon, provided always that all suits, actions, or prosecutions to be brought, commenced, or prosecuted, against any person or persons, for any thing done in pursuance of this act, shall be commenced and prosecuted without willful delay, within two callender months next after the fact was committed, and not otherwise.

*And whereas* vessels arriving from sea, and having onboard as part of their cargo a quantity of gun powder.

**Gunpowder on vessels to be landed before vessel hauls alongside of wharf, etc.**

*Be it enacted by the authority aforesaid,* That the commander, or owner or owners, of all such ships or vessels, having gun powder onboard, shall, within twenty-four hours after her arrival in the harbour, and before they hawl along side of any wharf, pier or key within the city, land the said gun powder, by means of their boat or boats, or any other craft, at any place along the ship yards on the East river, or at any place to the northward of the air furnace on the North river, which may be most contiguous to the magazine at Fresh water, and shall cause the same o be stored there, or in any other proper magazine, which now is or ereafter may be built for that purpose, at any place to the northward thereof, on pain of forfeiting all such gun powder, to any person or persons, who will inform and sue for the same, in like manner, as is herein before directed, with respect to the having and storing of gun powder within the city as aforesaid.

**How gunpowder to be transported through streets of city.**

And in order to prevent any fatal consequences which may arise, from the carriage of gun powder, in and through the streets of the city of New York, by carts, carriages, or by hand, or otherways, it shall be in tight cask, well headed and hooped, and shall be put into bags or leather-cases, and intirely covered therewith, so as that none be spilt or scattered in the passage thereof, on pain of forfeiting all such gun powder, as shall be conveyed through any of the streets aforesaid in any other manner than is herein directed, and it shall and may be lawfull for any person or persons, to seize the same to his or their own use and benefit — provided the person or persons so offending, be thereof lawfully convicted, before the mayor, recorder, or any two justices of the city aforesaid.

**Warrant to search in day time for gun powder unlawfully stored may be issued, etc.**

And that it shall and may be lawfull, for the mayor recorder, or any two justices of the peace of the city and county of New York, upon demand made by any inhabitant or inhabitants of the said city, who assigning a reasonable cause of suspicion on oath, of the sufficiency of which the said mayor or recorder, or justices, is and are to judge, to issue his or their warrant or warrants, under his or their hands and seals, for searching in the day time for gun powder in any building or place whatsoever, within the limits aforesaid, or any ship or vessel within forty eight hours after her arrival in the harbour, or at any time after any such ship or vessel shall and may have hawled alongside of any wharf pier or key within the limits aforesaid, and that upon any such search, it shall be lawfull for the searchers or persons finding the same, immidiatly to seize, and at any time within twelve hours after such seizure, to cause the same to be removed to the magazine at Fresh water, or to any other proper magazine, which now is or hereafter may be at any place north of Fresh water aforesaid, and the same being so removed, it shall be lawfull to detain and keep the same untill it shall be determined by the mayor, recorder or any two of the justices of the peace of the city and county aforesaid, whether the same shall be forfeited by virtue of this act, and the person or persons so detaining the same, shall not be subject or liable to any action or suit, for the detention thereof, provided always that nothing in the act con-

Digitized by Google

tained, shall be construed to authorize any person, having such warrant to take advantage of the same, for serving any civil process of any kind whatsoever.

*And be further enacted by the authority aforesaid,* That if any gun powder, exceeding the quantity which any person by this act may lawfully keep in his custody, shall be found during any fire, or alarm of fire, in the said city, by any of the firemen of the said city, it shall be lawfull for him to seize the same, without warrant from a majestrate, and to hold and have the same to his own use, any thing in this act to the contrary notwithstanding.   This act to be and continue in force from the passing thereof, untill the twenty-eight day of February in the year of our Lord one thousand, seven hundred and eighty six.

*If found during any fire may be seized without warrant.*

---

# CHAP. 29.

AN ACT to lengthen the terms of the inferior courts of common pleas and general sessions of the peace, in the counties of Westchester, Queens and Richmond; and for other purposes therein mentioned.

PASSED the 13th of April, 1784.

WHEREAS the duration of the terms of the inferior courts of common pleas and general sessions of the peace, in the counties of Westchester, Queens and Richmond; which, in the county of Westchester, continue from the fourth Tuesday in May until the Friday following, and from the first Tuesday in November until the Friday following, in every year; in Queens county, from the third Tuesday in May until the Friday following, and from third Tuesday in September until the Friday following, in every year; and in Richmond county, from the first Tuesday in May until the Friday following, and from the last Tuesday in September until the Friday following, in every year, are found from experience, to be too short for the discharge of the necessary business in the said respective courts.

*Preamble.*

*Be it therefore enacted by the People of the State of New York represented in Senate and Assembly, and it is hereby enacted by the authority of the same,* That the terms of the inferior courts of common pleas and general sessions of the peace in the county of Westchester, shall hereafter commence on the fourth Monday in May and first Monday in November, in every year, and shall continue until the several Saturdays next following, inclusive; that the terms of the inferior courts of common pleas and general sessions of the peace in Queens county, shall commence on the third Mondays in May and September, in every year, and shall continue until the several Saturdays next following, inclusive; and that the inferior courts of common pleas and general sessions of the peace in the county of Richmond, shall commence on the first Monday in May and last Monday in September, in every year, and shall continue until the several Saturdays next following, inclusive.   That all process issued out of the said respective courts, and made returnable on the usual return days, and all recognizances by which any person or persons shall be bound to appear on the said usual return days, shall be deemed good and valid on such days, although such days of return and appearance, are by this act, respectively altered.

*Terms of the courts, when to commence and when to close.*

*Process issued returnable on usual return days valid.*

Digitized by Google

# LAWS

## OF THE

## COMMONWEALTH

### OF

# PENNSYLVANIA,

*FROM THE FOURTEENTH DAY OF OCTOBER, ONE THOUSAND*
*SEVEN HUNDRED, TO THE SIXTH DAY OF APRIL,*
*ONE THOUSAND EIGHT HUNDRED AND TWO.*



## REPUBLISHED,

### UNDER THE AUTHORITY OF THE LEGISLATURE,

#### BY

## M. CAREY AND J. BIOREN.

### VOL. II.

## *PHILADELPHIA:*

PRINTED BY J. BIOREN NO: 88, CHESNUT-STREET, FOR
MATHEW CAREY AND SELF.

### 1803.

Digitized by Google

[ 333 ]

## CHAPTER DCCCCLVII.

*An* ACT *for the relief of John Amiel, an insolvent debtor, confined in the old gaol of the city and county of Philadelphia.*

Passed 13th April, 1782.—Private Act.—Recorded in Law Book
No. I. page 492.

## CHAPTER DCCCCLVIII.

*An* ACT *for erecting the town of Carlisle, in the county of Cumberland, into a borough ; for regulating the buildings, preventing nuisances and encroachments on the commons, squares, streets, lanes and alleys of the same, and for other purposes therein mentioned.*

SECT. I. WHEREAS the inhabitants of the town of Carlisle have represented, by their petition to the Assembly, that the said town has greatly improved, and is yearly encreasing in buildings and number of inhabitants ; that a good court-house and gaol, and three churches or houses for public worship are erected, and that the courts of justice for the county are held there ; that encroachments and nuisances have been committed in the public squares, streets, lanes, alleys and commons of said town ; that contentions happen relative to partition walls and fences, and a variety of other matters, to the great annoyance and inconvenience of the inhabitants.

SECT. II. And whereas it is necessary, as well for the benefit of the inhabitants of the said town, as those who trade and resort there, and for the advantages of the public in general, that the encroachments, nuisances, contentions, annoyances and inconveniences, in the said town, and commons thereto, belonging, should for the future be prevented :

SECT. III. *Be it enacted, and it is hereby enacted by the Representatives of the Freemen of the commonwealth of Pennsylvania, in General Assembly met, and by the authority of the same,* That the said town of Carlisle and commons shall be, and the same is hereby, erected into a borough, which shall be called " The Borough of Carlisle," for ever ; the extent of which borough is and shall be comprised within the following boundaries, viz. beginning at a walnut corner tree of land, now of Thomas Wilson's heirs, being a post at the corner of the widow M'Donald's out-lots ; thence by the said land of Thomas Wilson's heirs, adjoining the out-lots, south twenty-four degrees and one quarter east, two hundred and thirty-three perches, to a post on Letort's Spring ; thence down the said spring, the different courses thereof, fifty-nine perches, to a white oak, at the corner of Jonathan Holme's land ; thence by the same and adjoining out-lots, south twenty-six degrees east, one hundred and twenty perches, to a post : thence by the same, south
**sixty-one**

*Incorporating clause.*

*Boundaries.*

Digitized by Google

said nuisance, or cause the same to be removed; and on failure thereof by the space of three days next after notice to him, her or them, for that purpose given, by order of the Burgesses of the said borough, or by the said regulators, or any two of them, then, and in that case, the regulators aforesaid, or any of them, shall and may remove the same, or cause the same to be removed; and the costs and expences attending such removal shall be paid by the party or parties so offending.

SECT. XL. *And be it further enacted by the authority aforesaid,* That the owner or owners of every house within the said borough, having, at the publication hereof, any porch, cellar-door or step, extending into any street beyond the limits aforesaid, or having fixed or fastened to such house any bulk, jut-window, or other incumbrance whatsoever, shall, yearly and every year, pay to the supervisors of the said streets, lanes, alleys and highways, to be applied towards repairing and amending the same, such sum or sums of money as the said Burgesses and Assistants shall assess, until such porch, cellar-door or step, to him, her or them, respectively belonging, shall be reduced to the limits aforesaid, or such bulk, jut-window, or other incumbrance, shall be removed and taken away; and every owner or owners of any house or houses, whereunto any spouts or gutters shall, at the time of the publication hereof, be so fixed or placed, that the waters thereby discharged may incommode persons passing in the streets, lanes or alleys, shall, and they are hereby enjoined and required, forthwith to remove, or effectually to alter or amend the same.

*Owners of porches, &c. exceeding the above limitation, to be assessed, till reduced or taken away.*

SEC. XLI. *And be it enacted by the authority aforesaid,* That if any person or persons, after the publication of this act, shall wilfully or maliciously remove, misplace, or injure any pipes or trunks already fixed or placed, or that may or shall be hereafter fixed or placed, by direction of the Burgesses and Assistants of the said borough, for conveying water to, from or through any part of the said borough; or if any person or persons shall wilfully and maliciously, without the consent and direction of the Burgesses and Assistants aforesaid, by any ways or means whatsoever, obstruct or prevent the course of such waters in or through any such trunks, pipes or conduits, as are or shall, or may be placed as aforesaid, or shall spoil or injure any cistern which shall or may be placed for the reception of such water, every person so offending, and being thereof legally convicted before the Burgesses of the said borough, or either of them, or before any Justice of the peace for the county aforesaid, shall forfeit and pay the sum of five pounds for every such offence, and shall pay the costs of repairing and putting such trunks, pipes, conduits or cisterns in good order and repair.

*Penalty on persons removing or damaging the pipes or trunks for conveying water, &c.*

SECT. XLII. And whereas it hath been usual for the merchants and traders within the said borough to keep large quantities

[ 350 ]

1782.

tities of gun-powder in their dwelling houfes and fhops, to the manifeft danger of the inhabitants: *Be it therefore enacted by the authority aforesaid*, That no perfon or perfons whatfoever, within the limits of faid borough, fhall, from and after the publication of this act, keep in any houfe, fhop, cellar, ftore or other place, within the faid borough, any more or greater quantity than twenty-five pounds weight of gun-powder, which fhall be kept in the higheft ftory of the houfe, at any one time, unlefs it be at leaft fifty yards from any dwelling houfe, under the penalty of ten pounds.

SECT. XLIII. And whereas feveral perfons, without right or legal authority, have built on and fenced in many parts of the faid commons, which by this act are included in and made part of the faid borough, which commons ought to be not only beneficial and convenient for the inhabitants for an out-lot for their cattle in the mean time, but in time to come may be appropriated for the further extenfion and increafe of the buildings in the faid borough: *Be it therefore enacted by the authority aforesaid*, That all fuch buildings, fences, or other erections whatfoever, already made or erected, or which fhall or may hereafter be fo made or erected, by any perfon or perfons whatfoever, on any part of the faid commons, fhall be deemed, held and taken for nuifances, and as fuch may be abated, proftrated, thrown down and removed; and that it fhall and may be lawful for the Burgeffes, Affiftants, regulators and fupervifors aforefaid, for the time being, or the majority of them, with the confent and approbation of the Chief Burgeffes, to abate, proftrate, throw down and remove all fuch buildings, fences and erections, as are now erected and built, or that hereafter may be erected and built on the fame commons. And in cafe the faid Burgeffes, Affiftants, regulators and fupervifors, or the majority of them as aforefaid, with the confent and approbation of the Chief Burgefs, fhall be oppofed in abating, proftrating, throwing down and removing the faid buildings, fences or other erections, that then it fhall and may be lawful for the faid Burgeffes, Affiftants, regulators and fupervifors, or the majority of them, as aforefaid, to call to their affiftance all or any of the inhabitants of the faid borough, who are hereby enjoined and required to be aiding and affifting to the Burgeffes, Affiftants, regulators and fupervifors, or the majority of them, as aforefaid, in abating, proftrating, throwing down and removing all fuch buildings, fences and erections, by this act declared nuifances, as aforefaid.

SECT. XLIV. *And be it further enacted by the authority aforesaid*, That if any perfon or perfons fhall, at any time after the publication of this act, prefume to erect or build any buildings, fences, or other erection whatfoever, on the faid commons, that then the faid buildings, fences or other erections, fhall be abated, proftrated, thrown down and removed as aforefaid;

## 5.66.020 Ammunition sales log required.

An ammunition vendor shall maintain an ammunition sales log which records all firearm ammunition sales as required by this chapter. The transferee shall provide, and the ammunition vendor shall record on the ammunition sales log, at the time of sale, the following information for each sale of firearms ammunition:

A.      The name, address, and date of birth of the transferee;

B.      The date of the sale;

C.      The transferee's driver's license number, state identification card number, passport number, or other valid government-issued photographic identification;

D.      The brand, type, and quantity of firearms ammunition transferred;

E.      The identity of the person transferring the firearms ammunition on behalf of the ammunition vendor;

F.      The transferee's signature and right thumbprint. (Ord. 2007-065 § 1)

San Francisco Police Code

# SEC. 613.9.5.  FINDINGS.

1.      "Enhanced-lethality ammunition" means the ammunition that licensees may not sell, lease or otherwise transfer under Police Code Sec. 613.10(g).

2.      Enhanced-lethality ammunition is designed to tear larger wounds in the body by flattening and increasing in diameter on impact and/or exploding and dispersing shrapnel throughout the body. These design features increase the likelihood that the bullet will hit a major artery or organ, that it will take a more circuitous path through the body to create more widespread damage, and that it will release all of its propulsive force inside the body to cause maximum injury. Accordingly, enhanced-lethality ammunition is more likely to cause severe injury and death than is conventional ammunition that does not flatten or fragment upon impact.

3.      Enhanced-lethality ammunition has been used in shooting massacres both in San Francisco and abroad. On July 1, 1993, heavily armed gunman Gian Luigi Ferri shot and killed eight people, then himself, in the 101 California Street high-rise in San Francisco using hollow-point bullets. Most recently, on July 24, 2011, Anders Behring Breivik used lethality-enhanced bullets designed to fragment inside the body and cause maximum internal damage to kill and grievously wound dozens of children at a youth camp in Norway.

4.      Banning the sale of enhanced-lethality ammunition in San Francisco does not substantially burden the right of self defense. The right to use firearms in self defense can be fully exercised using conventional, non-collapsing, non-fragmenting ammunition. Enhanced-lethality ammunition is not in general use, and this unusually injurious ammunition has been banned outside the United States. For example, the Hague Convention of 1899, Declaration III, has for more than a century prohibited the use in warfare of bullets that easily expand or flatten in the body.

5.      Personal firearms kept in the home are more likely to be used against family and friends than intruders. Home firearms may also be used in suicide attempts, accidental shootings and criminal assaults.

6.      The City and County of San Francisco has a legitimate, important and compelling governmental interest in reducing the likelihood that shooting victims in San Francisco will die of their injuries by reducing the lethality of the ammunition sold and used in the City and County of San Francisco.

(Added by Ord. 206-11, File No. 110901, App. 10/11/2011, Eff. 11/10/2011)

**Addend.000041**

San Francisco Police Code

# SEC. 613.10.  LICENSE-CONDITIONS.

In addition to all other requirements and conditions stated in this Article, each license shall be subject to all of the following conditions, the breach of any of which shall be sufficient cause for revocation of the license by the Chief of Police:

(a)     The business shall be carried on only in the building located at the street address shown on the license, except as otherwise authorized under Section 12071(b)(1) of the California Penal Code.

(b)     The licensee shall comply with Sections 12073, 12074, 12076, 12077 and 12082 of the California Penal Code, to the extent that the provisions remain in effect.

(c)     The licensee shall not deliver any pistol or revolver to a purchaser earlier than 10 days after the application for the purchase, lease or transfer, unless otherwise provided by State or federal law.

(d)     The licensee shall not deliver any firearm to a purchaser, lessee or other transferee unless the firearm is unloaded and securely wrapped or unloaded in a locked container.

(e)     The licensee shall not deliver any firearm, firearm ammunition, or firearm ammunition component to a purchaser, lessee or other transferee unless the purchaser, lessee or other transferee presents clear evidence of his or her identity and age to the seller. As used in this Section, "clear evidence of his or her identity and age" includes, but is not limited to, a motor vehicle operator's license, a State identification card, an armed forces identification card, an employment identification card which contains the bearer's signature and photograph, or any similar documentation which provides the seller reasonable assurance of the identity and age of the purchaser.

(f)     The licensee shall not display in any part of the premises where it can be readily seen from outside the premises, any firearm, firearm ammunition or imitation thereof, or placard advertising the sale or other transfer thereof, other than a sign identifying the name of the business.

(g)     The licensee shall not sell, lease or otherwise transfer to any person any ammunition that:

(1)     Serves no sporting purpose;

(2)     Is designed to expand upon impact and utilize the jacket, shot or materials embedded within the jacket or shot to project or disperse barbs or other objects that are intended to increase the damage to a human body or other target (including, but not limited to, Winchester Black Talon, Speer Gold Dot, Federal Hydra-Shok, Hornady XTP, Eldorado Starfire, Hollow Point Ammunition and Remington Golden Sabre ammunition; or

American Legal Publishing Corporation                    1

San Francisco Police Code

(3)     Is designed to fragment upon impact (including, but not limited to, Black Rhino bullets and Glaser Safety Slugs).

This subsection does not apply to conventional hollow-point ammunition with a solid lead core when the purchase is made for official law enforcement purposes and the purchaser is authorized to make such a purchase by the director of a public law enforcement agency such as the Chief of the San Francisco Police Department or the Sheriff of the City and County of San Francisco.

(h)     The licensee shall post within the licensee's premises a notice stating the following:

"THE CALIFORNIA PENAL CODE PROHIBITS THE SALE OF FIREARMS OR FIREARMS AMMUNITION TO PERSONS UNDER THE AGE OF 18, AND FURTHER GENERALLY PROHIBITS THE SALE OF A PISTOL, REVOLVER, OR FIREARM CAPABLE OF BEING CONCEALED UPON THE PERSON TO ANY PERSON UNDER THE AGE OF 21."

The posted notice shall be in a conspicuous location, shall be in 36 point type block letters in black ink on a white background, and shall be located so that the notice can easily and clearly be seen by all prospective purchasers of firearms and firearm ammunition.

(i)     The licensee shall not sell, lease or otherwise transfer any ultracompact firearm except as authorized by Section 613.10-2 or any 50 caliber firearm or 50 caliber cartridge except as authorized by Section 613.10-1.

(j)     Any license issued pursuant to this Article shall be subject to such additional conditions as the Chief of Police finds are reasonably related to the purpose of this Article.

(k)     The licensee shall comply with the requirements of Section 613.10-3 and shall, in addition, post the appropriate notice or notices, as specified below, in a conspicuous location at the entrance of the licensee's premises (or at the entrance to the separate room or, enclosure pursuant to Section 613.10-3(c)). Such notice shall be in 36 point type block letters in black ink on a white background.

(1)     Licensees that sell, lease or otherwise transfer firearms, other than firearms capable of being concealed on the person, shall post a notice at the entrance to the premises (or at the entrance to the separate room or enclosure pursuant to Section 613.10-3(c)) stating the following:

"THE SAN FRANCISCO POLICE CODE REQUIRES THAT FIREARMS DEALERS PROHIBIT ENTRY BY PERSONS UNDER AGE 18, AND FURTHER PROHIBITS ENTRY BY (1) PERSONS CONVICTED OF A VIOLENT OFFENSE WHO ARE PROHIBITED FROM POSSESSING FIREARMS PURSUANT TO CALIFORNIA PENAL CODE SECTIONS 12021 OR 12021.1; AND (2) PERSONS WHO ARE CURRENTLY PROHIBITED

San Francisco Police Code

FROM POSSESSING FIREARMS BECAUSE THEY HAVE BEEN ADJUDICATED AS
MENTALLY DISORDERED, NOT GUILTY BY REASON OF INSANITY OR
INCOMPETENT TO STAND TRIAL."

       (2)    Licensees that sell, lease or otherwise transfer firearms capable of being
concealed on the person shall post a notice at the entrance to the premises (or at the entrance to
the separate room or enclosure containing such firearms pursuant to Section 613.10-3(c)) stating
the following:

"THE SAN FRANCISCO POLICE CODE REQUIRES THAT FIREARMS DEALERS
PROHIBIT ENTRY BY PERSONS UNDER AGE 21, AND FURTHER PROHIBITS ENTRY
BY (1) PERSONS CONVICTED OF A VIOLENT OFFENSE WHO ARE PROHIBITED
FROM POSSESSING FIREARMS PURSUANT TO CALIFORNIA PENAL CODE
SECTIONS 12021 OR 12021.1; AND (2) PERSONS WHO ARE CURRENTLY PROHIBITED
FROM POSSESSING FIREARMS BECAUSE THEY HAVE BEEN ADJUDICATED AS
MENTALLY DISORDERED, NOT GUILTY BY REASON OF INSANITY OR
INCOMPETENT TO STAND TRIAL."

       (3)    Licensees that sell, lease or otherwise transfer firearms capable of being
concealed on the person, but who keep such firearms in a separate room or enclosure in
accordance with Section 613.10-3(c) shall post the notice required by paragraph (1) at the
entrance to the premises or separate room or enclosure containing firearms that are not capable
of being concealed on the person, and shall post the notice required by paragraph (2) at the
entrance to the separate room or enclosure containing firearms capable of being concealed on the
person.

       (l)    The licensee shall notify the Chief of Police of the name, age and address of, and
submit a certificate of eligibility under Penal Code Section 12071 from the State Department of
Justice for, any person not listed on the licensee's application under Section 613.2(a)(1) who will
be given access to, or control of, workplace firearms, firearm ammunition, or firearm
ammunition components. The licensee shall submit the required information and certificate
within 10 days of such person being employed or otherwise being given access to, or control
over workplace firearms, firearm ammunition, or firearm ammunition components.

       (m)    Within the first five business days of April and October of each year, licensees
shall cause a physical inventory to be taken that includes a listing of each firearm held by the
licensee by make, model, and serial number, together with a listing of each firearm the licensee
has sold since the last inventory period. In addition, the inventory shall include a listing of each
firearm lost or stolen that is required to be reported pursuant to Penal Code Section
12071(b)(13). Licensees shall maintain a copy of the inventory on the premises for which the
license was issued. Immediately upon completion of the inventory, licensees shall forward a
copy of the inventory to the address specified by the Chief of Police, by such means as specified
by the Chief of Police. With each copy of the inventory, licensees shall include an affidavit
signed by the licensee (or, if the licensee is not a natural person, by an officer, general manager,

San Francisco Police Code

or other principal of the licensee) stating under penalty of perjury that within the first five business days of that April or October, as the case may be, the signer personally confirmed the presence of the firearms reported on the inventory.

(Added by Ord. 91-94, App. 2/25/94; amended by Ord. 290-95, App. 9/1/95; Ord. 225-96, App. 6/11/96; Ord. 283-96, App. 7/3/96, Eff. 1/1/97; Ord. 62-00, File No. 000197, App. 4/14/2000; Ord. 242-00, File No. 000950, App. 10/27/2000; Ord. 260-04, File No. 031932, App. 11/4/2004; Ord. 192-07, File No. 070684, App. 8/1/2007)

4

# SEC. 615. RECORDS OF AMMUNITION SALES.

(a)  **Definitions.**

(1)  "Firearm ammunition," as used in this Section, shall include any ammunition for use in any pistol or revolver, or semiautomatic rifle or assault weapon, but shall not include ammunition for shotguns that contains shot that is No. 4 or smaller.

(2)  "Semiautomatic rifle," as used in this Section, shall mean any repeating rifle which utilizes a portion of the energy of a firing cartridge to extract the fired cartridge case and chamber the next round, and which requires a separate pull of the trigger to fire each cartridge.

(3)  "Assault weapon," as used in this Section, shall mean any of the weapons designated in California Penal Code Section 12276 or 12276.1.

(4)  "Vendor," as used in this Section, shall mean any person who is engaged in the sale of firearm ammunition, including any retail firearms dealer.

(b)  No vendor shall sell or otherwise transfer ownership of any firearm ammunition without at the time of purchase recording the following information on a form to be prescribed by the Chief of Police: (1) the name of the vendor (including the name of the specific individual) transferring ownership to the transferee; (2) the place where the transfer occurred; (3) the date and time of the transfer; (4) the name, address and date of birth of the transferee; (5) the transferee's driver's license number, or other identification number, and the state in which it was issued; (6) the brand, type and amount of ammunition transferred; and (7) the transferee's signature.

(c)  The records required by this Section shall be maintained on the premises of the vendor for a period of not less than two years from the date of the recorded transfer. Said records shall be subject to inspection at any time during normal business hours.

(d)  No person shall knowingly make a false entry in, or fail to make a required entry in, or fail to maintain in the required manner records prepared in accordance herewith. No person shall refuse to permit a police department employee to examine any record prepared in accordance with this Section during any inspection conducted pursuant to this Section.

(e)  **Penalties.**

(1)  **First Conviction.** Any person violating any provision of this Section shall be guilty of an infraction. Upon conviction of the infraction, the violator shall be punished by a fine of not less than $50 nor more than $100.

(2)  **Subsequent Convictions.** In any accusatory pleading charging a violation of this Section, if the defendant has been previously convicted of a violation of this Section, each such previous violation and conviction shall be charged in the accusatory pleading. Any person violating any provision of this Section a second time within a 90-day period shall be guilty of a misdemeanor and shall be punished by a fine of not less than $300 and not more than $400 for each provision violated, or by imprisonment in the County Jail for a period of not more than six months, or by both such fine and imprisonment. Any person violating any provision of this Section, a third time, and each subsequent time, within a 30-day period shall be guilty of a misdemeanor and shall be punished by a fine of not less than $400 and not more than $500 for each provision violated, or by imprisonment in the County Jail for a period of not more than six months, or by both such fine and imprisonment.

(f)  **Severability.** If any subsection, sentence, clause, phrase, or word of this Section be for any reason declared unconstitutional or invalid or ineffective by any court of competent jurisdiction, such decision shall not affect the validity or the effectiveness of the remaining portions of this Section or any part thereof. The Board of Supervisors hereby declares that it would have adopted this Section notwithstanding the unconstitutionality, invalidity, or

(Formerly Sec. 618; added by Ord. 328-95, App. 10/20/95; renumbered and amended by Ord. 260-04, File No. 031932, App. 11/4/2004) (Former Sec. 615 amended by Ord. 407-86, App. 10/3/86; repealed by Ord. 260-04)

**Disclaimer:**
This Code of Ordinances and/or any other documents that appear on this site may not reflect the most current legislation adopted by the Municipality. American Legal Publishing Corporation provides these documents for informational purposes only. These documents should not be relied upon as the definitive authority for local legislation. Additionally, the formatting and pagination of the posted documents varies from the formatting and pagination of the official copy. The official printed copy of a Code of Ordinances should be consulted prior to any action being taken.

For further information regarding the official version of any of this Code of Ordinances or other documents posted on this site, please contact the Municipality directly or contact American Legal Publishing toll-free at 800-445-5588.

© 2013 American Legal Publishing Corporation
techsupport@amlegal.com
1.800.445.5588.

San Francisco Police Code

# SEC. 4511.  FINDINGS.

1.      Firearm injuries have a significant public health impact both nationally and locally.

a.      In the United States, firearm injuries accounted for 6.6 percent of premature deaths from 1999-2007. Shootings are a leading cause of injury deaths in the nation, second only to motor vehicle crashes. On average, there were 30,125 firearm deaths in the United States annually between 2000 and 2007, inclusive. In 2007, 31,224 Americans died in firearm-related homicides, suicides, and unintentional shootings – the equivalent of 85 deaths each day and more than three deaths each hour.

b.      Nationally, more than two thirds of homicides and over half of all suicides are committed with firearms.

c.      Unintentional shootings killed over 5,700 people in the U.S. between 2000 and 2007. In 2009, over 18,000 people were treated for unintentional gunshot wounds in the United States.

d.      The firearm-related homicide, suicide, and unintentional death rates for children 5-14 years old in the United States are significantly higher than those other industrialized nations.

e.      Over the last five years, firearm injuries have ranked third of all causes of injury death in San Francisco, after pedestrian fatalities and falls, respectively. Almost two thirds of these firearm deaths were homicides. In addition, gunshot wounds were the third most common reason for injury-related hospitalizations in San Francisco from 2005 to 2008 and fourth in 2009. Firearm-related suicides accounted for 16.2 percent of the suicide deaths in San Francisco in Fiscal Year 2009-2010.

f.      San Francisco General Hospital, as the only trauma center in San Francisco, treats approximately 98 percent of the city's shooting victims annually. Approximately 80 percent of the individuals treated for violent injuries at San Francisco General Hospital are uninsured.

2.      Having a loaded or unlocked gun in the home is associated with an increased risk of gun-related injury and death.

a.      A firearm stored loaded or unlocked increases the risk of an accidental shooting.

b.      All U.S. case control studies (12 to date) have found that people who die by suicide are more likely to have lived in a home with a gun than similar people who did not die by suicide. Studies have also shown that the risk of suicide increases in homes where guns are kept loaded or unlocked.

American Legal Publishing Corporation                                    1

Addend.000048

San Francisco Police Code

      c.     A 2007 study compared the 40 million people who live in the states with the lowest firearm prevalence (Hawaii, Massachusetts, Rhode Island, New Hampshire, Connecticut, and New York) to about the same number living in the states with the highest firearm prevalence (Wyoming, South Dakota, Alaska, West Virginia, Montana, Arkansas, Mississippi, Iowa, North Dakota, Alabama, Kentucky, Wisconsin, Louisiana, Tennessee, and Utah). Although non-firearm suicides were about equal in the two groups, total suicides were almost twice as high in the high-gun states.

      d.     Keeping unsecured guns in the home increases the flow of illegal guns into the community. More than half a million firearms are stolen each year in the United States and many are subsequently sold illegally.

     3.     Children are particularly at risk of injury and death, or causing injury and death, when they can access guns in their own homes or homes that they visit.

      a.     The authors of a 2005 study found that an estimated 1.69 million children age 18 and under are living in households with loaded and unlocked firearms. Many young children, including children as young as three years old, are strong enough to fire handguns.

      b.     A significant majority of the guns used in youth suicide attempts and unintentional injuries were stored in the residence of the victim, a relative, or a friend. Of youths under who died by firearm suicide, the vast majority used a family member's gun, usually a parent's. And more than two thirds of school shooters obtained their gun(s) from their own home or that of a relative.

      c.     Quick access to loaded firearms heightens the risk that a young person's impulsive decision to commit suicide will be carried out without reflection or seeking help, and that the impulsive attempt will be fatal. One third of youths who died by suicide had faced a crisis within the previous 24 hours. Among people who nearly died in a suicide attempt, almost a quarter indicated that fewer than five minutes had passed between deciding on suicide and making the attempt. While fewer than 10 percent of suicide attempts by other means are fatal, at least 85 percent of firearm suicide attempts end in death.

     4.     Guns kept in the home are most often used in suicides and against family and friends rather than in self-defense.

      a.     Guns kept in a home are more likely to be involved in an unintentional shooting, criminal assault, or suicide attempt than to kill or injure in self-defense.

      b.     Only one in ten firearm homicides in the shooter's home is considered justifiable, meaning the shooter was not the assailant. Of every ten firearm homicide victims killed at the shooter's residence, six were intimate partners or family members of the shooter, three were friends or acquaintances of the shooter, and only one was a stranger to the shooter.

     5.     Applying trigger locks or using lock boxes when storing firearms in the home

San Francisco Police Code

reduces the risk of firearm injury and death.

    a.     Keeping a firearm locked when it is not being carried ensures that it cannot be accessed and used by others without the owner's knowledge or permission. This simple measure significantly decreases the risk that the gun will be used to commit suicide, homicide, or inflict injury, whether intentionally or unintentionally.

    b.     Safe storage measures have a demonstrated protective effect in homes with children and teenagers where guns are stored.

    6.     There is a wide consensus among medical professionals, police chiefs, gun control advocates and gun rights groups that applying trigger locks or using lock boxes to store unsupervised guns in the home promotes health and safety.

    a.     The International Association of Chiefs of Police recommends that state and local governments mandate safe storage of firearms.

    b.     The American Academy of Pediatrics recommends that if families must have firearms in their homes, the firearms should be stored locked, unloaded, and separate from locked ammunition.

    c.     Both gun control and gun rights advocates endorse the use of locking devices when storing guns to ensure that unauthorized or untrained persons cannot use the gun to inflict injury or death. For example, the National Rifle Association's Home Firearm Safety Handbook, developed and used as part of the National Rifle Association (NRA) Basic Firearm Training Program, emphasizes that "there is one general rule that must be applied under all conditions: Store guns so they are not accessible to untrained or unauthorized persons." The NRA Guide To The Basics Of Personal Protection In The Home further explains that "all storage methods designed to prevent unauthorized access utilize some sort locking method."

    7.     Requiring unsupervised firearms stored to be secured with trigger locks or in a locked container does not substantially burden the right or ability to use firearms for self-defense in the home.

    a.     The locking requirements apply only to handguns that are not being carried. Gun owners and adults over 18 may carry loaded and unlocked handguns in the home at any time. The safe storage requirements also permit owners who wish to do so to store their handguns fully loaded.

    b.     Gun security does not preclude quick access. For example, affordable lockboxes using Simplex-type locks, which pop open immediately when several keys or pushbuttons are touched in a preset sequence, are widely available. Users report that they can retrieve a loaded weapon in just two to three seconds, and that the locks are also easy to open in the dark. The NRA describes this type lockbox as providing "a good combination of security and quick access." Some lockboxes also feature biometric locks, which provide immediate access when they scan the owner's fingerprint.

American Legal Publishing Corporation     3

San Francisco Police Code

       c.      Portable lockboxes can store loaded weapons such that they are always within easy reach on counters, tables or nightstands. Such safely stored weapons are more quickly and easily retrieved for use in self-defense than unlocked guns that have been hidden away in seldom-used locations.

   (Added by Ord. 206-11, File No. 110901, App. 10/11/2011, Eff. 11/10/2011)

Addend.000051

San Francisco Police Code

---

# SEC. 4512.  HANDGUNS LOCATED IN A RESIDENCE TO BE KEPT IN A LOCKED CONTAINER OR DISABLED WITH A TRIGGER LOCK.

(a)    **Prohibition.** No person shall keep a handgun within a residence owned or controlled by that person unless the handgun is stored in a locked container or disabled with a trigger lock that has been approved by the California Department of Justice.

(b)    **Definitions.**

(1)    "Residence." As used in this Section, "residence" is any structure intended or used for human habitation including but not limited to houses, condominiums, rooms, in law units, motels, hotels, SRO's, time-shares, recreational and other vehicles where human habitation occurs.

(2)    "Locked container." As used in this Section, "locked container" means a secure container which is fully enclosed and locked by a padlock, key lock, combination lock or similar locking device.

(3)    "Handgun." As used in this Section, "handgun" means any pistol, revolver, or other firearm that is capable of being concealed upon the person, designed to be used as a weapon, capable of expelling a projectile by the force of any explosion or other form of combustion, and has a barrel less than 16 inches in length.

(4)    "Trigger lock." As used in this Section, a "trigger lock" means a trigger lock that is listed in the California Department of Justice's list of approved firearms safety devices and that is identified as appropriate for that handgun by reference to either the manufacturer and model of the handgun or to the physical characteristics of the handgun that match those listed on the roster for use with the device under Penal Code Section 12088(d).

(c)    **Exceptions.** This Section shall not apply in the following circumstances:

(1)    The handgun is carried on the person of an individual over the age of 18.

(2)    The handgun is under the control of a person who is a peace officer under Penal Code Section 830.

(d)    **Lost or Stolen Handguns.** In order to encourage reports to law enforcement agencies of lost or stolen handguns pursuant to San Francisco Police Code Section 616, a person who files a report with a law enforcement agency notifying the agency that a handgun has been lost or stolen shall not be subject to prosecution for violation of Section 4512(a) above.

(e)    **Penalty.** Every violation of this Section shall constitute a misdemeanor and upon conviction shall be punished by a fine not to exceed $1,000.00 or by imprisonment in the county

San Francisco Police Code

jail not to exceed six months, or by both.

    (f)    **Severability.** If any provision, clause or word of this chapter or the application thereof to any person or circumstance is held invalid, such invalidity shall not affect any other provision, clause, word or application of this Section which can be given effect without the invalid provision, clause or word, and to this end the provisions of this Section are declared to be severable.

    (Added by Ord. 193-07, File No. 070683, App. 8/1/2007)

Addend.000053

AS AMENDED IN COMMITTEE – 3/9/06

FILE NO. 060151        ORDINANCE NO.    55-06

1    [Implementation of Proposition H, which prohibits the sale, manufacture or distribution of
2    firearms and limits possession of handguns within the City and County of San Francisco, by
    placement in the Police Code and by enacting penalties for violation.]

3

4    **Ordinance implementing Proposition H, which was enacted by the voters on**

5    **November 8, 2005, and which prohibits the sale, distribution, transfer, and manufacture**

6    **of firearms and ammunition and limits possession of handguns within the City and**

7    **County of San Francisco, by placing the text of Proposition H in the Police Code and by**

8    **enacting penalties for its violation.**

9          Note:       Additions are *single-underline italics Times New Roman*;
                     deletions are ~~*strikethrough italics Times New Roman*~~.
10                      Board amendment additions are <u>double underlined</u>.
                     Board amendment deletions are ~~strikethrough normal~~.
11

12   Be it ordained by the People of the City and County of San Francisco:

13   Section 1. The San Francisco Police Code is hereby amended by adding Article 36A,

14   Sections 3600A and 3601A, to read as follows:

15   *SEC. 3600A. STATEMENT OF FINDINGS AND TEXT OF ORDINANCE PROHIBITING THE*

16   *SALE, MANUFACTURE AND DISTRIBUTION OF FIREARMS AND AMMUNITION IN THE CITY*

17   *AND COUNTY OF SAN FRANCISCO AND LIMITING THE POSSESSION OF HANDGUNS IN THE*

18   *CITY AND COUNTY OF SAN FRANCISCO.*

19   *This ordinance is enacted to implement an initiative ordinance approved by the electors of*

20   *San Francisco as Proposition "H" at the election held on November 8, 2005. The provisions of*

21   *Proposition "H" are set forth herein for convenience and may only be amended as provided by law.*

22   *Proposition "H" reads as follows:*

23   "Section 1. Findings

24   The people of the City and County of San Francisco hereby find and declare:

25

Addend.000054

1      1.     Handgun violence is a serious problem in San Francisco. According to a

2   San Francisco Department of Public Health report published in 2002, 176 handgun incidents

3   in San Francisco affected 213 victims in 1999, the last year for which data is available. Only

4   26.8% of firearms were recovered. Of all firearms used to cause injury or death, 67% were

5   handguns.

6      2.     San Franciscans have a right to live in a safe and secure City. The presence of

7   handguns poses a significant threat to the safety of San Franciscans.

8      3.     It is not the intent of the people of the City and County of San Francisco to affect

9   any resident of other jurisdictions with regard to handgun possession, including those who

10   may temporarily be within the boundaries of the City and County.

11      4.     Article XI of the California Constitution provides Charter created counties with

12   the "home rule" power. This power allows counties to enact laws that exclusively apply to

13   residents within their borders, even when such a law conflicts with state law or when state law

14   is silent. San Francisco adopted its most recent comprehensive Charter revision in 1996.

15      5.     Since it is not the intent of the people of the City and County of San Francisco to

16   impose an undue burden on inter-county commerce and transit, the provisions of Section 3

17   apply exclusively to residents of the City and County of San Francisco.

18      "Section 2. Ban on Sale, Manufacture, Transfer or Distribution of Firearms in the City

19   and County of San Francisco

20      Within the limits of the City and County of San Francisco, the sale, distribution,

21   transfer and manufacture of all firearms and ammunition shall be prohibited.

22      "Section 3. Limiting Handgun Possession in the City and County of San Francisco

23      Within the limits of the City and County of San Francisco, no resident of the City and

24   County of San Francisco shall possess any handgun unless required for professional

25

MAYOR
**BOARD OF SUPERVISORS**

Addend.000055

1    purposes, as enumerated herein. Specifically, any City, state or federal employee carrying out

2    the functions of his or her government employment, including but not limited to peace officers

3    as defined by California Penal Code Section 830 et.seq. and animal control officers may

4    possess a handgun. Active members of the United States armed forces or the National Guard

5    and security guards, regularly employed and compensated by a person engaged in any lawful

6    business, while actually employed and engaged in protecting and preserving property or life

7    within the scope of his or her employment, may also possess handguns. Within 90 days from

8    the effective date of this section, any resident of the City and County of San Francisco may

9    surrender his or her handgun at any district station of the San Francisco Police Department,

10   or to the San Francisco Sheriff's Department without penalty under this section.

11           "Section 4. Effective Date

12           This ordinance shall become effective January 1, 2006.

13           "Section 5. Penalties

14           Within 90 days of the effective date of this section, the Board of Supervisors shall

15   enact penalties for violations of this ordinance. The Mayor, after consultation with the District

16   Attorney, Sheriff and Chief of Police shall, within 30 days from the effective date, provide

17   recommendations about penalties to the Board.

18           "Section 6. State Law

19           Nothing in this ordinance is designed to duplicate or conflict with California state law.

20   Accordingly, any person currently denied the privilege of possessing a handgun under state

21   law shall not be covered by this ordinance, but shall be covered by the California state law

22   which denies that privilege. Nothing in this ordinance shall be construed to create or require

23   any local license or registration for any firearm, or create an additional class of citizens who

24   must seek licensing or registration.

25

MAYOR
**BOARD OF SUPERVISORS**                                                                                          Page 3
                                                                                                                 1/30/2006
**Addend.000056**

1    "Section 7.  Severability

2          If any provision of this ordinance or the application thereof to any person or

3    circumstances is held invalid or unconstitutional, such invalidity or unconstitutionality shall not

4    affect other provisions or applications or this ordinance which can be given effect without the

5    invalid or unconstitutional provision or application. To this end, the provisions of this ordinance

6    shall be deemed severable.

7          "Section 8.  Amendment

8          By a two-thirds vote and upon making findings, the Board of Supervisors may amend

9    this ordinance in the furtherance of reducing handgun violence."

10

11    *SEC. 3601A.  PENALTY FOR SALE, DISTRIBUTION, TRANSFER, AND MANUFACTURE OF*

12    *FIREARMS AND AMMUNITION OR POSSESSION OF HANDGUNS WITHIN CITY AND COUNTY*

13    *OF SAN FRANCISCO.*

14          *(a)  In enacting Proposition "H" the voters required the Board of Supervisors to enact penalties*

15    *for its violation.  The following sections set forth the penalties for violation of Proposition H.*

16          *(b)  Any person who shall violate the provisions of Police Code Section 3600A that prohibit the*

17    *sale, distribution, transfer and manufacture of all firearms and ammunition within the limits of the City*

18    *and County of San Francisco or that prohibit the possession of any handgun within the limits of the*

19    *City and County of San Francisco shall be guilty of a misdemeanor and upon conviction shall be*

20    *punished by a fine not to exceed $1,000 and by imprisonment in the County Jail not to exceed six*

21    *months, or by both.*

22          *(c)  Any firearm or ammunition sold, distributed, transferred, or manufactured or any handgun*

23    *possessed within the City and County of San Francisco in violation of the provisions of Police Code*

24    *Section 3600A is hereby declared to be a nuisance, and shall be surrendered to the Police Department*

25

MAYOR
**BOARD OF SUPERVISORS**                                                                                      Page 4
                                                                                                             1/30/2006
n:\admins\lross\mayor\gunlaw.doc\gunlaw.htm
**Addend.000057**

1    *of the City and County of San Francisco. The Chief of Police is authorized to seize such firearms,*

2    *ammunition and handguns and shall destroy or cause to be destroyed such firearms, ammunition and*

3    *handguns, except upon the certificate of a judge of a court of record, or of the District Attorney that the*

4    *preservation thereof is necessary or proper to the ends of justice.*

5        *(d) This Section shall be enforced to the full extent of the authority of the City and County of*

6    *San Francisco. If any subsection, sentence, clause, phrase, or word of this Section or the application*

7    *thereof to any person or circumstances is held invalid or unconstitutional, such invalidity or*

8    *unconstitutionality shall not affect other provisions or applications of this Section which can be given*

9    *effect without the invalid or unconstitutional provision or application. To this end, the provisions of this*

10    *section shall be deemed severable.*

12   APPROVED AS TO FORM:
     DENNIS J. HERRERA, City Attorney

14   By:

15      LINDA M. ROSS
     Deputy City Attorney

MAYOR
**BOARD OF SUPERVISORS**

Page 5
1/30/2006
n:\admins\lross\mayor\gunleg.doc\gunpen3.doc
**Addend.000058**



# City and County of San Francisco

## Tails

### Ordinance

City Hall
1 Dr. Carlton B. Goodlett Place
San Francisco, CA 94102-4689

**File Number:** 060151      **Date Passed:**

Ordinance implementing Proposition H, which was enacted by the voters on November 8, 2005, and which prohibits the sale, distribution, transfer, and manufacture of firearms and ammunition and limits possession of handguns within the City and County of San Francisco, by placing the text of Proposition H in the Police Code and by enacting penalties for its violation.

March 14, 2006  Board of Supervisors — PASSED ON FIRST READING

Ayes: 10 - Alioto-Pier, Ammiano, Daly, Dufty, Elsbernd, Ma, Maxwell, Mirkarimi, Peskin, Sandoval
Excused: 1 - McGoldrick

March 21, 2006  Board of Supervisors — FINALLY PASSED

Ayes: 11 - Alioto-Pier, Ammiano, Daly, Dufty, Elsbernd, Ma, Maxwell, McGoldrick, Mirkarimi, Peskin, Sandoval

**Addend.000059**

File No. 060151

**I hereby certify that the foregoing Ordinance was FINALLY PASSED on March 21, 2006 by the Board of Supervisors of the City and County of San Francisco.**

_____
C/o  Gloria L. Young
Clerk of the Board

MAR 3 1 2006

_____
**Date Approved**

_____
Mayor Gavin Newsom

**File No. 060151**

_City and County of San Francisco_          2          _Printed at 10:41 AM on 3/22/06_
_Tails Report_

**Addend.000060**

# SENATE BILL        No. 53

**Introduced by Senator De León**
**(Principal coauthor: Senator Yee)**
**(Coauthor: Senator Steinberg)**
(Coauthor: Assembly Member Skinner)

December 20, 2012

An act to amend Sections 11106, 17315, 30312, 30347, 30350, 30352, and 30365 of, to amend the heading of Article 3 (commencing with Section 30345) of Chapter 1 of Division 10 of Title 4 of Part 6 of, to add Section 16663 to, and to add Article 4 (commencing with Section 30370) to Chapter 1 of Division 10 of Title 4 of Part 6 of, the Penal Code, relating to ammunition.

LEGISLATIVE COUNSEL'S DIGEST

SB 53, as introduced, De León. Ammunition: purchase permits.

(1)  Existing law requires the Attorney General to maintain records, including among other things, fingerprints, licenses to carry concealed firearms, and information from firearms dealers pertaining to firearms, for purposes of assisting in the investigation of crimes, and specified civil actions.

This bill would require the Attorney General to also maintain copies of ammunition purchase permits for those purposes.

(2)  Existing law, subject to exceptions, requires that the delivery or transfer of ownership of handgun ammunition occur only in a face-to-face transaction. Existing law provides that the term "vendor" for purposes of ammunition sales is a "handgun ammunition vendor" as defined for those and other purposes.

This bill would extend those provisions to any ammunition. The bill would provide that the term "vendor" for purposes of ammunition sales

99

**SB 53** — 2 —

means "ammunition vendor" as defined for those and other purposes. The bill would make additional conforming changes.

(3) Existing law prohibits an ammunition vendor from allowing a person the vendor knows or should know is a person who is prohibited from possessing firearms for specified reasons, from handling, selling, or delivering handgun ammunition in the course and scope of their employment. Existing law prohibits an ammunition vendor from selling or otherwise transferring ownership of, offering for sale or otherwise offering to transfer ownership of, or displaying for sale or displaying for transfer of ownership of, any handgun ammunition in a manner that allows that ammunition to be accessible to a purchaser or transferee without the assistance of the vendor or an employee of the vendor.

This bill would extend those prohibitions to any ammunition. The bill would provide that a violation of those provisions is a misdemeanor.

By creating a new crime, this bill would impose a state-mandated local program.

(4) Existing law subject to exceptions, requires a handgun ammunition vendor to record specified information at the time of delivery of handgun ammunition to a purchaser, as specified.

This bill would extend those provisions to transactions of any ammunition. The bill would, commencing September 1, 2014, and subject to exceptions, require the purchaser of ammunition to hold an ammunition purchase permit, or other specified permit, license, or certificate pertaining to acquisition, possession, or carrying firearms, as provided, or other specified documentation for a person who is not a state resident. The bill would, commencing September 1, 2014, require the vendor to submit to the Department of Justice information demonstrating compliance with that verification requirement, as specified. The bill would, commencing June 1, 2014, authorize issuance of ammunition purchase permits by the Department of Justice to applicants who are residents of this state, at least 18 years of age, not prohibited from acquiring or possessing ammunition, and who pay the required fees, as specified. The bill would establish an application process and specify the information to be displayed on the permit. The bill would provide that the permit authorizes the holder to purchase ammunition from an ammunition vendor.

(5) The California Constitution requires the state to reimburse local agencies and school districts for certain costs mandated by the state. Statutory provisions establish procedures for making that reimbursement.

99

— 3 —                                      SB 53

This bill would provide that no reimbursement is required by this act for a specified reason.

Vote:  majority.  Appropriation:  no. Fiscal committee:  yes. State-mandated local program:  yes.

*The people of the State of California do enact as follows:*

1    SECTION 1.  Section 11106 of the Penal Code, as added by
2    Section 2.5 of Chapter 745 of the Statutes of 2011, is amended to
3    read:
4        11106.  (a)  In order to assist in the investigation of crime, the
5    prosecution of civil actions by city attorneys pursuant to paragraph
6    (3) of subdivision ~~(e)~~ *(b),* the arrest and prosecution of criminals,
7    and the recovery of lost, stolen, or found property, the Attorney
8    General shall keep and properly file a complete record of all copies
9    of fingerprints, copies of licenses to carry firearms issued pursuant
10   to Section 26150, 26155, 26170, or 26215, information reported
11   to the Department of Justice pursuant to Section 26225, *copies of*
12   *permits authorized in Section 30370,* dealers' records of sales of
13   firearms, reports provided pursuant to Article 1 (commencing with
14   Section 27500) of Chapter 4 of Division 6 of Title 4 of Part 6, or
15   pursuant to any provision listed in subdivision (a) of Section 16585,
16   forms provided pursuant to Section 12084, as that section read
17   prior to being repealed, reports provided pursuant to Article 1
18   (commencing with Section 26700) and Article 2 (commencing
19   with Section 26800) of Chapter 2 of Division 6 of Title 4 of Part
20   6, that are not dealers' records of sales of firearms, and reports of
21   stolen, lost, found, pledged, or pawned property in any city or
22   county of this state, and shall, upon proper application therefor,
23   furnish this information to the officers referred to in Section 11105.
24       (b) (1) The Attorney General shall permanently keep and
25   properly file and maintain all information reported to the
26   Department of Justice pursuant to the following provisions as to
27   firearms and maintain a registry thereof:
28       (A)  Article 1 (commencing with Section 26700) and Article 2
29   (commencing with Section 26800) of Chapter 2 of Division 6 of
30   Title 4 of Part 6.
31       (B)  Article 1 (commencing with Section 27500) of Chapter 4
32   of Division 6 of Title 4 of Part 6.

99

1    (C)  Chapter 5 (commencing with Section 28050) of Division 6
2  of Title 4 of Part 6.
3    (D)  Any provision listed in subdivision (a) of Section 16585.
4    (E)  Former Section 12084.
5    (F)  Any other law.
6    (2)  The registry shall consist of all of the following:
7    (A)  The name, address, identification of, place of birth (state
8  or country), complete telephone number, occupation, sex,
9  description, and all legal names and aliases ever used by the owner
10  or person being loaned the particular firearm as listed on the
11  information provided to the department on the Dealers' Record of
12  Sale, the Law Enforcement Firearms Transfer (LEFT), as defined
13  in former Section 12084, or reports made to the department
14  pursuant to any provision listed in subdivision (a) of Section 16585
15  or any other law.
16    (B)  The name and address of, and other information about, any
17  person (whether a dealer or a private party) from whom the owner
18  acquired or the person being loaned the particular firearm and
19  when the firearm was acquired or loaned as listed on the
20  information provided to the department on the Dealers' Record of
21  Sale, the LEFT, or reports made to the department pursuant to any
22  provision listed in subdivision (a) of Section 16585 or any other
23  law.
24    (C)  Any waiting period exemption applicable to the transaction
25  which resulted in the owner of or the person being loaned the
26  particular firearm acquiring or being loaned that firearm.
27    (D)  The manufacturer's name if stamped on the firearm, model
28  name or number if stamped on the firearm, and, if applicable, the
29  serial number, other number (if more than one serial number is
30  stamped on the firearm), caliber, type of firearm, if the firearm is
31  new or used, barrel length, and color of the firearm, or, if the
32  firearm is not a handgun and does not have a serial number or any
33  identification number or mark assigned to it, that shall be noted.
34    (3)  Information in the registry referred to in this subdivision
35  shall, upon proper application therefor, be furnished to the officers
36  referred to in Section 11105, to a city attorney prosecuting a civil
37  action, solely for use in prosecuting that civil action and not for
38  any other purpose, or to the person listed in the registry as the
39  owner or person who is listed as being loaned the particular firearm.

99

1   (4)  If any person is listed in the registry as the owner of a firearm
2   through a Dealers' Record of Sale prior to 1979, and the person
3   listed in the registry requests by letter that the Attorney General
4   store and keep the record electronically, as well as in the record's
5   existing photographic, photostatic, or nonerasable optically stored
6   form, the Attorney General shall do so within three working days
7   of receipt of the request. The Attorney General shall, in writing,
8   and as soon as practicable, notify the person requesting electronic
9   storage of the record that the request has been honored as required
10  by this paragraph.
11  (c)  (1)  Any officer referred to in paragraphs (1) to (6), inclusive,
12  of subdivision (b) of Section 11105 may disseminate the name of
13  the subject of the record, the number of the firearms listed in the
14  record, and the description of any firearm, including the make,
15  model, and caliber, from the record relating to any firearm's sale,
16  transfer, registration, or license record, or any information reported
17  to the Department of Justice pursuant to Section 26225, Article 1
18  (commencing with Section 26700) and Article 2 (commencing
19  with Section 26800) of Chapter 2 of Division 6 of Title 4 of Part
20  6, Article 1 (commencing with Section 27500) of Chapter 4 of
21  Division 6 of Title 4 of Part 6, Chapter 5 (commencing with
22  Section 28050) of Division 6 of Title 4 of Part 6, Article 2
23  (commencing with Section 28150) of Chapter 6 of Division 6 of
24  Title 4 of Part 6, Article 5 (commencing with Section 30900) of
25  Chapter 2 of Division 10 of Title 4 of Part 6, Chapter 2
26  (commencing with Section 33850) of Division 11 of Title 4 of Part
27  6, or any provision listed in subdivision (a) of Section 16585, if
28  the following conditions are met:
29  (A)  The subject of the record has been arraigned for a crime in
30  which the victim is a person described in subdivisions (a) to (f),
31  inclusive, of Section 6211 of the Family Code and is being
32  prosecuted or is serving a sentence for the crime, or the subject of
33  the record is the subject of an emergency protective order, a
34  temporary restraining order, or an order after hearing, which is in
35  effect and has been issued by a family court under the Domestic
36  Violence Protection Act set forth in Division 10 (commencing
37  with Section 6200) of the Family Code.
38  (B)  The information is disseminated only to the victim of the
39  crime or to the person who has obtained the emergency protective

99

1 order, the temporary restraining order, or the order after hearing
2 issued by the family court.
3    (C) Whenever a law enforcement officer disseminates the
4 information authorized by this subdivision, that officer or another
5 officer assigned to the case shall immediately provide the victim
6 of the crime with a "Victims of Domestic Violence" card, as
7 specified in subparagraph (H) of paragraph (9) of subdivision (c)
8 of Section 13701.
9    (2) The victim or person to whom information is disseminated
10 pursuant to this subdivision may disclose it as he or she deems
11 necessary to protect himself or herself or another person from
12 bodily harm by the person who is the subject of the record.
13    (d) This section shall become operative January 1, 2014.
14    SEC. 2. Section 16663 is added to the Penal Code, to read:
15    16663. As used in this part, "ammunition vendor" means any
16 person, firm, corporation, dealer, or any other business enterprise
17 that is engaged in the retail sale of any ammunition, or that holds
18 itself out as engaged in the business of selling any ammunition.
19    SEC. 3. Section 17315 of the Penal Code is amended to read:
20    17315. As used in Article 3 (commencing with Section 30345)
21 of Chapter 1 of Division 10 of Title 4, "vendor" means ~~a handgun~~
22 *an* ammunition vendor.
23    SEC. 4. Section 30312 of the Penal Code is amended to read:
24    30312. (a) ~~Commencing February 1, 2011, the~~ *The* delivery
25 or transfer of ownership of ~~handgun~~ ammunition may only occur
26 in a face-to-face transaction with the deliverer or transferor being
27 provided bona fide evidence of identity from the purchaser or other
28 transferee.
29    (b) Subdivision (a) shall not apply to or affect the sale, delivery,
30 or transfer of ~~handgun~~ ammunition to any of the following:
31    (1) An authorized law enforcement representative of a city,
32 county, city and county, or state or federal government, if the sale,
33 delivery, or transfer is for exclusive use by that government agency
34 and, prior to the sale, delivery, or transfer of the ~~handgun~~
35 ammunition, written authorization from the head of the agency
36 employing the purchaser or transferee is obtained, identifying the
37 employee as an individual authorized to conduct the transaction,
38 and authorizing the transaction for the exclusive use of the agency
39 employing the individual.

Addend.000066

— 7 —                                              **SB 53**

1    (2) A sworn peace officer, as defined in Chapter 4.5
2  (commencing with Section 830) of Title 3 of Part 2 who is
3  authorized to carry a firearm in the course and scope of the officer's
4  duties.
5    (3) An importer or manufacturer of ~~handgun~~ ammunition or
6  firearms who is licensed to engage in business pursuant to Chapter
7  44 (commencing with Section 921) of Title 18 of the United States
8  Code and the regulations issued pursuant thereto.
9    (4) A person who is on the centralized list maintained by the
10  Department of Justice pursuant to Article 6 (commencing with
11  Section 28450) of Chapter 6 of Division 6 of this title.
12    (5) A person whose licensed premises are outside this state and
13  who is licensed as a dealer or collector of firearms pursuant to
14  Chapter 44 (commencing with Section 921) of Title 18 of the
15  United States Code and the regulations issued pursuant thereto.
16    (6) A person who is licensed as a collector of firearms pursuant
17  to Chapter 44 (commencing with Section 921) of Title 18 of the
18  United States Code and the regulations issued pursuant thereto,
19  whose licensed premises are within this state, and who has a current
20  certificate of eligibility issued by the Department of Justice
21  pursuant to Section 26710.
22    (7) ~~A handgun~~ *An* ammunition vendor.
23    (8) A consultant-evaluator.
24    (c) A violation of this section is a misdemeanor.
25    SEC. 5.   The heading of Article 3 (commencing with Section
26  30345) of Chapter 1 of Division 10 of Title 4 of Part 6 of the Penal
27  Code is amended to read:
28
29            Article 3.  ~~Handgun~~ Ammunition Vendors
30
31    SEC. 6.   Section 30347 of the Penal Code is amended to read:
32    30347.   A vendor shall not permit any employee who the vendor
33  knows or reasonably should know is a person described in Chapter
34  2 (commencing with Section 29800) or Chapter 3 (commencing
35  with Section 29900) of Division 9 of this title or Section 8100 or
36  8103 of the Welfare and Institutions Code to handle, sell, or deliver
37  ~~handgun~~ ammunition in the course and scope of employment.
38    SEC. 7.   Section 30350 of the Penal Code is amended to read:
39    30350.   A vendor shall not sell or otherwise transfer ownership
40  of, offer for sale or otherwise offer to transfer ownership of, or

99

1 display for sale or display for transfer of ownership of any ~~handgun~~
2 ammunition in a manner that allows that ammunition to be
3 accessible to a purchaser or transferee without the assistance of
4 the vendor or an employee of the vendor.
5   SEC. 8.   Section 30352 of the Penal Code is amended to read:
6   30352.   (a) ~~Commencing February 1, 2011, a~~ *A* vendor shall
7 not sell or otherwise transfer ownership of any ~~handgun~~
8 ammunition without, at the time of delivery, legibly recording the
9 following information:
10   (1) The date of the sale or other transaction.
11   (2) The purchaser's or transferee's driver's license or other
12 identification number and the state in which it was issued.
13   (3) The brand, type, and amount of ammunition sold or
14 otherwise transferred.
15   (4) The purchaser's or transferee's signature.
16   (5) The name of the salesperson who processed the sale or other
17 transaction.
18   (6) The right thumbprint of the purchaser or transferee on the
19 above form.
20   (7) The purchaser's or transferee's full residential address and
21 telephone number.
22   (8) The purchaser's or transferee's date of birth.
23   *(b) Commencing September 1, 2014, an ammunition vendor*
24 *shall submit information in a format prescribed by the department*
25 *to show compliance with subdivision (c).*
26   *(c) Commencing on September 1, 2014, only those persons listed*
27 *below or those persons or entities listed in subdivision (d) shall*
28 *be permitted to purchase ammunition. Prior to the delivery of the*
29 *ammunition, the vendor shall verify that the person who is*
30 *receiving delivery of the ammunition is a properly identified person*
31 *or entity listed in subdivision (d) or one of the following:*
32   *(1) A holder of a valid ammunition purchase permit issued*
33 *pursuant to Section 30370.*
34   *(2) A person who is authorized to carry loaded firearms*
35 *pursuant to Section 25900, 25905, 25910, 25925, 26010, 26015,*
36 *26025, or 26030.*
37   *(3) A holder of a special weapons permit issued by the*
38 *department pursuant to Section 32650 or 33300, pursuant to Article*
39 *3 (commencing with Section 18900) of Chapter 1 of Division 5 of*

99

1    *Title 2, or pursuant to Article 4 (commencing with Section 32700)*
2    *of Chapter 6 of this division.*
3        *(4) A holder of a current certificate of eligibility issued pursuant*
4    *to Section 26710.*
5        *(5) A holder of a valid entertainment firearms permit issued*
6    *pursuant to Chapter 2 (commencing with Section 29500) of*
7    *Division 8.*
8        *(6) If a person is not the holder of an ammunition purchase*
9    *permit because he or she is not a resident of this state, then*
10   *pursuant to procedures prescribed by the department, the person*
11   *presents documentation to the vendor that shows that the person*
12   *would not be prohibited from acquiring or possessing ammunition*
13   *within this state.*
14   ~~(b)~~
15       *(d )* Subdivision (a) shall not apply to or affect sales or other
16   transfers of ownership of ~~handgun~~ ammunition by ~~handgun~~
17   ammunition vendors to any of the following, if properly identified:
18       (1) A person licensed pursuant to Sections 26700 to 26915,
19   inclusive.
20       (2) ~~A handgun~~ *An* ammunition vendor.
21       (3) A person who is on the centralized list maintained by the
22   department pursuant to Article 6 (commencing with Section 28450)
23   of Chapter 6 of Division 6 of this title.
24       (4) A target facility that holds a business or regulatory license.
25       (5) A gunsmith.
26       (6) A wholesaler.
27       (7) A manufacturer or importer of firearms *or ammunition*
28   licensed pursuant to Chapter 44 (commencing with Section 921)
29   of Title 18 of the United States Code, and the regulations issued
30   pursuant thereto.
31       (8) An authorized law enforcement representative of a city,
32   county, city and county, or state or federal government, if the sale
33   or other transfer of ownership is for exclusive use by that
34   government agency, and, prior to the sale, delivery, or transfer of
35   the ~~handgun~~ ammunition, written authorization from the head of
36   the agency authorizing the transaction is presented to the person
37   from whom the purchase, delivery, or transfer is being made.
38   Proper written authorization is defined as verifiable written
39   certification from the head of the agency by which the purchaser,
40   transferee, or person otherwise acquiring ownership is employed,

99

1 identifying the employee as an individual authorized to conduct
2 the transaction, and authorizing the transaction for the exclusive
3 use of the agency by which that individual is employed.
4 SEC. 9. Section 30365 of the Penal Code is amended to read:
5 30365. (a) A violation of Section *30347, 30350,* 30352, 30355,
6 30360, or 30362 is a misdemeanor.
7 (b) The provisions of this section are cumulative, and shall not
8 be construed as restricting the application of any other law.
9 However, an act or omission punishable in different ways by
10 different provisions of law shall not be punished under more than
11 one provision.
12 SEC. 10. Article 4 (commencing with Section 30370) is added
13 to Chapter 1 of Division 10 of Title 4 of Part 6 of the Penal Code,
14 to read:
15
16              Article 4. Ammunition Purchase Permits
17
18 30370. (a) (1) Commencing on June 1, 2014, any person who
19 is a resident of this state and who is 18 years of age or older may
20 apply to the department for an ammunition purchase permit, in a
21 format to be prescribed by the department.
22 (2) The ammunition purchase permit shall entitle the
23 permitholder to purchase or otherwise acquire ownership of
24 ammunition from an ammunition vendor as that term is defined
25 in Section 16663 and shall have no other force or effect.
26 (b) The department shall issue an ammunition purchase permit
27 to the applicant if all of the following conditions are met:
28 (1) The applicant is 18 years of age or older.
29 (2) The applicant is not prohibited from acquiring or possessing
30 ammunition by the laws of this state.
31 (3) The applicant pays the fees set forth in subdivision (i).
32 (c) (1) Upon receipt of an initial or renewal application, the
33 department shall examine its records and is authorized to request
34 records from the State Department of Mental Health, pursuant to
35 Section 8104 of the Welfare and Institutions Code, and if
36 authorized, the National Instant Criminal Background Check
37 System, as described in of Section 922(t) of Title 18 of the United
38 States Code, in order to determine if the applicant is prohibited
39 from possessing or acquiring ammunition.

99

**SB 53**

1    (2) The applicant shall be approved or denied within 30 days
2 of the date of the application. If the application is denied, the
3 department shall state the reasons for doing so and provide the
4 applicant an appeal process to challenge that denial.
5    (d) The ammunition purchase permit shall be valid for one year
6 from the date of issuance.
7    (e) The department shall send a notice of the expiration of an
8 ammunition purchase permit, by first-class mail or other means
9 that are equivalent, including electronic mail, to the address of the
10 person as shown by the records of the department, not less than
11 90 days before the expiration date, and shall enclose or contain a
12 form for the renewal of the permit.
13    (f) The ammunition purchase permit shall be revoked by the
14 department upon the occurrence of any event which would have
15 disqualified the holder from being issued the ammunition purchase
16 permit pursuant to this section.
17    (g) The ammunition purchase permit shall be in a tamper-proof
18 form prescribed by the department and shall include the name,
19 address, photograph, date of birth, a unique identifying number,
20 expiration date from the date of issuance, physical characteristics,
21 including the height, weight, eye color, and hair color of the
22 permitholder, and other information that may be prescribed by the
23 department.
24    (h) The department shall recover the reasonable cost of
25 administering this section by charging applicants an initial
26 application and annual renewal application fee.
27    (i) All fees received pursuant to this section shall be deposited
28 into the Dealer's Record of Sale Special Account of the General
29 Fund.
30    (j) The implementation of this section by the department is
31 exempt from the Administrative Procedure Act (Chapter 3.5
32 (commencing with Section 11340) of Part 1 of Division 3 of Title
33 2 of the Government Code).
34    (k) The department shall annually review and shall adjust the
35 fees specified in subdivision (h), if necessary, to fully fund, but
36 not to exceed the reasonable costs of, the permit program provided
37 by this section, including the enforcement of this program.
38    (*l*) The Attorney General is authorized to adopt regulations to
39 implement the provisions of this section.

99

**SB 53** — 12 —

1     SEC. 11.   No reimbursement is required by this act pursuant to
2 Section 6 of Article XIII B of the California Constitution because
3 the only costs that may be incurred by a local agency or school
4 district will be incurred because this act creates a new crime or
5 infraction, eliminates a crime or infraction, or changes the penalty
6 for a crime or infraction, within the meaning of Section 17556 of
7 the Government Code, or changes the definition of a crime within
8 the meaning of Section 6 of Article XIII B of the California
9 Constitution.

O