No. 12-17803

───────────────

UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

───────────────

ESPANOLA JACKSON *et al.*,

*Plaintiffs-Appellants*,

v.

CITY AND COUNTY OF SAN FRANCISCO, *et al.*,

*Defendants-Appellees*.

───────────────

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
(CV-09-2143-RS)

───────────────

BRIEF AMICUS CURIAE OF
THE LAW ENFORCEMENT ALLIANCE OF AMERICA
IN SUPPORT OF PLAINTIFFS-APPELLANTS
AND IN SUPPORT OF REVERSAL

───────────────

Richard E. Gardiner
Suite 403
3925 Chain Bridge Road
Fairfax, VA 22030
(703) 352-7276
(703) 359-0938 (fax)
regardiner@cox.net

## RULE 26.1 STATEMENT

The Law Enforcement Alliance of America ("LEAA") is a Virginia non-stock corporation and has no parent corporation and no stock, so that no publicly held corporation owns 10% or more of its stock.

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES.......................................... iii

IDENTITY OF *AMICUS CURIAE*...................................... 1

ARGUMENT...................................................... 3

    Introduction................................................. 3

    I. The District Court Misinterpreted
      *District Of Columbia* v. *Heller*. ................................. 3

    II. Imposing The Financial Burden
      Of Purchasing A Locked Container
      Or A Trigger Lock Violates The
      Second Amendment. ........................................ 11

    III. Section 4512 May Increase Crime. ........................... 12

CONCLUSION.................................................. 14

## TABLE OF AUTHORITIES

**CASES** Page

*Balistreri* v. *Pacifica Police Dept.*,
901 F.2d 696 (9th Cir. 1988). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

*City of Sunnyvale* v. *Superior Court*,
203 Cal. App. 3d 839 (Ct. App. 1988). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

*Cox v. New Hampshire*,
312 U.S. 569 (1941). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*District Of Columbia* v. *Heller*,
554 U.S. 570 (2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 4, 5, 6

*Harper v. Virginia State Board of Elections*,
383 U.S. 663 (1966). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*M.L.B. v. S.L.J.*,
519 U.S. 102 (1996). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Murdock v. Com. of Pennsylvania*,
319 U.S. 105 (1943). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Planned Parenthood of Southeastern Pa. v. Casey,*
505 U.S. 833 (1992). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12


**STATUTES**

D.C. Code § 7-2507.02. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 6

D.C. Code § 22-4504. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

Section 4512, San Francisco Police Code. . . . . . . . . . . . . . . . . . . . . 3, 5, 6, 8, 12

## OTHER AUTHORITIES

*The Journal of Law And Economics*
(Vol. XLIV) (October 2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

www.southernstates.com/catalog/p-10407-
stack-on-personal-safe-with-biometric-
lock-14in-x-10in-x-10in.aspx. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

www.sportsauthority.com/product/
index.jsp?productId=11367620.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

# IDENTITY OF *AMICUS CURIAE*

*Amicus curiae* is the Law Enforcement Alliance of America, Inc. ("LEAA"), a non-profit, non-partisan advocacy and public education organization founded in 1992 and made up of thousands of law enforcement professionals, crime victims, and concerned citizens united for justice and dedicated to making America safer. Many of LEAA's members reside and/or work in California.

LEAA represents its members' interests by assisting law enforcement professionals, securing victims' rights over criminals' rights, seeking criminal justice reforms that target violent criminals, not law-abiding citizens, and explaining, from a law enforcement perspective, why firearms regulation is not effective in controlling crime, but make law-abiding persons more vulnerable to becoming crime victims.[1]

---

[1] LEAA is especially sensitive to the fact that, in general, there is:

> no constitutional duty of state officials to protect members of the public at large from crime. See *Martinez* v. *California*, 444 U.S. 277, 284–85, 100 S.Ct. 553, 558–59, 62 L.Ed.2d 481 (1980); *Ketchum*, 811 F.2d 1243, 1247 (9th Cir.1987); *Bowers* v. *DeVito*, 686 F.2d 616, 618 (7th Cir.1982).

*Balistreri* v. *Pacifica Police Dept.*, 901 F.2d 696, 699-700 (9th Cir. 1988).

California courts have taken the same position; *see e.g.*, *City of Sunnyvale* v. *Superior Court*, 203 Cal. App. 3d 839, 842 (Ct. App. 1988) ("Many recent cases which have considered what duty a police officer owes to members of the public have concluded the police have no duty to protect individuals from potential wrongdoers.").

-1-

LEAA's interest in this case is two-fold: 1) protecting the interests of law enforcement officers from the negative effects of *malum prohibitum* laws regulating firearms possession by peaceful, honest persons which law enforcement officers must enforce; effects such as lawsuits for false arrest and failure to train, setting aside of convictions to which limited law enforcement resources have been devoted, the need for specialized training, and that such laws create an environment of mistrust between law enforcement and the public due to their restrictions on the fundamental right of self-defense; and 2) the advancement of public safety, based on the experience of the large majority of states, where law-abiding persons are allowed to possess firearms in the home for lawful self-defense without storage restrictions.

LEAA has been an *amicus curiae* in other California cases, on the prevailing side in two United States Supreme Court cases, and, as an organization representing law enforcement professionals on the front lines of enforcing the law, LEAA can assist the court by providing the perspective of law enforcement professionals.

LEAA has received consent from all parties to file this brief.

No party's counsel authored the brief in whole or in part; no party or party's counsel contributed money that was intended to fund preparing or submitting the brief; and no person — other than the amicus curiae, its members, or its counsel — contributed money that was intended to fund preparing or submitting the brief.

**ARGUMENT**

Introduction

Section 4512 of the San Francisco Police Code requires that a person possessing a handgun install a trigger lock on the handgun or store the handgun in a locked container, unless the handgun is actually being carried on the person.

I.

The District Court Misinterpreted *District Of Columbia* v. *Heller*

A) The district court concluded that Section 4512 did not violate the Second Amendment (as applied to the states through the Fourteenth Amendment) because Section 4512 "gives San Francisco residents the very set of rights the [*District Of Columbia* v.] *Heller*[, 554 U.S. 570 (2008)] plaintiff sought and obtained." Appellants' Excerpts of R., vol. I ("E.R. I") 007. This conclusion is erroneous.

In *Heller*, the Court invalidated, *inter alia*, a District of Columbia law which:

> requires residents to keep their lawfully owned firearms, such as registered long guns, "unloaded and dissembled or bound by a trigger lock or similar device" unless they are located in a place of business or are being used for lawful recreational activities.

554 U.S. at 575.

*Heller* held that "the District's ban on handgun possession in the home violates the Second Amendment, as does its prohibition against rendering any lawful firearm in the home operable for the purpose of immediate self-defense." 554 U.S. at 635.

-3-

The Court explained that it invalidated the District's storage requirement because the handgun is "the quintessential self-defense weapon" and that there are "many reasons that a citizen may prefer a handgun for home defense: It is easier to store in a location that is *readily accessible* in an emergency . . . ." 554 U.S. at 629 (emphasis added). The consequence of the Court's invalidation of the District's storage law was that residents could possess firearms in their homes loaded and assembled and not bound by a trigger lock or similar device.[2] When the District revised its law after *Heller*, it

---

[2] The plaintiff in *Heller* had also challenged the requirement of District law that a person have a license to carry a firearm in his home. The Court did not address this requirement because the District stated that:

> "if the handgun ban is struck down and respondent registers a handgun, he could obtain a license, assuming he is not otherwise disqualified," by which they apparently mean if he is not a felon and is not insane.

554 U.S. at 631.

When the District revised the law after *Heller*, it repealed the requirement for a license to carry in the home. D.C. Code § 22-4504 now provides:

> (a) No person shall carry within the District of Columbia either openly or concealed on or about their person, a pistol, or any deadly or dangerous weapon capable of being so concealed. Whoever violates this section shall be punished as provided in § 22-4515, except that:

> (1) A person who violates this section by carrying a pistol, or any deadly or dangerous weapon, in a place other than the person's dwelling place, place of business, or on other land possessed by the person, shall be fined not more than $5,000 or imprisoned for not more than 5 years, or both . . . .

correctly understood *Heller* as prohibiting the enactment of a law requiring the incapacitation of firearms in the home. It thus enacted D.C. Code § 7-2507.02:

> (a) It shall be the policy of the District of Columbia that each registrant should keep any firearm in his or her possession unloaded and either disassembled or secured by a trigger lock, gun safe, locked box, or other secure device.
>
> (b) No person shall store or keep any firearm on any premises under his control if he knows or reasonably should know that a minor is likely to gain access to the firearm without the permission of the parent or guardian of the minor unless such person:
>
> > (1) Keeps the firearm in a securely locked box, secured container, or in a location which a reasonable person would believe to be secure; or
> >
> > (2) Carries the firearm on his person or within such close proximity that he can readily retrieve and use it as if he carried it on his person.

Accordingly, Section 4512 does not comply with *Heller*.

B) The statement in *Heller* quoted by the district court (E.R. I 008), *i.e.*, that nothing in the Court's "analysis suggest[s] the invalidity of laws regulating the storage of firearms to prevent accidents," 554 U.S. at 632, is taken out of context by the district court. In view of the fact that *Heller* invalidated the requirement that residents keep their firearms "unloaded and dissembled or bound by a trigger lock or similar device" so that a handgun could be "readily accessible in an emergency" (554 U.S. at 629), thereby allowing residents to possess firearms in their homes loaded and

-5-

assembled and not bound by a trigger lock or similar device, the Court's statement plainly refers to laws which regulate the storage of firearms when the resident is not in the residence and other persons, such as children, may have access to the firearms. Indeed, that is precisely how the District interpreted *Heller* when it enacted D.C. Code § 7-2507.02 in response to *Heller*.

C) The district court concluded that "Section 4512 imposes no *direct* restrictions at all on the right to 'bear' arms. Nor does it preclude anyone from 'keeping' arms." E.R. I 007, n.6. The district court based this conclusion on *Heller*'s statement that "'Keep arms' means to 'have weapons' or 'possess weapons.' 554 U.S. at 583-84." Because *Heller* held that "the most natural reading of 'keep Arms' in the Second Amendment is to 'have weapons'" (554 U.S. at 582), Section 4512 *does* preclude a person from "keeping" arms because Section 4512 prevents a person from having a *weapon*, in that there must be a trigger lock on the handgun or the handgun must be in a locked container, thereby making the handgun useless as a weapon.[3]

D) The district court held that Section 4512 was not invalid because:

---

[3] It is thus not true that the "only question" is whether the restrictions of Section 4512 "on how handguns maybe stored interferes with the underlying purposes served by the rights, insofar as they might delay a person's ability to go from merely 'keeping' a handgun to 'bearing' it in a condition suitable for use in self-defense." E.R. I 007, n.6.

>Plaintiffs have offered only the possibility that in a very narrow range of circumstances, the delay inherent in rendering a handgun operable or in retrieving it from a locked container theoretically could impair a person's ability to employ it successfully in self-defense.

E.R. I 007-08.

In fact, the delay inherent in rendering a handgun operable, or in retrieving it from a locked container, so that it can be used for self-defense imposes such a great burden on the right to use a handgun for self-defense that the delay effectively nullifies the right.

As explained in the Declaration of Massad Ayoob (E.R. II 053-60), law enforcement officers' training:

>often includes an exercise known as the Tueller Drill, which demonstrates to officers an attacker who is 21 feet away can close the entire distance between himself and the victim in approximately one second-and-a-half.

E.R. II 057-58.

Further, Ayoob explained:

>[T]he amount of time it takes for a person with proper firearms training to draw a readily accessible firearm, and hit well placed shots on a person-sized target at seven yards is approximately about one and one-half seconds. For a not so well trained individual, it could take two and a half to four seconds to do so.

E.R. II 058.

Thus, if the handgun is not in a holster on the person where it is readily

-7-

accessible to be drawn, an attacker could complete an attack without the handgun possessor being able to utilize the handgun for self-defense. Plainly, therefore, requiring that a handgun have a trigger lock or be stored in a locked container effectively nullifies the right to use the handgun for self-defense because, by having to render a handgun operable, or to retrieve it from a locked container -- no matter how quickly it can be rendered operable, or retrieved from a locked container -- its use in self-defense is frustrated. It is no response that there may be situations where a person has adequate time to render a handgun operable, or to retrieve it from a locked container, even if such situations may be the majority. If there is any instance where the right to use a handgun for self-defense is prevented, the law imposes an unconstitutional burden.

The only evidence offered by San Francisco to show that there was minimal delay resulting from the requirements of Section 4512 was the results of "tests" conducted by Cathy Garza, an investigator with the San Francisco City Attorney's Office. E.R. II 091-93. As explained above, however, even if there was merely the minimal delay described by Ms. Garza in retrieving a handgun from a locked container, because of the time necessary to draw and aim the handgun, and hit well placed shots on a person-sized target, that delay effectively nullifies the right to use the handgun for self-defense given the time needed to use the handgun effectively.

-8-

E.R. II 057-58.

Further, the results of these "tests" are meaningless. First, Ms. Garza's Declaration indicates that the lockboxes were new and thus were presumably in as good working condition as they ever would be. E.R. II 092. But, as the Ayoob Declaration explains, these lockboxes are known to malfunction:

> I have tested such gun boxes. I have seen some that did not work. I was present at a National Mid-Winter Championship event of the International Defensive Pistol Association in which one stage involved retrieving the gun from a lock box and shooting, with an electronic timer running. The stage had to be eliminated from the championship because the lock box malfunctioned so many times, preventing the shooter from getting the gun out of it at all.

E.R. II 058-59.

Second, Ms. Garza had just put in the batteries, so, if the lockbox was functioning correctly, there would have been sufficient power to enable the box to open. E.R. II 092. As Mr. Ayoob noted, however, "[i]f the batteries have died, the box will not open, and the shooter will have to retrieve and apply a key to open the box." E.R. II 059. Third, with respect to the use of the combination to open the lockboxes, Ms. Garza had just programmed the combinations into the lockbox, so that she could easily remember them. E.R. II 092-93. Had it been some time since the handgun possessor had opened the lockbox, he/she may have forgotten all or part of the combination. Fourth, Ms. Garza's tests took place under ideal conditions, *i.e.*,

-9-

during the day in a well-lit room without the stress of a possible attack. *See* E.R. II

092-93. Under stressful real-life conditions (which may include just having

awakened), the handgun possessor may not be able rapidly and accurately to

remember the combination, and, if he/she does remember the combination, may not

be able to enter the combination because the room may be dark and because entering

the combination involves fine motor skills which "degrade[] severely in human

beings under stress due to vasoconstriction (loss of blood flow to the extremities) and

also due to tremors induced by internally-generated adrenaline (epinephrine)." E.R.

II 059. Fifth, with respect to Ms. Garza's test of the first lockbox using the biometric

fingerprint scanning, Ms. Garza's Declaration states that the lockbox was new and

thus presumably was in as good working condition as it ever would be. E.R. II 092.

But, as the Ayoob Declaration explains:

> It is well known in the security field that biometrics applied in this
> respect are not yet a perfect science. There are people whose fingerprints
> will be recognized by the machines, and people whose fingerprints will
> not. In any case, no biometric device can recognize fingerprints that are
> obscured with clothing, dirt, or blood before accessing the lock box.

E.R. II 059.

Moreover, Ms. Garza's tests took place under ideal conditions, *i.e.*, during the

day in a well-lit room without the stress of a possible attack. See E.R. II 092-93.

Under stressful real-life conditions (which may include just having awakened), the

-10-

handgun possessor may not be able rapidly to place his fingers properly on the scanner.

In sum, the evidence in the record demonstrates conclusively that requiring that a handgun have a trigger lock or be stored in a locked container effectively nullifies the right to use the handgun for self-defense.

II.

Imposing The Financial Burden Of Purchasing A Locked
Container Or A Trigger Lock Violates The Second Amendment

Requiring that a handgun have a trigger lock or be stored in a locked container imposes financial costs on a person's exercise of the right of self-defense. While there is nothing in the record about the prices of lockboxes, the two lockboxes tested by Ms. Garza are readily available on the internet. The "Stack On Personal Safe With Biometric Lock" is available from Southern States for $134.99[4] and the "Stack-on Strong Box Personal Safe w/Electronic Lock" is available from Sports Authority for $79.99.[5] A state may not, however, "impose a charge for the enjoyment of a right granted by the federal constitution." *Murdock v. Com. of Pennsylvania*, 319 U.S. 105, 113 (1943). Thus, the Supreme Court has concluded that "wealth or fee paying

---

[4] www.southernstates.com/catalog/p-10407-stack-on-personal-safe-with-biometric-lock-14in-x-10in-x-10in.aspx

[5] www.sportsauthority.com/product/index.jsp?productId=11367620

has . . . no relation to voting qualifications; the right to vote is too precious, too fundamental to be so burdened or conditioned." *Harper v. Virginia State Board of Elections*, 383 U.S. 663, 670 (1966) (poll tax).[6]  The same applies to exercise of the right to keep arms; San Francisco may not impose a charge for its exercise.  While the costs are not paid to a government agency, the costs are imposed on the exercise of the right to keep arms just the same.

III.

Section 4512 May Increase Crime

Section 4512 is likely to increase criminal activity.  In an article in *The Journal of Law And Economics* entitled "Safe Storage Gun Laws: Accidental Deaths, Suicides, And Crime," Lott & Whitley, Vol. XLIV (October 2001) ("Safe Storage"), the authors stated:

> If criminals are deterred from attacking victims because of the fear that
> people might be able to defend themselves, gun locks may in turn reduce

---

6  *Cox v. New Hampshire*, 312 U.S. 569 (1941) is not to the contrary as it involved fees for a parade permit for the "public expense of policing the spectacle" and "the maintenance of public order."  312 U.S. at 577.  *Cox* did not suggest that constitutionally-protected activity in the home is to be treated on a par with public gatherings on public streets.  See also *M.L.B. v. S.L.J.*, 519 U.S. 102, 124, n.14 (1996) (privileges like driving may require license fees, "[b]ut voting cannot hinge on ability to pay . . . ., for it is a 'fundamental political right'") (citation omitted).  Similarly, cases involving the cost of abortion are inapposite because they have only upheld state regulation which "might have the incidental effect of increasing the cost . . . of medical care . . . ." *Planned Parenthood of Southeastern Pa. v. Casey,* 505 U.S. 833, 874 (1992).  The cost imposed by Section 4512 is not an incidental effect of the law.

-12-

the cost of criminals committing crime and, thus, increase crime. This problem is exacerbated because many mechanical locks (such as barrel or trigger locks) also require that the gun be stored unloaded. [footnote] 5. Loading a gun then requires yet more time to respond to a criminal. [footnote] 6. The costs of locks and the fear of accidental gun deaths, which is highly publicized when these laws pass, should also reduce gun ownership and may thus also further encourage crime.

Safe Storage at 660.[7]

The authors also note:

The potential defensive nature of guns is indicated by the different rates of so-called hot burglaries, where residents are at home when the criminals strike. [footnote omitted]. Fifty-nine percent of the burglaries in Britain, which has tough gun control laws, are "hot burglaries." By contrast, the United States, with laxer restrictions, has a "hot-burglary" rate of only 13 percent. Consistent with this, surveys of convicted felons in America reveal that they are much more worried about armed victims than they are about running into the police. This fear of potentially armed victims causes American burglars to spend more time than their foreign counterparts "casing" a house to ensure that nobody is home. Felons frequently comment in these interviews that they avoid

---

[7] Footnote 5 stated: "Putting a lock on a loaded gun actually makes an accidental discharge possible (for example, by dropping the gun) that would not be possible if a loaded gun were not locked." *Id.* at n.5. Footnote 6 stated:

One almost humorous example of the problems associated with removing gun locks was provided by Maryland Governor Parris Glendening, who set up a press conference to demonstrate how easy it was to use a gun lock, but the lock did not easily disengage and it took him "numerous" tries before he was able to remove the lock (Gerald Mizejewski, Glendening Shows Off Trigger Lock, Wash. Times, March 23, 2000, at Cl).

*Id.* at n.5.

-13-

late-night burglaries because "that's the way to get shot."

Safe Storage at 660-661.

CONCLUSION

This court should reverse the judgment of the district court and remand the matter for further proceedings.

Respectfully submitted,

Law Enforcement Alliance of America
By counsel

/s/Richard E. Gardiner
Richard E. Gardiner
Suite 403
3925 Chain Bridge Road
Fairfax, VA 22030
(703) 352-7276
(703) 359-0938 (fax)
regardiner@cox.net

-14-

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that a copy of the foregoing BRIEF AMICUS CURIAE OF THE LAW ENFORCEMENT ALLIANCE OF AMERICA was served, via the CM/ECF system, on C. D. Michel, Michel & Associates, P.C. and on Christine Van Aken, Deputy City Attorney, San Francisco City Attorney's Office, this 13th day of February, 2013.

/s/Richard E. Gardiner
Richard E. Gardiner