No. 12-17803

---

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

---

ESPANOLA JACKSON, et al.,

*Plaintiffs-Appellants*,

v.

CITY AND COUNTY OF SAN FRANCISCO, et al.,

*Defendants-Appellees*.

---

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
(CV-09-2143-RS)

---

**APPELLANTS' REPLY BRIEF**

---

C. D. Michel (S.B.N. 144258)
Glenn S. McRoberts (S.B.N. 144852)
Clinton B. Monfort (S.B.N. 255609)
Anna M. Barvir (S.B.N. 268728)
MICHEL & ASSOCIATES, P.C.
180 East Ocean Blvd., Suite 200
Long Beach, CA 90802
Tel. No. (562) 216-4444
Fax No: (562) 216-4445
e-mail: cmichel@michellawyers.com

**Counsel for Plaintiffs-Appellants**

# <u>TABLE OF CONTENTS</u>

**PAGE(S)**

INTRODUCTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

I.   THE CITY'S LOCKED-STORAGE MANDATE VIOLATES
     PLAINTIFFS' RIGHTS TO ACCESS AND USE ARMS FOR THE
     CORE PURPOSE OF SELF-DEFENSE WITHIN THEIR HOMES. . . . . . . . . . . . . 3

     A.   The District Court Abused its Discretion by Applying
          an Erroneous Legal Standard and Failing to Shift the
          Burden of Proof to the City to Justify Its Infringement
          of Plaintiffs' Rights. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

     B.   A Textual, Historical Approach Is Consistent with *Heller*
          and *McDonald* – It Is Not a Radical Approach Signaling
          the End of Gun Regulation. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

     C.   The Laws Cited by the City Do Not Save the Locked-storage
          Mandate. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

     D.   If the Court Applies a Means-End Test, Strict Scrutiny
          Must Apply Because the Law Burdens the Right to Use
          Arms for a Core Purpose. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

     E.   If the Court Applies a "Substantial Burden" Test, It
          Should Clarify that Substantially Burdensome Laws
          Are Unconstitutional Per Se or Subject to Strict Scrutiny. . . . . . . 14

     F.   The Locked-Storage Mandate Cannot Survive Any Level
          of Heightened Scrutiny. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

     G.   Plaintiffs' Facial Claim Is Not Defeated by the Existence
          of Less Burdensome Storage Laws. . . . . . . . . . . . . . . . . . . . . . . . . . 17

i

## TABLE OF CONTENTS (CONT.)

PAGE(S)

II. THE CITY'S AMMUNITION BAN VIOLATES THE SECOND
AMENDMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

    A. Plaintiffs Have Standing to Vindicate Their Rights to
Purchase Ammunition the City Has Banned From Sale . . . . . . . 18

    B. The City Ignores Authority Confirming Protections for
Ammunition Typically Possessed for Lawful Purposes . . . . . . . . 19

    C. The City Does Not Dispute that Hollow-Point Ammunition
Is the Most Common Ammunition for In-Home Self-Defense . . . 22

    D. The Second Amendment Precludes the Government From
Banning the Sale of The Most Common and Effective Self-
Defense Ammunition . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

III. BECAUSE PLAINTIFFS' CONSTITUTIONAL RIGHTS CONTINUE TO BE
INFRINGED, IRREPARABLE HARM EXISTS REGARDLESS OF WHEN
PLAINTIFFS BROUGHT THEIR MOTION . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

IV. THE BALANCE OF HARMS AND PUBLIC INTEREST COMPEL RELIEF . . . . . 30

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

CERTIFICATE OF COMPLIANCE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

CERTIFICATE OF SERVICE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

# TABLE OF AUTHORITIES

**PAGE(S)**

## FEDERAL CASES

*Bd. of Trustees of State Univ. of N.Y. v. Fox*,
  492 U.S. 469 (1989). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Citizens United v. Fed. Election Comm'n*,
  558 U.S. 310 (2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Dist. of Columbia v. Heller*,
  554 U.S. 570 (2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*Ezell v. City of Chicago*,
  651 F.3d 684 (7th Cir. 2011). . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 6, 18, 24

*Heller v. Dist. of Columbia*,
  670 F.3d 1244 (D.C. Cir. 2011). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Herrington v. United States*,
  6 A.3d 1237 (D.C. Cir. 2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Klein v. San Clemente*,
  584 F.3d 1196 (9th Cir. 2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*Lane v. Holder*,
  703 F.3d 668 (4th Cir. 2012). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Lydo Enterprises v. City of Las Vegas*,
  745 F.2d 1211 (9th Cir. 1984). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29, 30

*Lujan v. Defenders of Wildlife*,
  504 U.S. 555 (1992). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

iii

## TABLE OF AUTHORITIES (CONT.)

**PAGE(S)**

### FEDERAL CASES (CONT.)

*McDonald v. City of Chicago,*
    130 S. Ct. 3020 (2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 7, 14

*Monterey Mech. Co. v. Wilson,*
    125 F.3d 702 (9th Cir. 1997). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*Nat'l Rifle Ass'n of Am. Inc. v. BATFE,*
    700 F.3d 185 (5th Cir. 2012). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 19

*Reliable Consultants, Inc. v. Earle,*
    517 F.3d 738(2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*Roberts v. U.S. Jaycees,*
    468 U.S. 609 (1984). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*United States v. Chester,*
    628 F. 3d 673 (4th Cir. 2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*United States v. Decastro,*
    682 F.3d 160 (2d Cir. 2012). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*United States v. Masciandaro,*
    638 F.3d 458 (4th Cir. 2011). . . . . . . . . . . . . . . . . . . . . . . . . . 11, 12, 13

*United States v. Playboy Entm't Group, Inc.,*
    529 U.S. 803 (2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*United States v. Salerno,*
    481 U.S. 739 (1987). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

## TABLE OF AUTHORITIES (CONT.)

**PAGE(S)**

### FEDERAL CASES (CONT.)

*Ward v. Rock Against Racism*,
    491 U.S. 781 (1989). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *15*

*Washington v. Glucksberg*,
    521 U.S. 702 (1997). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*,
    425 U.S. 748 (1976). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Vincenty v. Bloomberg*,
    476 F.3d 74 (2d Cir. 2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

### STATUTES, RULES & REGULATIONS

California Penal Code. §16460. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

California Penal Code. §30210. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

California Penal Code. §30320. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

Kentucky Rev. Stat. Ann. §237.060. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

Kentucky Rev. Stat. Ann. §527.080. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

New Jersey Stat. Ann. §2C:39-3(f)(1). . . . . . . . . . . . . . . . . . . . . . . . . . . . *22*

New Jersey Stat. Ann. §2C:39-3(g)(2). . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

San Francisco Police Code § 618. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

v

## TABLE OF AUTHORITIES (CONT.)

**PAGE(S)**

## OTHER AUTHORITY

Arthur Kellermann et al.,
  *Gun Ownership as a Risk Factor For Homicide in the Home*,
  329 New Eng. J. Med. 1084, 1090 (1993). . . . . . . . . . . . . . . . . . . . . . . . . . 27

James Madison,
  The Federalist No. 46. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

Michael Planty & Jennifer Truman,
  U.S. Dep't of Justice, *Firearm Violence,
  1993-2011*, at 12 (2013). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

Nicholas I. Johnson,
  *Administering the Second Amendment*,
  50 Santa Clara L. Rev. 1263, 1265, 1271-72 (2010). . . . . . . . . . . . . . . . . . 20

Philip J. Cook & Jens Ludwig,
  U.S. Dep't of Justice, *Guns in America: National Survey
  on Private Ownership and Use of Firearms* 8-10 (1997),
  *available at*  http://www.ncjrs.gov/pdffiles/165476.pdf. . . . . . . . . . . 27, 28

*Use of Expanding Ammunition by U.S. Military Forces
in Counterterrorist Incidents*, Op. JAG, U.S. Army,
DAJA-IA/No. 7026, 23 Sept. 1985. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

## INTRODUCTION

Given that *Heller*'s holding was contrary to circuit law governing most of the nation, one would expect governments to respond by reexamining their laws for compliance with the individual right to arms. Instead, the nearly five years since *Heller* have been marked by intransigence – if not outright defiance – of the Court's decision by many jurisdictions that seemingly disagree with its conclusion.

*Heller's* detractors have begrudgingly accepted that laws identical to those invalidated in *Heller* must fall, but they have viewed the decision as narrowly as possible, limiting the scope of the Second Amendment to the precise circumstances of that case. The City's brief does just that. Its arguments are remarkably disconnected from *Heller*.

The City claims there is an "overwhelming consensus" that intermediate scrutiny or less should apply to the restrictions in this case – restrictions on the ability of law-abiding adults to exercise their right to use protected arms for self-defense in their own homes. There is not. In part, that is because the *only* case to have addressed these issues is *Heller*, which looked only to text and history.

Plaintiffs recognize that the restrictions in *Heller* were more severe than those challenged here. That is not in dispute. But, likewise, it is beyond dispute

1

that the City's restrictions are now the most severe of their kind in the nation. Invalidating them will not necessitate invalidation of others.

Moreover, while the severity of the laws in question differs from those in *Heller*, the nature of the laws does not. Both sets of laws are inimical to the Second Amendment insofar as they reflect a distrust of law-abiding citizens to responsibly exercise their fundamental rights, and both interfere with the exercise of those rights in the home. This is key. For although *Heller* left much unresolved, it clearly identified the Second Amendment interests implicated here, finding them "surely" elevated above all others. The City ignores this finding. It is worth repeating, for it clearly shows the rights at stake here are of the highest order, deserving the utmost protection.

> Like the First, [the Second Amendment] is the very product of an interest-balancing by the people-which Justice BREYER would now conduct for them anew. And whatever else it leaves to future evaluation, it surely elevates above all other interests the right of law-abiding, responsible citizens to use arms in defense of hearth and home.

*Dist. of Columbia v. Heller*, 554 U.S. 570, 635 (2008).

In sum, Plaintiffs look to *Heller* for guidance in terms of its findings, holdings, and its analytical framework. The City, in contrast, relies on *Heller's* dicta and dissenting opinions and on circuit court cases that contextually have

little in common with *Heller* or *Jackson*. R.B. 10-13. Respectfully, when the federal case most closely on point is a recent, landmark Supreme Court case, we should look to that case for guidance first.

## ARGUMENT

### I. THE CITY'S LOCKED-STORAGE MANDATE VIOLATES PLAINTIFFS' RIGHTS TO ACCESS AND USE ARMS FOR THE CORE PURPOSE OF SELF-DEFENSE WITHIN THEIR HOMES

The City raises a broad range of safety interests as justification for its locked-storage mandate, most of which are irrelevant. Plaintiffs contend that *Heller* precludes "balancing" these interests against the rights of law-abiding-adults to use arms for self-defense in their homes – an interest that the Second Amendment "elevates above all others." *Heller*, 554 U.S. at 635. But even assuming that the City's interests could outweigh Plaintiffs' fundamental rights, the City must explain how, as to each interest it asserts, that interest is served by forcing a law-abiding adult, like Espanola Jackson, to lock up her handgun within her home when she is alone and the gun is under her control. The answer: "It doesn't."

Ultimately, we're left with the City's true motivation: It does not "trust" its law-abiding adults to exercise their constitutional rights within their own homes. It admits as much, stating that, "[i]n San Francisco's legislative judgment . . . ,

3

people are not always very good judges of what kind of consequences are reasonably likely to occur when they keep their guns unlocked." R.B. 28. But the City's "judgment" is antithetical to the considered judgment of those who enacted the Second Amendment. The Founders knew our right to arms distinguished Americans from citizens of most other countries, noting that our government "trusts" its citizens with arms whereas others only trust government personnel. The Federalist No. 46 (James Madison).

### A. The District Court Abused its Discretion by Applying an Erroneous Legal Standard and Failing to Shift the Burden of Proof to the City to Justify Its Infringement of Plaintiffs' Rights

Regardless of the analysis ultimately applied, including the "substantial burden" test the district court seemed to favor, E.R. I 006-07, the court erred by placing the burden solely on Plaintiffs to prove the City's locked-storage law was unjustified. Indeed, the court found that, even assuming the restriction imposes a substantial burden on Plaintiffs' rights, "plaintiffs have not shown the regulation to be overreaching or improper in any way, or that it fails to serve a legitimate governmental interest." E.R. I 008. That is a misapplication of heightened scrutiny.

"Assuming" the City's locked-storage law imposes a burden on the right to use arms for in-home self-defense, the burden of proof necessarily shifts to the

City. *United States v. Chester,* 628 F.3d 673, 680 (4th Cir. 2010) ("unless the

conduct at issue is not protected by the Second Amendment at all, the Government

bears the burden of justifying the constitutional validity of the law"). The district

court's failure to shift the burden to the City is reversible error.

The district court's foundational errors, here, are similar to those made by

the district court in *Ezell v. City of Chicago*, which was also on appeal from denial

of a motion for preliminary injunction. 651 F.3d 684, 690 (7th Cir. 2011). There,

the district court identified the question raised, but stopped short of addressing it.

On appeal, the court noted:

> There are several problems with this analysis. First, it is incomplete. The
> judge identified but did not evaluate the Second Amendment merits
> question. More importantly, the court framed the inquiry the wrong way.
> Finally, it was a mistake to reject heightened scrutiny. The judge was
> evidently concerned about the novelty of Second Amendment litigation and
> proceeded from a default position in favor of the City. The concern is
> understandable, but the default position cannot be reconciled with *Heller*.

*Id.* at 700.

Here too, the district court improperly framed the merits question and then

did not seriously evaluate it. Failing to recognize that the right to *use arms* in self-

defense is central to the Second Amendment, *Heller*, 554 U.S. at 635, the court

viewed the right to keep arms and carry arms separately, detached from the interest

protected. It relegated the critical "merits question" about restrictions on the "use

5

of arms" in self-defense to a passing reference in a footnote. E.R. I 007. Further, as in *Ezell*, the district court adopted a default position favoring the City, leaving the burden on Plaintiffs at all times. E.R. I 007-08. The district court's analysis was flawed from the outset. It cannot be reconciled with *Heller*, and it constitutes reversible error.

### B. A Textual, Historical Approach Is Consistent with *Heller* and *McDonald* – It Is Not a Radical Approach Signaling the End of Gun Regulation

Plaintiffs do not suggest some radical test for Second Amendment challenges. Instead, they adhere to an approach that mirrors the Supreme Court's analysis in *Heller* and *McDonald*. *See Heller*, 554 U.S. at 634-35; *McDonald v. City of Chicago*, 130 S. Ct. 3020, 3050 (2010). Both cases are binding authority and, like this case, both involved restrictions on the use of firearms for self-defense by law-abiding adults within the home. Unlike the vast majority of circuit court cases relied on by the City to support the adoption of some variant of means-end scrutiny, R.B. 11-12, this case is not about firearms in sensitive public places, prohibited persons, or unprotected arms.

The Court need not fear that adoption of this approach would foreclose the continuing development of firearms laws. "[J]ust because gun regulations are assessed by reference to history and tradition does not mean that governments lack

flexibility or power to enact gun regulations." *Heller v. Dist. of Columbia*, 670 F.3d 1244, 1274 (D.C. Cir. 2011) ("*Heller II*") (Kavanaugh, J., dissenting). Under Plaintiffs' approach, reasonable regulation may continue, as long as it remains consistent with our history and traditions. As *Heller* recognized, "history and tradition show that a variety of gun regulations have co-existed with the Second Amendment right and are consistent with" it. *Id.*

The important difference between applying a textual, historical approach and means-end scrutiny is not necessarily the number of laws that will survive review. "Instead, it is that the *Heller* test will be more determinate and 'much less subjective' because 'it depends upon a body of evidence susceptible of reasoned analysis rather than a variety of vague ethico-political First Principles whose combined conclusion can be found to point in any direction the judges favor.' " *Id.* (quoting *McDonald*, 130 S. Ct. at 3058 (Scalia, J., concurring)).

## C. The Laws Cited by the City Do Not Save the Locked-storage Mandate

To establish a history of locked firearm storage, the City and Amicus Law Center to Prevent Gun Violence reference several Founding-era laws regulating the means of storing excess amounts of gunpowder.[1] R.B. 17; LCPGV Br. 9-16.

---

[1] Most of these laws were rejected by the Supreme Court as insufficient to save the locked-storage requirement at issue in *Heller*. 554 U.S. at 631-32.

The City attempts to analyze those laws "[a]t a high level of generality" to place its locked-storage mandate on par with restrictions the Framers would have considered co-existent with the right to arms. R.B. 22, 31 n.16. Its argument is not persuasive.

Under the City's analysis, the laws must be "of the same general kind of restriction" as those common at the Founding. R.B. 31 n.16. But a law requiring firearms to be kept under lock-and-key at all times unless carried is *not* of the "same general kind" as laws dictating the sorts of containers to be used for gunpowder storage. The City simply *assumes* it is. *See id. Heller* identified only one marginally relevant law forbidding the depositing of loaded firearms into buildings, and it tossed it aside as insufficient to establish a *tradition* of such regulation. 554 U.S. at 632.

Further, the City and its amici rely on dicta to suggest that firearm storage laws are necessarily valid. R.B. 17; Brady Br. 2; LCPGV Br. 7-8. They are not. They did not make *Heller's* list of laws that might be considered "presumptively lawful." 554 U.S. at 627, n.26.[2] And there is no long-standing tradition suggesting

---

[2] The City's reliance on footnote 26 is ironic. The previous note admonishes: "It is inconceivable that we would rest our interpretation of the basic meaning of any guarantee of the Bill of Rights upon such a footnoted dictum in a case where the point was not at issue and was not argued." *Heller*, 554 U.S. at 625 n.25.

that they should be. Despite multiple amici briefs and four lengthy dissenting opinions, there was not one historical locked-storage mandate presented to justify the storage law at issue in *Heller*. A.O.B. 34-36. Nor is there one here.

The City next turns to modern storage laws, R.B. 33-34, but it fails to identify a *single* law anywhere requiring locked storage of firearms at all times unless carried. Instead, it claims its storage law is the "equivalent" of the laws of Massachusetts and New York City. *Id*. Those laws have an important exception, however, allowing a person to keep a firearm unlocked if it is "under the[ir] control." The City's locked-storage requirement also has an "under the control" exception, but it applies only to law enforcement, not to Plaintiffs or most City residents. Addend. 52. In short, there is no equivalency.

An "under the control" exception allows gun owners to keep their arms unlocked and available for self-defense use at times when it is impractical, impossible, or dangerous to carry them on one's person – without defeating the City's safety interests. For example, it enables owners to keep their handguns on a bedside table for immediate access in case of a late-night attack. The City's law, in contrast, makes that a crime, even for those who live alone. The City cites to no law, modern or historical, that goes so far.

9

Because there is no relevant history or tradition, the Court's analysis can end there. If, however, the Court considers the historical record unclear, it should subject the City's storage law to strict scrutiny.

### D. If the Court Applies a Means-End Test, Strict Scrutiny Must Apply Because the Law Burdens the Right to Use Arms for a Core Purpose

The City cannot seriously argue that forcing Ms. to lock up her handgun at all times when not carried does not burden her ability to access that gun for self-defense in her home. Chief Justice Roberts, Justice Scalia, and observers of the *Heller* oral argument found the notion that it doesn't laughable. *See* E.R. III 205-06. All other things being equal, a locked gun is *always* harder to access and use in a self-defense emergency than an unlocked one. Contrary to the City's claims, the delayed access will *significantly* burden, if not negate, one's right to armed self-defense against a sudden attack, as described by self-defense expert, Massad Ayoob, and Amicus Law Enforcement Association of America. E.R. II 057-60; LEAA Br. 7-8; *see also* E.R. II 043 (referencing study finding that storage requirements *do* impair self-defense).

Based on dubious tests conducted on brand new lockboxes under ideal circumstances, *compare* E.R. II 092-93, *with* A.O.B. 5-6, LEAA Br. 8-11, the City claims that it takes "a few seconds at most" to access a locked firearm, R.B. 16.

10

Assuming this is so, this coincides with Plaintiffs' evidence that such a delay can prevent one from effectively using a firearm in self-defense. *Compare* E.R. II 092-93 (estimating 2.6-4.5 seconds to open box), *with* E.R. II 057-60 (establishing that 2.5-4 seconds can prevent self-defense). The City suggests that seconds cannot equate to any burden on the right to use arms for self-defense. But the record shows that in a self-defense emergency, seconds matter. Indeed, they can be fatal. E.R. II 057-60. The record is devoid of any evidence to the contrary.

While *Heller* did not resolve everything about the scope of the Second Amendment, it removed all doubt that the ability to use handguns for self-defense within the home is the preeminent Second Amendment interest. 554 U.S. at 635. If strict scrutiny does not apply to a law directly burdening the core right to access a handgun for self-defense within one's home, when would it apply? As the City would have it, only to a complete ban on the right.

But, just as "any law regulating the content of speech is subject to strict scrutiny, . . . any law that would burden the 'fundamental,' core right of self-defense in the home by a law-abiding citizen would be subject to" the same. *United States v. Masciandaro*, 638 F.3d 458, 470 (4th Cir. 2011). Courts uniformly apply strict scrutiny when restrictions on core First Amendment conduct are concerned. In these contexts, courts consider the severity of a regulation's

11

burden on core conduct in *applying* strict scrutiny, not in determining which level of scrutiny applies. *See, e.g.*, *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 340 (2010); *United States v. Playboy Entm't Group, Inc.*, 529 U.S. 803, 813 (2000); *Roberts v. U.S. Jaycees*, 468 U.S. 609, 623 (1984).

Here too, where the law restricts *core* Second Amendment conduct, strict scrutiny must apply regardless of the severity of the burden imposed. In short, "strict scrutiny [is] important to protect the core right of the self-defense of a law-abiding citizen in his home[.]" *Masciandaro*, 638 F.3d at 471.

The City cites cases claiming a lesser standard that are easily distinguished. For instance, the City cites two speech cases, neither of which involve core protections of the First Amendment. R.B. 32-33 (citing cases involving a commercial speech prohibition and a content-neutral time, place, and manner restriction). It also relies on a voting rights case, a context in which courts apply varying degrees of scrutiny because the Constitution explicitly grants broad authority to states to regulate elections – an express countervailing consideration *not* present in the Second Amendment context. R.B. 32. Finally, the City provides a string of Second Amendment cases applying less than strict scrutiny. R.B. 11-12. But every case is tainted by a factor (e.g., prohibited persons, unprotected arms, sensitive places) that arguably militates against strict scrutiny as the conduct at

12

issue moves further from the Second Amendment's "core." Ultimately, the City ignores the cases that *are* relevant, those where the court applied strict scrutiny regardless of the severity of the burden because core conduct was restricted.

Arguing that the severity of a law's burden informs which level of scrutiny applies, the City proposes a novel analytical framework that denigrates the Second Amendment. Since *Heller*, a troubling trend has emerged where courts select the applicable means-end review according to: (1) whether the law restricts "core" conduct, (2) the severity of the burden, and (3) the government's interests. *See, e.g.*, *Nat'l Rifle Ass'n of Am. Inc. v. BATFE*, 700 F.3d 185, 195-96 (5th Cir. 2012); *Masciandaro*, 638 F.3d at 470. This breed of analysis is a new creature, foreign to fundamental rights jurisprudence. It melds together the task of determining which level of scrutiny applies (informed by the nature of the Second Amendment interest) and the work of applying the chosen test (where, in part, the severity of the burden and the government's interests are weighed).

In essence, what should be the entire means-end analysis has morphed into the threshold test for determining which level of scrutiny applies. The result is a mode of analysis that invites mischief as courts consider *twice* the severity of the regulation's burden on, and the government's interest in, regulating Second Amendment conduct. This treats the Second Amendment as a "lesser"

13

fundamental right, in defiance of *McDonald's* admonition to the contrary. *See* 130 S. Ct. at 3044.

### E. If the Court Applies a "Substantial Burden" Test, It Should Clarify that Substantially Burdensome Laws Are Unconstitutional Per Se or Subject to Strict Scrutiny

The City asserts that restrictions that do not "flatly prohibit" the use of arms in the home are subject, at most, to intermediate scrutiny – and if the burden imposed is not "substantial," the restrictions warrant only rational basis review. R.B. 1-2. The City claims this is "[c]onsistent with the Supreme Court's guidance and the overwhelming consensus of the circuits . . . ." *Id*. But *Heller* expressly rejected rational basis and only one circuit has defied the Supreme Court's instruction on this point.

Contrary to the City's claims, the majority of circuits apply some level of *heightened* scrutiny to *all* regulations that impose more than an incidental burden on Second Amendment conduct – as determined by a review of the historical scope of the right. A.O.B. 17-18. This analysis is critically different from the "substantial burden" test, which, as a threshold matter, focuses on the magnitude of the burden imposed rather than the nature of the conduct regulated. *See United States v. Decastro*, 682 F.3d 160, 164 (2d Cir. 2012). The result is a framework that applies rational basis to all laws that do not amount to a "substantial burden."

14

But *Heller* forecloses any test that essentially treats rational basis as the default standard. 554 U.S. at 628, n.27.

As such, the Court should find that any regulation that substantially burdens Second Amendment conduct is necessarily invalid or, at minimum, subject to strict scrutiny. A.O.B. 20-22. When a restriction imposes more than an incidental burden, but one that is not quite "substantial enough," the Court must apply nothing less than intermediate scrutiny.

## F. The Locked-Storage Mandate Cannot Survive Any Level of Heightened Scrutiny

To pass muster under even intermediate scrutiny, the City must establish a tight "fit" between the locked-storage requirement and a substantial governmental interest, a fit that employs "a means narrowly tailored to achieve the desired objective." *Bd. of Trustees of State Univ. of N.Y. v. Fox*, 492 U.S. 469, 480 (1989). A law is narrowly tailored if it "promotes a substantial government interest that would be achieved less effectively absent the regulation," and "the means chosen are not substantially broader than necessary . . . ." *Ward v. Rock Against Racism*, 491 U.S. 781, 799-800 (1989). The City repeatedly claims that Plaintiffs fail to prove it is "less safe" to keep guns locked up, but it is the City's burden to prove its law meets heightened scrutiny, not Plaintiffs' to prove it doesn't.

15

The City's law broadly sweeps up all gun owners and requires that they keep their handguns locked up regardless of the circumstances. The City never establishes that less burdensome storage laws are less effective means for achieving its interests. Indeed, by absolving gun owners of criminal liability in the case one's firearms are misused, such laws provide substantial incentive to keep guns locked when reasonable. The City's expert admits that California's storage law reduces unintentional firearm deaths, but he never opines that the City's law is more effective. E.R. II 085.[3]

The City complains that while it "could have confined its ordinance to homes where children are . . . present, such a regulation would have done nothing to prevent theft or to reduce suicides and homicides among adults living in homes with guns." E.R. II 116. But neither does the City's law. Trigger locks and lock boxes that allow the owner to move the locked firearm about the home (as contemplated by the City, R.B. 14) provide little deterrent to burglars who can simply carry away a locked firearm to pry off the lock or break open the box. And the ordinance itself allows adults to carry their handguns, making the argument the

---

[3] Plaintiffs note the absurdity of arguing that the threat of a misdemeanor for failing to secure one's handgun will incentivize those not moved to lock their guns under the threat of felony charges under California's storage law. In accord, the City's own expert testimony dispels that notion. *See* E.R. II 085.

16

law reduces accidents, suicides, and homicides among authorized, adult users

tenuous at best.

Again, we ask how forcing Ms. Jackson to lock up a handgun entirely

within her control – especially when she is alone in her home – serves public

safety? It doesn't. There are a plethora of options available to the City to

accomplish its interests without restricting Ms. Jackson's access to her handgun in

a self-defense emergency.

### G. Plaintiffs' Facial Claim Is Not Defeated by the Existence of Less Burdensome Storage Laws

Contrary to the City's claims, R.B. 25-26, Plaintiffs never concede that the

storage laws of other jurisdictions are constitutional. Plaintiffs simply note that

they are less burdensome than the City's law. This establishes that the City's

storage ordinance cannot meet strict scrutiny because it is not the least restrictive

means or intermediate scrutiny because it does not have the required "fit" with the

City's purported interests. A.O.B. 37.[4]

---

  [4] Even if the City's locked-storage mandate could be applied in certain
circumstances, this would not be fatal to Plaintiffs' claim. The *Salerno* "void in all
applications" standard, *United States v. Salerno*, 481 U.S. 739, 745 (1987), has
almost never been applied by the Supreme Court. *Washington v. Glucksberg*, 521
U.S. 702, 739-40 (1997) (Stevens, J., concurring) ("I do not believe the Court has
ever actually applied such a strict standard, even in *Salerno* itself..."). Under the
City's approach, even a flat ban would survive challenge, as certain persons can be
denied arms altogether, presumably presenting some valid applications.

17

## II.   THE CITY'S AMMUNITION BAN VIOLATES THE SECOND AMENDMENT

### A.   Plaintiffs Have Standing to Vindicate Their Rights to Purchase Ammunition the City Has Banned From Sale

Plaintiffs contend the right to acquire hollow-point ammunition is guaranteed by the Second Amendment, and they would presently purchase it within the City if not for the City's law banning any retailer from selling it to them. *See* E.R. IV 431; *see also* E.R. II 162, 171, 175, 180, 185. Plaintiffs have thus suffered an "injury in fact" that is "fairly traceable" to defendant's conduct, and the harm to Plaintiffs will be "redressed" by the requested relief. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992). The injury lies in the ongoing deprivation of Plaintiffs' right to purchase the ammunition. Such harm is directly traceable to the City's law banning its purchase and sale, and it will be redressed by an injunction preventing enforcement.

The City's characterization of Plaintiffs' harm as the burden of purchasing ammunition outside the City ignores authority universally condemning this notion. A.O.B. 57-58. The City's assumption that a constitutional injury is measured by the ability to exercise the right in another jurisdiction is "profoundly mistaken." *Ezell*, 651 F.3d at 697.

18

Additionally, the City's reliance on *Lane v. Holder*, 703 F.3d 668 (4th Cir. 2012), to bar Plaintiffs' claims is misplaced. In stark contrast to *Lane*, where laws precluded a resident of one state from purchasing and taking possession of a handgun in another state, *id.* at 670-71, the City bans *any retailer* from selling the prohibited ammunition outright. In *Lane*, the laws did not prohibit the plaintiffs, who were D.C. residents, from buying the firearms they desired from a gun store in D.C. Here, the City proscribes hollow point sales anywhere within its borders.

The harm that befalls Plaintiffs is a direct result of the City's actions, as the City's law barring sales inherently prohibits consumer purchases. The City cannot use the fact that it has chosen to ban retailers from selling protected arms to its advantage to preclude individuals from bringing suit. *Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748, 750-57, (1976) (consumer standing where law barred pharmacists from advertising prices, absent showing pharmacists *would* advertise); *Nat'l Rifle Ass'n*, 700 F.3d at 191-92.

## B.    The City Ignores Authority Confirming Protections for Ammunition Typically Possessed for Lawful Purposes

Plaintiffs' brief explains that circuit courts have already looked to whether types of ammunition, certain ammunition feeding devices, and silencers are "typically possessed for lawful purposes" to determine Second Amendment

19

protections.[5] A.O.B. 40-41. The City contends only that the D.C. Circuit decided the issue incorrectly. R.B. 40. It ignores the Fourth Circuit's application of this test to a class of ammunition. And it further disregards *this* Court's use of the test to a case involving firearm accessories. The weight of authority instructs application of the "typically used for lawful purposes" standard here.

That constitutional protections for ammunition mirror those of firearms is expected. Ammunition is as crucial to the use of an operable firearm as the firearm itself. For, without ammunition, a firearm is reduced to an expensive paperweight. It follows, then, that ammunition is afforded protections that are coextensive to those of firearms. *See Herrington v. United States*, 6 A.3d 1237, 1243 (D.C. Cir. 2010).

Further, it is has been noted that applying the common use standard to ammunition "works well to resolve a range of questions with a high level of predictability." Nicholas I. Johnson, *Administering the Second Amendment*, 50 Santa Clara L. Rev. 1263, 1265, 1271-72 (2010). If not applied, "it is easy to anticipate ongoing manipulation of regulated categories . . . and consequent weakening of the" Second Amendment. *Id*. at 1272.

---

[5] Unpublished opinions are properly cited as persuasive authority as of January 1, 2007. *See* 9th Cir. Rule 36-3.

The City nonetheless proposes that this standard should be limited to firearms, and it asks this Court to adopt a different test for ammunition that would permit the government to ban any ammunition, so long as other suitable ammunition is available. R.B. 36-37, 39-40. In support its novel position, the City points to the fact that *Heller* did not frame its discussion in terms of ammunition. But the absence of discussion concerning ammunition in that opinion is hardly surprising, since *Heller* had before it a prohibition on *firearms*.

The City's view finds no support in any circuit or district court opinion to date, and it conflicts with the Supreme Court's approach to determining the scope of Second Amendment rights.

Indeed, the City's suggested approach would permit the government to ban the sale of the most common types of self-defense ammunition. This conflicts with the historical tradition of restricting unusual ammunition that is not particularly suitable for lawful purposes. There is no tradition of banning hollow-point bullets – ammunition the City falsely describes as serving no "sporting purpose." Contrary to Amicus Brady Center's misleading suggestion, the statutes cited in its brief do not purport to ban ammunition unless it serves a "sporting purpose."

21

Brady Br. 17. Nor do these laws ban the sale of hollow-point ammunition.[6]

Instead, they prohibit ammunition such as exploding, armor-piercing, incendiary,

and flame-throwing rounds, that are already prohibited under California law. *See*

Cal. Penal Code. §§ 16460, 30210, 30320.

Finally, the City's suggested approach does not comport with the Second

Amendment's core guarantee of self-defense, a right that is at its "zenith" in the

home. Indeed, the City's approach would allow the government to ban the most

effective and common types of home-defense ammunition, so long as some type of

ammunition is available that might be "sufficient" for that purpose.

Accordingly, the City's ammunition ban is invalid because it restricts

ammunition typically used for the core lawful purpose of self-defense.

### C.    The City Does Not Dispute that Hollow-Point Ammunition Is the Most Common Ammunition for In-Home Self-Defense

The ammunition prohibited by the City's ordinance is the most common and

effective ammunition for self-defense, particularly within the home. A.O.B. 44-46;

FFLG/GOC Br. 6-10. The record on this point is overwhelming. Retailers estimate

that *3.5 billion* hollow-point rounds are produced for private use annually,

---

[6] Kentucky prohibits the use of certain hollow-point cartridges during commission of a crime, but does not restrict law-abiding citizens. Ky. Rev. Stat. Ann. §§ 237.060, 527.080.  And New Jersey expressly authorizes hollow-point ammunition for home defense. N.J. Stat. Ann. §§ 2C:39-3(f)(1), (g)(2).

accounting for roughly *forty percent* of the market share. FFLG/GOC Br. 8. And it

is the *most common* type of ammunition for self-defense. E.R. III 231, 262;

FFLG/GOC Br. 7. The City and its amici do not dispute this.

The City instead asks the Court to save subsection (2) of its ordinance,

suggesting that it does not ban hollow-point ammunition. The City's position

conflicts with both the ordinance's text and the City's legislative findings.

As described in Plaintiffs' brief, section 613.10(g) prohibits ammunition

designed to expand or fragment upon impact due to the bullet having a "hollow

point." A.O.B. 6-8. Subsection (2), which prohibits ammunition that "expands" to

"project or disperse barbs or other objects" that are "intended to increase damage"

to the target, plainly prohibits hollow-point ammunition. The hollow-point

characteristic, by design, causes a bullet to flatten out and/or break apart to project

wider or disperse into the target to increase drag and prevent over-penetration.

E.R. III 228, 262, 268, 270. Subsection (2) does not target a few "exotic"

cartridges.[7] To the contrary, it expressly identifies hollow-point ammunition as

generally prohibited, along with individual examples of hollow-point cartridges.

---

[7] To the extent City is concerned with "exotic" ammunition like the Black
Talon cartridge that is largely the focus of the Brady brief, the City recently passed
a separate ordinance banning that ammunition and others like it. S.F., Cal., Pol.
Code § 618.

23

Further, the City's findings specifically describe the ammunition banned by this section as that which flattens or expands upon impact and identify it as hollow-point ammunition. Addend. 41. In sum, section (2) plainly restricts ammunition protected by the Second Amendment.[8]

### D. The Second Amendment Precludes the Government From Banning the Sale of the Most Common and Effective Self-Defense Ammunition

The City's ammunition ban is the most extreme in the nation. It denies Plaintiffs the right to acquire the most common and effective self-defense ammunition on the market. As such, the ordinance must fall under any level of heightened review.

The City does not attempt to counter the weight of authority confirming that categorical bans on protected conduct are unconstitutional regardless of the standard of review applied. *See* A.O.B. 46-48. Nor does it cite to any authority suggesting laws denying access to protected items do not substantially burden fundamental rights.[9] Finally, it declines to address clear guidance concerning the

---

[8] Plaintiffs need not establish the common, lawful usage of every hollow-point cartridge. Indeed, the Supreme Court invalidated D.C.'s handgun ban absent a showing that every model of handgun was in lawful use.

[9] The district court (and the City) improperly focused on whether Plaintiffs could purchase the ammunition outside the City to assess Plaintiffs' "burden." This directly conflicts with *Ezell*, and the Court's examination of Plaintiffs' harm

24

government's ability to ban arms the Second Amendment protects. The Supreme Court found it impermissible to ban protected arms so long as other firearms were available for self-defense, and the circuit court in *Heller* described such arguments as "frivolous." A.O.B. 58-59. As Plaintiffs noted, if the availability of other arms "sufficient" for lawful purposes were the test, *Heller* itself would have upheld the handgun ban given the availability of shotguns.

Plaintiffs' brief also analyzes a number of fundamental rights cases establishing that, where an individual has a fundamental right to a good or service, the government cannot foreclose access by stifling sales. A.O.B. 46-49. In each case, the court found individuals had a right to the particular item or service and summarily struck the sales restriction – regardless of the standard of review applied. *See* n.11, *infra*. The City provides no countervailing authorities.[10]

Instead, the City attempts to transpose varying tests discussed in those contexts to analyze whether firearms may be banned under the Second

_____

in those terms is reversible error. A.O.B. 57-58; *see also* 651 F.3d at 697.

[10]  Brady's suggestion that *Heller* grants "presumptive validity" to laws banning the sale of protected arms without criminal penalties misreads *Heller*. Brady Br. 19. It is inconceivable that the Supreme Court would guarantee the right to possess a handgun, but permit them to be banned from sale entirely, so long as the government effectuates the ban by prohibiting sales as a condition of maintaining a dealer's license.

25

Amendment. R.B. 38-39.[11] Such tests are inappropriate here, where the courts are clear that firearms and ammunition are afforded protection if they are typically used for lawful purposes – regardless of whether other arms are available. *See supra* Part II.B. In any event, each of the sales restrictions were stricken despite the availability of other means to exercise the right in question.[12]

Next, the City argues that *Heller II* directs application of intermediate scrutiny in this case. It does not. The City suggests that intermediate scrutiny applies because the ammunition ban does not "substantially affect [individuals'] ability to defend themselves." R.B. 40. This conflicts with the weight of the record on this point. The City's ban denies access to the most effective ammunition for in-home defense and it greatly reduces the likelihood that a violent aggressor will be incapacitated before completing his attack. E.R. II 231; A.O.B. 44-46. What is more, the City entirely disregards the fact that *Heller II* applied intermediate scrutiny because there was little evidence the prohibited items were "well-suited for self-defense or sport." *Id*. at 1262. The City never disputes hollow-point ammunition's superior effectiveness for self-defense, E.R. III 225-35, 259-74,

---

[11] *See, e.g.*, *Reliable Consultants*, *Inc. v. Earle*, 517 F.3d 738, 744 (2008); *Vincenty v. Bloomberg*, 476 F.3d 74, 85 (2d Cir. 2007).

[12] *Id*.

291-305, FFLG/GOC Br. 7-10, and it never acknowledges California's requirement that hunters use it, E.R. III 289. Far from instructing intermediate scrutiny, *Heller II* strongly suggests strict scrutiny is appropriate here.

But even under intermediate scrutiny, the City's ban must fall. Despite the City's similar interests in reducing firearm-related injuries, the Supreme Court instructed that D.C.'s ban on protected arms would fail any level of scrutiny. *Heller*, 554 U.S. at 628-29. Likewise, the City's findings cannot justify an outright ban on the sale of the most common self-defense ammunition to all law-abiding citizens.

In any event, the City's justifications for its ban are prime examples of the "shoddy" reasoning the Constitution forbids. Its claim that a firearm is more likely to be used against a household member than in self-defense is demonstrably false. R.B. 41. The study making that claim has been widely condemned, as it only accounted for those times the victim actually *killed* her attacker.[13] The City withholds this crucial piece of information. In reality, federal reports estimate firearms are used defensively approximately 250,000 to 2 million times per year.[14]

---

[13]  Arthur Kellermann et al., *Gun Ownership as a Risk Factor For Homicide in the Home*, 329 New Eng. J. Med. 1084, 1090 (1993).

[14]  *See, e.g.*, Michael Planty & Jennifer Truman, U.S. Dep't of Justice, *Firearm Violence, 1993-2011*, 12 (2013); Philip J. Cook & Jens Ludwig, U.S. Dep't of

27

Moreover, that citizens may not always have to shoot an attacker does not lessen their right to use common, effective self-defense ammunition when they do.

The City's characterization of Plaintiffs' harm as simply having to "fire more shots" trivializes the law's impact on Plaintiffs' rights. R.B. 39. In addition to the inherent, grievous harm of denying Plaintiffs their fundamental right to purchase protected ammunition, the harm lies in the fact that an attacker who is not incapacitated may carry out his violent attack. E.R. III 215-17, 231, 262, 270; FFLG/GOC Br. 9. The City cannot overcome this with a conclusory finding that other ammunition is "sufficient."[15]

Finally, the City fails to demonstrate its law is sufficiently tailored under intermediate scrutiny. It does not establish that its ban is more effective than less burdensome regulations aimed at achieving the same interest. *Compare* A.O.B. 54, *with* R.B. 40-41.

---

Justice, *Guns in America: National Survey on Private Ownership and Use of Firearms* 8-10 (1997), *available at* https://www.ncjrs.gov/pdffiles/165476.pdf.

[15] The City's reference to the Hague Declaration is a red herring. U.S. military branches commonly use hollow-point ammunition for self-defense. It is not preferred in combat because wounding soldiers increases logistical burdens. *Use of Expanding Ammunition by U.S. Military Forces in Counterterrorist Incidents*, Op. JAG, U.S. Army, DAJA-IA/No. 7026, 23 Sept. 1985. Moreover, whether arms usage according to war treaties is irrelevant, otherwise missiles would plainly be protected.

28

Regardless, no amount of legislative findings can justify a total ban on the sale of protected arms. There will always be a "less lethal" type of firearm or ammunition that might be deemed "sufficient" for self-defense. The Court should decline to employ the City's novel approach that would authorize a flat ban on any ammunition, no matter how common and well-suited for core, lawful purposes, so long as some other ammunition is available.

### III. BECAUSE PLAINTIFFS' CONSTITUTIONAL RIGHTS CONTINUE TO BE INFRINGED, IRREPARABLE HARM EXISTS REGARDLESS OF WHEN PLAINTIFFS BROUGHT THEIR MOTION

The violation of a fundamental right is sufficient irreparable harm to warrant preliminary injunctive relief. A.O.B. 60-61. The City makes no argument that this well-established rule should not apply to the Second Amendment. Instead, it claims that Plaintiffs' choice to forego temporary relief at the outset of the case defeats its claim of irreparable harm. But the "urgent need for speedy action" to protect Plaintiffs' rights has not passed. *Contra* R.B. 42-43. Plaintiffs' irreparable harm is the very violation of their fundamental rights, *any* loss of which is irreparable harm per se. *See Monterey Mech. Co. v. Wilson*, 125 F.3d 702, 715 (9th Cir. 1997).

The City claims that *Lydo Enterprises v. City of Las Vegas*, 745 F.2d 1211, 1213-14 (9th Cir. 1984), a First Amendment case, supports its argument that

Plaintiffs' claim of irreparable harm is undercut because they waited to bring this motion. R.B. 42-43. It does not. The *Lydo* plaintiff lacked irreparable harm because its lost business could be compensated with money damages and the court found no First Amendment violation. 745 F.2d at 1213-14. *Lydo* discusses the delay issue *only in balancing the equities*, clarifying that it is but a "factor to be considered in weighing the propriety of relief."

As Plaintiffs continue to suffer irreparable harm, they cannot be denied relief on this basis alone.

## IV. THE BALANCE OF HARMS AND PUBLIC INTEREST COMPEL RELIEF

When laws trample on fundamental rights, the balance of equities and the public interest *sharply* favor injunction. R.B. 43-44; *see Klein v. San Clemente*, 584 F.3d 1196, 1208 (9th Cir. 2009). The City's only counterweight is that its laws must not be stricken lest this Court "miscalculate" Second Amendment rights and be "responsible for some unspeakably tragic act of mayhem." R.B. 44. But really, when Plaintiffs are in their homes alone, how can forcing them to lock up handguns otherwise under their control and load those guns with less effective ammunition prevent such harm? As with the City's other justifications – it doesn't.

Even if there were some connection between the City's harm and the lengths to which it goes to prevent them, any harm is sharply outweighed by the ongoing

30

denial of Plaintiffs' fundamental rights *and* the possibility that Plaintiffs may be unable to access and use their firearms effectively in self-defense before falling victim to an "unspeakabl[e] . . . act of mayhem" themselves.

## CONCLUSION

This case is fully briefed. There are no legitimate factual disputes. The only question is whether the City has the authority to intrude into the sanctity of Plaintiffs' homes and control the exercise of their fundamental right to use common and effective arms and ammunition for self-defense. Accordingly, and for reasons stated in their opening brief, Plaintiffs respectfully ask this Court to address these issues on the merits.

Date: May 20, 2013                    **MICHEL & ASSOCIATES, P.C.**


                                      /s/ C. D. Michel_____
                                      C. D. Michel
                                      Attorney for Plaintiffs-Appellants

## <u>CERTIFICATE OF COMPLIANCE</u>

I hereby certify that the attached Appellants' Reply Brief complies with Rule 32(a)(7)(B)(ii) of the Federal Rules of Appellate Procedure. According to the word count feature of the word-processing system used to prepare the brief, it contains 6990 words, exclusive of those matters that may be omitted under Rule 32(a)(7)(B)(iii).

I further certify that the attached brief complies with the typeface requirements of Rule 32(a)(5) and the type style requirements of Rule 32(a)(6). It was prepared in a proportionately spaced typeface using 14-point Times New Roman font in WordPerfect X5.

Date: May 20, 2013                                **MICHEL & ASSOCIATES, P.C.**


/s/ C. D. Michel
C. D. Michel
Attorney for Plaintiffs-Appellants

32

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on May 20, 2013, an electronic PDF of APPELLANTS'
REPLY BRIEF was uploaded to the Court's CM/ECF system, which will
automatically generate and send by electronic mail a Notice of Docket Activity to
all registered attorneys participating in the case. Such notice constitutes service on
those registered attorneys.

Date: May 20, 2013                    **MICHEL & ASSOCIATES, P.C.**


/s/ C. D. Michel
C. D. Michel
Attorney for Plaintiffs-Appellants