No. 12-17803

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

ESPANOLA JACKSON, et al.,

*Plaintiffs-Appellants*,

v.

CITY AND COUNTY OF SAN FRANCISCO, et al.,

*Defendants-Appellees.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
(CV-09-2143-RS)

**APPELLANTS' PETITION FOR REHEARING
OR REHEARING EN BANC**

Paul D. Clement
Erin E. Murphy
BANCROFT PLLC
1919 M Street NW, Suite 470
Washington, D.C. 20036
Tel. No: (202) 234-0090
E-mail: pclement@bancroftpllc.com

C. D. Michel (S.B.N. 144258)
Glenn S. McRoberts (S.B.N. 144852)
Clinton B. Monfort (S.B.N. 255609)
Anna M. Barvir (S.B.N. 268728)
MICHEL & ASSOCIATES, P.C.
180 East Ocean Blvd., Suite 200
Long Beach, CA 90802
Tel. No: (562) 216-4444
Fax No: (562) 216-4445
E-mail: cmichel@michellawyers.com

**Counsel for Plaintiffs-Appellants**

# **TABLE OF CONTENTS**

**PAGE(S)**

RULE 35 STATEMENT ........................................................................1

STATEMENT OF THE CASE.............................................................1

ARGUMENT .......................................................................................3

I.  THE PANEL'S ANALYSIS OF THE CITY'S LOCKED-STORAGE MANDATE
    CONFLICTS WITH DECISIONS OF THE SUPREME COURT AND THIS
    COURT.........................................................................................3

    A.  Restrictions on the Core Right to Keep and Bear Arms
        for Self-Defense Inside the Home Demand Strict Scrutiny.................3

    B.  At Minimum, Restrictions on the Manner in Which Core
        Second Amendment Rights May Be Exercised Cannot Be
        Subject to a Lesser Form of Scrutiny than Restrictions on
        The Manner in Which Other Enumerated Rights May Be
        Exercised ..........................................................................8

II. THE PANEL'S ANALYSIS OF THE CITY'S BAN ON THE SALE OF HOLLOW-
    POINT AMMUNITION ALSO CONFLICTS WITH DECISIONS OF THE SUPREME
    COURT AND THIS COURT .............................................................11

CONCLUSION ..................................................................................18

CERTIFICATE OF COMPLIANCE....................................................19

CERTIFICATE OF SERVICE ............................................................20

ADDENDUM .....................................................................................21

        Panel Opinion ...................................................................22

i

# TABLE OF AUTHORITIES

**PAGE(S)**

## FEDERAL CASES

*Brown v. Entm't Merchants Ass'n*,
__ U.S. __, 131 S. Ct. 2729 (2011) ....................................................... 13, 17

*Buckley v. Am. Constitutional Law Found., Inc.*,
525 U.S. 182 (1999)....................................................................................4, 6

*Carey v. Population Servs.*,
431 U.S. 678 (1977)..................................................................................13, 15

*Caruso v. Yamhill Cnty. ex rel. Cnty. Com'r*,
422 F.3d 848 (9th Cir. 2005) ...........................................................................4

*District of Columbia v. Heller*,
554 U.S. 570 (2008)............................................................................. *passim*

*Ezell v. City of Chicago*,
651 F.3d 684 (7th Cir. 2011) ....................................................................14, 15

*Fyock v. City of Sunnyvale*,
C-13-5807-RMW, 2014 WL 984162 (N.D. Cal. Mar. 5, 2014) ...................12

*Kachalsky v. County of Westchester*,
701 F.3d 81 (2d Cir. 2012) ..............................................................................4

*Kodak v. Holder*,
342 F. App'x 907 (4th Cir. 2009)...................................................................12

*Martin v. Harrington and Richardson, Inc.*,
743 F.2d 1200 (7th Cir. 1995) .......................................................................13

## TABLE OF AUTHORITIES (CONT.)

**PAGE(S)**

### FEDERAL CASES (CONT.)

*McDonald v. City of Chicago*,
 561 U.S. 742, 130 S. Ct. 3020 (2010) ..............................................1, 5, 12, 18

*New York State Rifle & Pistol Ass'n, Inc. v. Cuomo*,
 13-CV-291S, 2013 WL 6909955 (W.D.N.Y. Dec. 31, 2013).......................12

*Parker v. District of Columbia*,
 478 F.3d 370 (D.C. Cir. 2007).......................................................................12

*Peruta v. County of San Diego*,
 742 F.3d 1144 (9th Cir. 2014) ..............................................................1, 3, 18

*Pest Comm. v. Miller*,
 626 F.3d 1097 (9th Cir. 2010) .........................................................................4

*Reno v. Am. Civil Liberties Union*,
 521 U.S. 844 (1997)........................................................................................16

*San Antonio Indep. Sch. Dist. v. Rodriguez*,
 411 U.S. 1 (1973)..............................................................................................5

*Schad v. Borough of Mount Ephraim*,
 452 U.S. 61 (1981)..........................................................................................15

*Spence v. State of Washington*,
 418 U.S. 405 (1974)........................................................................................16

*United States v. Chovan*,
 735 F.3d 1127 (9th Cir. 2013) ..............................................................1, 2, 5, 6

# <u>TABLE OF AUTHORITIES (CONT.)</u>

**PAGE(S)**

## <u>FEDERAL CASES (CONT.)</u>

*United States v. Masciandaro*,
638 F.3d 458 (4th Cir. 2011) ........................................................................4

*United States v. McCartney*,
357 F. App'x 73 (9th Cir. 2009) ..................................................................12

*Ward v. Rock Against Racism*,
491 U.S. 781 (1989)..................................................................................9, 10

## <u>STATUTES, RULES, REGULATIONS & OTHER AUTHORITY</u>

S.F., Cal, Police Code § 613.10 ....................................................................1

S.F., Cal, Police Code § 4512 ....................................................................1, 9

Cal. Penal Code § 25100.............................................................................10

## RULE 35 STATEMENT

Challenges to laws that infringe fundamental rights invoke questions of exceptional importance. This case involves two such challenges—one to a law imposing restrictions on how individuals may keep and bear arms for self-defense in their homes, and another prohibiting the sale of the ammunition overwhelmingly preferred for self-defense. In applying intermediate scrutiny to uphold both of these laws, the panel arrived at a decision at odds with decisions of the Supreme Court in *District of Columbia v. Heller*, 554 U.S. 570 (2008) and *McDonald v. City of Chicago*, __ U.S. __, 130 S. Ct. 3020 (2010), and this circuit in *United States v. Chovan*, 735 F.3d 1127 (9th Cir. 2013) and *Peruta v. County of San Diego*, 742 F.3d 1144 (9th Cir. 2014). The Court should grant en banc review to conform its jurisprudence with Supreme Court precedent and to ensure uniformity in its treatment of Second Amendment challenges.

## STATEMENT OF THE CASE

San Francisco Police Code section 4512 requires handguns to be stored in a locked container or disabled with a trigger-lock, unless they are "carried on the person of an individual over the age of 18" or "under the control of a person who is a peace officer." Non-peace-officer residents may unlock their handguns *only* when they "carry" them—even if they are home alone. Section 613.10(g) bans the

1

sale of hollow-point ammunition, the most common and effective self-defense ammunition in American society. A.O.B. 6-8; E.R. III 208-305.

In 2009, Jackson filed suit challenging both of these laws under the Second Amendment. In August 2012, she moved to enjoin the laws' enforcement pending resolution of this case. E.R. II 126-58. The district court denied that relief, finding Jackson was unlikely to succeed on the merits. E.R. I 001-08.

On March 25, 2014, a panel of this Court affirmed. Op. 5 (Addendum A). The panel began by stating that it would apply the approach adopted in *Chovan*, which asks if a "challenged law burdens conduct protected by the Second Amendment," and if it does, "directs courts to apply an appropriate level of scrutiny." 735 F.3d at 1136. Citing *Chovan*, the panel considered "how close the law comes to the core of the Second Amendment right" and "the severity of the law's burden" in selecting the level of review. Op. 11.

Regarding the storage law, the panel correctly held that the law burdens core Second Amendment conduct because it makes it more difficult to use firearms for self-defense in the home. Op. 16-17. Nonetheless, the panel subjected the law only to "intermediate scrutiny," reasoning that it is akin to a "time, place, or manner" restriction on public speech. Op. 17-19. The panel then largely deferred to the City's contention that the locked-storage mandate furthers public safety in a sufficiently tailored manner. Op. 21-22.

2

The panel similarly held that the ammunition ban burdens Second Amendment conduct. But because residents can purchase other ammunition in San Francisco and access the prohibited ammunition elsewhere, the court applied only intermediate scrutiny, once again reasoning that the law is akin to a "manner" regulation. Op. 26-27. The panel then concluded that banning sales of the most common self-defense ammunition serves a substantial government interest because the qualities that make this ammunition highly effective for self-defense also make it more lethal. Op. 27. And even though the ammunition remains legal to possess, the panel found a reasonable fit between the City's interest and its ban. Op. 28-29.

## ARGUMENT

I.   **THE PANEL'S ANALYSIS OF THE CITY'S LOCKED-STORAGE MANDATE CONFLICTS WITH DECISIONS OF THE SUPREME COURT AND THIS COURT**

### A.   Restrictions on the Core Right to Keep and Bear Arms for Self-Defense Inside the Home Demand Strict Scrutiny

There can be no serious dispute that the City's attempt to impose restrictions on how responsible, law-abiding individuals keep and bear arms for self-defense in their homes burdens core Second Amendment activity. While the right to keep and bear arms is certainly not confined to the home, *see Peruta*, 742 F.3d at 1155-67, the home is "where the need for defense of self, family, and property is most acute." *Heller*, 554 U.S. at 628. Accordingly, "whatever else [the Second Amendment] leaves to future evaluation, it surely elevates above all other interests

the right of law-abiding, responsible citizens to use arms in defense of hearth and home." *Id.* at 635.

Precisely because Second Amendment rights are "at their zenith" in the home, *Kachalsky v. County of Westchester*, 701 F.3d 81, 89 (2d Cir. 2012), "any law that would burden the 'fundamental,' core right of self-defense in the home by a law-abiding citizen would be subject to strict scrutiny,' " *United States v. Masciandaro*, 638 F.3d 458, 470 (4th Cir. 2011). This is clear from settled precedent in other constitutional contexts. For instance, in the First Amendment context, when restrictions on core political speech are at issue, courts "ordinarily appl[y] strict scrutiny without first determining that the . . . law severely burdens speech." *Buckley v. Am. Constitutional Law Found., Inc.*, 525 U.S. 182, 207 (1999) (Thomas, J., concurring); *see, e.g.*, *Pest Comm. v. Miller*, 626 F.3d 1097, 1107 (9th Cir. 2010) (strict scrutiny applies if a law implicates core political speech *or* severely burdens speech); *Caruso v. Yamhill Cnty. ex rel. Cnty. Com'r*, 422 F.3d 848, 855-56 (9th Cir. 2005) (laws regulating communications for which First Amendment protections are at their "zenith" demand strict scrutiny). As these cases reflect, "because restrictions on core political speech so plainly impose a 'severe burden,' " strict scrutiny necessarily applies. *Buckley*, 525 U.S. at 207.

Here, the panel acknowledged that the City's locked-storage law regulates core Second Amendment activity, as it imposes restrictions on how law-abiding

4

individuals may keep and bear arms for self-defense in their homes. Yet the panel subjected the law to only intermediate scrutiny—and a very weak form of intermediate scrutiny at that. This conclusion simply cannot be reconciled with the Supreme Court's admonishment that the Second Amendment may not be "singled out for special—and specially unfavorable—treatment." *McDonald*, 130 S. Ct. at 3043. Just as restrictions on conduct at the core of other enumerated constitutional rights demand nothing less than strict scrutiny, so too do restrictions on core Second Amendment activity.

Indeed, in most contexts, *any* law that interferes with "fundamental constitutional rights" is subject to "strict judicial scrutiny." *San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 16 (1973). And yet, according to the panel, strict scrutiny does not apply even when the government imposes direct restrictions on conduct the Second Amendment "elevates above all other interests." *Heller*, 554 U.S. at 635. Left standing, that holding will relegate the Second Amendment to exactly the kind of "second-class right, subject to an entirely different body of rules than the other Bill of Rights guarantees," that the Supreme Court has declared it is not. *McDonald*, 130 S. Ct. at 3044.

Contrary to the panel's reasoning, nothing in *Chovan* permits or even contemplates the conclusion the panel reached. To be sure, *Chovan* instructs courts to consider "how close the law comes to the core of the Second Amendment right"

and "the severity of the law's burden" in determining the applicable standard of scrutiny. Op. 11. But, as in the First Amendment context, when a law imposes restrictions on activity at *the very core* of the Second Amendment, "it makes little difference whether [courts] determine burden first because [such] restrictions . . . so plainly impose a 'severe burden.' " *Buckley*, 525 U.S. at 207 (Thomas, J., concurring). The panel's contrary contention renders *Chovan*'s two-step analysis meaningless. If the panel were correct that nothing short of the kind of wholesale ban that is already categorically unconstitutional under *Heller* were sufficiently "severe" to trigger strict scrutiny, *see* Op. 18-19, then the *Chovan* test would always produce the same result: intermediate scrutiny. Surely that is not the result this Court intended in *Chovan*—or a result the Supreme Court would countenance.

In any event, even if some burdens on core Second Amendment activity are not sufficiently "severe" to trigger strict scrutiny, the burden imposed by the City's locked-storage law clearly is. In concluding otherwise, the panel attempted to liken the City's restriction on the right to keep and bear arms in the home to a restriction on the time, place, and manner in which First Amendment rights may be exercised. Op. 17. But First Amendment time, place, and manner restrictions are permissible only because the right to free speech generally is capable of meaningful exercise in many different times, places, and manners. The same cannot be said of the right to self-defense, which is meaningful only if it can be exercised when the need arises.

Two Justices vividly illustrated this point during oral argument in *Heller* when exploring the severity of the burden the District of Columbia's locked-storage law would impose should the need for self-defense arise during the night:

> JUSTICE SCALIA:  You turn on, you turn on the lamp next to your bed so you can—you can turn the knob at 3-22-95, and so somebody—
> . . . .
> CHIEF JUSTICE ROBERTS: Is it like that? Is it a numerical code?
> MR. DELLINGER:  Yes, you can have one with a numerical code.
> CHIEF JUSTICE ROBERTS: So then you turn on the lamp, you pick up your reading glasses—
> (Laughter.)

E.R. III 205-06. As this exchange underscores, to treat restrictions on how firearms may be kept in the home as no more burdensome than restrictions on the time, place, and manner in which First Amendment rights may be exercised blinks reality. Laws that allow residents to access their firearms only after they are under attack, like the City's, plainly impose a severe burden on core Second Amendment conduct.

To the extent there could be any room for doubt about that common-sense conclusion, the record below eliminates it. As Jackson's evidence demonstrated, precisely because a locked gun is *always* harder to access in an emergency than an unlocked one, locked-storage laws significantly burden, and sometimes *wholly negate*, the right to self-defense. *Compare* Op. 17-18, *with* E.R. II 043, 057-60; LEAA Br. 7-8. Although the City estimated that a locked-storage device may be disabled in "a few seconds," Jackson countered with uncontroverted evidence that

7

such delay can have *fatal consequences*. *Compare* E.R. II 092-93 (2.6-4.5 seconds to open locked-box), *with* E.R. II 057-60 (3-4 seconds can prevent self-defense). Rather than grapple with this evidence of the severe burden that the City's law imposes, the panel ignored it.

In short, the panel's refusal to apply strict scrutiny to a law that indisputably strikes at the very core of the Second Amendment cannot be reconciled with decisions of the Supreme Court or this Court. As a general matter, the government has no more business regulating how individuals keep and bear arms inside the home than in regulating how individuals exercise other enumerated constitutional rights inside the home. Indeed, if anything, it has even less interest in doing so, as the home is where Second Amendment rights are at their zenith. Accordingly, any attempt by the government to impose restrictions on the core right to self-defense inside the home must satisfy the strictest of scrutiny.

**B. At Minimum, Restrictions on the Manner in Which Core Second Amendment Rights May Be Exercised Cannot Be Subject to a *Lesser* Form of Scrutiny than Restrictions on the Manner in Which Other Enumerated Rights May Be Exercised**

The panel's decision is all the more problematic because it does not even subject the City's locked-storage law to the same rigorous standard of scrutiny that governs in the First Amendment time, place, and manner context. Even a time, place, and manner restriction still must be "narrowly tailored to serve a substantial government interest," and it is the government's burden to prove that this standard

is satisfied. *Ward v. Rock Against Racism*, 491 U.S. 781, 798-800 (1989). Yet rather than hold the City to that burden of proof, the panel relied almost exclusively on the erroneous contention that the locked-storage law "imposes only a minimal burden," Op. 22, and therefore largely ignored the wealth of evidence that the law is a vastly overbroad means of addressing any substantial interest the City may have.

According to the panel, the City's locked-storage ban is "appropriately tailored" because it helps reduce the "risk of unauthorized access by children or others," "the risk of firearms . . . being stolen," and "the number of handgun-related suicides and deadly domestic violence incidents." Op. 22. Even a cursory analysis of section 4512 readily confirms that it is a vastly overbroad means of furthering those interests. The law sweeps in all handgun owners, requiring them to lock their handguns through the night regardless of whether there is a child, spouse, domestic partner, or anyone else in the home who might try to access their handguns. Accordingly, in many (if not most) of its applications, the law does little or nothing to address the unauthorized access, suicide, or domestic violence concerns the City invoked—leaving only the City's purported interest in reducing firearm thefts. But the very purpose of the Second Amendment is to protect individuals' right to keep and bear arms to defend against those who would do harm to their person or property. A law requiring individuals to keep the very

9

means of doing so locked away during the night, when home invasions are most likely, turns the Second Amendment on its head.

In concluding otherwise, the panel committed legal error twice over. First, it placed near-dispositive weight on its determination that the City's law "imposes only a minimal burden" on Second Amendment rights, Op. 22, even though it had already relied on the same erroneous reasoning to reduce the standard of scrutiny from strict to intermediate, Op. 16. The flaw in this logic is obvious: If the purportedly "minimal" nature of the burden not only compels application of intermediate scrutiny but also suffices to satisfy it, then every law subject to intermediate scrutiny necessarily *will* satisfy it.

Second, the panel improperly absolved the City of its burden to prove its interests "would be served less effectively" absent the regulation. *Ward*, 491 U.S. at 799-800. State law already provides an incentive to keep one's firearms locked when not in use by excusing one of criminal liability if an unauthorized person accesses and misuses his/her locked firearm. Cal. Penal Code § 25100(a)-(b). Certainly, the additional potential for misdemeanor liability for failure to comply with the City's locked-storage law is little incentive for those unmotivated by potential *felony* charges to lock their guns in circumstances where someone might gain access. Indeed, the only statistically significant reduction in firearms death is linked to storage laws in "the few states [including California] where . . . violators

10

can be charged with a felony." E.R. II 085. Accordingly, the City's public safety concerns not only *can* be furthered by less burdensome laws but *already are*.

At bottom, the panel's analysis of the City's locked-storage law cannot be reconciled with the principle that the Second Amendment protects a *fundamental* constitutional right. Laws that strike at the very core of a fundamental, enumerated constitutional right demand nothing less than strict scrutiny. Certainly, they cannot be upheld under a watered-down form of scrutiny that would not pass muster were any other fundamental right—enumerated or not—at issue. The panel's contrary conclusion warrants reconsideration en banc.

## II. THE PANEL'S ANALYSIS OF THE CITY'S BAN ON THE SALE OF HOLLOW-POINT AMMUNITION ALSO CONFLICTS WITH DECISIONS OF THE SUPREME COURT AND THIS COURT

The panel fared no better with its analysis of the City's ban on the sale of the most popular form of ammunition used to exercise the Second Amendment right to self-defense. As *Heller* makes clear, the Second Amendment protects the people's right to access arms "typically possessed by law-abiding citizens for lawful purposes." 554 U.S. at 624-25. Consequently, the Second Amendment also necessarily protects the people's right to access ammunition to *use* those arms for self-defense. As such, any attempt to restrict access to the types of ammunition

typically possessed by law-abiding citizens for lawful purposes demands the strictest of scrutiny.[3]

Once again, that conclusion is compelled by *Heller* and *McDonald*. In *Heller*, the Court flatly rejected the notion "that it is permissible to ban the possession of handguns so long as the possession of other firearms (i.e., long guns) is allowed." 554 U.S. at 630. And as the decision affirmed by *Heller* declared, the District's attempt to justify its handgun ban on the ground that " 'residents still have access to hundreds more' " types of firearms was "frivolous." *Parker v. District of Columbia*, 478 F.3d 370, 400 (D.C. Cir. 2007). Two years later, Justice Alito explained the *Heller* Court's reasoning when writing for the plurality in *McDonald*:

> [I]n *Heller*, we held that individual self-defense is the central component of the Second Amendment right. . . . . [W]e found that this right applies to handguns because they are the most preferred firearm in the nation to keep and use for protection of one's home and family. Thus, we concluded, citizens must be permitted to use handguns for the core lawful purpose of self-defense.

---

[3] Every federal court to consider protections for ammunition, magazines, and firearms components acknowledge the question turns on common usage. *See, e.g.*, *Kodak v. Holder*, 342 F. App'x 907, 908-09 (4th Cir. 2009); *United States v. McCartney*, 357 F. App'x 73, 76 (9th Cir. 2009); *Fyock v. City of Sunnyvale*, C-13-5807-RMW, 2014 WL 984162, at *4 (N.D. Cal. Mar. 5, 2014); *New York State Rifle & Pistol Ass'n, Inc. v. Cuomo*, 13-CV-291S, 2013 WL 6909955, at *9 (W.D.N.Y. Dec. 31, 2013).

130 S. Ct. at 3036 (citations, emphasis, quotation marks, and brackets omitted). As that explanation makes clear, restrictions on access to the preferred means of exercising the right to self-defense necessarily impose a severe burden on the core of the right itself. Accordingly, like restrictions on the right to keep and bear arms in the home, they can survive only if they satisfy strict scrutiny.

That is true regardless of whether a restriction prohibits the possession or use of such ammunition or prohibits only its sale or purchase. As the Supreme Court has confirmed in other contexts, prohibiting the sale of items integral to the exercise of a constitutional right burdens that right "as harshly as a direct ban on their" use. *Carey v. Population Servs.*, 431 U.S. 678, 687-88 (1977). For example, in *Brown v. Entertainment Merchants Association*, the Supreme Court applied strict scrutiny to strike down a law prohibiting the sale of violent video games to minors. __ U.S. __, 131 S. Ct. 2729, 2738 (2011). That the law did not prevent minors from possessing or playing the games was of no consequence, either to the standard of scrutiny or the result. *Id.* at 2734 n.1. In short, as the Seventh Circuit has recognized, banning the sale of arms is the functional equivalent of banning their possession. *See Martin v. Harrington and Richardson, Inc.*, 743 F.2d 1200, 1204 (7th Cir. 1995).

Here, too, the panel's opinion conflicts with binding Supreme Court precedent. Just as "the American people have considered the handgun to be the

quintessential self-defense weapon," *Heller*, 554 U.S. at 629, the American people have made hollow-point ammunition the overwhelmingly preferred form of ammunition for self-defense, accounting for roughly 40% of all ammunition. *FFLGuard* & GOC Br. 6-10; E.R. II 151; E.R. III 217-18, 230-31, 262, 409.[5] This point was not even disputed below. And yet, the panel subjected the City's total ban on the sale of hollow-point ammunition to only intermediate scrutiny, reasoning that it "neither regulates conduct at the core of the Second Amendment nor burdens that right severely." Op. 27. That conclusion flies in the face of the Supreme Court's repeated holdings that the Constitution protects not just rights in the abstract, but the means to exercise those rights as well.

Although the panel purported to respect this principle, it promptly disavowed it. The panel began its analysis by correctly recognizing:

> That [one] may easily purchase ammunition elsewhere is irrelevant. In the First Amendment context, the Supreme Court long ago made it clear that one is not to have the exercise of his liberty of expression in appropriate places abridged on the plea that it may be exercised in some other place. That same principle applies here.

Op. 24 (quoting *Ezell v. City of Chicago*, 651 F.3d 684, 697 (7th Cir. 2011)) (quotations omitted). When it came time to determine whether the City's ordinance

---

[5] Hollow-point ammunition is preferred because it more effectively incapacitates attackers, which can mean the difference between life and death. It is also safer because it won't over-penetrate walls, striking someone in the next room. It is thus the preferred self-defense ammunition of American civilians and law-enforcement agencies, including San Francisco's. E.R. III 216, 228-231, 262-274, 409, 412.

passes constitutional muster, however, the panel turned around and insisted that the ordinance "imposes only modest burdens on the Second Amendment right" because individuals may still purchase hollow-point ammunition *elsewhere* and use it within the City's borders. Op. 27, 29.

Of course, such reasoning is not tolerated in other rights contexts. In *Schad v. Borough of Mount Ephraim*, 452 U.S. 61 (1981), the Supreme Court struck down an ordinance prohibiting live entertainment despite the argument that it was amply available in neighboring areas outside the borough. And in *Carey v. Population Services*, the Supreme Court invalidated a ban on contraceptive sales despite the ability to purchase them in other jurisdictions. 431 U.S. 678.

In short, the panel had it right the first time. The City's total ban on the sale of ammunition preferred by the American people for self-defense does not impose any less severe a burden on Second Amendment rights just because nearby jurisdictions have yet to follow in its footsteps. *See Ezell*, 651 F.3d at 711 (rejecting argument that shooting ranges in nearby jurisdictions made their prohibition in Chicago less burdensome).

Nor does it matter whether other forms of ammunition are "ineffective" for self-defense. *See* Op. 26. Surely mace, knives, and shotguns can all be effective for self-defense to varying degrees, but that does not empower governments to restrict their residents' access to handguns. *See Heller*, 554 U.S. at 630. Similarly, that

15

other forms of ammunition may be effective does not give the City carte blanche to restrict its residents' access to the overwhelmingly preferred form of ammunition. That the City considers other ammunition "less lethal" can hardly make a difference, as the same characteristics that the City claims render hollow-point ammunition more lethal are the very characteristics that make it the most popular choice for self-defense. That is precisely why *Heller* stressed that the government may restrict access to firearms or ammunition only when they are both "dangerous *and unusual*." 554 U.S. at 627 (emphasis added).

The reasoning employed by the panel has been squarely rejected in other rights contexts. In *Spence v. State of Washington*, the Supreme Court rejected a finding that the burden on speech was "minuscule and trifling" because there were "thousands of other means available . . . for the dissemination of his personal views." 418 U.S. 405, 411 n.4 (1974). And in *Reno v. American Civil Liberties Union*, the Supreme Court invalidated a law restricting the transmission of indecent messages via certain Internet modalities. 521 U.S. 844 (1997). Although the government argued that the provisions still allowed speakers to "engage in the restricted speech" in some form online, the Court quickly dismissed this contention as "equivalent to arguing that a statute could ban leaflets on certain subjects as long as individuals are free to publish books." *Id.* at 880.

16

In sum, because the City's ordinance bans access to the preferred self-defense ammunition of the American people, the Court erred in rejecting strict scrutiny. The City never attempted to meet its burden under this standard, and it cannot. To be sure, the government may regulate the time, place, and manner of selling protected arms and ammunition. But banning sales altogether no more regulates the "manner" of exercising one's Second Amendment rights than banning the sale of protected books regulates the "manner" of exercising one's First Amendment rights. Moreover, by banning sales, but allowing the import and use of ammunition that the City claims to be particularly dangerous and unsuitable for self-defense, the City's approach is simultaneously over-inclusive and under-inclusive. "Legislation such as this, *which is neither fish nor fowl*, cannot survive strict scrutiny." *Brown*, 131 S. Ct. at 2742.

## CONCLUSION

The panel's analysis contravenes the Supreme Court's admonition that "the Second Amendment is not a second-class right." *McDonald*, 130 S. Ct. at 3044. The Court should grant rehearing en banc.[4]

June 23, 2014                                        Respectfully Submitted,

Paul D. Clement                                      /s/ C.D. Michel
Erin E. Murphy                                       C. D. Michel (S.B.N. 144258)
BANCROFT PLLC                                        Glenn S. McRoberts (S.B.N. 144852)
1919 M Street NW, Suite 470                          Clinton B. Monfort (S.B.N. 255609)
Washington, D.C. 20036                               Anna M. Barvir (S.B.N. 268728)
Tel. No. (202) 234-0090                              MICHEL & ASSOCIATES, P.C.
                                                     180 East Ocean Blvd., Suite 200
                                                     Long Beach, CA 90802
                                                     Tel. No. (562) 216-4444
                                                     Fax No: (562) 216-4445

---

[4] This Court is considering third-party requests to intervene and seek rehearing en banc in *Peruta*. While petitioners believe *Peruta* is correct and does not warrant rehearing, should the en banc court disagree, petitioners suggest rehearing of this case in conjunction with *Peruta* to provide the Court with a broader range of circumstances in which to consider the correct Second Amendment analysis. At minimum, the Court should consider holding this petition in abeyance until it decides how to proceed in *Peruta*.

18

## **CERTIFICATE OF COMPLIANCE**

I certify that pursuant to Circuit Rules 35-4 and 40-1, the attached Petition for Rehearing En Banc is proportionately spaced, has a typeface of 14 points or more and contains 4200 words.

June 23, 2014                              /s/ C.D. Michel_____
                                          C.D. Michel

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on June 23, 2014, an electronic PDF of APPELLANTS'

PETITION FOR REHEARING OR REHEARING EN BANC was uploaded to the

Court's CM/ECF system, which will automatically generate and send by electronic

mail a Notice of Docket Activity to all registered attorneys participating in the

case. Such notice constitutes service on those registered attorneys.

/s/ C.D. Michel
C.D. Michel

## **ADDENDUM**

Panel Opinion ............................................................................. Addend. A

**ADDENDUM**
**Espanola Jackson, et al**
**v.**
**City and County of San Francisco et al**
**Case No. 12-17803**

**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| ESPANOLA JACKSON; PAUL COLVIN; THOMAS BOYER; LARRY BARSETTI; DAVID GOLDEN; NOEMI MARGARET ROBINSON; NATIONAL RIFLE ASSOCIATION OF AMERICA, INC.; SAN FRANCISCO VETERAN POLICE OFFICERS ASSOCIATION, *Plaintiffs-Appellants*, | No. 12-17803 D.C. No. 3:09-cv-02143-RS |
| v. | OPINION |
| CITY AND COUNTY OF SAN FRANCISCO; EDWIN M. LEE, Mayor for the City and County of San Francisco; GREG SUHR, San Francisco Police Chief, *Defendants-Appellees*. | |

Appeal from the United States District Court
for the Northern District of California
Richard Seeborg, District Judge, Presiding

Argued and Submitted
October 7, 2013—San Francisco, California

Filed March 25, 2014

2    JACKSON V. CITY & CNTY. OF SAN FRANCISCO

Before: Dorothy W. Nelson, Milan D. Smith, Jr.,
and Sandra S. Ikuta, Circuit Judges.

Opinion by Judge Ikuta

---

## SUMMARY[*]

---

### Civil Rights

The panel affirmed the district court's denial of plaintiffs' motion to preliminarily enjoin two San Francisco firearm and ammunition regulations in an action alleging that the regulations were impermissible violations of the right to bear arms under the Second Amendment.

The panel held that the first regulation, San Francisco Police Code section 4512(a), (c)(1), which requires handguns to be stored in a locked container at home or disabled with a trigger lock when not carried on the person, burdened the rights protected by the Second Amendment because such storage regulations were not part of a long historical tradition of proscription. Nevertheless, the panel determined that section 4512 was not a substantial burden on the Second Amendment right itself because it did not prevent an individual from possessing a firearm in the home. Applying intermediate scrutiny, the panel held that San Francisco had shown that section 4512's requirement that persons store handguns in a locked storage container or with a trigger lock when not carried on the person was substantially related to

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

the important government interest of reducing firearm-related deaths and injuries.

The panel held that the second regulation, San Francisco Police Code section 613.10(g), which prohibits the sale of hollow-point ammunition within San Francisco, may burden the core Second Amendment right of self-defense and the record contained no persuasive historical evidence suggesting otherwise. The panel therefore held that section 613.10(g) regulated conduct within the scope of the Second Amendment. Applying intermediate scrutiny, the panel held that San Francisco carried its burden of establishing that section 613.10(g) was a reasonable fit to achieve its goal of reducing the lethality of ammunition.

The panel held that because San Francisco's regulations did not destroy the Second Amendment right, and survived intermediate scrutiny, the district court did not abuse its discretion in concluding that plaintiffs would not succeed on the merits of their claims.

---

## COUNSEL

C.D. Michel (argued), Michel & Associates, P.C., Long Beach, California for Plaintiffs-Appellants.

Dennis J. Herrera, City Attorney; Wayne Snodgrass and Christine Van Aken (argued), Deputy City Attorneys, San Francisco, California for Defendants-Appellees.

Richard E. Gardiner, Fairfax, Virginia, for Amicus Curiae The Law Enforcement Alliance of America.

4        JACKSON V. CITY & CNTY. OF SAN FRANCISCO

Anthony T. Caso, John C. Eastman, and Karen J. Lugo, Orange, California, for Amicus Curiae Center for Constitutional Jurisprudence.

David B. Kopel, Denver, Colorado; Dan M. Peterson, Dan M. Peterson PLLC, Fairfax, Virginia, for Amici Curiae California Rifle and Pistol Association Foundation and Independence Institute.

Don B. Kates, Battle Ground, Washington, for Amicus Curiae FFLGuard LLC and Gun Owners of California, Inc.

Paul Flum and Anand Viswanathan, San Francisco, California, for Amicus Curiae Brady Center to Prevent Gun Violence and Major Cities Chiefs Association; Jonathan Lowy, Washington D.C., for Amicus Curiae Brady Center to Prevent Gun Violence.

Brent P. Ray and Casey R. Frank, Chicago, Illinois, for Amicus Curiae Law Center to Prevent Gun Violence.

## OPINION

IKUTA, Circuit Judge:

### I

This appeal raises the question whether two of San Francisco's firearm and ammunition regulations, which limit but do not destroy Second Amendment rights, are constitutional. We conclude that both regulations withstand constitutional scrutiny, and affirm the district court's denial of Jackson's motion for preliminary injunction.

### II

San Francisco Police Code section 4512 provides that "[n]o person shall keep a handgun within a residence owned or controlled by that person unless" (1) "the handgun is stored in a locked container or disabled with a trigger lock that has been approved by the California Department of Justice," or (2) "[t]he handgun is carried on the person of an individual over the age of 18."[1] S.F., Cal., Police Code art. 45, § 4512(a), (c)(1). Violations of section 4512 are punishable by a fine of up to $1,000 and up to six months in prison. *Id.* § 4512(e).

San Francisco Police Code section 613.10(g) prohibits the sale of ammunition that (1) has "no sporting purpose," (2) is "designed to expand upon impact and utilize the jacket, shot or materials embedded within the jacket or shot to project or disperse barbs or other objects that are intended to increase

---

[1] Section 4512 also contains an exception for a handgun "under the control of a peace officer."

6      JACKSON V. CITY & CNTY. OF SAN FRANCISCO

the damage to a human body or other target," or (3) is "designed to fragment upon impact." S.F., Cal., Police Code art. 9, § 613.10(g). Bullets that expand or fragment upon impact are generally referred to as "hollow-point" ammunition.

On May 15, 2009, Espanola Jackson, Paul Colvin, Thomas Boyer, Larry Barsetti, David Golden, Noemi Margaret Robinson, the National Rifle Association, and the San Francisco Veteran Police Officers Association brought suit against the City and County of San Francisco, and other defendants, to challenge the validity of Police Code sections 4512 and 613.10(g) as impermissible violations of the right to bear arms under the Second Amendment.[2] The individual plaintiffs are handgun owners and citizens of San Francisco "who presently intend to keep their handguns within the home in a manner ready for immediate use to protect themselves and their families." The organizations have brought this suit on behalf of their members, who have an interest in keeping handguns within their home for self-defense.

On August 30, 2012, Jackson moved for a preliminary injunction. The district court denied that motion on November 26, 2012. Plaintiffs filed a timely notice of appeal on December 21, 2012.

### III

Jackson challenges the district court's order denying her motion for preliminary injunction of sections 4512 and

---

[2] We refer to plaintiffs collectively as "Jackson." We refer to the defendants as "San Francisco."

613.10(g) on the ground that both infringe upon her Second Amendment rights.   To obtain a preliminary injunction, Jackson must establish that (1) she is likely to succeed on the merits; (2) she is likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in her favor; and (4) an injunction is in the public interest. *Am. Trucking Ass'ns v. City of Los Angeles*, 559 F.3d 1046, 1052 (9th Cir. 2009) (citing *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)).  A denial of preliminary injunction is reviewed for abuse of discretion.  *See Sanders Cnty. Republican Cent. Comm. v. Bullock*, 698 F.3d 741, 744 (9th Cir. 2012).   However, "[t]he district court's interpretation of the underlying legal principles . . . is subject to de novo review." *Sw. Voter Registration Educ. Project v. Shelley*, 344 F.3d 914, 918 (9th Cir. 2003).

IV

We turn first to the question whether the district court abused its discretion in concluding that Jackson did not carry her burden of showing a likelihood of success on the merits of her challenge to sections 4512 and 613.10(g).

We begin with the text of the Second Amendment: "A well regulated militia being necessary to the security of a free state, the right of the people to keep and bear arms shall not be infringed." U.S. Const. amend. II.  Our analysis of this text starts with *District of Columbia v. Heller*, 554 U.S. 570 (2008).  In *Heller*, the Supreme Court considered whether the District of Columbia's regulations, which barred the possession of handguns both inside and outside the home, and required other firearms to be kept "unloaded and disassembled or bound by a trigger lock or similar device," violated the plaintiff's Second Amendment rights.  554 U.S.

8    JACKSON V. CITY & CNTY. OF SAN FRANCISCO

at 575.  After undertaking a lengthy analysis of the original public meaning of the Second Amendment, the Court concluded that it confers "an individual right to keep and bear arms." *Id.* at 595.  Guided by the same historical inquiry, the Court emphasized that "the inherent right of self-defense has been central to the Second Amendment right." *Id.* at 628. Therefore, prohibiting the possession of handguns was unconstitutional.  *Id.* at 628–29.  Similarly, the District of Columbia's requirement that "firearms in the home be rendered and kept inoperable at all times" made "it impossible for citizens to use [firearms] for the core lawful purpose of self-defense and [was] hence unconstitutional." *Id.* at 630.[3]

   *Heller* did not purport to "clarify the entire field" of Second Amendment jurisprudence and does not provide explicit guidance on the constitutionality of regulations which are less restrictive than the near-total ban at issue in that case. *Id.* at 635.  But *Heller*'s method of analysis suggests a broad framework for addressing Second Amendment challenges. First, *Heller* determined whether the possession of operable weapons in the home fell within "the historical understanding of the scope of the [Second Amendment] right." *Id.* at 625. In conducting this analysis, *Heller* indicated that the Second Amendment does not preclude certain "longstanding prohibitions" and "presumptively lawful regulatory measures," such as "prohibitions on carrying concealed weapons," "prohibitions on the possession of firearms by felons and the mentally ill," "laws forbidding the carrying of firearms in sensitive places such as schools and government

---

[3] *McDonald v. City of Chicago* held that the Second Amendment right recognized in *Heller* is fully applicable to the States.  130 S. Ct. 3020, 3050 (2010).

buildings," "laws imposing conditions and qualifications on the commercial sale of arms," and prohibitions on "the carrying of 'dangerous and unusual weapons,'" referring to weapons that were not "in common use at the time" of the enactment of the Second Amendment.  *Id.* at 626–27, 627 n.26 (internal citations and quotations omitted).

Next, after determining that the possession of operable weapons fell within the scope of the Second Amendment, *Heller* considered the appropriate level of scrutiny for the challenged regulation.   In light of the severity of the restriction posed by the D.C. regulation, *Heller* determined that it was unconstitutional "[u]nder any of the standards of scrutiny that we have applied to enumerated constitutional rights." *Id.* at 628.  As *Heller* made clear, "'[a] statute which, under the pretence of regulating, amounts to a destruction of the right, or which requires arms to be so borne as to render them wholly useless for the purpose of defence, would be clearly unconstitutional.'"  *Id.* at 629 (quoting *State v. Reid*, 1 Ala. 612, 616–17 (1840)).  While *Heller* did not specify the appropriate level of scrutiny for Second Amendment claims, it nevertheless confirmed that rational basis review is not appropriate, explaining that "[i]f all that was required to overcome the right to keep and bear arms was a rational basis, the Second Amendment would be redundant with the separate constitutional prohibitions on irrational laws, and would have no effect."  *Id.* at 628 n.27.

Like the majority of our sister circuits, we have discerned from *Heller*'s approach a two-step Second Amendment inquiry.   *See United States v. Chovan*, 735 F.3d 1127, 1136–37 (9th Cir. 2013) (collecting cases).   The two-step inquiry we have adopted "(1) asks whether the challenged law burdens conduct protected by the Second Amendment

and (2) if so, directs courts to apply an appropriate level of scrutiny." *Id.* at 1136 (citing *United States v. Chester*, 628 F.3d 673, 680 (4th Cir. 2010); *United States v. Marzzarella*, 614 F.3d 85, 89 (3d Cir. 2010)). As other circuits have recognized, this inquiry bears strong analogies to the Supreme Court's free-speech caselaw. *See, e.g.*, *Ezell v. City of Chicago*, 651 F.3d 684, 702–03, 706 (7th Cir. 2011) ("Both *Heller* and *McDonald* suggest that First Amendment analogies are more appropriate, and on the strength of that suggestion, we and other circuits have already begun to adapt First Amendment doctrine to the Second Amendment context." (internal citation omitted)).

In the first step, we ask "whether the challenged law burdens conduct protected by the Second Amendment," *Chovan*, 735 F.3d at 1136, based on a "historical understanding of the scope of the [Second Amendment] right," *Heller*, 554 U.S. at 625, or whether the challenged law falls within a "well-defined and narrowly limited" category of prohibitions "that have been historically unprotected," *Brown v. Entm't Merchants Ass'n*, 131 S. Ct. 2729, 2733, 2734 (2011). To determine whether a challenged law falls outside the historical scope of the Second Amendment, we ask whether the regulation is one of the "presumptively lawful regulatory measures" identified in *Heller*, 554 U.S. at 627 n.26, or whether the record includes persuasive historical evidence establishing that the regulation at issue imposes prohibitions that fall outside the historical scope of the Second Amendment, *Chovan*, 735 F.3d at 1137. *See also United States v. Alvarez*, 132 S. Ct. 2537, 2544 (2012) (noting that only "the few historic and traditional categories [of conduct] long familiar to the bar" fall outside the scope of First Amendment protection (internal quotations omitted)).

If a prohibition falls within the historical scope of the Second Amendment, we must then proceed to the second step of the Second Amendment inquiry to determine the appropriate level of scrutiny. *Chovan*, 735 F.3d at 1136. When ascertaining the appropriate level of scrutiny, "just as in the First Amendment context," we consider: "(1) 'how close the law comes to the core of the Second Amendment right' and (2) 'the severity of the law's burden on the right.'" *Chovan*, 735 F.3d at 1138 (quoting *Ezell*, 651 F.3d at 703).

In analyzing the first prong of the second step, the extent to which the law burdens the core of the Second Amendment right, we rely on *Heller*'s holding that the Second Amendment has "the core lawful purpose of self-defense," 554 U.S. at 630, and that "whatever else it leaves to future evaluation, [the Second Amendment] surely elevates above all other interests the right of law-abiding, responsible citizens to use arms in defense of hearth and home." *Id.* at 635; *see also Chovan*, 735 F.3d at 1138 (stating that a core right under the Second Amendment is "the right of law-abiding, responsible citizens to use arms in defense of hearth and home").

In analyzing the second prong of the second step, the extent to which a challenged prohibition burdens the Second Amendment right, we are likewise guided by First Amendment principles. *Cf. Ezell*, 651 F.3d at 706–07. As we explained in *Chovan*, laws which regulate only the "*manner* in which persons may exercise their Second Amendment rights" are less burdensome than those which bar firearm possession completely. 735 F.3d at 1138; *see also Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989) (noting that laws that place "reasonable restrictions on the time, place, or manner of protected speech" and that "leave open alternative

channels for communication of information," pose less of a burden on the First Amendment right and are reviewed under intermediate scrutiny).  Similarly, firearm regulations which leave open alternative channels for self-defense are less likely to place a severe burden on the Second Amendment right than those which do not.  *Cf. Marzzarella*, 614 F.3d at 97 (applying intermediate scrutiny to a regulation which "leaves a person free to possess any otherwise lawful firearm he chooses—so long as it bears its original serial number").

A law that imposes such a severe restriction on the core right of self-defense that it "amounts to a destruction of the [Second Amendment] right," is unconstitutional under any level of scrutiny.  *Heller*, 554 U.S. at 629 (internal quotations omitted).  By contrast, if a challenged law does not implicate a core Second Amendment right, or does not place a substantial burden on the Second Amendment right, we may apply intermediate scrutiny.  *See, e.g.*, *Chovan*, 735 F.3d at 1138–39; *cf. Heller v. District of Columbia* (*Heller II*), 670 F.3d 1244, 1257 (D.C. Cir. 2011) ("[A] regulation that imposes a substantial burden upon the core right of self-defense protected by the Second Amendment must have a strong justification, whereas a regulation that imposes a less substantial burden should be proportionately easier to justify.").

V

We now apply these principles to the facts of this case. We begin by addressing Jackson's facial and as-applied challenge to the constitutionality of section 4512, which requires handguns to be stored in a locked container when not carried on the person.

A

As a threshold issue, San Francisco argues that Jackson may not bring a facial challenge to section 4512. San Francisco contends that Jackson conceded that locked storage is appropriate in some circumstances, such as when it is foreseeable that a child would otherwise gain possession of a firearm. Therefore, San Francisco claims that section 4512 has a "plainly legitimate sweep," and a facial challenge is inappropriate. *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 449 (2008) (quoting *Wash. v. Glucksberg*, 521 U.S. 702, 739–40 & n.7 (1997)).

San Francisco's argument reflects a misunderstanding of the Supreme Court's jurisprudence. Facial challenges are disfavored for two reasons. First, when considering "complex and comprehensive legislation," we may not "resolve questions of constitutionality with respect to each potential situation that might develop," especially when the moving party does not demonstrate that the legislation "would be unconstitutional in a large fraction of relevant cases." *Gonzales v. Carhart*, 550 U.S. 124, 167–68 (2007) (internal quotation omitted). Second, facial challenges "often rest on speculation." *Wash. State Grange*, 552 U.S. at 450. Consequently, "they raise the risk of premature interpretations of statutes on the basis of factually barebones records," and "threaten to short circuit the democratic process by preventing laws embodying the will of the people from being implemented in a manner inconsistent with the Constitution." *Id.* at 450–51.

Jackson's facial challenge to section 4512 raises neither concern. First, section 4512 is not an example of "complex and comprehensive legislation" which may be constitutional

in a broad swath of cases. Either it is a permissible burden on the Second Amendment right to "keep and bear arms" or it is not. Second, unlike the voting scheme at issue in *Washington State Grange*, the constitutionality of section 4512 does not turn on how San Francisco chooses to enforce it. The statute constitutes a flat prohibition on keeping unsecured handguns in the home. On its face, it does not give courts the opportunity to construe the prohibition narrowly or accord the prohibition "a limiting construction to avoid constitutional questions." *Id.* at 450.

## B

We next apply the two-step inquiry to determine whether section 4512 is constitutional. We consider whether section 4512 burdens conduct protected by the Second Amendment. If so, we then determine an appropriate level of scrutiny. *Chovan*, 735 F.3d at 1136.

First, we ask whether section 4512 regulates conduct "historically understood to be protected" by the Second Amendment "right to keep and bear arms." *Chovan*, 735 F.3d at 1136, 1137. In analyzing the scope of the Second Amendment, we begin with the list of "presumptively lawful" regulations provided by *Heller*. *See* 554 U.S. at 626–27; *see also Chovan*, 735 F.3d at 1137. Section 4512 resembles none of them, because it regulates conduct at home, not in "sensitive places"; applies to all residents of San Francisco, not just "felons or the mentally ill"; has no impact on the "commercial sale of arms," and it regulates handguns, which *Heller* itself established were not "dangerous and unusual." 554 U.S. at 626–27.

Nor does section 4512 resemble the prohibitions discussed in "historical evidence in the record before us." *Chovan*, 735 F.3d at 1137 (internal citation omitted). *Heller* discusses two founding-era laws which regulated the storage of firearms and gunpowder. *See* 554 U.S. at 631–32. First, it notes a 1783 Massachusetts law that prohibited residents of Boston from taking loaded firearms into "any Dwelling House, Stable, Barn, Out-house, Ware-house, Store, Shop or other Building." *Id.* at 631 (quoting Act of Mar. 1, 1783, ch. 13, 1783 Mass. Acts p. 218.) *Heller* indicated that this statute should be construed narrowly in light of its context, "which makes clear that the purpose of the prohibition was to eliminate the danger to firefighters posed by the 'depositing of loaded Arms' in buildings." 554 U.S. at 631. *Heller* also concluded that the Massachusetts law was an outlier that contradicted "the overwhelming weight of other evidence regarding the right to keep and bear arms for defense of the home." *Id.* at 632. With respect to "gunpowder-storage laws," *Heller* noted they "did not clearly prohibit loaded weapons, but required only that excess gunpowder be kept in a special container or on the top floor of the home." *Id.* Because *Heller* rejected the probative value of this evidence, these historical precedents do not establish that San Francisco's requirement is historically longstanding.

The other historical evidence in the record does not establish that prohibitions such as those in section 4512 fall outside the scope of "the Second Amendment, as historically understood." *Chovan*, 735 F.3d at 1137. San Francisco and its amici note that many states regulated the storage of gunpowder in the founding era, *see, e.g.*, Act of June 28, 1762, 1762–1765 R.I. Acts & Resolves 132 (mandating that large quantities of gunpowder be stored in a powder house); 1784 N.Y. Laws 627 (requiring gunpowder to be stored in

appropriate containers), and also point to reconstruction-era state court decisions upholding gunpowder-storage regulations as lawful applications of the state's police powers, *see, e.g.*, *Williams v. City Council of Augusta*, 4 Ga. 509, 511–12 (1848); *Foote v. Fire Dep't of the City of New York.*, 5 Hill 99, 100 (N.Y. Sup. Ct. 1843).  But, as noted by *Heller*, such laws are best described as "fire-safety" regulations. 554 U.S. at 632.  The fact that states historically imposed modest restrictions on the storage of gunpowder, a dangerous and highly flammable substance, does not raise the inference that the Second Amendment is inapplicable to regulations imposing restrictions on the storage of handguns.

Because storage regulations such as section 4512 are not part of a long historical "tradition of proscription," *Entm't Merchants Ass'n*, 131 S. Ct. at 2734, we conclude that section 4512 burdens rights protected by the Second Amendment, *see Chovan*, 735 F.3d at 1137.

### C

Having determined that section 4512 regulates conduct within the scope of the Second Amendment, we now turn to the second step of the inquiry: deciding what level of heightened scrutiny to apply to the ordinance.  The level of scrutiny depends upon "(1) how close the law comes to the core of the Second Amendment right, and (2) the severity of the law's burden on the right."  *Id.* at 1138 (internal quotations omitted).

We first consider whether the conduct regulated by section 4512 is close to the core of the Second Amendment. On its face, section 4512 implicates the core because it applies to law-abiding citizens, and imposes restrictions on

the use of handguns within the home. *See Heller*, 554 U.S. at 635 (emphasizing "the right of law-abiding responsible citizens to use arms in defense of hearth and home"). Section 4512 requires San Franciscans to choose, while in their homes, between carrying a handgun on their person and storing it in a locked container or with a trigger lock. S.F., Cal., Police Code art. 45, § 4512(a), (c)(1). As Jackson argues, there are times when carrying a weapon on the person is extremely impractical, such as when sleeping or bathing. Therefore, as a practical matter, section 4512 sometimes requires that handguns be kept in locked storage or disabled with a trigger lock. Having to retrieve handguns from locked containers or removing trigger locks makes it more difficult "for citizens to use them for the core lawful purpose of self-defense" in the home. *Heller*, 554 U.S. at 630. Section 4512 therefore burdens the core of the Second Amendment right.

This is not the end of our inquiry, however. We next look to the severity of section 4512's burden on the Second Amendment right. Section 4512 does not impose the sort of severe burden imposed by the handgun ban at issue in *Heller* that rendered it unconstitutional. *Id.* Unlike the challenged regulation in *Heller*, *id.* at 629, section 4512 does not substantially prevent law-abiding citizens from using firearms to defend themselves in the home. Rather, section 4512 regulates how San Franciscans must store their handguns when not carrying them on their persons. This indirectly burdens the ability to use a handgun, because it requires retrieving a weapon from a locked safe or removing a trigger lock. But because it burdens only the "*manner* in which persons may exercise their Second Amendment rights," *Chovan* 735 F.3d at 1138, the regulation more closely resembles a content-neutral speech restriction that regulates only the time, place, or manner of speech. The record

18    JACKSON V. CITY & CNTY. OF SAN FRANCISCO

indicates that a modern gun safe may be opened quickly. Thus, even when a handgun is secured, it may be readily accessed in case of an emergency. Further, section 4512 leaves open alternative channels for self-defense in the home, because San Franciscans are not required to secure their handguns while carrying them on their person. Provided San Franciscans comply with the storage requirements, they are free to use handguns to defend their home while carrying them on their person.

Thus, Section 4512 does not impose the sort of severe burden that requires the higher level of scrutiny applied by other courts in this context. In *Moore v. Madigan*, for instance, the government was obliged to meet a higher level of scrutiny than intermediate scrutiny to justify a "blanket prohibition" on carrying an operable gun in public. 702 F.3d 933, 940 (7th Cir. 2012). By contrast, section 4512 does not constitute a complete ban, either on its face or in practice, on the exercise of a law-abiding individual's right to self defense. Nor does section 4512 burden Second Amendment rights to the same degree as a Chicago ordinance prohibiting firing ranges in the city, which the Seventh Circuit analyzed under "a more rigorous showing" than intermediate scrutiny, "if not quite 'strict scrutiny.'" *Ezell*, 651 F.3d at 708. The Seventh Circuit reasoned that the "ban is not merely regulatory; it *prohibits* the law-abiding, responsible citizens of Chicago from engaging in target practice in the controlled environment of a firing range," and was therefore "a serious encroachment on the right to maintain proficiency in firearm use, an important corollary to the meaningful exercise of the core right to possess firearms for self-defense." *Id*. (internal quotation marks omitted). Section 4512 does not impose such a serious encroachment on the core right; rather, it is more similar to the registration requirements upheld in *Heller*

*II.* In that case, the D.C. Circuit applied intermediate scrutiny to evaluate registration requirements, including mandatory firearm training and instruction, which "make it considerably more difficult for a person lawfully to acquire and keep a firearm, including a handgun, for the purpose of self-defense in the home . . . ." 670 F.3d at 1255. The D.C. Circuit reasoned that "none of the District's registration requirements *prevents* an individual from possessing a firearm in his home or elsewhere, whether for self-defense or hunting, or any other lawful purpose," and therefore intermediate scrutiny was appropriate. *Id.* at 1257–58 (emphasis added). Likewise, section 4512 does not prevent an individual from possessing a firearm in the home.

Accordingly, we conclude section 4512 is not a substantial burden on the Second Amendment right itself. Even though section 4512 implicates the core of the Second Amendment right, because it does not impose a substantial burden on conduct protected by the Second Amendment, we apply intermediate scrutiny. *Cf. id.*

D

Having determined the applicable standard of review, we must now determine whether section 4512 withstands intermediate scrutiny. "[C]ourts have used various terminology to describe the intermediate scrutiny standard." *Chovan*, 735 F.3d at 1139; c*ompare Ward v. Rock Against Racism*, 491 U.S. 781, 798 (1989) (holding that "a regulation of the time, place, or manner of protected speech must be narrowly tailored to serve the government's legitimate, content-neutral interests but that it need not be the least restrictive or least intrusive means of doing so,") *with Bd. of Trs. of State Univ. of N.Y. v. Fox*, 492 U.S. 469, 480 (1989)

(requiring "the government goal to be substantial, and the cost to be carefully calculated," and holding that "since the State bears the burden of justifying its restrictions, it must affirmatively establish the reasonable fit we require" (internal citation omitted)). But "all forms of the standard require (1) the government's stated objective to be significant, substantial, or important; and (2) a reasonable fit between the challenged regulation and the asserted objective." *Chovan*, 735 F.3d at 1139.

In analyzing the first prong of intermediate scrutiny review, whether the government's stated objective is significant, substantial, or important, we must first define the government's objective. *Cf. id.* According to San Francisco, the governmental objective in enacting section 4512 was to reduce the number of gun-related injuries and deaths from having an unlocked handgun in the home. *See* S.F., Cal., Police Code art. 45, § 4511(1)–(4). In considering a city's justifications for its ordinance, we do not impose "an unnecessarily rigid burden of proof . . . so long as whatever evidence the city relies upon is reasonably believed to be relevant to the problem that the city addresses." *City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 50–52 (1986). Here, as the legislative findings explain, "[h]aving a loaded or unlocked gun in the home is associated with an increased risk of gun-related injury and death." *Id.* § 4511(2). San Francisco relied on evidence that "[g]uns kept in the home are most often used in suicides and against family and friends rather than in self-defense," and that children are particularly at risk of injury and death. *Id.* § 4511(3)–(4). San Francisco therefore sought to "reduce[] the risk of firearm injury and death" in the home through the use of trigger locks or lock boxes under section 4512. *Id.* § 4511(5). "It is self-evident," *Chovan*, 735 F.3d at 1139, that public safety is an important

government interest. *See, e.g., Nat'l Treasury Emps. Union v. Von Raab*, 489 U.S. 656, 670–71, 677 (1989) (holding that government's compelling interest in public safety justifies drug testing of border agents who carry firearms); *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 768 (1994) ("The State also has a strong interest in ensuring the public safety and order . . . ."). Accordingly, San Francisco has carried its burden of demonstrating that its locked-storage law serves a significant government interest by reducing the number of gun-related injuries and deaths from having an unlocked handgun in the home.

We next turn to the question whether section 4512 is substantially related to San Francisco's important interest. In considering the question of fit, we review the legislative history of the enactment as well as studies in the record or cited in pertinent case law, *Chovan*, 735 F.3d at 1140, giving the city "a reasonable opportunity to experiment with solutions to admittedly serious problems," *City of Renton*, 475 U.S. at 52 (internal quotations omitted). In the legislative findings accompanying section 4512, San Francisco concluded that firearm injuries are the third-leading cause of death in San Francisco, and that having unlocked firearms in the home increases the risk of gun-related injury, especially to children. *See* S.F., Cal., Police Code art. 45, § 4511(1)(e), (2)–(3). The record contains ample evidence that storing handguns in a locked container reduces the risk of both accidental and intentional handgun-related deaths, including suicide. Based on the evidence that locking firearms increases safety in a number of different respects, San Francisco has drawn a reasonable inference that mandating that guns be kept locked when not being carried will increase public safety and reduce firearm casualties. This evidence supports San Francisco's position that section 4512 is

substantially related to its objective to reduce the risk of firearm injury and death in the home.

Jackson contends that section 4512 is over-inclusive because it applies even when the risk of unauthorized access by children or others is low, such as when a handgun owner lives alone. We reject this argument, because San Francisco has asserted important interests that are broader than preventing children or unauthorized users from using the firearms, including an interest in preventing firearms from being stolen and in reducing the number of handgun-related suicides and deadly domestic violence incidents. *See id.* § 4511(2)(d), (4). Intermediate scrutiny does not require that section 4512 be the *least* restrictive means of reducing handgun-related deaths. *Ward*, 491 U.S. at 798. Moreover, the burden imposed by the legislation is not substantial. San Francisco relied on evidence showing that section 4512 imposes only a minimal burden on the right to self-defense in the home because it causes a delay of only a few seconds while the firearm is unlocked or retrieved from storage. Because the ordinance imposes only a minimal burden on the right to self-defense and San Francisco's interest encompasses more than just preventing minors from gaining access to firearms, the ordinance is appropriately tailored to fit San Francisco's interest.

Accordingly, San Francisco has shown that section 4512's requirement that persons store handguns in a locked storage container or with a trigger lock when not carried on the person is substantially related to the important government interest of reducing firearm-related deaths and injuries. Jackson is thus not likely to succeed on the merits, and we therefore affirm the district court's denial of Jackson's motion for preliminary injunction. Because we decide on this

basis, we need not reach Jackson's arguments that she established the remaining prongs of the preliminary injunction standard. *See Am. Trucking Ass'ns*, 559 F.3d at 1052.

## VI

We now turn to the constitutionality of section 613.10(g), which prohibits the sale of hollow-point ammunition within San Francisco.

## A

As a threshold issue, San Francisco contends that Jackson lacks standing to challenge section 613.10(g). To satisfy Article III standing, a plaintiff must show: "(1) an 'injury in fact' that is 'concrete and particularized' and 'actual or imminent,' not 'conjectural or hypothetical'; (2) a 'causal connection between the injury' and the challenged action of the defendant; and (3) that it is 'likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.'" *Multistar Indus., Inc. v. U.S. Dep't of Transp.*, 707 F.3d 1045, 1054 (9th Cir. 2013) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992)). An injury in fact is an "invasion of a legally protected interest." *Lujan*, 504 U.S. at 560.

San Francisco asserts that Jackson has not suffered an injury in fact because she could easily obtain hollow-point ammunition outside San Francisco. But the injury Jackson alleges is not the inconvenience of leaving San Francisco; rather, she alleges that the Second Amendment provides her with a "legally protected interest," *id.*, to purchase hollow-point ammunition, and that but for section 613.10(g), she

would do so within San Francisco. That Jackson may easily purchase ammunition elsewhere is irrelevant. "In the First Amendment context, the Supreme Court long ago made it clear that one is not to have the exercise of his liberty of expression in appropriate places abridged on the plea that it may be exercised in some other place. The same principle applies here." *Ezell*, 651 F.3d at 697 (internal citations and quotations omitted). Accordingly, section 613.10(g) constitutes an injury in fact to Jackson, and she has standing to challenge it.

B

Applying the two-step analysis outlined above, we first ask whether a prohibition on the sale of hollow-point ammunition regulates conduct "historically understood to be protected" by the Second Amendment "right to keep and bear arms." *Chovan*, 735 F.3d at 1136–37.

The Second Amendment protects "arms," "weapons," and "firearms"; it does not explicitly protect ammunition. Nevertheless, without bullets, the right to bear arms would be meaningless. A regulation eliminating a person's ability to obtain or use ammunition could thereby make it impossible to use firearms for their core purpose. *Cf. Heller*, 554 U.S. at 630 (holding that "the District's requirement (as applied to respondent's handgun) that firearms in the home be rendered and kept inoperable at all times . . . makes it impossible for citizens to use them for the core lawful purpose of self-defense and is hence unconstitutional"). Thus "the right to possess firearms for protection implies a corresponding right" to obtain the bullets necessary to use them. *Cf. Ezell*, 651 F.3d at 704 (holding that the right to possess firearms implied a corresponding right to have access to firing ranges

in order to train to be proficient with such firearms).  Indeed, *Heller* did not differentiate between regulations governing ammunition and regulations governing the firearms themselves.  *See* 554 U.S. at 632.  Rather, the Court considered the burden certain gunpowder-storage laws imposed on the Second Amendment right, and determined that they did not burden "the right of self-defense as much as an absolute ban on handguns."  *Id.*  This observation would make little sense if regulations on gunpowder and ammunition fell outside the historical scope of the Second Amendment.

Conducting our historical review, we conclude that prohibitions on the sale of ammunition do not fall outside "the historical understanding of the scope of the [Second Amendment] right."  *Id.* at 625.  *Heller* does not include ammunition regulations in the list of "presumptively lawful" regulations.  *See id.* at 626–27, 627 n.26.  Nor has San Francisco pointed to historical prohibitions discussed in case law or other "historical evidence in the record before us" indicating that restrictions on ammunition fall outside of the historical scope of the Second Amendment.  *Chovan*, 735 F.3d at 1137 (internal quotation omitted).

Because restrictions on ammunition may burden the core Second Amendment right of self-defense and the record contains no persuasive historical evidence suggesting otherwise, section 613.10(g) regulates conduct within the scope of the Second Amendment.

## C

We next turn to the appropriate level of scrutiny to apply to the challenged regulation.  We consider how close section

613.10(g) is to the core of the Second Amendment right, and the severity of its burden on that right. *See Chovan*, 735 F.3d at 1138.

We first consider how close San Francisco's ban on the sale of hollow-point bullets comes to the core of the Second Amendment right. Jackson contends that hollow-point bullets are far better for self-defense than fully jacketed ammunition because they have greater stopping power and are less likely to overpenetrate or ricochet. Barring their sale, she argues, therefore imposes a substantial burden on the right of self-defense. We disagree. There is no evidence in the record indicating that ordinary bullets are ineffective for self-defense. Moreover, section 613.10(g) prohibits only the sale of hollow-point ammunition within San Francisco, not the use or possession of such bullets. Such a sales prohibition burdens the core right of keeping firearms for self-defense only indirectly, because Jackson is not precluded from using the hollow-point bullets in her home if she purchases such ammunition outside of San Francisco's jurisdiction.

Nor does section 613.10(g) place a substantial burden on the Second Amendment right. A ban on the sale of certain types of ammunition does not prevent the use of handguns or other weapons in self-defense. The regulation in this case limits only the manner in which a person may exercise Second Amendment rights by making it more difficult to purchase certain types of ammunition. This is akin to a content-neutral time, place, and manner restriction, such as a regulation which prevents a person from owning a firearm with an obliterated serial number while not barring the possession of an otherwise lawful firearm. *See Marzzarella*, 614 F.3d at 97. Further, section 613.10(g) leaves open alternative channels for self-defense in the home. Jackson

may either use fully-jacketed bullets for self-defense or obtain hollow-point bullets outside of San Francisco's jurisdiction.  Because section 613.10(g) neither regulates conduct at the core of the Second Amendment right nor burdens that right severely, we review it under intermediate scrutiny.

D

In considering whether section 613.10(g) withstands intermediate scrutiny, we must first define the governmental interest served by section 613.10(g), and determine whether it is substantial.  Again, we review the legislative history of the enactment as well as studies in the record or cited in pertinent case law.  *Chovan*, 735 F.3d at 1139.  In the legislative findings accompanying section 613.10(g), San Francisco states that it "has a legitimate, important and compelling government interest in reducing the likelihood that shooting victims in San Francisco will die of their injuries by reducing the lethality of the ammunition sold and used in the City and County of San Francisco." S.F., Cal., Police Code art. 9, § 613.9.5(6).  It is self-evident that San Francisco's interest in reducing the fatality of shootings is substantial.  *See Chovan*, 735 F.3d at 1139.

We next consider the fit between section 613.10(g) and this interest to determine whether section 613.10 is substantially related to San Francisco's important interest of reducing the lethality of ammunition.  *See id.* at 1140.

Legislative findings explain San Francisco's reasons for adopting the approach in section 613.10(g).  Section 613.9.5(2) states that hollow-point bullets are "designed to tear larger wounds in the body by flattening and increasing in

diameter on impact," and that "[t]hese design features increase the likelihood that the bullet will hit a major artery or organ." Therefore, San Francisco concluded that hollow-point bullets are "more likely to cause severe injury and death than is conventional ammunition that does not flatten or fragment upon impact." *Id.* Jackson generally argues that these legislative findings rely on bad science and erroneous assumptions. More specifically, she challenges San Francisco's conclusion that hollow-point ammunition is more lethal than other bullets. She bases this argument on an American Bar Association publication, which states that "medical examiners have been unable to show any difference in lethality between hollow-point and traditional round-nosed lead bullets." Lisa Steel, Ballistics, in Science for Laywers 11 (ABA Sec. of Sci. & Tech. Law) (Eric York Drogin ed., 2008).

We are not persuaded by Jackson's arguments. The Supreme Court has held that a municipality may rely on any evidence "reasonably believed to be relevant" to substantiate its important interest in regulating speech. *City of Renton*, 475 U.S. at 51–52. Of course, "the municipality's evidence must fairly support the municipality's rationale for its ordinance," *City of Los Angeles v. Alameda Books, Inc.*, 535 U.S. 425, 438 (2002) (plurality), and courts should not credit facially implausible legislative findings. In this case, San Francisco's evidence more than "fairly supports" its conclusion that hollow-point bullets are more lethal than other types of ammunition. At most, Jackson's evidence suggests that the lethality of hollow-point bullets is an open question, which is insufficient to discredit San Francisco's reasonable conclusions. Section 613.10(g) is a reasonable fit for achieving its objective of reducing the lethality of

ammunition because it targets only that class of bullet which exacerbates lethal firearm-related injuries.

Jackson contends that San Francisco could have adopted less burdensome means of restricting hollow-point ammunition, for example by prohibiting the possession of hollow-point bullets in public, but allowing their purchase for home defense. *See, e.g.*, N.J. Stat. Ann. § 2C:39-3(f), (g). Even if this is correct, intermediate scrutiny does not require the least restrictive means of furthering a given end. *Ward*, 491 U.S. at 798. *City of Renton* emphasizes that a "city must be allowed a reasonable opportunity to experiment with solutions to admittedly serious problems." 475 U.S. at 52 (internal quotation omitted). We also doubt that the laws to which Jackson points are indeed less burdensome than section 613.10(g). Because section 613.10(g) affects only the *sale* of hollow-point ammunition, San Franciscans are free to use and possess hollow-point bullets within city limits. Under Jackson's "less burdensome" alternatives, individuals would face criminal prosecution for possessing such ammunition outside the home. Given the availability of alternative means for procuring hollow-point ammunition, section 613.10(g) imposes only modest burdens on the Second Amendment right.

Accordingly, we conclude that San Francisco carried its burden of establishing that section 613.10(g) is a reasonable fit to achieve its goal of reducing the lethality of ammunition, and section 613.10(g) thus satisfies intermediate scrutiny. We therefore conclude that Jackson has not carried her burden of showing she is likely to succeed on the merits. Accordingly, we need not reach the remaining preliminary injunction factors. *See Am. Trucking Ass'ns*, 559 F.3d at 1052.

## VII

We recognize the significance of the Second Amendment right to keep and bear arms. "[I]t is clear that the Framers and ratifiers of the Fourteenth Amendment counted the right to keep and bear arms among those fundamental rights necessary to our system of ordered liberty." *McDonald*, 130 S. Ct. at 3042. But we also recognize that the Second Amendment right, like the First Amendment right to freedom of speech, may be subjected to governmental restrictions which survive the appropriate level of scrutiny. Because San Francisco's regulations do not destroy the Second Amendment right, and survive intermediate scrutiny, the district court did not abuse its discretion in concluding that Jackson would not succeed on the merits of her claims. We therefore affirm the district court's denial of Jackson's motion for preliminary injunction.

**AFFIRMED.**