No. 12-17803

IN THE UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

ESPANOLA JACKSON, *et al.*,

*Plaintiffs-Appellants*

v.

CITY AND COUNTY OF SAN FRANCISCO, *et al.*,

*Defendants-Appellees*

ON APPEAL FROM THE UNITED STATES DISTRICT
COURT FOR THE NORTHERN DISTRICT OF CALIFORNIA
(No. 3:09–cv–02143–RS)

*AMICI CURIAE* BRIEF OF GUN OWNERS OF CALIFORNIA,
INC., HUNT FOR TRUTH ASSOCIATION, CALGUNS
SHOOTING SPORTS ASSOCIATION, AND THE OUTDOOR
SPORTSMEN'S COALITION OF CALIFORNIA IN SUPPORT OF
PETITION FOR REHEARING OR REHEARING *EN BANC*
AND IN SUPPORT OF REVERSAL

Stephen P. Halbrook (Va. Bar # 18075)
3925 Chain Bridge Road, Suite 403
Fairfax, Virginia 22030
Telephone: (703) 352-7276
Email: protell@aol.com
Counsel for *Amici Curiae*

CORPORATE DISCLOSURE STATEMENT

Gun Owners of California, Inc., Hunt for Truth Association, Calguns Shooting Sports Association, and The Outdoor Sportsmen's Coalition of California have no parent corporations. Since they have no stock, no publicly held company owns 10% or more of their stock.

Date: July 3, 2014               Respectfully Submitted,

                                 /s/ Stephen P. Halbrook
                                 Counsel for Amici Curiae
                                 Gun Owners of California, Inc.,
                                 Hunt for Truth Association,
                                 Calguns Shooting Sports
                                 Association, and
                                 The Outdoor Sportsmen's Coalition
                                 of California

# TABLE OF CONTENTS

**PAGE**

**TABLE OF AUTHORITIES**................................. iv

**IDENTITY AND INTEREST OF THE *AMICUS CURIAE***........ 1

**ARGUMENT**.......................................... 4

**Introduction**........................................ 4

**I. The Text Guarantees Against Any "Infringement,"
Not Just "Destruction" or Other Negation of the Right**..... 5

**II. The Right to "Keep" Operable "Arms" is Protected**......... 9

**III. The Ban on the Sale of Ammunition that is Commonly
Used by Law-Abiding Citizens for Lawful Purposes
Violates the Second Amendment**...................... 11

**IV. A Constitutional Right May Not Be Overridden
by Legislative Findings in an Interest-Balancing Test**.... 17

**CONCLUSION**........................................ 22

**CERTIFICATE OF COMPLIANCE**........................ 23

# TABLE OF AUTHORITIES

**PAGE**

## CASES

*Burdick v. Takushi*, 504 U.S. 428 (1992). . . . . . . . . . . . . . . . . . . . . . . 19

*Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410 (1993). . . . . . . . 16

*District of Columbia v. Heller*, 554 U.S. 570 (2008). . . . . . . . . . . . *passim*

*Ezell v. City of Chicago*, 651 F.3d 684 (7th Cir. 2011). . . . . . . . . . . . . . 16

*Heller v. District of Columbia*, 698 F. Supp.2d 179
(D. D.C. 2010), *aff'd in part & rev'd in part*,
670 F.3d 1244 (D.C. Cir. 2011). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Jackson v. City & County of San Francisco*,
2014 WL 1193434 (9th Cir. 2014). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525 (2001). . . . . . . . . . . . . . . 21

*Los Angeles v. Alameda Books, Inc.*, 535 U.S. 425 (2002). . . . . . . . . . . 21

*McDonald v. City of Chicago*, 130 S.Ct. 3020 (2010). . . . . . . . 6, 8, 19, 20

*Nunn v. State,* 1 Ga. 243 (1846). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Parker v. State*, 164 Cal. Rptr.3d 345 (5th Dist. 2013),
*appeal granted*, 167 Cal. Rptr.3d 658 (Cal. 2013). . . . . . . . . . . . . . . . . . 1

*Peruta v. County of San Diego*, 742 F.3d 1144
(9th Cir. 2014), *petition for rehearing en banc pending.*. . . . . . . . . . . . . . 1

*Republican Party of Minnesota v. White*, 536 U.S. 765 (2002).. . . . . . . . 21

*Sable Commcns. of Cal., Inc. v. FCC,* 492 U.S. 115 (1989). . . . . . . . . . 18

*San Antonio Independent School District v. Rodriguez*, 411 U.S. 1 (1973). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*State v. Reid*, 1 Ala. 612 (1840). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*United States v. Marzzarella*, 614 F.3d 85, 97 (3d Cir. 2010), *cert. denied*, 131 S.Ct. 958 (2011). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

## CONSTITUTIONS

U.S. Const., First Amendment. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

U.S. Const., Second Amendment . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

## STATUTES, ORDINANCES, AND REGULATIONS

Militia Act, 1 *Statutes at Large* 271 (1792). . . . . . . . . . . . . . . . . . . . . 14

Cal. Code Regs. tit. 14, § 353(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

S.F. Police Code § 4512. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

S.F. Police Code § 613.10(g). . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 12, 16

## OTHER AUTHORITIES

*California Hunter's Ed Course*, http://www.hunter-ed.com/california/studyGuide/Rifle-and-Handgun-Cartridges/201005_700040815 (visited June 13, 2014). . . . . . . . . . . . . . . 16

*Documentary History of the Ratification of the Constitution* (2000). . . . 7

*Documentary History of the First Federal Congress* (1986). . . . . . . . . . . 7

Halbrook, Stephen P., *The Founders' Second Amendment* (2008).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

Moller, George D. , *Massachusetts Military Shoulder Arms, 1784-1877* (1988).. . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*New Hampshire Gazette & Historical Chronicle*, Jan. 13, 1775. . . . . . 13

Newman, George C., *The History of Weapons of the American Revolution* (1967). . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Reichsgesetzblatt* 1938, I, 265, in Federal Firearms Legislation, Hearings before the Subcommittee to Investigate Juvenile Delinquency, Senate Judiciary Committee, 90th Cong., 2d Sess., 494 (1968). . . . . . . . . . . . . . . . . . . . . . . . . . . 11

Tucker, St. George, BLACKSTONE'S COMMENTARIES (1803). . . . . . . . . . 8

vi

## IDENTITY AND INTEREST OF THE *AMICUS CURIAE*

Gun Owners of California, Inc. (GOC) was founded in 1974 by Senator H. L. "Bill" Richardson, who served in the California Senate for 22 years. GOC is a California non-profit corporation organized under I.R.C. § 501(c)(4) located in Folsom with offices in Sacramento. GOC is a leading voice in California in support of the right to keep and bear arms. See www.gunownersca.com.

GOC has expertise in assisting the courts regarding the Second Amendment, having joined in amici curiae briefs in this case in the court below and in cases such as *Peruta v. County of San Diego*, 742 F.3d 1144 (9th Cir. 2014), and *Parker v. State*, 164 Cal. Rptr.3d 345 (5th Dist. 2013), *appeal granted*, 167 Cal. Rptr.3d 658 (Cal. 2013).

The Hunt For Truth Association (HFTA) was established in 2003 to collect and distribute scientific information on the use of "traditional" lead ammunition and regulatory matters involving sportsmen. HFTA is a California non-profit corporation located in Long Beach and is organized under I.R.C. § 501(c)(4). HFTA is one of the leading organizations in California regarding the science involving the use of firearms for hunting

and sporting activities. HFTA seeks to protect the right to use the most effective ammunition for hunting and recreational shooting activities. See www.huntfortruth.org.

The Calguns Shooting Sports Association, located in West Covina, CA, seeks to advance the Second Amendment in today's California shooting community. It seeks to encourage firearm owners to meet at ranges to promote a constantly-developing community; to empower this community with information about the political landscape and the future of shooting sports options in California; and to encourage the community to reach out to others through education and community development events. See http://cgssa.org/.

The Outdoor Sportsmen's Coalition of California (OSCC) is a nonprofit organization of clubs and individuals, totaling several thousand, dedicated to preserving outdoor recreation. It monitors legislation that impacts hunting, fishing and other recreation, and opposes unwise changes in laws and regulations. OSCC promotes the conservation, enhancement, scientific management, and wise use of our natural resources; seeks to end activities needlessly destructive to natural

resources; and endeavors to educate the public, particularly youth, to understand the importance of the conservation and enhancement of our natural resources. OSCC is particularly interested in this case to preserve access to the most effective and humane ammunition for hunting and recreation. See http://theoscc.org/.

The interest of amici in this case is to protect the rights of law-abiding gun owners from restrictions that violate the right to keep and bear arms and interfere with hunting and the shooting sports. Because the full scope of Second Amendment rights has only recently been recognized by the courts, the issues arising on its application to the restrictions here are novel and complex.

The arguments herein do not repeat those made by the parties and are relevant to the disposition of the case in that, if accepted, they would lead to a granting of the petition and a ruling that the restrictions at issue violate the Second Amendment.

Pursuant to Circuit Rule 29-2(a), all parties have consented to the filing of this amicus curiae brief.

No party's counsel authored this brief in whole or in part. No party

or a party's counsel contributed money that was intended to fund preparing or submitting this brief. No person – other than the amicus curiae, its members, or its counsel – contributed money that was intended to fund preparing or submitting this brief.

## ARGUMENT

### Introduction

San Francisco makes it a crime to "keep a handgun within a residence" unless it is either "stored in a locked container or disabled with a trigger lock" or "carried on the person of an individual . . . ." S.F. Police Code § 4512. It is illegal to sell ammunition that is designed to expand or fragment upon impact, which includes hollow-point and softnose ammunition. S.F. Police Code § 613.10(g). The panel upheld these prohibitions because they "do not destroy" Second Amendment rights and because the legislature alleged that the prohibited acts cause harm. *Jackson v. City & County of San Francisco*, 2014 WL 1193434, *1, *13 (9th Cir. 2014).

The decision thus failed to apply the Amendment's standard of whether the bans "infringe" on the right, rather than "destroy" the right

-4-

or negate it based on a legislative resolution. It disregarded the right to "keep" (as distinguished from "bear") operable "arms" in the home for self-defense, as well as the right to buy and sell ammunition that is commonly used for lawful purposes by law-abiding citizens. Finally, the panel found that a constitutional right may be overridden by the same kind of legislative findings that were given no weight in *District of Columbia v. Heller*, 554 U.S. 570 (2008).

The decision is contrary to the explicit text of the Second Amendment and to its interpretation in *Heller*, and should be corrected by a rehearing or rehearing *en banc*.

## I. The Text Guarantees Against Any "Infringement," Not Just "Destruction" or Other Negation of the Right

The Second Amendment provides in part that "the right of the people to keep and bear arms, shall not be infringed." After quoting the Amendment (2014 WL 1193434, *2), the panel failed to refer to the term "infringe" again.

Instead, the panel considered only whether the restrictions "destroy" the right or negate it based on a legislative declaration. It began by asking "whether two of San Francisco's firearm and ammunition

-5-

regulations, which limit but do not destroy Second Amendment rights, are constitutional." *Id*. at *1. At the end, just after acknowledging that the right is "among those fundamental rights necessary to our system of ordered liberty" (quoting *McDonald v. City of Chicago*, 130 S.Ct. 3020, 3042 (2010)), the panel concluded that "San Francisco's regulations do not destroy the Second Amendment right, and survive intermediate scrutiny . . . ." *Id*. at *13.

The Second Amendment does not state that "the right of the people to keep and bear arms, shall not be destroyed." Nor does it say that "the right of the people to keep and bear arms, shall not be infringed unless the legislature passes findings asserting that exercise of the right endangers the public safety." The constitutional text states categorically that the right "*shall not be infringed*."

It is unthinkable that the First Amendment prohibition on "abridging the freedom of speech, or of the press" only means that such freedom may not be "destroyed," or that it may be prohibited based on a legislative declaration that the right is too dangerous to allow. Yet the panel reduced the term "infringe" in the Second Amendment to those

lowest of levels.

The terms "infringe" and "abridge" were used interchangeably during the debate over what became the Bill of Rights, and have been so used ever since. Samuel Adams proposed that the Constitution "be never construed to authorize Congress, to infringe the just liberty of the press . . .; or to prevent the people . . . from keeping their own arms . . . ."[1] The "Federal Farmer" proposed a declaration of "fundamental" rights on which the government "can never infringe."[2] A version of the Bill of Rights in the House of Representatives provided that the freedom of speech, press, assembly, and petition may not be "infringed."[3] Madison proposed that "no state shall infringe . . . the freedom of speech, or of the press," explaining that both the United States and the States should be restrained "from infringing upon these essential rights . . . ."[4]

Commentator St. George Tucker wrote: "Wherever . . . the right of

---

[1] 6 *Documentary History of the Ratification of the Constitution* 1453 (2000).

[2] *Id.*, vol. 14, at 45-46 (1983).

[3] 4 *Documentary History of the First Federal Congress* 28-29 (1986).

[4] *Id.*, vol. 11, at 1291-02 (1992).

the people to keep and bear arms is, under any colour or pretext whatsoever, prohibited, liberty, if not already annihilated, is on the brink of destruction." Tucker, *View of the Constitution of the United States*, in 1 BLACKSTONE'S COMMENTARIES, ed. app. at 300 (1803). *Heller* endorsed this passage from Tucker. 554 U.S. at 606.

*Heller* also approved the following broad usage of "infringe": "The right of the whole people . . . to keep and bear *arms* of every description, . . . shall not be *infringed*, curtailed, or broken in upon, in the smallest degree . . . ." 554 U.S. at 612, quoting *Nunn v. State,* 1 Ga. 243, 251 (1846). And *McDonald* referred generally to "the rights protected by the Fourteenth Amendment against state infringement . . . ." 130 S.Ct. at 3030-31. See also *id.* at 3098 (Stevens, J., dissenting) ("The right to free speech . . . has been safeguarded from state infringement").

If the test is whether a restriction "destroys" a constitutional right, *Heller* would not have invalidated D.C.'s handgun ban, because long guns were not banned. If the test is whether a restriction is buttressed by a legislative declaration, Heller would not have invalidated D.C.'s handgun ban, because the legislature declared the ban to be necessary for public

safety. On the contrary, the test is whether a ban "infringes" on the right, and on that basis the law was found to be unconstitutional. The panel erred in not applying that test here.

## II. The Right to "Keep" Operable "Arms" is Protected

The panel recognized that possession of operable weapons in the home falls within the historical understanding of the scope of the Second Amendment. 2014 WL 1193434, *2. It conceded that it is impossible to carry a weapon on the person when sleeping or bathing, that "[h]aving to retrieve handguns from locked containers or removing trigger locks makes it more difficult" to use them for self-defense, and thus that the prohibition "burdens the core of the Second Amendment right." *Id*. at *6.

But the panel's optimistic assurance that a gun safe "may be opened quickly" and that a gun may be unlocked in "a few seconds" is purely conjectural. *Id*. at *7, 9. Under stress, one may not be able to find the key at all, or work the combination in the dark, and even a brief delay may give an intruder the advantage.

The ordinance bans "keeping" an operable handgun at home, and only allows "bearing" it at home. But the Amendment protects the right

to "keep" as well as to "bear" operable arms, i.e., "to *possess and carry* weapons in case of confrontation." *Heller*, 554 U.S. at 592 (emphasis added).

*Heller* considered whether D.C.'s "prohibition on the possession of usable handguns in the home violates the Second Amendment . . . ." *Id*. at 573. It found that the requirement that firearms "be rendered and kept inoperable . . . makes it impossible for citizens to use them for the core lawful purpose of self-defense . . . ." *Id*. at 630. And it held that the Second Amendment "surely elevates above all other interests the right of law-abiding, responsible citizens to use arms in defense of hearth and home." *Id*. at 635.[5]

The mere possibility of crime by third parties and of accidents does not justify prohibiting responsible persons from keeping operable arms, as "the enshrinement of constitutional rights necessarily takes certain

---

[5]"[T]he inherent right of self-defense has been central to the Second Amendment right," and it is the home where "the need for defense of self, family, and property is most acute . . . ." *Id*. at 628. "A statute . . . which requires arms to be so borne as to render them wholly useless for the purpose of defence, would be clearly unconstitutional." *Id*. at 629, quoting *State v. Reid*, 1 Ala. 612, 616-617 (1840).

policy choices off the table. These include the absolute prohibition of handguns held and used for self-defense in the home." *Id*. at 636.

### III. The Ban on the Sale of Ammunition that is Commonly Used by Law-Abiding Citizens for Lawful Purposes Violates the Second Amendment

The panel acknowledged that "without bullets, the right to bear arms would be meaningless." 2014 WL 1193434 *10. Ability to "purchase ammunition elsewhere is irrelevant," just as under the First Amendment freedom of expression may not be abridged "on the plea that it may be exercised in some other place." *Id*. (citation omitted). Based on the burden and the lack of historical antecedent in the United States,[6] the ban "regulates conduct within the scope of the Second Amendment." *Id*. at *11.

But the panel found it irrelevant "that hollow-point bullets are far better for self-defense than fully jacketed ammunition because they have

---

[6]While lacking historical precedent in the United States, Nazi Germany prohibited sale and possession of .22 caliber rimfire cartridges with hollow-point bullets. *Reichsgesetzblatt* 1938, I, 265, § 25. Federal Firearms Legislation, Hearings before the Subcommittee to Investigate Juvenile Delinquency, Senate Judiciary Committee, 90th Cong., 2d Sess., 494 (1968).

-11-

greater stopping power and are less likely to overpenetrate or ricochet," and relied on the alleged absence of evidence "that ordinary bullets are ineffective for self-defense."[7] *Id.* Further, it noted that the banned ammunition may be purchased outside of San Francisco. *Id.*[8]

The Second Amendment was adopted in part as a reaction to the disarming policies of the Crown. "[W]hat the Stuarts had tried to do to their political enemies, George III had tried to do to the colonists. In the tumultuous decades of the 1760's and 1770's, the Crown began to disarm the inhabitants of the most rebellious areas. That provoked polemical reactions by Americans invoking their rights as Englishmen to keep arms." *Heller*, 554 U.S. at 594.

---

[7]San Francisco admits this ineffectiveness by exempting from the sales ban "conventional hollow-point ammunition with a solid lead core when the purchase is made for official law enforcement purposes . . . ." S.F. Police Code § 613.10(g).

[8]The panel analogized the ban to the prohibition on possession of a firearm with an obliterated serial number. *Id.* at *11, citing *United States v. Marzzarella*, 614 F.3d 85, 97 (3d Cir. 2010), *cert. denied*, 131 S.Ct. 958 (2011). The analogy is invalid "[b]ecause unmarked weapons are functionally no different from marked weapons," which are legal, *id.* at 94, while hollow-point bullets do function differently than other bullets. See also *id.* at 92 n.8 ("prohibiting the commercial sale of firearms . . . would be untenable under *Heller*").

Restricting the buying and selling of ammunition was one method used by the Crown to disarm the Americans. The colonists protested mightily when General Gage seized powder houses in Massachusetts to prevent merchants from withdrawing gunpowder to sell it. See Stephen P. Halbrook, *The Founders' Second Amendment* 37-41 (2008).

When the Crown prohibited the importation of arms and ammunition into the colonies, one patriot wrote: "Whether, when we are by an arbitrary Decree prohibited *the having* Arms and Ammunition by Importation, we have not by the Law of Self Preservation, a Right to seize upon all those within our Power, in order to *defend the* Liberties which GOD and Nature have given us . . .?" *Id.* at 63, quoting *New Hampshire Gazette & Historical Chronicle*, Jan. 13, 1775, at 1, col. 1.

The conflict escalated when the Redcoats began the direct seizure of arms and of ammunition in all forms – gunpowder, bullets, and ball cartridges. *Id.* at 69-72. The colonists obviously thought that they had a right to obtain the ammunition of their choice.

Consistent with this right to choose is the recognition that the Second Amendment protects arms – and with them, types of ammunition

– that are "in common use" and are "typically possessed by law-abiding citizens for lawful purposes . . . ." *Heller*, 554 U.S. at 624-25. At the founding, "weapons used by militiamen and weapons used in defense of person and home were one and the same." *Id.* at 625. Militiamen made up "the body of all citizens capable of military service, who would bring the sorts of lawful weapons that they possessed at home to militia duty." *Id.* at 627.

Each militiaman was required to provide himself with a musket or firelock with "not less than twenty-four cartridges, suited to the bore of his musket or firelock, each cartridge to contain a proper quantity of powder and ball . . . ." Militia Act, 1 *Statutes at Large* 271 (1792). Within five years of the law's passage, musket bores were required to hold "balls of the eighteenth part of a pound." *Id.* at 271-72. That is .69 caliber, which was typical of militia muskets of the era. George D. Moller, *Massachusetts Military Shoulder Arms, 1784-1877* 20-25 (1988). Such muskets were "serviceable as both a military and as a sporting arm." *Id.* at 25.

A "pair of pistols" was required of horsemen and officers. 1 *Statutes at Large* 271 -72. Pistols of the era typically fired balls that were between

.56 and .75 caliber. George C. Newman, *The History of Weapons of the American Revolution* 150-52 (1967).

These musket and pistol ball sizes would have made enormous wounds, far larger than would be made by today's far-smaller .22 to .45 caliber hollow-point and softnose bullets. Yet these were the arms typically possessed by private citizens for militia, defensive, and hunting purposes. *Heller*, 554 U.S. at 599.

The panel ignored *Heller*'s common-use test, which hollow-point and softnose ammunition clearly meets. Its legislative findings notwithstanding, the District's handgun ban was void because it prohibited "an entire class of 'arms' that is overwhelmingly *chosen by American society* for that lawful purpose [self defense]." *Id.* at 628 (emphasis added). Those words are clear – "chosen by American society," not by the legislature.

A ban on the sale of hollow-point and softnose ammunition cannot be justified on the basis that other ammunition is available. "It is no answer to say . . . that it is permissible to ban the possession of handguns so long as the possession of other firearms (*i.e.,* long guns) is allowed." *Id.*

-15-

at 629. The same applies to a ban on sales, just as a "categorical ban on the distribution, via newsrack, of 'commercial handbills' cannot be squared with the dictates of the First Amendment." *Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410, 430-31 (1993). See *Ezell v. City of Chicago*, 651 F.3d 684, 697 (7th Cir. 2011) (rejecting argument that city may ban shooting ranges on the basis that persons could practice elsewhere).

Hollow-point and softnose ammunition is in common use not just for self-defense, but also for hunting, another original purpose of the Second Amendment. "[P]reserving the militia was [not] the only reason Americans valued the ancient right; most undoubtedly thought it even more important for self-defense and hunting." *Heller*, 554 U.S. at 599.

Hollow-point ammunition and softnose ammunition are the *only* types of ammunition allowed for hunting deer and other large game in California.[9] S.F. Police Code § 613.10(g) prohibits the sale of ammunition

---

[9] Cal. Code Regs. tit. 14, § 353(a) ("big game (as defined by Section 350, Title 14, CCR) may only be taken by rifles using centerfire cartridges with softnose or expanding projectiles"); (c) & (d) ("Pistols and revolvers using centerfire cartridges with softnose or expanding projectiles" required for certain game). "Bullets used for hunting game may have soft or hollow points designed to expand (mushroom) upon impact." "Rifle and Handgun Cartridges," *California Hunter's Ed Course,*

in part that has "no sporting purpose" or is "designed to expand upon impact" ("including, but not limited to, . . . Hollow Point Ammunition") or "designed to fragment upon impact," which is what California game regulations refer to as "softnose or expanding projectiles." Cal. Code Regs. tit. 14, § 353. San Francisco's "finding" that such ammunition has "no sporting purposes" flies in the face of California law.

In sum, hollow-point ammunition and softnose ammunition are the descendents of types of ammunition that were historically recognized as in common use for lawful purposes, and they remain so today. Banning their sale infringes on Second Amendment rights.

## IV. A Constitutional Right May Not Be Overridden by Legislative Findings in an Interest-Balancing Test

While the ban on keeping an operable firearm "implicates the core of the Second Amendment right," the panel found that the burden is not substantial, and intermediate scrutiny applies. 2014 WL 1193434, *8. The legislative findings are said to demonstrate that a significant

---

http://www.hunter-ed.com/california/studyGuide/Rifle-and-Handgun-Ca rtridges/201005_700040815 (visited June 13, 2014).

government interest of reducing death and injuries is served by the ban. *Id*. at *8-9.

The panel also deferred to the legislative finding that the ban on the sale of hollow-point ammunition "is a reasonable fit to achieve its goal of reducing the lethality of ammunition . . . ." *Id*. at *13. But neither the goal nor the fit is reasonable – the Second Amendment protects "arms," which are "weapons of offence, or armour of defence," *Heller*, 554 U.S. at 581, and which may be used with deadly force where justifiable under the law of self-defense.

Without deferring to or so much as even mentioning D.C.'s legislative findings denouncing handguns,[10] *Heller* held that "the ban at issue amounted to a prohibition of an entire class of arms that was 'overwhelmingly' accepted and properly utilized for self-defense in the home by the general population." 554 U.S. at 628. It failed to muster support "[u]nder any of the standards of scrutiny that we have applied to

---

[10]"[I]t is [the Court's] task in the end to decide whether [the legislature] has violated the Constitution," and thus "whatever deference is due legislative findings would not foreclose our independent judgment of the facts bearing on an issue of constitutional law . . . ." *Sable Commcns. of Cal., Inc. v. FCC,* 492 U.S. 115, 129 (1989).

enumerated constitutional rights," thereby not requiring any weighing of legislative findings or policy arguments. *Id*. "Constitutional rights are enshrined with the scope they were understood to have when the people adopted them, whether or not future legislatures or (yes) even future judges think that scope too broad." *Id*. at 634-35.

*Heller* rejected Justice Breyer's "judge-empowering 'interest-balancing inquiry' under which a right is outweighed by 'important governmental interests.'" *Heller*, 554 U.S. at 634. Such a test would allow "arguments for and against gun control" and the upholding of a handgun ban "because handgun violence is a problem . . . ." *Id*. Justice Breyer would have relied on D.C.'s legislative findings about "gun-related crime, accidents, and deaths," of the same genre as those of San Francisco on which the panel relies here. *Id*. at 694 (Breyer, J., dissenting).

Interest balancing was seen as a form of intermediate scrutiny. See *id*. at 690 (Breyer, J., dissenting), citing *Burdick v. Takushi*, 504 U.S. 428 (1992), and other intermediate-scrutiny cases. By contrast, *Heller* took a categorical approach in invalidating the D.C. bans.

*McDonald* barely mentioned Chicago's legislative findings – again

of the same genre as those of San Francisco – and accorded them no deference or even discussion. 130 S.Ct. at 3026 (City Council findings about "injury or death from firearms"). Instead, *McDonald* rejected the power "to allow state and local governments to enact any gun control law that they deem to be reasonable," *id*. at 3046, and noted that "the Second Amendment right protects the rights of minorities and other residents of high-crime areas whose needs are not being met by elected public officials." *Id*. at 3049.

The view that intermediate scrutiny applies to infringements on Second Amendment rights originated from the mistaken conclusion that Second Amendment rights are not fundamental. Before *McDonald* was decided, a district court opined that the Supreme Court in *Heller* did *not* hold that the right is fundamental, and thus intermediate rather than strict scrutiny applies. *Heller v. District of Columbia*, 698 F. Supp.2d 179, 187 (D. D.C. 2010), *aff'd in part & rev'd in part*, 670 F.3d 1244 (D.C. Cir. 2011). Then *McDonald* squarely held that "the right to keep and bear arms is fundamental to *our* scheme of ordered liberty," 130 S.Ct. at 3036, and thereafter called the right "fundamental" over a dozen times. *Id*. at

3036-44, 3049-50. That left no justification for application of intermediate scrutiny.

A right is "fundamental" if it is "explicitly or implicitly protected by the Constitution, thereby requiring strict judicial scrutiny." *San Antonio Independent School District v. Rodriguez*, 411 U.S. 1, 17, 33 (1973). "Under the strict-scrutiny test," the government has the burden to prove that a restriction "is (1) narrowly tailored, to serve (2) a compelling state interest." *Republican Party of Minnesota v. White*, 536 U.S. 765, 774-75 (2002).

And while intermediate scrutiny is not the correct test, the mere recitation of the kind of legislative findings here fails to justify the restrictions under intermediate scrutiny as properly applied. "This burden is not satisfied by mere speculation or conjecture; rather, a governmental body seeking to sustain a restriction . . . must demonstrate that the harms it recites are real and that its restriction will in fact alleviate them to a material degree." *Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525, 555 (2001). Even where relaxed scrutiny applies, a municipality cannot "get away with shoddy data or reasoning." *Los Angeles v. Alameda*

-21-

*Books, Inc.*, 535 U.S. 425, 438-39 (2002) (adult bookstores).

In sum, *Heller* found D.C.'s bans on possession of handguns and of usable firearms categorically to infringe on Second Amendment rights. San Francisco's bans on keeping usable handguns in the home and on sale of hollow-point ammunition likewise infringe on Second Amendment rights, and they are not saved by legislative findings applied in the equivalent to the interest-balancing test that *Heller* rejected.

## CONCLUSION

This Court should grant the appellants' petition for a rehearing or for rehearing *en banc*.

Date: July 3, 2014                    Respectfully Submitted,

                              Gun Owners of California, Inc.,
                              Hunt for Truth Association,
                              Calguns Shooting Sports Association,
                              and The Outdoor Sportsmen's
                              Coalition of California
                              *Amici Curiae*

                              By Counsel

                               /s/ Stephen P. Halbrook
                              Stephen P. Halbrook

**CERTIFICATE OF COMPLIANCE**

This brief complies with the type-volume limitation of Circuit Rule 29-2(c)(2) because this brief contains 4173 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii). This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Word Perfect 12 in 14-point New Century Schoolbook.

Date: July 3, 2014

/s/ Stephen P. Halbrook
Stephen P. Halbrook

-23-

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on July 3, 2014.

Participants in the case are registered CM/ECF users and will be served by the appellate CM/ECF system.

Date: July 3, 2014

/s/ Stephen P. Halbrook
Stephen P. Halbrook