No. 12-17803

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

ESPANOLA JACKSON, et al.,
*Plaintiffs-Appellants*,

v.

CITY AND COUNTY OF SAN FRANCISCO, et al.,
*Defendants-Appellees*.

On Appeal from United States District Court
for the Northern District of California
(CV-09-2143-RS)

**BRIEF OF AMICI CURIAE WOMEN'S GROUPS, THE LGBT COMMUNITY, AND THE DISABLED COMMUNITY IN SUPPORT OF APPELLANTS' PETITION FOR REHEARING**

Brian S. Koukoutchos
28 Eagle Trace
Mandeville, LA 70471
(985) 626-5052
bkoukoutchos@gmail.com

*Counsel for Amici Curiae*

**CORPORATE DISCLOSURE STATEMENT**

Amicus Curiae Pink Pistols is an unincorporated association without shareholders or parent companies. Amicus Curiae Women Against Gun Control, Inc. is a domestic non-profit corporation without any parent corporation, nor does any publicly held corporation own 10% or more of its stock. Amicus Curiae Second Amendment Sisters is a non-profit corporation organized in accord with Section 501(c)(4); it has no parent corporation, nor does any publicly held corporation own 10% or more of its stock. Amicus Curiae Blush & Bullets Gun Club is an unincorporated organization. Amicus Curiae Disabled Sportsmen of North America is a non-profit enterprise (an application for status under Section 501(c)(3) is pending); it has no parent corporation nor does any publicly held corporation own 10% or more of its stock.

# **TABLE OF CONTENTS**

**Page**

CORPORATE DISCLOSURE STATEMENT ..........................................................i

TABLE OF AUTHORITIES ................................................................................ iii

INTEREST OF AMICI CURIAE ...........................................................................1

ARGUMENT .........................................................................................................2

I. THE SUPREME COURT HAS STRESSED THE IMPORTANCE OF THE SECOND AMENDMENT RIGHT TO MINORITY GROUPS DISPROPORTIONATELY SUBJECT TO ARMED CRIMINAL VIOLENCE.........................................................2

II. SAN FRANCISCO'S INFRINGEMENT OF SECOND AMENDMENT RIGHTS CANNOT BE JUSTIFIED BY THE SUPPOSED THREAT THAT ARMED CITIZENS POSE TO PUBLIC SAFETY. ..........................................................................6

CONCLUSION .......................................................................................................8

# **TABLE OF AUTHORITIES**

**Cases**                                                                                                    **Page**

*District of Columbia v. Heller*, 554 U.S. 570 (2008) ............................................ 4, 5

*McDonald v. Chicago*, 130 S. Ct. 3020 (2010) ......................................................... 2

*Moore v. Madigan*, 702 F.3d 933 (7th Cir. 2012) ..................................................... 6

**Constitutional Materials and Statute**

U.S. CONST. amend. II .....................................................................................*passim*

U.S. CONST. amend. XIV ............................................................................................ 2

18 U.S.C. § 249(a)(2) .................................................................................................. 3

**Other**

A.L. Kellerman & D.T. Reay, *Protection or Peril? An Analysis of Firearm-Related Deaths in the Home*, 314 NEW ENG. J. MED. 1557 (1986) ...................................................................................................................... 6

A.L. Kellerman et al., *Gun Ownership as a Risk Factor for Homicide in the Home*, 329 NEW ENG. J. MED. 1084 (1993) ........................................................ 6

A.L. Kellerman et al., *Injuries and Deaths Due to Firearms in the Home*, 45 J. TRAUMA 263 (1998) .................................................................................... 6

FBI, *2012 Hate Crime Statistics, Incidents and Offenses*, www.fbi.gov/about-us/cjis/ucr/hate-crime/2012/topic-pages/incidents-and-offenses/incidentsandoffenses_final.pdf ........................................................ 3

FIREARMS AND VIOLENCE: A CRITICAL REVIEW (Charles F. Wellford et al. eds., 2005) ........................................................................................................... 7

*First Reports Evaluating the Effectiveness of Strategies for Preventing Violence: Early Childhood Home Visitation and Firearms Laws*, 52 MORBIDITY & MORTALITY WEEKLY REP. 15 (Oct. 3, 2003), *available at* www.cdc.gov/mmwr/PDF/rr/rr5214.pdf ............................................................. 7

Gary Kleck, *Keeping, Carrying, and Shooting Guns for Self-Protection*, in DON B. KATES, JR. & GARY KLECK, THE GREAT AMERICAN GUN DEBATE: ESSAYS ON FIREARMS & VIOLENCE (1997) ......................................................... 8

JOYCE LEE MALCOLM, GUNS AND VIOLENCE: THE ENGLISH EXPERIENCE (2002) ................................................................................................................... 8

M. Miller et al., *Household Firearm Ownership Levels and Homicide Rates Across U.S. Regions and States*, 13 EPIDEMIOLOGY 517 (2002) ........................... 6

Robert Hahn et al., *Firearms Laws and the Reduction of Violence: A Systematic Review*, 28 AM. J. PREV. MED. 40 (2005) ........................................... 7

## **INTEREST OF AMICI CURIAE**

Amici are organizations comprising segments of the California population that are disproportionately the targets of armed criminal violence and that therefore vigorously support the right to keep and bear arms.[1] Pink Pistols is a shooting society that honors gender and sexual diversity and that advocates the responsible use of firearms for self-defense. Its position is that, "[w]ithout self-defense, there are no gay rights." It has chapters throughout the United States, the largest of which are in California. Women Against Gun Control has been a leading national advocacy group for women's Second Amendment rights for more than two decades. Its motto is: "The Second Amendment *is* the Equal Rights Amendment." Second Amendment Sisters is an advocacy group dedicated to preserving the right of self-defense. It admits both women and men and advocates responsible gun practices by citizens and parents. Blush & Bullets Gun Club is an advocacy and training group in the Central Valley of California that is dedicated to educating women in the proper use and handling of firearms for self-defense. Disabled Sportsmen of North America is a non-profit enterprise that serves the interests of disabled Americans in pursuing the shooting sports and the responsible use of firearms for self-

---

[1] This brief was not authored in whole or in part by a party's counsel, nor has a party or a party's counsel contributed money to fund its submission. No one other than amici, their members, and their counsel funded this submission.

1

defense. Many of America's disabled citizens who engage in shooting sports were disabled while in military service. The parties have consented to this filing.

## ARGUMENT

**I.  THE SUPREME COURT HAS STRESSED THE IMPORTANCE OF THE SECOND AMENDMENT RIGHT TO MINORITY GROUPS DISPROPORTIONATELY SUBJECT TO ARMED CRIMINAL VIOLENCE.**

Amici are a coalition of groups representing those who are more likely than average to become victims of firearms violence, including women, individuals with disabilities, and members of the Lesbian-Gay-Bisexual-Transgender (LGBT) community. We wish to dispel the misleading and insulting caricature that supporters of Second Amendment rights are either tobacco-chewing, gap-toothed, camouflage-wearing rednecks or militia posers who are morbidly fascinated with firepower. The Supreme Court held in *McDonald v. Chicago* that the 14th Amendment recognized in 1868 the need for then-recently emancipated black citizens in the South to bear arms for self-defense against the Klan and others who acted against African-Americans on the basis of twisted notions about white-male supremacy. 130 S. Ct. 3020, 3038-41, 3049 (2010).

A century and a half later, it is still the case that some groups have a particularly acute need for armed self-defense. For example, sexual minorities—whether gay, lesbian, bisexual, or transgender—are especially subject to violence based on discriminatory animus, as Congress recognized when it enacted the Matthew Shep-

ard/James Byrd, Jr. Hate Crimes Prevention Act of 2009, which expanded the scope of the federal statute to include violence driven by the perpetrator's animus toward the victim's actual or perceived sexual orientation or gender identity. *See* 18 U.S.C. § 249(a)(2). The FBI reports that approximately one-fifth of all hate crimes are motivated by such bias, which makes this category of hate crime second only to crimes based on racial animus.[2] Women, too, fall victim to higher rates of violence because of their supposed vulnerability as "easy prey" for male predators, whether in the form of domestic violence by husbands and boyfriends or street violence by common muggers and rapists. ***Today, women, the disabled, and the LGBT community are the face of the Second Amendment right to bear arms.***

Members of these groups need the most effective self-defense ammunition they can obtain, especially when, as is usually true with the LGBT community, they are attacked by gangs of thugs bent on venting hatred. In all situations where isolated female, gay, or disabled victims face multiple predators, every single shot counts. In such circumstances, the use of hollow-point ammo with a good record of one-shot stops is very important. This is, of course, the same ammunition San Francisco issues to its police officers. San Francisco has taken the position that highly trained, able-bodied cops with flak vests, shotguns, and SWAT teams for

---

[2] *See* FBI, *2012 Hate Crime Statistics, Incidents and Offenses*, www.fbi.gov/about-us/cjis/ucr/hate-crime/2012/topic-pages/incidents-and-offenses/incidentsandoffenses_final.pdf.

backup need hollow-point handgun ammo, but regular citizens—who lack all those police resources—do not. That is patently absurd and we suspect that even San Francisco knows it.

In *District of Columbia v. Heller*, the Supreme Court recognized a Second Amendment "right to keep and bear" firearms that are " 'in common use at the time' for lawful purposes like self-defense." 554 U.S. 570, 624 (2008). Firearms are useless without ammunition; therefore, a ban on the most effective type of self-defense ammunition implicates the Second Amendment right. Arguments to the contrary are frivolous.

It is beyond cavil that the hollow-point ammunition banned from sale in San Francisco is not only "in common use" for "lawful purposes like self-defense," *id.*, but is also essential for quickly incapacitating assailants without undue risk of penetrating the criminal's body and striking an innocent child or passerby, E.R. II 151; E.R. III 216-18, 228-31, 262-74, 409 & n.21, 411-12. Indeed, **San Francisco tacitly—but unavoidably—concedes this point by arming its own police with the same hollow-point ammunition that it denies to its citizens**. E.R. III 231, 378, 394-95, 409-10. If the police, with all of their resources, require hollow-point ammunition to defend themselves, it follows *a fortiori* that such ammunition is essential to our citizens who are targeted for crime.

4

Nor may the right to self-defense be hobbled by obstructive trigger-locks or other supposed "safe storage" requirements that leave one defenseless for precious moments when violence invades one's home. The Supreme Court categorically struck down a storage requirement in *Heller*. 554 U.S. at 630. The availability of a self-defense exception for those whose homes are being invaded makes no practical difference when one has no advance warning before the door is kicked in; in such situations, every second counts, and the Ordinance's storage requirements rob homeowners of those valuable seconds. Such laws have an especially harsh impact on those who are typically least capable of defending themselves in hand-to-hand combat against more physically powerful assailants while they are struggling to open a gun-safe or dismantle a trigger-lock. Women are smaller and less muscular than the male criminals who prey on them, and every second of delay that the City's Ordinance imposes on its female citizens could be the difference between life and death. *See* E.R. II 43, 57-60. Similarly, the plight of a disabled person hobbling on his crutches or trying to climb into a wheelchair to move across his bedroom to a gun safe, or desperately fumbling with a trigger-lock in the middle of the night while an armed thug breaks through the window, is too horrific to contemplate. *Cf.* Oral Argument in *Heller*, E.R. III 205-06 (ridiculing efforts of District of Columbia's counsel to characterize opening a trigger lock when awakened

5

in terror in the middle of the night as a quick and easy task even for an able-bodied citizen (remarks of Roberts, C.J., and Scalia, J.)).

II. **SAN FRANCISCO'S INFRINGEMENT OF SECOND AMENDMENT RIGHTS CANNOT BE JUSTIFIED BY THE SUPPOSED THREAT THAT ARMED CITIZENS POSE TO PUBLIC SAFETY.**

Although "the Supreme Court made clear in *Heller* that it wasn't going to make the right to bear arms depend on casualty counts," *Moore v. Madigan*, 702 F.3d 933, 939 (7th Cir. 2012), Defendants try to justify their ordinance on the supposition that armed, law-abiding citizens pose a threat to public safety. In particular, San Francisco, its expert witnesses, and its amici rely on authorities that supposedly show that a gun kept in the home for self-defense is more likely to shoot a friend, neighbor, or a member of the family than a criminal intruder.[3] This research has been discredited by (1) the National Research Council (NRC) of the National Academies of Science and (2) the Centers for Disease Control (CDC).

The NRC reviewed the entire body of firearms literature and singled out the studies invoked by Defendants and their allies for particular censure. The NRC concluded that the studies: (i) utterly failed to establish that gun ownership

---

[3] *See, e.g.*, A.L. Kellerman & D.T. Reay, *Protection or Peril? An Analysis of Firearm-Related Deaths in the Home*, 314 NEW ENG. J. MED. 1557 (1986); A.L. Kellerman et al., *Gun Ownership as a Risk Factor for Homicide in the Home*, 329 NEW ENG. J. MED. 1084 (1993); A.L. Kellerman et al., *Injuries and Deaths Due to Firearms in the Home*, 45 J. TRAUMA 263 (1998); *see also* M. Miller et al., *Household Firearm Ownership Levels and Homicide Rates Across U.S. Regions and States*, 13 EPIDEMIOLOGY 517, 517 & n.7 (2002) (relying on Kellerman's work).

increased the risk of violence to the owner, (ii) were incapable of throwing light on "the impact of firearms on homicide or the utility of firearms for self-defense," and (iii) made conclusions "that owning firearms for personal protection is 'counterproductive' and that 'people should be strongly discouraged from keeping guns in the home' " that were simply "not tenable." FIREARMS AND VIOLENCE: A CRITICAL REVIEW 118-19 (Charles F. Wellford et al. eds., 2005) (citation omitted). The CDC likewise found that the research was flawed and "inconsistent" and as a result there was "insufficient evidence" to conclude that firearms injury can be reduced either by "[b]ans on specified firearms or ammunition" or by requiring gun owners "to store . . . firearms locked . . . [or] unloaded" in the home. *See First Reports Evaluating the Effectiveness of Strategies for Preventing Violence: Early Childhood Home Visitation and Firearms Laws*, 52 MORBIDITY & MORTALITY WEEKLY REP. 15, 17-18 (Oct. 3, 2003), *available at* www.cdc.gov/mmwr/PDF/rr/rr5214.pdf; Robert Hahn et al., *Firearms Laws and the Reduction of Violence: A Systematic Review*, 28 AM. J. PREV. MED. 40, 40, 49, 56 (2005).

Nor can San Francisco justify denying civilians the ammunition it issues to its own police on the premise that civilians, unlike the police, cannot be trusted to identify when it is proper to use a firearm in self-defense. Armed civilians—even though they outnumber police by several orders of magnitude—***make far fewer mistakes with their firearms than do the police***. Each year there are approximate-

7

ly thirty instances in which a civilian mistakenly shoots and kills an innocent individual who was not actually a burglar, mugger, or similar assailant—but "[o]ver the same period the *police erroneously kill five to eleven times more innocent people*."[4] Armed civilians are an asset to public safety: "Regardless of which counts of homicides by police are used, the results indicate that civilians legally kill far more felons than police officers do."[5]

## CONCLUSION

The Court should grant rehearing and reverse the panel's decision.

Dated: July 3, 2014                                             Respectfully submitted,

BRIAN S. KOUKOUTCHOS
   *Counsel for Amici Curiae*
28 Eagle Trace
Mandeville, LA 70471
(985) 626-5052
bkoukoutchos@gmail.com

---

[4] *See* JOYCE LEE MALCOLM, GUNS AND VIOLENCE: THE ENGLISH EXPERIENCE 239 & n.71 (2002) (emphasis added).

[5] *See* Gary Kleck, *Keeping, Carrying, and Shooting Guns for Self-Protection*, *in* DON B. KATES, JR. & GARY KLECK, THE GREAT AMERICAN GUN DEBATE: ESSAYS ON FIREARMS & VIOLENCE 199 (1997).

8

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on July 3, 2014.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Dated: July 3, 2014
s/ Brian S. Koukoutchos
Brian S. Koukoutchos
*Attorney for Amicus Curiae*