No. 12-17803

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT
_____

ESPANOLA JACKSON, *et al.*,
*Plaintiffs-Appellants*,
v.
CITY AND COUNTY OF SAN FRANCISCO, *et al.*,
*Defendants-Appellees*.
_____

On Appeal from the United States District Court
For the Northern District of California
Case No. CV-09-2143-RS
_____

BRIEF OF *AMICI CURIAE* INTERNATIONAL LAW ENFORCEMENT
EDUCATORS AND TRAINERS ASSOCIATION, LAW ENFORCEMENT
LEGAL DEFENSE FUND, LAW ENFORCEMENT ACTION NETWORK,
CRPA FOUNDATION, LAW ENFORCEMENT ALLIANCE OF AMERICA,
AND CALIFORNIA SHERIFFS ALLMAN, BOSENKO, CHRISTIANSON,
D'AGOSTINI, DOWNEY, GROWDON, HAGWOOD, HANEY,
HENCRATT, L. JONES, S. JONES, LOPEY, MELE, MIMS,
POINDEXTER, RYAN, WILSON, AND YOUNGBLOOD
IN SUPPORT OF PETITION FOR REHEARING

Dan M. Peterson
Dan M. Peterson PLLC
3925 Chain Bridge Road, Suite 403
Fairfax, Virginia 22030
Telephone: (703) 352-7276
dan@danpetersonlaw.com
*Counsel for Amici Curiae*

## CORPORATE DISCLOSURE STATEMENT

International Law Enforcement Educators and Trainers Association is a nonprofit organization which has no parent corporation. It issues no stock, and therefore no publicly held company owns 10% or more of its stock.

Law Enforcement Legal Defense Fund is a nonprofit organization which has no parent corporation. It issues no stock, and therefore no publicly held company owns 10% or more of its stock.

Law Enforcement Action Network is a nonprofit organization which has no parent corporation. It issues no stock, and therefore no publicly held company owns 10% or more of its stock.

CRPA Foundation is a nonprofit organization which has no parent corporation. It issues no stock, and therefore no publicly held company owns 10% or more of its stock.

Law Enforcement Alliance of America is a nonprofit organization which has no parent corporation. It issues no stock, and therefore no publicly held company owns 10% or more of its stock.

/s/ Dan M. Peterson
Dan M. Peterson

Counsel for *Amici Curiae*

i

## <u>TABLE OF CONTENTS</u>

CORPORATE DISCLOSURE STATEMENT ......................................................i

TABLE OF AUTHORITIES ................................................................ iii

INTEREST OF *AMICI CURIAE* .......................................................... 1

STATEMENT PURSUANT TO RULE 29(c) ...........................................4

ARGUMENT .................................................................................4

    I.   THE PANEL OPINION IS UNSUPPORTED BY EVIDENCE THAT
    THESE ORDINANCES ADVANCE THE ASSERTED INTERESTS IN
    PUBLIC SAFETY ...................................................................4

    II.  THE LOCKED STORAGE REQUIREMENT IS NOT SUPPORTED
    BY EVIDENCE, AND WILL ENDANGER CITIZENS AND LAW
    ENFORCEMENT PERSONNEL ..........................................................7

    III.  HOLLOWPOINT BULLETS ARE NOT MORE "LETHAL,"
    BUT ARE  SUPERIOR FOR LAW ENFORCEMENT PURPOSES
    AND FOR LAWFUL DEFENSE BY CITIZENS BECAUSE OF
    THEIR GREATER STOPPING POWER............................................... 14

        A.    Stopping power, not lethality, is the key to effective defense
        by law enforcement personnel and civilians ..................................... 14

        B.    The ban on hollow-points adversely affects law enforcement
        personnel as well as civilians ................................................... 18

CONCLUSION ...............................................................................20

CERTIFICATE OF COMPLIANCE.........................................................21

CERTIFICATE OF SERVICE ...............................................................22

<u>TABLE OF AUTHORITIES</u>

**CASES** **Page**

*City of Renton v. Playtime Theaters*, 475 U.S. 41 (1986) .....................................5, 6

*Heller v. District of Columbia*, 670 F.3d 1244 (D.C. Cir. 2011)..............................6

*United States v. Playboy Entmt. Grp., Inc.,* 529 U.S. 803 (2000) ............................6


**CONSTITUTIONS, STATUTES, AND ORDINANCES**

U.S. CONST. Amend. II..............................................................................*passim*

CAL. PENAL CODE §§ 830 *et seq.* .............................................................................13

CAL. PENAL CODE § 830.39 ........................................................................................13

CAL. PENAL CODE § 830.8 ..........................................................................................13

S. F., CAL., POLICE CODE § 613.10(g) ................................................................5, 18

S. F., CAL., POLICE CODE § 4512 .......................................................................6, 13


**OTHER AUTHORITIES**

Massad Ayoob, *Choose your ammo…police style* (May/June 2005)
(http://www.backwoodshome.com/articles2/ayoob93.html)...........................15, 16

California Department of Public Health, *San Francisco County's Health Status Profile for 2014* (2014) ..................................................................7, 8

Gary Kleck & Marc Gertz, *Armed Resistance to Crime:
The Prevalence and Nature of Self-Defense with a Gun*,
86 J. CRIM. L. & CRIMINOLOGY 150 (1995) ...........................................................11

Evan P. Marshall & Edwin J. Sanow, *Stopping Power:*
*A Practical Analysis of the Latest Handgun Ammunition* (2001) ...........................15

Evan P. Marshall & Edwin J. Sanow, *Street Stoppers:*
*The Latest Handgun Stopping Power Street Results* (1996) .............................16, 17

Office of the San Francisco Chief Medical Examiner,
*Annual Report FY-2013-2014* 103 (2014) ............................................................8, 9

San Francisco Police Department, *General Order 10.02(C)* (2007) .......................18

iv

## INTEREST OF *AMICI CURIAE*

### International Law Enforcement Educators and Trainers Association

International Law Enforcement Educators and Trainers Association ("ILEETA"), is a professional association of 4,000 persons committed to the reduction of law enforcement risk and to saving lives of police officers and the general citizenry through the provision of training enhancements for criminal justice practitioners. ILEETA has joined this brief because unconstitutional firearms restrictions not only disadvantage law-abiding citizens whose lawful self-defense deters crime, but also disadvantage police officers who may be subject to such provisions in an off duty capacity or otherwise.

### Law Enforcement Legal Defense Fund

Law Enforcement Legal Defense Fund ("LELDF") is a 501(c)(3) non-profit organization, headquartered in Alexandria, Virginia, that provides legal assistance to law enforcement officers. LELDF has aided nearly one hundred officers, many of whom have been acquitted, mostly in cases where officers have faced legal action for otherwise authorized and legal activity in the line of duty. While LELDF supports measures that will further legitimate public safety interests and protection of law enforcement officers, it does not support provisions that are ill-conceived, violate the constitutional rights of citizens, and may subject police officers to undue

1

risk.

## Law Enforcement Action Network

Law Enforcement Action Network ("LEAN") is a sister organization of LELDF, headquartered in Alexandria, Virginia, which has received 501(c)(4) status. LEAN promotes policies that protect law enforcement officers' personal and professional safety. LEAN seeks to provide insight to the Court about the negative ground level impact the challenged provisions will have on police officers and citizens.

## CRPA Foundation

CRPA Foundation is a non-profit entity classified under section 501(c)(3) of the Internal Revenue Code, with headquarters in Fullerton, California. The CRPA Foundation seeks, among other goals, to raise awareness about unconstitutional laws, defend and expand the legal recognition of the rights protected by the Second Amendment, educate the general public about firearms, and support law enforcement.

## Law Enforcement Alliance of America, Inc.

Law Enforcement Alliance of America, Inc. ("LEAA") is a non-profit, non-partisan advocacy and public education organization founded in 1992 and made up of thousands of law enforcement professionals, crime victims, and concerned

2

citizens. Many of LEAA's members reside and/or work in California. LEAA represents its members' interests by assisting law enforcement professionals and seeking criminal justice reforms that target violent criminals not law-abiding citizens. LEAA has been an *amicus curiae* in other California cases, and on the prevailing side in two United States Supreme Court cases.

### Individual Amici

The following individual *Amici* are elected County Sheriffs in California: Sheriffs Tom Allman (Mendocino), Tom Bosenko (Shasta), Adam Christianson (Stanislaus), John D'Agostini (El Dorado), Michael Downey (Humboldt), Dean Growdon (Lassen), Greg Hagwood (Plumas), Bruce Haney (Trinity), Dave Hencratt (Tehama), Larry Jones (Glenn), Scott Jones (Sacramento), Jon E. Lopey (Siskiyou), James Mele (Tuolumne), Margaret Mims (Fresno), Mike Poindexter (Modoc), Martin A. Ryan (Amador), Dean Wilson (Del Norte), and Donny Youngblood (Kern). All of these individuals have distinguished records of practical experience in the fields of law enforcement and public safety. Their interest in this lawsuit is protecting the constitutional rights of their constituents and California residents generally, promoting effective strategies in combating crime and promoting public safety, and helping to ensure that law abiding citizens and law enforcement officers are not deprived of their rights to self-defense by laws that serve no law

3

enforcement purpose.

## STATEMENT PURSUANT TO RULE 29(c)

No party's counsel authored this brief in whole or in part. No party or party's counsel, and no person other than *Amici*, their members, or their counsel, contributed money that was intended to fund preparing or submitting this brief. All parties have consented to the filing of this brief.

## ARGUMENT

### I. THE PANEL OPINION IS UNSUPPORTED BY EVIDENCE THAT THESE ORDINANCES ADVANCE THE ASSERTED INTERESTS IN PUBLIC SAFETY.

Appellants' Petition for Rehearing addresses the fact that strict scrutiny should apply in this case, and that under any level of heightened scrutiny San Francisco's ordinances are not narrowly tailored to advance an important or compelling governmental interest. *Amici* concur in those arguments. This brief addresses from a law enforcement perspective the lack of evidence to support the panel's opinion that these ordinances advance governmental interests in public safety. Instead, for both the locked storage and ammunition issues, San Francisco's ordinances undermine the safety of officers and citizens while providing no benefits.

4

The panel opinion did not cite *any empirical evidence* to support the hollow-point ban, S. F., CAL., POLICE CODE § 613.10(g). The panel relied only on a legislative "finding" that hollow-points are "more likely to cause severe injury and death than is conventional ammunition," and San Francisco's conclusion that hollow-points are "more lethal than other types of ammunition." Op. 28. But the only evidence cited by the panel on this issue was evidence produced *by Jackson* that "medical examiners have been *unable to show any difference in lethality* between hollow-point and traditional round-nosed lead bullets." *Id.* (emphasis added). The panel opinion disregarded this evidence without explanation, stating only that it was "not persuaded by Jackson's arguments." *Id.*

That reverses the burden of proof, whether under strict scrutiny or intermediate scrutiny. The burden of proof and persuasion is on San Francisco to show that its ordinances, which burden Second Amendment rights, advance public safety in a narrowly tailored manner. The panel stated "that a municipality may rely on any evidence 'reasonably believed to be relevant' to substantiate" the governmental interest. Op. at 28 (citing *City of Renton v. Playtime Theaters*, 475 U.S. 41, 51-52 (1986)). But the key word is "evidence," not speculation or assumptions. As the *Renton* court actually stated, in context:

5

The First Amendment does not require a city, before enacting such an ordinance, to conduct new studies or produce *evidence independent of that already generated* by other cities, so long as whatever *evidence* the city relies upon is reasonably believed to be relevant to the problem that the city addresses.

*Id.* (emphasis added). *See also United States v. Playboy Entmt. Grp., Inc.,* 529 U.S. 803, 822 (2000) ("the Government must present more than anecdote and supposition"); *Heller v. District of Columbia*, 670 F.3d 1244, 1259 (D.C. Cir. 2011) (in Second Amendment case, municipality must present "meaningful evidence, not mere assertions, to justify its predictive judgments").

Similarly, the portion of the opinion relating to S. F., CAL., POLICE CODE § 4512, the locked storage requirement, cited only the "findings" by the supervisors, not any actual evidence.[1]  It then concluded that based "on the *evidence* that locking firearms increases safety in a number of different respects, San Francisco has drawn a reasonable inference that mandating that guns be kept locked when not being carried will increase public safety and reduce firearms casualties," and that "[t]his

---

[1] The "findings" were delivered to the supervisors by the City Attorney's office on September 27, 2011, after the hollow-point ban and storage ordinances were challenged in court.   ER000256.  The Deputy City Attorney explained to the supervisors that because of the lawsuits the ordinances "are more likely to be subject to judicial scrutiny and constitutional review…. It gives the court something to look at."  *Id.*  These "findings" are not evidence, cite no studies or sources, and were added *post hoc* solely to buttress San Francisco's litigating position.  They are entitled to no weight in determining whether the asserted governmental interests are advanced by these ordinances.

6

*evidence* supports San Francisco's position that section 4512" is related to its supposed objectives. Op. 21-22 (emphasis added). But no actual evidence is cited by the panel. Real world law enforcement experience, however, confirms that both the locked storage requirement and the hollow-point ban are likely to *increase* the risk of harm or death to citizens and law enforcement personnel who are seeking to defend themselves, without any corresponding benefit.

## II. THE LOCKED STORAGE REQUIREMENT IS NOT SUPPORTED BY EVIDENCE, AND WILL ENDANGER CITIZENS AND LAW ENFORCEMENT PERSONNEL.

The only alleged fact cited by the panel to justify the locked storage requirement is that "firearm injuries are the third-leading cause of death in San Francisco." Op. 21. That simply is not true. According to the California Department of Public Health, the average number of deaths in San Francisco County during the period 2010-2012 was 5,598.3. "Firearm-Related Deaths" accounted for 50.7 of those deaths, or about 9/10ths of 1 percent. *See* California Department of Public Health, *San Francisco County's Health Status Profile for 2014* (2014) (available at http://www.cdph.ca.gov/programs/ohir/Pages/ CHSPCountySheets.aspx-- Individual County Data Sheets). When the 18 leading official causes of death on that sheet are rank ordered, "Firearm-Related Deaths" is

ranked 17th—second to last, not "third-leading."  *See* Attachment 1.[2]

The primary justifications offered by San Francisco and by the panel opinion for the locked storage requirement are prevention of suicides and reducing deaths from accidental shootings.  Op. 21; Addendum 000049.  However, of the total of 60 firearm related deaths in San Francisco in 2010-11, the most recent year reported, 40 were homicides, and only 20 were suicides.  Medical Examiner Report 104.  The chief method of suicide was hanging (25%).  *Id.* at 54.  Firearms accounted for only 18% of suicides as a whole.  *Id.*  Jumps, asphyxiation, and drug-related suicides together made up about 45%.  *Id.* at 54-55.  There are many ways to commit suicide, which generally may be substituted for each other, and it is contrary to reason that a locked storage requirement would prevent a person bent on suicide from unlocking the gun or using an alternative means.

Prof. Daniel Webster discusses in his Declaration ¶¶ 14-18 (ER000066-000068) why having unlocked firearms in the home will (in his opinion) likely cause adolescents to commit suicide impulsively with a firearm.  However, a review

---

[2] Data provided by the Chief Medical Examiner of San Francisco is consistent with these figures.  The most recent two years reported were 2009-10 and 2010-11, with "Firearm Related Deaths" of 43 and 60, respectively.  Office of the San Francisco Chief Medical Examiner, *Annual Report FY-2013-2014* 103 (2014) (available at http://sfgsa.org/modules/showdocument.aspx?documentid=10737 )  ("Medical Examiner Report") *See* Attachment 2.

of the Medical Examiner Report shows that the total number of persons aged nineteen and under who committed suicide with a firearm in San Francisco during the most recent year (2010-11) was: zero. Medical Examiner Report 63. Fact trumps opinion in determining whether this ordinance is necessary for public safety.

But what about accidental deaths, where a helpless child or untrained person stumbles across an unlocked firearm, and kills himself or someone else? According to the Medical Examiner Report, the number of accidental firearms deaths in 2010-11 in San Francisco was: zero. *Id.* at 104. That has been the case for many years. As the Report states, "There were no firearm related accidents in FY 2010–2011, *which is consistent with the prior five years*." *Id.* These data are for years *preceding* the ordinance.

Individuals who are grossly irresponsible or impaired, and leave a loaded gun where an unsupervised and untrained child could find it, are not the types of individuals who are likely to follow locked storage ordinances. The only individuals that this ordinance will affect are law-abiding citizens who wish to maintain a firearm for lawful purposes such as defense of life and limb, where immediate access will be critical.

What about homicides in the home, which the City contends will be reduced by its ordinance? Section 4512 requires handguns to either be locked, or carried

9

directly on the person. Assuming again that people will be aware of and actually obey this law, does San Francisco believe that impulsive homicides will be reduced by encouraging people to carry a gun on their person? For locked firearms, San Francisco contends that they can be unlocked in three seconds. Garza Decl. (ER000091-000093). No person of experience could believe that three seconds is enough of a cool-down period to prevent an enraged person disposed to commit murder from doing so. It is certain that an individual who premeditates a murder will unlock the firearm well in advance (if murderers obey locked storage laws in the first place).

Thus, the panel's statement that there is "ample evidence that storing handguns in a locked container reduces the risk of both *accidental* and *intentional* handgun-related deaths, including *suicide*," is untenable on each of those points. Op. 21.

On the other hand, for law abiding citizens who do try to obey firearms laws, a delay in accessing a handgun for purposes of self-defense may well prove fatal. Defensive gun uses ("DGUs") are far more frequent than the tiny number of instances where firearms are misused by their owners.

Although results have varied, the best studies indicate that there are something between 1.5 million and 2.5 million defensive gun uses a year by law

10

abiding citizens against attackers. The leading study is Gary Kleck & Marc Gertz, *Armed Resistance to Crime: The Prevalence and Nature of Self-Defense with a Gun*, 86 J. CRIM. L. & CRIMINOLOGY 150 (1995). Using a very large sample size (4,977 respondents), and concentrating on rectifying the design flaws of earlier surveys, Kleck and Gertz concluded that "each year in the U.S. there are about 2.2 to 2.5 million DGUs of all types by civilians against humans, with about 1.5 to 1.9 million of the incidents involving use of handguns." Kleck & Gertz 164. The defensive use of the gun may involve simply identifying or displaying it to the assailant, to shots being fired with no one hit, to wounding or death of the assailant. In the vast majority of instances, of course, a simple display of the gun is enough, and deaths and woundings are relatively rare. As a consequence, a great (though undetermined) number of these instances are never officially recorded. As Kleck and Gertz note, "Neither the defender/victim nor the criminal ordinarily has much incentive to report this sort of event to the police, and either or both often have strong reasons *not* to do so." *Id.* at 168.

Based on the ratio of San Francisco's population (825,000) to the population of the United States (315 million), defensive gun uses by civilians in San Francisco can therefore be estimated at something over 5000 per year. When those 5000 defensive gun uses are compared with the 20 total firearm suicides in the latest year

11

(which probably would not be prevented by this law), the zero suicides of adolescents or children by firearm, and the zero accidental deaths by firearm year after year, it becomes plain that placing useless obstacles in the way of lawful self defense by innocent parties does not promote public safety. It harms it.

Assailants generally plan their attacks, and will already be armed. By the time the intended victim at home even identifies the threat, the assailant will be nearly upon him. As stated by Massad Ayoob in his Declaration, "San Francisco's estimate of three to four seconds to retrieve a loaded gun from a lock box appears to be highly optimistic." ER000058-59. Many are dependent on batteries, which die. Those that require a key or combination depend on "fine motor skill, the type of skill which degrades severely in human beings under stress due to vasoconstriction (loss of blood flow to the extremities) and also due to tremors induced by internally-generated adrenaline (epinephrine)." *Id.* Lockboxes operated by biometric identification (fingerprints) are far from perfect:

> There are people whose fingerprints will be recognized by the machines, and people whose fingerprints will not. In any case, no biometric device can recognize fingerprints that are obscured with clothing, dirt, or blood before accessing the lock box.

*Id.* The panel opinion did not refute this evidence; it simply did not address it.

12

Section 4512 will also negatively affect the safety of law enforcement officers. Although there is an exception for firearms under the control of "peace officers," not all law enforcement officers meet that definition. CAL. PENAL CODE §§ 830 *et seq*. defines who is and who is not considered a "peace officer." Law enforcement officers from other states who are temporarily in California for business, family matters, or other reasons are not "peace officers," with extremely limited exceptions. *See* CAL. PENAL CODE § 830.39. "Federal criminal investigators and law enforcement officers are not California peace officers…." CAL. PENAL CODE § 830.8. § 4512 also contains no exception for retired officers.

Officers from out of state and federal officers may easily be trapped by storage requirements of which they have no knowledge. In a perverse twist, peace officers who may maintain a firearm under their personal control at home for family defense will have to instruct their spouses and loved ones to lock up any firearms when he or she leaves the house and can no longer protect them.

In addition, § 4512 creates a dangerous incentive for persons to be armed when police are called to a home. In instances where there has been a defensive encounter, the homeowner (if he knows San Francisco law) will be tempted to *pick up the gun* and carry it in his hand or on his person to avoid a violation of § 4512. When police arrive, they have no way of knowing if that individual with a gun is a

13

violent assailant or an intended victim. Under such perilous circumstances, the danger to law enforcement personnel and to the innocent homeowner is appallingly obvious.

## III. HOLLOWPOINT BULLETS ARE NOT MORE "LETHAL," BUT ARE SUPERIOR FOR LAW ENFORCEMENT PURPOSES AND FOR LAWFUL DEFENSE BY CITIZENS BECAUSE OF THEIR GREATER STOPPING POWER.

### A. Stopping power, not lethality, is the key to effective defense by law enforcement personnel and civilians.

"Enhanced lethality ammunition" is not a recognized term of art, but a term invented by San Francisco to vilify hollow-point ammunition that is widely used by civilians, and almost universally used by law enforcement agencies. Although there is a vast literature in the fields of study known as terminal ballistics or wound ballistics, the panel cited no evidence that hollow-points are more lethal than fully jacketed or round-nose lead ammunition. Greater "lethality" is not a basis on which law enforcement personnel or informed citizens choose ammunition for defensive purposes. The object for police and citizens is the same: to stop an attacker immediately with the fewest shots possible, preferably a single shot. This is widely referred to as "stopping power."

Police trainer and four-time police action gunfight survivor Keith Jones has

14

observed that while gunshot wounds with some types of ammunition "may certainly be lethal," their effect may not be immediate, and "'immediate' is the only thing that really counts." The object is "to put your attacker out of action now, before he injures you, not to cause his lingering death in a hospital bed next week." Evan P. Marshall & Edwin J. Sanow, *Stopping Power: A Practical Analysis of the Latest Handgun Ammunition* 6 (2001) ("Marshall and Sanow 2001"). Stopping power saves innocent life, and hollow-point ammunition has proven to be superior for that purpose.[3]

That is why hollow-point ammunition is nearly universally chosen by law enforcement departments around the country. Massad Ayoob, one of the most widely recognized authorities in the world on police tactics and self-defense, has summarized what he calls the "traditional model" that was employed during the first two thirds of the twentieth century.[4] It was based on the .38 Special revolver, using 158 grain round-nose lead bullets. This lead round-nose ammunition "failed miserably." The round-nose projectile "slipped through flesh," and "would kill, but

---

[3] As addressed by other briefs before this Court, hollow-points are also superior from a safety point of view because they are less likely to "overpenetrate" and harm bystanders, to ricochet, to penetrate police body armor, and to require multiple shots.

[4] Massad Ayoob, *Choose your ammo…police style* (May/June 2005), available at http://www.backwoodshome.com/articles2/ayoob93.html.

15

slowly." It "had little stopping effect," and "performed dismally at its intended purpose." *Id.*

By contrast, Ayoob notes that the ".40 S & W caliber is the overwhelming top choice of police departments today, followed by the .357 SIG and the .45." *Id.* Some agencies also use the 9mm. The "star performers in .40 ammo tend to be high tech bullets such as the Winchester SXT or Ranger T, the [Speer] Gold Dot, and the Remington Golden Saber…." In .45 caliber, "the matured Federal Hydra-Shok design is something of a gold standard…." Agencies use it "[b]ecause it works better, and with human life on the line, they cannot afford to economize." This is precisely the ammunition that San Francisco would deny to citizens and many law enforcement officers for self-defense.

Police officer Evan Marshall and ballistics expert Edwin Sanow have jointly published three books on handgun stopping power, including the types of bullets used. Their principal contribution has been to collect many thousands of reports of actual police gunfights, determine what ammunition was used, and report the number of "one shot stops."[5] Their most recent results are reported in Marshall and

---

[5] One shot stops are those in which the criminal was hit once and only once with a solid shot to the torso (where police are trained to aim), and the criminal was rapidly incapacitated by that single shot. *See* Evan P. Marshall & Edwin J. Sanow, *Street Stoppers: The Latest Handgun Stopping Power Street Results* 161-62 (1996)

16

Sanow 2001, cited above. Results for several of the most common police calibers are attached as Attachment 3 hereto. For 19 different loads of 9mm, one-shot stops ranged from 91% to 70%, with the full metal jacket bullet (the only one on the list not banned by San Francisco) coming in dead last. In the 20 loadings for .40 S&W, one shot stops ranged from 94% to 71%. Again, the full metal jacket bullet was the least effective at putting down an attacker. In .45 ACP, one shot stops varied from 96% to 62% of the 16 rounds listed, with the three full metal jacket rounds at the bottom of the list.

Thus, based on an extensive database of actual police shootings collected over decades, the full metal jacket round consistently had the least stopping power. Again, stopping power is essential to incapacitating a criminal attacker, but does not necessarily equate with lethality. That is especially true because ammunition that is less effective at stopping an attacker will likely result in more shots being fired. Being shot multiple times will almost certainly cause greater lethality as well as endangering innocent bystanders.

---

("Marshall & Sanow 1996"). The percentages reported are the ratio of successful one shot stops to the total number of single shots to the torso: the higher the percentage, the better the stopping power.

17

**B.    The ban on hollow-points adversely affects law enforcement personnel as well as civilians.**

The only exception in § 613.10(g) is for "conventional hollow-point ammunition with a solid lead core when the purchase is made for official law enforcement purposes and the purchaser is authorized to make such a purchase by the director of a public law enforcement agency…."

Thus, police officers cannot purchase hollow-point ammunition in San Francisco for defense of themselves and their loved ones when off-duty. Furthermore, police department regulations prohibit San Francisco police officers from using their departmentally issued ammo in another weapon off-duty. "Ammunition used in primary on-duty firearms shall be Department-issued. Department-issued ammunition shall not be used in any other weapon, either on or off duty." San Francisco Police Department, *General Order 10.02(C)* (2007) (available at http://www.sf-police.org/modules/ShowDocument.aspx?documentid=14840). There is no exception for individual purchase by other California police or peace officers who happen to reside in San Francisco, or for retired officers. Thus, highly trained law enforcement officers who are entitled to defend their lives with the most safe and effective ammunition while on-duty, are not allowed to purchase it in San Francisco to defend their lives and the lives of

18

loved ones when off-duty or when they retire.

The panel's incorrect and contradictory position that this law poses little burden on Second Amendment rights because hollow-points can be purchased outside San Francisco, Op. 29, has been refuted on constitutional grounds in Appellant's Opening Brief and Petition for Rehearing.[6] *Amici* would like to add an additional important practical consideration. If the panel opinion is allowed to stand, it opens the way for similar laws in other jurisdictions within California, for such a ban in California statewide, and for similar bans in other states within the Ninth Circuit. Thus, the argument that such ammunition is available outside of San Francisco can be rapidly rendered invalid by the panel's decision itself. A representative an anti-firearms rights group explicitly stated their intention to do just that:

> [L]ocal government can show leadership in Sacramento. We have seen a trickle up affect [sic] where local ordinances—[jurisdictions] will adopt ordinances and are later adopted by the state legislature.

ER000249-ER000250. If that occurs, the linchpin will be pulled from the panel opinion. Yet it is doubtful that this Court would later overrule the panel's decision because the factual situation regarding availability in other jurisdictions has

---

[6] That argument also refutes any notion that the ordinance will accomplish its ostensible purpose, because criminals can and will obtain ammunition from outside San Francisco.

19

changed. Accordingly, this Court should rehear this case *en banc* now, to prevent this unconstitutional method of reasoning from taking effect.

## <u>CONCLUSION</u>

For the reasons stated above, the petition for rehearing should be granted.

Respectfully submitted,

/s/ Dan M. Peterson
Dan M. Peterson
Dan M. Peterson PLLC
3925 Chain Bridge Road, Suite 403
Fairfax, Virginia 22030
Telephone: (703) 352-7276
dan@danpetersonlaw.com

Counsel for *Amici Curiae*

20

## CERTIFICATE OF COMPLIANCE

I hereby certify that the attached opening brief complies with Rule 32(a)(7)(C) of the Federal Rules of Appellate Procedure. According to the word count feature of the word-processing system used to prepare the brief, it contains 4,199 words, exclusive of those matters that may be omitted under Rule 32(a)(7)(B)(iii).

I further certify that the attached brief complies with the typeface requirements of Rule 32(a)(5) and the type style requirements of Rule 32(a)(6). It was prepared in a proportionately spaced typeface using 14-point Times New Roman font in Microsoft Word.

/s/ Dan M. Peterson
Dan M. Peterson

Counsel for *Amici Curiae*

Date: July 3, 2014

## CERTIFICATE OF SERVICE

I hereby certify that on July 3, 2014, an electronic PDF of the foregoing Brief of *Amici Curiae* International Law Enforcement Educators and Trainers Association *et al.* in Support of Plaintiffs-Appellants and in Support of the Petition for Rehearing was uploaded to the Court's CM/ECF system, which will automatically generate and send by electronic mail a Notice of Docket Activity to all registered attorneys participating in the case.   Such notice constitutes service on those registered attorneys.

/s/ Dan M. Peterson
Dan M. Peterson